# **Exhibit 4**

**2622-CC00325**

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

**IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI**

|  |  |  |
|---|---|---|
| RANDALL KING, SCOTT BUTTERFIELD, ROBERT KOEHLER, MICHAEL MERX, and BRUCE WALDMAN, *on behalf of themselves and others similarly situated*, | ) ) ) ) ) ) ) | Case No. Division No. **JURY TRIAL DEMANDED** |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| MONSANTO COMPANY, **Hold for Service** | ) ) ) ) |  |
| Defendant. | ) |  |

## CLASS ACTION PETITION

Plaintiffs Randall King, Scott Butterfield, Robert Koehler, Michael Merx, and Bruce Waldman, (collectively, "Plaintiffs"), individually and as representatives of all similarly situated persons, by their undersigned counsel, for their Class Action Petition against Defendant Monsanto Company ("Monsanto")[1], state as follows:

## I.    INTRODUCTION

1.    This proposed class action arises from injuries alleged to be caused by Monsanto's glyphosate-based herbicide products—including Roundup and other weedkillers containing Monsanto's glyphosate.  Scientific evidence links exposure to

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Settlement Agreement filed by Plaintiffs with the Court on this date.

1

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

glyphosate to Non-Hodgkin Lymphoma, or NHL, a group of cancers that affect white blood cells in the immune system.

2.　　Roundup is one of the most widely used herbicides in agriculture and gardening in the United States and worldwide and, for decades, served as Monsanto's flagship product.

3.　　Roundup Products are "non-selective" herbicides used to kill weeds that compete with agricultural crops, garden plants, and landscaping.  Glyphosate, the active ingredient in Roundup Products, works by inhibiting a specific enzyme required for plant growth.  Once absorbed by the plant, it travels to the root system and kills the plant completely, thus preventing regrowth.

4.　　Monsanto discovered glyphosate's herbicidal properties in the 1970s and subsequently designed, researched, manufactured, sold, and distributed glyphosate-based Roundup Products as a broad-spectrum herbicide.

5.　　Monsanto introduced the original glyphosate-based Roundup formulation in 1974.  By 1980, it had become the best-selling herbicide in the United States, used in large-scale agriculture and for landscape maintenance, and sold as a consumer product for home gardeners and lawn care.

6.　　But from as early as the 1980s, Monsanto was aware of glyphosate's carcinogenic properties.  Glyphosate and Roundup Products have long been associated with carcinogenicity and the development of NHL.

7.　　In 2015, a working group at the International Agency for Research on Cancer ("IARC") concluded that glyphosate is "probably carcinogenic to humans."

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

IARC is one "of the most well-respected and prestigious scientific bodies," whose assessments of the carcinogenicity of chemicals "are generally recognized as authoritative." Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 20, 564 n.46 (3d ed. 2011), https://perma.cc/V9UT-98DR. The IARC Working Group found an increased risk of NHL associated with glyphosate exposure, with this increased risk persisting even after controlling for exposure to other pesticides.

8.     For decades, Plaintiffs and Class members—including agricultural and industrial workers, landscapers, home gardeners, and others—used or were Exposed to Roundup Products through application, handling the herbicides, or proximity to areas where herbicides were applied, unaware that this exposure substantially increased their risk of developing NHL.

9.     All the while, Monsanto knew or should have known that Roundup Products are carcinogenic and increase the risk of developing NHL. Yet Monsanto failed to appropriately warn Plaintiffs and the Class of the serious health risks associated with Roundup Product use and exposure. Instead, Monsanto conducted a prolonged misinformation campaign designed to convince government agencies, farmers, customers, and the public that Roundup Products and other glyphosate-containing weedkillers were safe. Monsanto made these material misrepresentations with the intent to induce consumer reliance, to promote continued sales and use of Roundup Products, and to maximize corporate profits, while demonstrating conscious disregard for the health and safety of those exposed to its products.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

10.     Since 2015, more than 52,000 Roundup lawsuits have been filed against Monsanto involving approximately 125,000 plaintiffs; 24 cases involving 31 plaintiffs have been tried to a verdict across 10 jurisdictions, resulting in 11 verdicts for Plaintiffs and 13 verdicts for Defendant, but only a tiny fraction of the remaining plaintiffs will receive trial dates or compensation in the foreseeable future absent a broad settlement. Through this class action, Plaintiffs seek to represent all individuals who have been Exposed to Roundup Products and either have been diagnosed with NHL or may be diagnosed with NHL in the future due to their Exposure to Roundup Products, thus ensuring comprehensive compensation for the full scope of harm caused by Monsanto's conduct.

## II.     PARTIES

### A.     Plaintiffs

11.     Plaintiff Randall King is a natural person currently residing in Inverness, Florida.  For more than 30 years, Mr. King worked in the ornamental horticulture industry in Florida, including owning and operating a nursery business, where he routinely used Roundup Products.  He also used Roundup Products at home for weed prevention.  Thereafter, at the age of 72, Mr. King was diagnosed with Follicular Lymphoma.  Mr. King had heard that Roundup Products were safe.  He would not have used them had he known that they caused NHL.  Mr. King is a member of the Class and Subclass 1, as defined herein.  Mr. King submits to the jurisdiction of this Court and alleges venue in this Court is proper.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

12. Plaintiff Scott Butterfield is a natural person currently residing in Palm Springs, California. Over the course of many years, he used Roundup Products for weed control on his residential properties in Independence, Missouri, and on his family's residential property in Raytown, Missouri. Thereafter, at the age of 56, Mr. Butterfield was diagnosed with Hairy Cell Leukemia. Mr. Butterfield had heard that Roundup Products were safe. He would not have used them had he known that they caused NHL. Mr. Butterfield is a member of the Class and Subclass 1, as defined herein. Mr. Butterfield submits to the jurisdiction of this Court and alleges venue in this Court is proper.

13. Plaintiff Bruce Waldman is a natural person currently residing in Boynton Beach, Florida. For more than a decade, he used Roundup Products for weed control at his residence in Broomall, Pennsylvania. Thereafter, at age 78, Mr. Waldman was diagnosed with Follicular Lymphoma. Mr. Waldman had heard that Roundup Products were safe. He would not have used them had he known that they caused NHL. Mr. Waldman is a member of the Class and Subclass 1, as defined herein. Mr. Waldman submits to the jurisdiction of this Court and alleges venue in this Court is proper.

14. Plaintiff Robert Koehler is a natural person currently residing in the City of St. Louis, Missouri. Mr. Koehler sprayed Roundup Products around his residence in the City of St. Louis for weed control beginning in 1991 several times each year during the spring and summer months. Mr. Koehler has not been diagnosed with NHL as of the date of this Petition, but he has an increased risk of developing NHL in the future due to his Exposure to Roundup Products. Mr. Koehler had heard that Roundup Products were

5

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

safe. He would not have used them had he known that they increased his risk of developing NHL. Mr. Koehler is a member of the Class and Subclass 2, as defined herein. Mr. Koehler submits to the jurisdiction of this Court and alleges venue in this Court is proper.

15. Plaintiff Michael Merx is a natural person currently residing in St. Louis, Missouri. Mr. Merx worked for Growing Green, Inc. as a landscaping technician from 2018 through 2022. A significant part of his landscaping work involved spraying Roundup Products from a backpack sprayer at various commercial properties in and around the St. Louis area. Mr. Merx has not been diagnosed with NHL as of the date of this Petition, but he has an increased risk of developing NHL in the future due to his Exposure to Roundup Products. Mr. Merx had heard that Roundup Products were safe. He would not have used them had he known that they increased his risk of developing NHL. Mr. Merx is a member of the Class and Subclass 2, as defined herein. Mr. Merx submits to the jurisdiction of this Court and alleges venue in this Court is proper.

16. Plaintiffs maintain that Roundup Products and/or glyphosate-based weedkillers are defective, dangerous to human health, and unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with their use.

**B.     Monsanto**

17. Defendant Monsanto is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

18.    At all times relevant to this Petition, Monsanto was the entity that discovered and promoted the herbicidal properties of glyphosate and was engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and selling Roundup Products in the State of Missouri and throughout the United States.  Monsanto derived substantial revenue from Roundup Products sold within the City of St. Louis and nationwide.

19.    On information and belief, important scientific, manufacturing, marketing, sales and other business decisions regarding Roundup Products were made from and in the State of Missouri and contributed to Monsanto's wrongdoing with respect to Plaintiffs and the Class.  The causes of action asserted by Plaintiffs and the Class relate to and arise from Monsanto's Missouri-based conduct.

20.    Plaintiffs are informed and believe, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative, or employee of Monsanto was working within the course and scope of said agency, representation, or employment with the knowledge, consent, ratification, and authorization of Monsanto and its directors, officers, or managing agents.

21.    Any and all references to Monsanto in this Petition include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendant in addition to those expressly identified in the Petition.

## III.    JURISDICTION AND VENUE

22.    This Court has personal jurisdiction over Monsanto by virtue of its transacting and doing business in the State of Missouri, including locating and operating

7

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

its headquarters in St. Louis, Missouri. Monsanto has purposefully availed itself of the benefits and protections of the State of Missouri by continuously and systematically conducting substantial business within the State. Monsanto has intentionally and purposefully sold, supplied, and distributed Roundup Products into the stream of commerce within Missouri and throughout the United States.

23. Venue is proper in this Court under Mo. Rev. Stat. § 508.010.4 because, *inter alia*, this action alleges a tort and Plaintiffs Robert Koehler and Michael Merx were first injured in the City of St. Louis within this Judicial District, and because the parties consent to venue in this Court.

## IV. FACTS

### A. The Discovery of Glyphosate and Development of Roundup

24. Glyphosate is a broad-spectrum herbicide used for the control of weeds.

25. Glyphosate is a non-selective herbicide, meaning it effectively kills or suppresses all plant types, including grasses, perennials, vines, shrubs, trees, and broadleaf weed and grass species.

26. Upon application, glyphosate is absorbed through the plaint's leaves, stems, or roots and is translocated throughout the plant.

27. Glyphosate kills weeds and crops by striking a specific target within a plant. When sprayed on a leaf, it enters the plant's cells and binds to an enzyme that helps produce amino acids necessary for survival. Glyphosate disables that enzyme, interfering with the plant's ability to form amino acids necessary for protein synthesis. When the plant cannot synthesize those essential building blocks, it dies.

8

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

28.    Glyphosate is the most used herbicide in the world.  Since 1974, more than 3.5 billion pounds of glyphosate have been sprayed in the United States alone, and another 15.4 billion pounds have been sprayed worldwide.  Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns and patios, parks, highways, golf courses, and more.

29.    At all times relevant to this Petition, Monsanto was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, or acquire responsibility for Roundup Products with the active ingredient glyphosate.

30.    Monsanto discovered the herbicidal properties of glyphosate in the 1970s and subsequently began to design, research, manufacture, sell, and distribute glyphosate-based Roundup as a broad-spectrum herbicide.

31.    From the outset, Monsanto marketed Roundup as a safe, general-purpose herbicide for widespread commercial and consumer use.  It still markets Roundup Products as safe today.

32.    For more than 50 years, farmers, landscapers, and consumers, including Plaintiffs and the Class, have used or been exposed to Roundup Products—unaware of their carcinogenic properties.

33.    Monsanto is also involved in the development, design, manufacture, marketing, sale, and distribution of genetically modified ("GMO") crops, many of which are marketed as being resistant to Roundup, i.e., "Roundup Ready."

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

34.    Monsanto was able to secure its dominant market position in the glyphosate and herbicide market through a marketing strategy that coupled proprietary Roundup Ready seeds with continued sales of Roundup Products.

35.    During its first two decades on the market, Roundup had relatively limited utility to farmers because it killed all vegetation in an application area.  But in the mid-1990s, Monsanto developed the Roundup Ready crop system, selling Roundup along with seeds genetically modified to withstand glyphosate.  The system allowed farmers to spray their fields without harming the crops.

36.    As of 2009, Monsanto was the world's leading producer of seeds designed to be Roundup Ready.  In 2010, an estimated 70% of corn and cotton, and 90% of soybean fields in the United States contained Roundup Ready seeds.

**B.    Evidence of Roundup's Carcinogenicity**

37.    Monsanto was aware of glyphosate's carcinogenic properties, alone or in combination with other ingredients, as early as the 1980s.

38.    By way of example, studies and scientific statements reflecting the carcinogenicity of glyphosate or glyphosate-based formulations include:

a.    On March 4, 1985, the EPA Toxicology Branch published a memorandum classifying glyphosate as a Category C oncogene.  Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.  EPA staff toxicologist William Dykstra, in an April 3, 1985, memo, stated unequivocally, "Glyphosate was oncogenic in male mice causing renal tubule adenomas, a rare tumor, in a dose-related manner."

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

b.      In 1986, the EPA issued a "Registration Standard for Pesticide Products Containing Glyphosate as the Active Ingredient" (NTIS PB87-103214). The Registration Standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies.

c.      A 2006 study examining DNA damage in human subjects exposed to glyphosate produced evidence of chromosomal damage in blood cells. Subject blood cells showed significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting that the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

39.    Glyphosate and Roundup have long been associated with carcinogenicity and the development of NHL.

40.    Numerous human and animal studies have evidenced the carcinogenicity of glyphosate or Roundup Products, including but not limited to:

a.      As described above, in 1985, the EPA studied the effects of glyphosate in mice, finding a dose-related response in male mice linked to renal tubal adenomas, a rare tumor. The study concluded that glyphosate was oncogenic, meaning it may cause normal cells to become cancer cells and grow in the body.

b.      In 2003, scientists published the results of two case-controlled studies on pesticides as a risk factor for NHL and hairy cell leukemia. The studies concluded that glyphosate had the most significant relationship to NHL among all herbicides, with an increased odds ratio of 3.11.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

c.    A 2003 study examined pesticides and herbicides as risk factors for NHL based on the pooled data of Midwestern farmers.  Even controlling for confounders, the study found a relationship between glyphosate and increased incidence of NHL.

d.    A 2008 population-based case-control study of exposure to various pesticides as a risk factor for NHL strengthened previous associations between glyphosate and NHL.

41.    Moreover, glyphosate is not the only ingredient in Roundup Products; the formulation also contains a surfactant.  In the United States, the surfactant is polyethoxylated tallow amine ("POEA").  Surfactants decrease surface tension, enabling Roundup Products to penetrate the waxy surface of a leaf—or human skin.  POEA has been shown to make Roundup Products more genotoxic.  POEA is banned in Europe, where Monsanto now sells Roundup Products with a less toxic surfactant.  In addition to POEA, Roundup Products contain other carcinogenic ingredients, including ethylene oxide and 1,4-dioxane.

42.    Many studies suggest that glyphosate formulations, like those found in Roundup Products, are more dangerous and more toxic than glyphosate alone.  As early as 1991, evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.

43.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."  The

study found that Roundup Products caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone did not alter cell cycles.

44.     In 2004, Julie Marc published another study entitled "Glyphosate-based pesticides affect cell cycle regulation." The study demonstrated a molecular link between glyphosate-based products and cell-cycle dysregulation. The study also noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer. Failure in the cell-cycle checkpoints leads to genomic instability and subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."

45.     A 2005 study showed that Roundup Products' effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone. This finding could be attributable to other chemicals in Roundup Products, namely the surfactant POEA, or due to the possible synergy between glyphosate and Roundup formulation products.

46.     A 2009 study examined the effects of Roundup Products and glyphosate-based weedkillers on human umbilical, embryonic, and placental cells and concluded that supposed "inert" ingredients, and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone. The study confirmed that the adjuvants in Roundup Products are not inert and that Roundup Products are always more toxic than their active ingredient, glyphosate, acting alone.

13

47.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Monsanto.

48.    Monsanto knew or should have known that Roundup Products are more toxic than glyphosate alone, and that safety studies on Roundup Products, Roundup Products' adjuvants and "inert" ingredients, and/or the surfactant POEA were necessary to protect Plaintiffs and the Class from Roundup Products.  Indeed, Monsanto's own Dr. Heydens wrote in 2015 that he believed "the surfactant in the formulation . . . . played a role" in a tumor promotion study.

49.    Monsanto knew or should have known that tests limited glyphosate (Roundup Products' active ingredient) were insufficient to prove the safety of Roundup Products.

50.    Monsanto has resisted testing formulated Roundup Products, including their adjuvants and surfactants, to determine their safety for Plaintiffs and the Class, despite knowledge that these ingredients may increase toxicity.

51.    Monsanto has never tested whether Roundup Products as formulated cause cancer.  Even as of 2009, with Roundup Products having been on the market for decades, a senior toxicologist at Monsanto wrote that the company "cannot say that Roundup does not cause cancer . . . . we have not done carcinogenicity studies with 'Roundup.'" (ellipsis in original).

52.    Rather than performing appropriate tests, Monsanto relied upon flawed industry-supported studies.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

53.     And despite its knowledge that Roundup Products were considerably more dangerous even than glyphosate alone, Monsanto continued to promote Roundup Products as safe.

**C.    IARC's Classification of Glyphosate as a Probable Human Carcinogen**

54.     IARC is the specialized intergovernmental cancer agency forming part of the World Health Organization ("WHO").  IARC conducts and coordinates research into the causes of human cancer.  IARC promotes international collaboration in cancer research, "bringing together skills in epidemiology, laboratory sciences, and biostatistics to identify the causes of cancer."

55.     IARC is transparent.  The minutes and documents presented at its council meetings are publicly available and subject to scientific scrutiny.

56.     Starting in 1971, IARC began assessing whether chemicals were carcinogenic through the Monograph program.  Over time, the IARC Monograph program has reviewed at least 1,042 chemical agents. Of those, it has determined 126 agents to be Group 1 (carcinogenic to humans); 94 agents to be Group 2A (probably carcinogenic to humans); 322 agents to be Group 2B (possibly carcinogenic to humans); and 500 agents to be Group 3 (not classifiable as to its carcinogenicity to humans).

57.     Evaluations for the IARC Monograph are performed by panels of international experts, selected based on their expertise and the absence of any conflicts of interest.

58.     In assessing a chemical agent, the IARC Working Group reviews: (a) human, experimental, and mechanistic data; (b) all pertinent epidemiological studies and

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

cancer bioassays; and (c) representative mechanistic data.  The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

59.    With respect to glyphosate, an IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2019 met in April 2014.  Although nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs:  there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

60.    IARC set glyphosate for review in 2015-2016.  IARC uses five criteria for determining priority in reviewing chemicals:  (a) the substance must have a potential for direct impact on public health; (b) scientific literature to support suspicion of carcinogenicity; (c) evidence of significant human exposure; (d) high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and (e) related agents similar to one given high priority by the above considerations.  Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

61.    For Volume 112, the volume that assessed glyphosate, the Working Group was chaired by Aaron Blair, Ph.D., M.P.H., formerly of the National Cancer Institute, and was composed of 17 experts from 11 countries.

62.    On March 20, 2015, after a year-long, cumulative review of human, animal, and DNA studies—*many of which had been in Monsanto's possession since as early as*

*1985*—the IARC Working Group published its conclusion that the glyphosate contained in Roundup Products "is probably carcinogenic to humans (Group 2A)."

63.    The IARC Working Group's agreement on the classification for glyphosate was unanimous.

64.    IARC's full Monograph was published on July 29, 2015, and concluded that glyphosate "is probably carcinogenic to humans (Group 2A)."

65.    The IARC Working Group noted that "a positive association has been observed for non-Hodgkin lymphoma," including several subtypes of NHL, and that "there is sufficient evidence in experimental animals for the carcinogenicity of glyphosate." IARC further noted that "the mechanistic data provide strong evidence for genotoxicity and oxidative stress" and that "there *is* evidence that these effects can operate in humans."

66.    In particular, in its evaluation of human carcinogenicity data, the IARC Working Group noted that "[t]wo large case-control studies of NHL from Canada and the USA, and two case-control studies from Sweden reported statistically significant increased risks of NHL in association with exposure to glyphosate," and that "[t]he increased risk persisted in the studies that adjusted for exposure to other pesticides."

67.    And in its evaluation of animal carcinogenicity data, the IARC Working Group concluded that there was "sufficient evidence in experimental animals for the carcinogenicity of glyphosate" including: (a) one feeding study demonstrating a positive trend in the incidence rate of a renal tubule carcinoma and of renal tubule adenoma or carcinoma (a rare tumor in CD-1 mice); (b) another feeding study establishing a

17

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

significant positive trend in the incidence of haemangiosarcoma in male CD-1 mice; and (c) two studies showing that glyphosate increased pancreatic islet cell adenoma in male rats.

68.    The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells, concluding that "[t]here is strong evidence that glyphosate causes genotoxicity."  Additionally, the IARC assessed whether glyphosate exposure can induce oxidative stress, which has been implicated in the development of cancer and other conditions, and concluded that "[t]here is strong evidence that glyphosate . . . can act to induce oxidative stress."

**D.    Scientific Fraud Underlying the Marketing and Sale of Roundup**

69.    Monsanto obtained EPA approval to sell glyphosate-based weedkillers in the mid-1970s.  To obtain that approval, Monsanto submitted studies conducted by Industrial Bio-Test Laboratories ("IBT"), which performed approximately 30 tests on glyphosate and related products, including 11 of the 19 chronic toxicology studies needed for registration.

70.    In 1976, after EPA approval, the Food and Drug Administration inspected IBT and discovered discrepancies between raw data and final report relating to the toxicological impacts of glyphosate.

71.    The EPA then audited IBT and determined that the toxicology studies conducted for Roundup Products were invalid.  An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

18

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

72.    IBT's fraud surfaced in 1976, yet Monsanto did not inform consumers, withdraw Roundup Products from the market, or add warnings.

73.    In 1983, an EPA report explained that, after IBT's fraud was uncovered, some experts urged removing all 212 pesticides tested in whole or in part by IBT from the market pending retesting, but that option was unavailable under then-current law.

74.    In 1983, three IBT executives were convicted of criminal fraud, including Dr. Paul Wright, a longtime Monsanto employee.

75.    Nearly a decade passed before a valid study assessed glyphosate. In 1985, EPA reviewed studies showing that glyphosate could cause cancer in laboratory animals. Based on that review, EPA classified glyphosate as a possible human carcinogen.

76.    Monsanto exerted pressure on the EPA to change the Group C classification, culminating in reclassification to Group E, purportedly based on evidence of non-carcinogenicity in humans. In reclassifying, the EPA cautioned that Group E was based on available evidence at the time and was not a definitive conclusion that the agent could not be carcinogenic.

77.    Separately, in 1990 Monsanto hired Craven Laboratories to perform pesticide and herbicide studies, including several on Roundup.

78.    In March 1991, the EPA announced it was investigating Craven for allegedly falsifying test data used to secure EPA pesticide approvals.

79.    The owner of Craven and three employees were indicted and later convicted of fraudulent laboratory practices in pesticide and herbicide testing.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

80.    In addition, as more studies began to establish an association between glyphosate and NHL, Monsanto began a strategy to poison the science by ghostwriting its own articles.

81.    In the late 1990s, four studies concluded glyphosate was possibly genotoxic, meaning that it damages genetic information in cells, thus causing mutations that may lead to cancer.

82.    Monsanto retained Dr. James Parry to review those studies.  He concluded glyphosate could be genotoxic and recommended a battery of tests that Monsanto could conduct to learn more.

83.    After reading Dr. Parry's report, Monsanto's Dr. William Heydens wrote internally:

> [L]et's step back and look at what we are really trying to achieve here. We want to find/develop someone who is comfortable with the genetox profile of glyphosate/Roundup and who can be influential with regulators and Scientific Outreach operations when genetox[] issues arise. My read is that Parry is not currently such a person, and it would take quite some time and $$$/studies to get him there. . . . Mark, do you think Parry can become a strong advocate without doing this work . . . ? If not, we should *seriously* start looking for one or more other individuals to work with. Even if we think we can eventually bring Parry around closer to where we need him, we should be currently looking for a second/back-up genetox[] supporter.

84.    Dr. Heydens stated, "We simply aren't going to do the studies Parry suggests."

85.    And Monsanto never did conduct any of Dr. Parry's suggested tests.  Nor did Monsanto share Dr. Parry's report or suggestions with EPA.

20

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

86.     Monsanto instead retained Dr. Gary Williams, a pathologist.  Dr. Williams published an article in 2000 concluding that Roundup Products do not pose a health risk to humans (the "2000 Williams Study").  But Dr. Williams did not write that article; Monsanto's Dr. Heydens ghostwrote it.

87.     The EPA later relied on the 2000 Williams Study when evaluating glyphosate's carcinogenic potential.

88.     Monsanto recognized the importance of the 2000 Williams Study but also recognized that they needed a "stronger arsenal of robust papers scientific papers."

89.     Dr. Mark Martens, a Monsanto scientist, noted in 2001, "I don't know for sure how suppliers would react—but if somebody came to me and said they wanted to test Roundup I know how I would react—with serious concern."

90.     In sum, after Monsanto's own hired expert, Dr. Parry, found that glyphosate—alone and when mixed with other chemicals in Roundup Products—had increased genotoxic risks, Monsanto largely failed to perform further studies.  Instead, Monsanto helped author an article *downplaying* glyphosate's health and safety concerns.

91.     In 2013, Monsanto ghostwrote another article entitled "Review of genotoxicity studies of glyphosate and glyphosate-based formulations."  Although the noted "authors" of the study are Drs. Kier and Kirkland, internal Monsanto documents reveal that David Saltmiras of Monsanto was the original author of the paper.  In requesting funding for the manuscript, Saltmiras stated that it "will be a valuable resource in future product defense against claims that glyphosate is mutagenic or genotoxic."  But even Monsanto realized that the initial draft of the manuscript "turned into such a large

mess of studies reporting genotoxic effects, that the story as written stretched the limits of credibility among less sophisticated audiences." It was therefore decided that a way to "help enhance credibility is to have an additional author on the papers who is a renowned specialist in the area of genotoxicity." Monsanto identified Dr. David Kirkland as the "best candidate."

92. And in 2015, immediately after IARC deemed glyphosate a probable human carcinogen, Monsanto devised a response plan due to the "[s]evere stigma attached to Group 2A Classification." That plan included convening an expert panel— privately selected by Monsanto—to "[p]ublish comprehensive evaluation of carcinogenic potential by credible scientists." Monsanto noted that the "Genetox / MOA" section would be important for "future litigation support," and the panel would be "[a]ppealing; best if use big names; better if sponsored by some group."

93. Despite contrary statements to the EPA that the panel of scientists were never directly contacted by Monsanto and that Monsanto played no role in the panel's manuscripts, Monsanto did, in fact, recruit, contact, and approve of the expert panelists.

94. Monsanto also reviewed and wrote portions of the panel's manuscripts, which are still today relied upon by the EPA.

95. In 2016, *Critical Reviews in Toxicology*, a journal devoted to research about toxic exposure, published a study that determined that glyphosate is not "genotoxic." One of the academics listed on the research team, however, was John Acquavella, a former Monsanto employee. Monsanto emails revealed that Acquavella expressed discomfort with the study: "I can't be part of deceptive authorship on a

22

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

presentation or publication." He also said of the way Monsanto was trying to present the authorship: "We call that ghost writing and it is unethical."

96.     Many of these fraudulent, ghostwritten articles have been relied upon, and are still being relied upon, by the EPA in connection with its reviews of glyphosate.

**E.      For Decades, Monsanto Falsely Advertised Roundup as Being Safe**

97.     Monsanto has falsely advertised the safety of Roundup Products for decades.

98.     For example, in 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup Products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup Products, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. The representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup Products include, but are not limited to:

a.      "Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences."

b.      "And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem."

c.      "Roundup biodegrades into naturally occurring elements."

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

d. "Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation."

e. "This non-residual herbicide will not wash or leach in the soil. It . . . stays where you apply it."

f. "Glyphosate is less toxic to rats than table salt following acute oral ingestion."

g. "Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it."

h. "You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish."

i. "Roundup can be used where kids and pets will play and breaks down into natural material." This advertisement depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.

99. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with the NYAG, in which Monsanto agreed, among other things, to "cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication," that its glyphosate-containing pesticides, including Roundup Products, or any component thereof:

24

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

a.    are safe, non-toxic, harmless, free from risk, or biodegradable;

b.    stay where they are applied under all circumstances and will not move through the environment by any means;

c.    are "good" for the environment or are "known for their environmental characteristics";

d.    are safer or less toxic than common consumer products other than herbicides; or

e.    might be classified as "practically non-toxic."

100.    Monsanto did not alter its advertising in the same manner in any state other than New York and, on information and belief, still has not done so today with respect to glyphosate-based Roundup Products.

101.    Despite its knowledge to the contrary, Monsanto continued to issue broad and sweeping statements suggesting that Roundup Products were, and are, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements, and despite the evidence to the contrary.

**F.    The Importance of Roundup to Monsanto's Bottom Line**

102.    That Monsanto would resort to fraudulent science and false advertisements espousing Roundup Products' purported "safety" makes perfect sense for one fundamental reason:  Roundup is the best-selling herbicide ever.  It has been the key driver of Monsanto's business since its launch and remains critical to Monsanto's bottom line.

25

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

103.    By the mid-1990s—even before the introduction of Roundup Ready crops—Roundup Products were Monsanto's top selling products by far.  At that time, Roundup accounted for $1.5 billion of Monsanto's $8 billion in revenue and half of its $625 million in earnings.

104.    Then, in 1996, with the expiration of Monsanto's glyphosate patent on the horizon, Monsanto devised a strategy to maintain Roundup Products' market dominance. Monsanto began marketing genetically modified Roundup Ready seeds that were immune to Roundup Products.  Roundup Ready seeds allowed farmers to spray Roundup on their fields, killing weeds but not their crops.  The catch, however, was that farmers using Roundup Ready seeds could *only* use Roundup Products as a weedkiller, because any other broad-spectrum herbicide would kill their crops.  So, with every sale of Roundup Ready seeds, Monsanto also sold a season's worth of Roundup Products.

105.    Around this same time, Monsanto also lowered the retail price of Roundup Products, dropping the price from about $44 a gallon in 1997, to $34 a gallon in 1999, to about $28 a gallon in 2001.  These price reductions increased demand and simultaneously deterred competitors.  Monsanto's profits did not suffer from these price reductions, as volume gains made up for the price cuts.

106.    By 2000, Monsanto's Roundup Ready seeds were planted on more than 80 million acres worldwide.  Nearly 70% of American soybeans were planted from Roundup Ready seeds.

107.    Through Monsanto's strategy of decreased prices, increased production, and coupling Roundup Products with Roundup Ready seeds, Roundup Products, together, became Monsanto's most profitable offering.

108.    By 2000, Roundup sales had nearly doubled from 1996, accounting for almost $2.8 billion in annual sales (close to half of Monsanto's annual revenue), and 1.4 billion in profits, and outselling other herbicides by a five-to-one margin.

109.    In 2008 and 2009, Monsanto reported annual profits of $1.98 billion and $1.80 billion, respectively, from sales of Roundup Products and other glyphosate-based herbicides.

110.    And in the years 2014, 2015, and 2016, Monsanto's Agricultural Productivity segment, which includes Roundup Products, had sales of $5.12 billion, $4.76 billion, and $3.51 billion, respectively—over 30% of Monsanto's total sales during that three-year period.

111.    In the United States, glyphosate remains far and away the most widespread pesticide.  Globally, glyphosate use has risen almost 15-fold since Monsanto's Roundup Ready crops were introduced in 1996.

**G.    Bans on Roundup/Glyphosate**

112.    Countries around the world have instituted bans on the sale of Roundup Products and other glyphosate-containing herbicides, both before and since IARC's March 2015 classification of glyphosate as a probable human carcinogen.

113.    Countries that have outright banned, imposed restrictions, or issued statements of intent to ban or restrict glyphosate include: Austria, Belgium, Bahrain (and

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

other Gulf Cooperation Council countries, including Saudi Arabia, Qatar, Kuwait, Oman, and the United Arab Emirates), Barbados, Belgium, Bermuda, Canada, Costa Rica, Czech Republic, Denmark, Fiji, France, Germany, Greece, India, Italy, Malta, Netherlands, New Zealand, Portugal, Scotland, Slovenia, Spain, Sweden, Switzerland, and Vietnam.

### H.  The Ninth Circuit Vacated the EPA's Flawed Determination That Glyphosate Is Not Likely To Cause Cancer

114.  The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136, et seq. requires that "registrations of pesticides are to be periodically reviewed" by the EPA every 15 years.  § 136a(g)(1)(A).  In 2009, the EPA started its re-registration review of glyphosate.  The EPA "decided to conduct registration review on glyphosate, an active ingredient," rather than to "evaluate each pesticide registration [such as Roundup Products] individually." *Nat. Res. Def. Council v. U.S. Env't Prot. Agency,* 38 F.4th 34, 41 n.2 (9th Cir. 2022).

115.  The EPA's re-registration proceeding resulted in an interim, rather than a final, registration decision for glyphosate, which the EPA issued in January 2020.

116.  The EPA, in its 2020 Interim Decision, "determined that there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans." *NRDC*, 38 F.4th at 43.

117.  But following a challenge to the EPA's decision—in which Monsanto and various agricultural and landscaping groups intervened—the Ninth Circuit vacated the agency's "not likely to be carcinogenic" conclusion, finding that the EPA's reasoning

was "the hallmark of arbitrary action." *NRDC*, 38 F.4th at 51 (internal quotation marks omitted). The EPA's "not likely" determination was "in tension with parts of the agency's own analysis and with the guidelines it purports to follow" and not supported by "substantial evidence." *Id.* at 46, 51.

118. The Ninth Circuit found the EPA's "choice of the 'not likely' descriptor" for glyphosate "conflict[ed] with" its analysis of epidemiological studies. *NRDC*, 38 F.4th at 46. The agency uses the "not likely" descriptor when there are "robust" data demonstrating that "there is no basis for human hazard concern." *Id.* Here, by contrast, the EPA had compelling reasons for concern, as there was "suggestive evidence" in the form of human epidemiological studies "that glyphosate exposure causes NHL." *Id.* Indeed, "most studies EPA examined indicated that human exposure to glyphosate is associated with an at least somewhat increased risk of developing [NHL]." *Id.*

119. And although in an earlier "Cancer Paper," the EPA had concluded "the association between glyphosate exposure and risk of [cancer] cannot be determined based on the available evidence," *NRDC*, 38 F.4th at 46, the court found that the EPA could not "reasonably treat its inability to reach a conclusion about [cancer] risk as consistent with a conclusion that glyphosate is 'not likely' to cause cancer" *id.* at 47.

120. In addition, the EPA's "not likely" conclusion did not "withstand[] scrutiny under the agency's own framework." *NRDC*, 38 F.4th at 47. As one example, EPA guidelines describe how the agency should use historical-control data showing how often certain tumors occur naturally in animals. That data can either "bolster" or "undermine" study results: if a study uncovers rare tumors, "the result is in fact unlikely to be due to

29

chance," while a study that turns up only common tumors is of "reduce[d] . . . . importance." *Id.* at 47-48. But for glyphosate, "EPA use[d] this type of data only to discount studies indicating that glyphosate may cause tumors"— never to credit them. *Id.* at 48. An EPA-commissioned Scientific Advisory Panel criticized this selective application as likely to "potentially introduce biases," yet "the agency did not change the way in which it factored those data into its analysis." *Id.* This and other issues rendered the "analysis underpinning EPA's 'not likely' descriptor . . . flawed." *Id.* at 47.

121. On September 21, 2022, in light of the Ninth Circuit's decision to vacate the human-health portion of the EPA's Interim Decision, the EPA withdrew its Interim Decision. In its memorandum withdrawing the Interim Decision, the EPA stated that it "intends to revisit and better explain its evaluation of the carcinogenic potential of glyphosate and to consider whether to do so for other aspects of its human health analysis."

122. The EPA does not anticipate issuing a final registration review decision for glyphosate until later this year.

123. One scholar attempted to explain how the IARC and the EPA (in the now-vacated human-health portion of its Interim Decision) could have reached conflicting conclusions as to the genotoxicity of glyphosate-based herbicides based upon the available data. He concluded that the agencies emphasized and relied more heavily upon very different types of data, noting that "[t]he IARC's evaluation relied heavily on studies capable of shedding light on the distribution of *real-world exposures and genotoxicity risk in exposed human populations*, whereas EPA's evaluation placed *little or no weight*

*on such evidence.*" Charles M. Benbrook, *How Did the US EPA and the IARC Reach Diametrically Opposed Conclusions on the Genotoxicity of Glyphosate Herbicides?*, Environ. Sci. Eur. 31:2, at 14 (2019) (emphasis added).

## I.    Recent Scientific Evidence Linking Roundup to NHL

124.    Scientific evidence continues to mount that glyphosate-based weedkillers and Roundup Products cause NHL.

125.    Recently published, peer-reviewed research conducted by leading scientists at the National Cancer Institute and the National Institute of Environmental Health Sciences demonstrated that individuals exposed to glyphosate exhibit urinary biomarkers that are mechanistically linked to the development of cancer.  *See* Chang, V.C. 1 et al., Glyphosate Exposure and Urinary Oxidative Stress Biomarkers in the Agricultural Health Study, *J. Nat'l Cancer Inst.* (2023) ("Chang 2023").

126.    Chang 2023 analyzed urine samples from licensed pesticide applicators and their spouses enrolled in the federally funded Agricultural Health Study ("AHS") and found a statistically significant, exposure-dependent association between elevated urinary glyphosate concentrations and increased levels of oxidative-stress biomarkers.  Health experts, including IARC, have identified oxidative stress as a "key characteristic of carcinogens," and "accumulating evidence supports the role of oxidative stress in the pathogenesis of hematologic cancers" like NHL.  The authors of Chang 2023 expressly concluded that their findings "contribute to the weight of evidence supporting an association between glyphosate exposure and oxidative stress in humans and may inform evaluations of the carcinogenic potential of this herbicide."

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

127.    This new research is part of the Agricultural Health Study, a long-term examination of the health impacts of pesticide use on farmers, funded by the National Cancer Institute and the National Institute of Environmental Health Sciences in collaboration with the EPA.  Monsanto steadfastly points to the Agricultural Health Study, including on its website and in litigations across the country, as supporting the lack of an association between glyphosate use and cancer.

128.    The mechanistic findings of Chang 2023 are bolstered by recent independent epidemiologic evidence.  A University of Washington meta-analysis of glyphosate and NHL risk—Zhang, L. et al., Exposure to glyphosate-based herbicides and risk for non-Hodgkin lymphoma: A meta-analysis and supporting evidence, *Mutation Research/Reviews* 781 (2019) ("Zhang 2019")—reported that individuals in the highest exposure categories had a 41% increased risk of developing NHL, a risk estimate substantially greater than previously recognized.  Zhang 2019 concluded that "the link between glyphosate and NHL is even stronger than previously reported."

129.    Taken together, Chang 2023 supplies compelling mechanistic evidence of glyphosate's ability to cause oxidative DNA damage in humans, while Zhang 2019 provides robust epidemiologic confirmation of an elevated cancer risk among highly exposed populations.  These complementary lines of evidence reinforce IARC's 2015 classification of glyphosate as a "probable human carcinogen" and further establish that Roundup Products are capable of causing NHL in persons exposed to them.

130.    In addition, a comprehensive systematic review published in 2023 by Rana, I. et al., "Mapping Carcinogenic Characteristics of Glyphosate: A Systematic Review,"

32

further supports the link between glyphosate and cancer. This review evaluated all available mechanistic studies of glyphosate and its formulations in relation to the ten key characteristics of carcinogens recognized by IARC. The authors found strong evidence that glyphosate and glyphosate-based formulations "possess several of the ten key characteristics of carcinogens," as they are genotoxic, induce epigenetic alterations, cause oxidative stress, promote chronic inflammation, and disrupt hormone signaling—mechanisms that are central to cancer development. The review concluded that these mechanistic findings strengthen the biological plausibility of previously reported associations between glyphosate exposure and NHL and provide further support for glyphosate's classification as a probable human carcinogen.

131. Just a couple of months ago, a study conducted by the Ramazzini Institute, as part of the Global Glyphosate Study, provided additional and compelling evidence of glyphosate's carcinogenicity. *See* Panzacchi, S., et al., Carcinogenic effects of long-term exposure from prenatal life to glyphosate and glyphosate-based herbicides in Sprague–Dawley rats. *Environ Health* 24, 36 (2025). In this long-term bioassay, male and female Sprague-Dawley rats were exposed to glyphosate and two glyphosate-based herbicides beginning prenatally and continuing through two years of age, at doses corresponding to the European Union's acceptable daily intake and no-observed-adverse-effect level (NOAEL). The study found statistically significant, dose-related increases in both benign and malignant tumors at multiple sites, including the blood (leukemia), skin, liver, thyroid, nervous system, ovary, mammary gland, adrenal glands, kidney, urinary bladder, bone, endocrine pancreas, uterus, and spleen. Notably, many of these tumors are rare in

33

this strain of rat, and a substantial proportion of leukemia deaths occurred early in life, before one year of age. Notably, the Ramazzini Institute study "observed effects" of glyphosate "at doses equal or lower than the NOAEL in rodents and other animal models." These findings "support the IARC conclusion that there is 'sufficient evidence of carcinogenicity [of glyphosate] in experimental animals.'"

132.   The Ramazzini Institute study concluded that its findings were "consistent also with the epidemiological evidence showing increases in incidence of multiple malignancies in humans exposed to glyphosate and GBHs" and "indicate that, while glyphosate alone is capable of causing a number of benign and malignant tumors, GBHs co-formulants may enhance the carcinogenicity of glyphosate."

133.   In sum, the scientific evidence linking glyphosate and Roundup Products to NHL has continued to strengthen substantially since IARC's 2015 classification. The recent post-2015 research detailed above—spanning mechanistic, epidemiologic, systematic review, and bioassay studies—provides compelling, convergent evidence that exposure to glyphosate and glyphosate-based herbicides causes NHL.

### J.   Recent Retraction of the 2000 Williams Study

134.   Just a few months ago, on November 28, 2025, the journal Regulatory Toxicology and Pharmacology formally retracted the 2000 Williams Study, which had claimed that glyphosate was not a human health risk, despite evidence of a cancer link.[2]

---

[2] Gary M. Williams, Robert Kroes, Ian C. Munro, RETRACTED: Safety Evaluation and Risk Assessment of the Herbicide Roundup and Its Active Ingredient, Glyphosate, for Humans, Regulatory Toxicology and Pharmacology, Volume 31, Issue 2, 2000, Pages

135.    The 2000 Williams Study became the backbone of regulations that deemed Roundup Products safe and was cited by Monsanto and other researchers for a quarter century as definitive evidence of the products' safety.

136.    But since then, as described in part above, emails uncovered as part of litigation against Monsanto revealed that Monsanto's own scientists played a significant role in conceiving and writing the study.  In the emails, Monsanto employees praised each other for their "hard work" on the paper, which included data collection, writing, and review.  One Monsanto employee expressed hope that the study would become "'*the'* reference on Roundup and glyphosate safety." (emphasis added).

137.    The retraction of the 2000 Williams Study came after two Harvard scientists urged the journal to re-examine the article.  The scientists estimated that the 2000 paper was in the top 0.1 percent of cited academic literature on glyphosate safety— *even after Monsanto's scientific fraud had been revealed.*[3]

138.    In retracting the study in late 2025, however, the journal Regulatory Toxicology and Pharmacology cited "several critical issues that are considered to undermine the academic integrity of this article and its conclusions."  The journal's editor in chief, found that "[t]he scientific concerns regarding the lack of carcinogenicity only

---

117-165, ISSN 0273-2300,https://doi.org/10.1006/rtph.1999.1371. (https://www.sciencedirect.com/science/article/pii/S0273230099913715).

[3] Alexander A. Kaurov, Naomi Oreskes, The afterlife of a ghost-written paper: How corporate authorship shaped two decades of glyphosate safety discourse, Environmental Science & Policy, Volume 171, 2025, 104160, ISSN 1462-9011, https://doi.org/10.1016/j.envsci.2025.104160. (https://www.sciencedirect.com/science/article/pii/S1462901125001765).

derived from Monsanto studies, concerns regarding (ghost-) authorship(s) and potential conflicts of interest, none of which have been responded to, are sufficient to warrant" retraction, and he "had lost confidence the results and conclusions of the article."

139.    This retraction confirms what plaintiffs have long alleged:  by concealing Monsanto's authorship, cherry-picking favorable data while suppressing contrary scientific evidence, and failing to disclose financial conflicts of interest, Monsanto manufactured a false scientific consensus and systematically deceived regulators, the scientific community, and the public about the true cancer risks associated with Roundup Products exposure—a deception that shaped regulatory policy and endangered public health for over two decades.

### K.    Monsanto's Ongoing Concealment of Roundup's Carcinogenicity

140.    Despite knowing its claims are false, Monsanto has continued to assert that Roundup Products are safe, making statements that lack scientific support and contradict available evidence.

141.    Upon information and belief, these statements and representations have been made with the intent of inducing the agricultural community and the public at large—including Plaintiffs and members of the Class—to purchase and use Roundup Products for Monsanto's pecuniary gain.  These statements did, in fact, induce Plaintiffs and members of the Class to purchase and use Roundup Products.

142.    Monsanto made these statements with complete disregard and reckless indifference to the safety of Plaintiffs and members of the Class.

36

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

143.    Notwithstanding Monsanto's representations, scientific evidence has established a clear causal association between Roundup Products—including glyphosate alone or in combination with other Roundup Product ingredients—and genotoxicity, inflammation, and an increased risk of NHL.

144.    Monsanto knew or should have known since the 1980s that Roundup Products—including glyphosate alone or in combination with other Roundup Product ingredients—are associated with an increased risk of developing NHL.

145.    Monsanto misrepresented, omitted, and concealed material facts regarding—and failed to appropriately and adequately inform and warn Plaintiffs and members of the Class of information regarding—the serious risks associated with Exposure to glyphosate-based weedkillers or Roundup Products, including the risk of developing NHL, which reasonable persons would consider important in assessing such risks.

146.    Monsanto failed to appropriately and adequately inform and warn Plaintiffs and members of the Class of the serious and dangerous risks associated with the Exposure to glyphosate and Roundup Products, including the risk of developing NHL and the associated physical pain, mental anguish, diminished enjoyment of life, and need for medical treatment.

147.    Despite IARC's classification of glyphosate as a Group 2A probable carcinogen, Monsanto continues to maintain that Roundup Products and/or glyphosate-based formulations are safe, non-carcinogenic, and non-genotoxic, and to falsely warrant to users like Plaintiffs and members of the Class that independent experts and regulatory

37

agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate or Roundup Products.

148.    Monsanto has claimed and continues to claim that Roundup Products are safe, non-carcinogenic, and non-genotoxic.

149.    For example, on the website of Monsanto's parent company, Bayer:

a.    Monsanto falsely claims: "There is an extensive body of research on glyphosate and Bayer's glyphosate-based herbicides, including more than 800 rigorous studies submitted to EPA, European and other regulators in connection with the registration process, that confirms that these products are safe when used as directed."

b.    Monsanto falsely claims that glyphosate-based products "are not only highly effective and drive economic and environmental benefits, but they also have a strong safety profile."

c.    Monsanto falsely claims that there is "clear science behind Roundup's safety and benefits."

d.    Monsanto includes materials falsely claiming that "[e]xperts agree" that glyphosate is "safe to use" and that it is "one of the most studied herbicides in the world – and, like all crop protection products, it is subject to rigorous testing and oversight by regulatory authorities."

e.    Monsanto falsely claims: "For more than 50 years, leading health regulators around the world have repeatedly concluded that our glyphosate products can be used safely, and that glyphosate is not carcinogenic."

38

f.    Monsanto also includes materials on its website quoting extensively from the EPA's now-vacated Interim Decision on the carcinogenicity of glyphosate, without disclosing that a federal appellate court has vacated the EPA's findings, concluding that the EPA's errors in assessing the human-health risk of glyphosate were "serious" and that the analysis underpinning the EPA's determination was "flawed in various other ways."

150.    But Monsanto's Roundup Products have long been associated with serious side effects, and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

151.    Despite Monsanto's knowledge that Roundup Products were associated with an elevated risk of developing NHL, Monsanto's promotional campaigns focused on Roundup Products' purported "safety profile."

152.    Monsanto's statements proclaiming the safety of Roundup Products and disregarding its dangers misled Plaintiffs and members of the Class.

153.    Monsanto's failure to adequately warn resulted in: (a) Plaintiffs and members of the Class using and being Exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (b) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup Products.

154.    Monsanto failed to seek modification of the labeling of Roundup Products to include relevant information regarding the risks and dangers associated with exposure to Roundup Products.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

155.    Monsanto's failure to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers, including Plaintiffs and members of the Class.

156.    Monsanto's failure to appropriately warn and inform the EPA has resulted in the directions for use that are not adequate to protect health and the environment.

157.    Even in July 2021, when Monsanto's parent company announced that it would replace all glyphosate-based products in the United States residential market with non-glyphosate alternatives starting in 2023, it denied that this decision was due to any safety concerns.

158.    Eventually, in 2023, Monsanto ceased selling glyphosate-based herbicides in the residential lawn and garden market in the United States and replaced them with new formulations that rely on alternative active ingredients. As such, there is no new supply of glyphosate-based Roundup Products entering the residential market.

## V.    EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

159.    Plaintiffs incorporate by reference all prior paragraphs of this Petition as if fully set forth herein.

160.    The running of any statute of limitations has been tolled by reason of Monsanto's fraudulent concealment and because Plaintiffs and members of the Class could not have reasonably known that their injuries were attributable to exposure to Roundup Products because of Monsanto's fraudulent concealment and affirmative misrepresentations.  Monsanto, through its affirmative misrepresentations and omissions,

40

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

actively concealed from Plaintiffs and members of the Class the true risks associated with Roundup Products and glyphosate.

161.   At all relevant times, Monsanto has maintained that Roundup Products are safe, non-toxic, and non-carcinogenic.

162.   To this day, Monsanto has continued to deny and attempt to conceal the harmful effects of Roundup Products.  According to its parent company's website, "For more than 50 years, leading health regulators around the world have repeatedly concluded that our glyphosate products can be used safely, and that glyphosate is not carcinogenic."

163.   As a result of Monsanto's actions, Plaintiffs and members of the Class were unaware, and could not reasonably have known or learned through reasonable diligence that Roundup Products and/or glyphosate contact exposed them to the risks alleged herein and that those risks were the direct and proximate result of Monsanto's acts and omissions.

164.   Furthermore, Monsanto is estopped from relying on any statute of limitations because of its fraudulent concealment of the true character, quality, and nature of Roundup Products.  Monsanto was under a duty to disclose the true character, quality, and nature of Roundup Products because this was non-public information over which Monsanto had, and continues to have, exclusive control, and because Monsanto knew that this information was not available to Plaintiffs and members of the Class.  In addition, Monsanto is estopped from relying on any statute of limitations because of its intentional concealment of these facts.

41

165.    Plaintiffs and members of the Class had no knowledge that Monsanto was engaged in the wrongdoing alleged herein.  Because of the fraudulent acts of concealment of wrongdoing alleged herein, Plaintiffs and members of the Class could not have reasonably discovered the wrongdoing at any time prior.  Also, the economics of this fraud should be considered: Monsanto had the ability to, and did, spend enormous amounts of money in furtherance of its purpose of marketing, promoting, or distributing a profitable herbicide, notwithstanding the known or reasonably known risks. Accordingly, Monsanto is precluded by the discovery rule and the doctrine of fraudulent concealment from relying upon any statute of limitations.

## VI.    CLASS ALLEGATIONS

166.    Plaintiffs bring this action as a class action pursuant to Rule 52.08 of the Missouri Supreme Court Rules on behalf of themselves and all others similarly situated as members of the following "Class":

> U.S. Persons who, prior to the Settlement Date, have been Exposed to one or more Roundup Products and who (i) Applied any Roundup Products; (ii) purchased or paid for any Roundup Products or for the Application of any Roundup Products; (iii) participated in, directed, or saw the Application of any Roundup Products; or (iv) otherwise had reason to know of their Exposure.  The Settlement Class also includes Derivative Claimants of the foregoing individuals.

167.    The Class defined above is comprised of two subclasses, defined below:

"Subclass 1" consists of Class members who have been diagnosed with NHL as of the Preliminary Approval Date, and their Derivative Claimants.

"Subclass 2" consists of Class Members who have not been diagnosed with NHL as of the Preliminary Approval Date, and their Derivative Claimants.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

168.    Excluded from the Class are:

a.    judicial officers and associated court staff assigned to this Lawsuit, and their immediate family members;

b.    past and present (as of the Settlement Date) officers, directors, and employees of the Defendant or any of its direct or indirect subsidiaries;

c.    any Person who, prior to the Settlement Date, received consideration in exchange for a release of any Roundup Claims, or received a judgment on a Claim relating to a Roundup Product or a Roundup Claim, even if the judgment is on appeal;

d.    any Person who, as of the close of Settlement Date, has a claim pending in *In re Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal.); provided, however, that any such Person who would otherwise be a Class Member will be included in the Class upon (1) request and (2) dismissal of their pending claim in such MDL;

e.    any Person whose Roundup Claims have been dismissed with prejudice as of the Settlement Date, unless such dismissal is subject to appeal, in which case such Person shall be included in the Class;

f.    any Person who would be a Class Member solely because they saw the Application of a Roundup Product but, by the Settlement Date, neither they nor any of their Representative Claimants had reason to suspect that the Roundup Product in question was an herbicide; and

43

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

g. all those Persons otherwise in the Class who timely and properly exclude themselves from the Class in the manner approved by the Court and set forth in the Settlement Class Notice.

169. Plaintiffs bring this action on behalf of the entire Class, including Plaintiffs Randall King, Scott Butterfield, and Bruce Waldman on behalf of Subclass 1 and Plaintiffs Robert Koehler and Michael Merx on behalf of Subclass 2, under Rules 52.08(a)(1)-(4) and 52.08(b)(3) for monetary damages and compensation.

170. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used in individual actions alleging the same claims.

171. Plaintiffs reserve the right to amend the Class definitions if further investigation reveals that any Class should be expanded, reduced, divided into additional subclasses, or otherwise modified.

172. **Numerosity/Impracticality of Joinder – Rule 52.08(a)(1).** The Class and each Subclass are so numerous that joinder of all members would be impracticable. Although the precise number of Class members is unknown, based upon information and belief, Plaintiffs allege that the Class contains tens of thousands of members.

173. Class and Subclass members may be notified of the pendency, certification, or other important steps in this action under Rule 52.08(c) or (d), as appropriate, through a Court-approved combination of direct and indirect methods, including print, broadcast, digital, social media, posting, and other physical and electronic means.

44

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

174.   **Commonality and Predominance – Rule 52.08(a)(2) and Rule (b)(3).**

Common questions of fact and law exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class—that is, questions with answers not dependent upon the particular circumstances of Class members, the answers to which are the same for everyone in the Class, and that meet the requirements of Rule 52.08(a)(2), including but necessarily limited to: (a) whether Roundup Products can cause NHL in humans (general causation); (b) whether Monsanto knew, or should have known, about the risks of Exposure to Roundup Products; (c) whether Monsanto misrepresented, omitted, concealed, or failed to warn of or disclose material facts (facts a reasonable person would consider important) regarding the risks of Exposure to Roundup Products; (d) whether Monsanto's conduct was tortious and caused Plaintiffs and Class members to be at increased risk of NHL; (e) whether Plaintiffs and the Class members are entitled to damages and other monetary relief and, if so, in what amount; and (f) whether Monsanto's conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppel.

175.   Common questions regarding Monsanto's Roundup Products, its knowledge regarding their risks, and its conduct in marketing Roundup Products— whether Monsanto misrepresented, omitted, or concealed material facts regarding the NHL risk caused by Roundup Products—are inquiries that are salient to all claims. Resolving them on a class-wide basis would significantly advance the resolution or determination of all Class members' claims and save millions of dollars for the Class members and countless hours of judicial time and resources.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

176. **<u>Typicality – Rule 52.08(a)(3).</u>** Plaintiffs' claims are typical of the claims of Class members whom they seek to represent in that each of them was Exposed to Roundup Products. The claims of Plaintiffs Randall King, Scott Butterfield, and Bruce Waldman are likewise typical of those held by other members of Subclass 1, in that they have been diagnosed with NHL. The claims of Plaintiffs Robert Koehler and Michael Merx are likewise typical of those held by other members of Subclass 2, in that they have not yet been diagnosed with NHL.

177. **<u>Adequacy of Representation – Rule 52.08(a)(4).</u>** Plaintiffs will fairly and adequately protect the interests of the Class. The claims of Plaintiffs Randall King, Scott Butterfield, and Bruce Waldman are substantially similar to those of absent members of Subclass 1; they have no interests antagonistic to the Class. The claims of Plaintiffs Robert Koehler and Michael Merx are likewise substantially similar to those of absent members of Subclass 2; they have no interests antagonistic to the Class.

178. Plaintiffs Randall King, Scott Butterfield, and Bruce Waldman, on behalf of Subclass 1, have retained counsel competent and highly experienced in complex class action litigation and they intend to prosecute this action vigorously on behalf of Subclass 1. Plaintiffs and their counsel have the necessary resources to adequately and vigorously litigate this action if necessary.

179. Plaintiffs Robert Koehler and Michael Merx, on behalf of Subclass 2, have retained counsel competent and highly experienced in complex class action litigation and they intend to prosecute this action vigorously on behalf of Subclass 2. Plaintiffs and

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

their counsel have the necessary resources to adequately and vigorously litigate this action if necessary.

180.    **Superiority – Rule 52.08(b)(3).**  In light of the circumstances alleged in this Petition, a class action is superior to any other available means for the fair and efficient adjudication of this controversy, within the meaning of Rule 52.08.

181.    The sheer volume of cases pending in Missouri would threaten to overwhelm the court system.  Individual litigation would subject each plaintiff to years-long delays before obtaining their day in court, if ever.  Many Class members may never receive meaningful access to justice due to the practical impossibility of timely case resolution given current docket congestion.

182.    Individual litigation would require repetitive discovery, duplicative expert testimony, and redundant legal briefing on identical issues thousands of times over.  Class treatment conserves judicial resources by resolving common questions once rather than relitigating the same issues in countless separate proceedings.

183.    Individualized litigation also creates a potential for inconsistent or contradictory judgments.

184.    By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

185.    This forum's familiarity with Monsanto's operations and the underlying legal framework makes it the most appropriate and efficient venue for comprehensive resolution.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

## VII.    CLAIMS FOR RELIEF

### COUNT ONE
### STRICT LIABILITY – DESIGN DEFECT

186.    Plaintiffs and the Class incorporate by reference all prior paragraphs of this Petition as if fully set forth herein.

187.    Plaintiffs and the Class bring this strict liability claim against Monsanto for defective design.

188.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, selling, distributing, marketing, packaging design, and promoting of Roundup Products, which are defective and unreasonably dangerous to consumers, including Plaintiffs and the Class, thereby placing Roundup Products into the stream of commerce.  These actions were under the ultimate control and supervision of Monsanto.  At all times relevant to this litigation, Monsanto designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Roundup Products that Plaintiffs and the Class were Exposed to.

189.    At all times relevant to this litigation, Roundup Products were manufactured, designed, labeled, marketed, distributed, and sold in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or Exposure to the public and, in particular, to Plaintiffs and the Class.

190.    At all relevant times, Monsanto's Roundup Products reached the intended consumers, handlers, users, or other persons Exposed to these products in Missouri and

48

throughout the United States, including Plaintiffs and the Class, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Monsanto.

191.   Roundup Products—as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto—were defective in design and formulation in that, when they left the hands of Monsanto, Monsanto's manufacturers, or Monsanto's suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary consumer would contemplate.

192.   Monsanto's Roundup Products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation in that when they left the hands of Monsanto, Monsanto's manufacturers, or Monsanto's suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

193.   At all times relevant to this action, Monsanto knew or had reason to know that Roundup Products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Monsanto.

194.   Therefore, at all times relevant to this litigation, Roundup Products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Monsanto were defective in design and formulation, in one or more of the following ways:

49

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

a. When placed in the stream of commerce, Monsanto's Roundup Products were defective in design and formulation and thus dangerous to an extent beyond that which an ordinary consumer would contemplate.

b. When placed in the stream of commerce, Monsanto's Roundup Products were unreasonably dangerous in that they were hazardous and posed a significant risk of NHL when used in a reasonably anticipated manner.

c. When placed in the stream of commerce, Monsanto's Roundup Products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

195. Monsanto did not sufficiently test, investigate, or study its Roundup Products and, specifically, the active ingredient, glyphosate—alone or in combination with other Roundup Product ingredients.

196. Exposure to Roundup Products and glyphosate-containing products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

197. Monsanto knew or should have known at the time of marketing its Roundup Products that exposure to them could cause NHL.

198. Monsanto did not conduct adequate post-marketing surveillance of its Roundup Products.

199. Monsanto could have employed safer alternative designs and formulations.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

200.    Plaintiffs and the Class used and were Exposed to Monsanto's Roundup Products in an intended or reasonably foreseeable manner and without knowledge of their dangerous characteristics.

201.    Plaintiffs and the Class could not have reasonably discovered the defects and risks associated with Roundup Products or glyphosate-containing products before or at the time of Exposure.  Plaintiffs and the Class relied on the skill, superior knowledge, and judgment of Monsanto.

202.    The harm caused by Monsanto's Roundup Products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate.  Monsanto's Roundup Products were and are more dangerous than alternative products and Monsanto could have designed Roundup Products (including their packaging and sales aids) to make them less dangerous.  Indeed, at the time that Monsanto designed Roundup Products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

203.    At the time Monsanto's Roundup Products left Monsanto's control, there was a practical, technically feasible, and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of those herbicides.

204.    Monsanto's defective design of Roundup Products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup Products, including Plaintiffs and the Class.

205. Therefore, due to the unreasonably dangerous condition of its Roundup Products, Monsanto is strictly liable to Plaintiffs and the Class.

206. The defects in Monsanto's Roundup Products were substantial and contributing factors in causing NHL in Plaintiffs and the Class, and, but for Monsanto's misconduct and omissions, Plaintiffs and the Class would not have sustained their injuries.

207. As a direct and proximate result of Monsanto's placing defective Roundup Products into the stream of commerce, Plaintiffs and the Class have suffered and will continue to suffer damages, injury in fact, or ascertainable loss—including but not limited to economic losses in the form of past and future medical care and lost earnings and non-economic losses in the form of past and future physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment of life, and impairment of quality of life.

208. Plaintiffs and the Class suffered damages in an amount to be determined.

209. Additionally, Monsanto's conduct, as described above, was oppressive, fraudulent, malicious, reckless, and conducted with willful and conscious disregard for the health and safety of those Exposed to Roundup Products, including Plaintiffs and the Class. Monsanto had knowledge of the safety problems associated with Roundup Products but suppressed this knowledge from the general public. Monsanto also made conscious decisions not to modify or alter the Roundup Products. Monsanto's conduct warrants an award of punitive damages.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

210.    The determination of common questions on a class-wide basis will advance the resolution of this claim for individual Class members.

WHEREFORE, Plaintiffs pray for judgement against Defendant for an amount in excess of $25,000, together with interest and costs, and such further relief deemed just and proper.

**COUNT TWO**
**STRICT LIABILITY – FAILURE TO WARN**

211.    Plaintiffs and the Class incorporate by reference all prior paragraphs of this Petition as if fully set forth herein.

212.    Plaintiffs and the Class bring this strict liability claim against Monsanto for failure to warn.

213.    At all times relevant to this litigation, Monsanto engaged in the business of testing, developing, designing, manufacturing, selling, distributing, marketing, packaging design, and promoting of Roundup Products, which are defective and unreasonably dangerous to consumers, including Plaintiffs and the Class, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Roundup Products and, specifically, the active ingredient, glyphosate, or glyphosate-based formulations.  These actions were under the ultimate control and supervision of Monsanto.

214.    Monsanto researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Roundup Products and, in the course of same, directly advertised or

53

marketed the products to consumers and end users, including Plaintiffs and the Class, and persons responsible for consumers (such as employers), and therefore had a duty to warn of the risks associated with the Exposure to Roundup Products and glyphosate-containing products.

215. At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, and provide proper warnings, and take such steps as necessary to ensure that Roundup Products did not cause those who were Exposed to Roundup Products to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn Plaintiffs and the Class of the dangers associated with Exposure to Roundup Products. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides, is held to the knowledge of an expert in the field.

216. At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup Products and glyphosate-containing products because they knew or should have known of the unreasonable risks of harm associated with the Exposure to such products.

217. At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to those Exposed to its Roundup Products and to those who would foreseeably be Exposed and harmed by these herbicides, including Plaintiffs and the Class.

218. Despite that Monsanto knew or should have known that Roundup Products posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

risks associated with Exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto, through appropriate research and testing by known methods, at the time Monsanto distributed, marketed, promoted, supplied, or sold the products, and not known to those who were Exposed to the Roundup Products like Plaintiffs and the Class.

219.  Monsanto knew or should have known that Roundup Products created significant risks of serious bodily harm to those Exposed, as alleged herein, but Monsanto failed to adequately warn consumers and reasonably foreseeable users of the risks of Exposure to Roundup Products. Monsanto has wrongfully concealed information concerning the dangerous nature of Roundup Products and further made false or misleading statements concerning the safety of Roundup Products.

220.  At all times relevant to this litigation, Roundup Products reached the intended consumers, handlers, users, or other persons Exposed to these products in Missouri and throughout the United States, including Plaintiffs and the Class, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

221.  At all times relevant to this litigation, Plaintiffs and the Class were Exposed to Monsanto's Roundup Products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

222.  Plaintiffs and the Class could not have reasonably discovered the defects and risks associated with Roundup Products or glyphosate-containing products prior to or

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

at the time of their Exposure.  Plaintiffs and the Class relied upon the skill, superior knowledge, and judgment of Monsanto.

223.    Monsanto knew or should have known that its Roundup Products were defective because the minimal warnings disseminated with Roundup Products were inadequate, failed to communicate adequate information on the dangers and safe Exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including agricultural, landscaping, or residential applications.

224.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions associated with Exposure to Roundup Products that would have enabled Plaintiffs and the Class to protect themselves from harm.  Instead, Monsanto: (a) disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with Exposure to Roundup Products and glyphosate; (b) continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from Exposure; and (c) concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of Exposure to Roundup Products and glyphosate.

225.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of the injured suffered by Plaintiffs and the Class associated with Exposure to Roundup Products and its active ingredient, glyphosate, a probable carcinogen.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

226. As a result of their inadequate warnings, Roundup Products were defective and unreasonably dangerous when they left the possession or control of Monsanto, when they were distributed, marketed, and promoted by Monsanto, and when Plaintiffs and the Class became Exposed to them.

227. Monsanto is liable to Plaintiffs and the Class for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the risks associated with Exposure to Roundup Products and glyphosate.

228. The defects in these Roundup Products were substantial and contributing factors in causing Plaintiffs' and the Class's injuries, and, but for Monsanto's misconduct and omissions, Plaintiffs and the Class would not have sustained their injuries.

229. Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup Products and application, Plaintiffs and the Class (or the individuals or entities that employed Class members) could have obtained alternative herbicides and thus could have avoided the risk of developing injuries as alleged herein.

230. As a direct and proximate result of Monsanto's placing defective Roundup Products into the stream of commerce, Plaintiffs and the Class have suffered and will continue to suffer damages, injury in fact, or ascertainable loss—including but not limited to economic losses in the form of past and future medical care and lost earnings and non-economic losses in the form of past and future physical and mental pain and suffering,

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

emotional distress, inconvenience, loss of enjoyment of life, and impairment of quality of life.

231.    Plaintiffs and the Class suffered damages in an amount to be determined.

232.    Additionally, Monsanto's conduct, as described above, was oppressive, fraudulent, malicious, reckless, and conducted with willful and conscious disregard for the health and safety of those Exposed to Roundup Products, including Plaintiffs and the Class.  Monsanto had knowledge of the safety problems associated with Roundup Products but suppressed this knowledge from the general public.  Monsanto also made conscious decisions not to modify or alter the Roundup Products.  Monsanto's conduct warrants an award of punitive damages.

233.    The determination of common questions on a class-wide basis will advance the resolution of this claim for individual Class members.

WHEREFORE, Plaintiffs pray for judgement against Defendant for an amount in excess of $25,000, together with interest and costs, and such further relief deemed just and proper.

## COUNT THREE
## LOSS OF CONSORTIUM

234.    Plaintiffs and the Class incorporate by reference all prior paragraphs of this Petition as if fully set forth herein.

235.    As a result of Monsanto's misconduct as alleged herein, Monsanto is liable to the spouses, parents, children, or any other individuals who properly have or assert a

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

right to maintain a claim against Monsanto independently or derivatively by reason of their relationship with a Plaintiff or the Class, i.e., "Derivative Claimants."

236.    As a direct and proximate result of Monsanto's misconduct, Plaintiffs and the Class have sustained the aforesaid injuries, and their Derivative Claimants have been damaged as follows:

a.    They have been and will continue to be deprived of the services, society, and companionship of their respective family members or loved ones;

b.    They have, will be and will continue to be required to spend money for medical care and household care for the treatment of their respective family members or loved ones; and

c.    They have been and will continue to be deprived of the earnings of their respective family members or loved ones.

237.    As a result of the injuries to Plaintiffs and the Class, their Derivative Claimants are entitled to damages, as alleged herein or allowed by law.

WHEREFORE, Plaintiffs pray for judgement against Defendant for an amount in excess of $25,000, together with interest and costs, and such further relief deemed just and proper.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, request the Court to enter judgment against Monsanto as follows:

a.    An order certifying the proposed Class and Subclasses, designating Plaintiffs as the named representatives of the Class, designating Plaintiffs Randall

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

King, Scott Butterfield, and Bruce Waldman as the named representatives of Subclass 1, designating Robert Koehler and Michael Merx as the named representatives of Subclass 2, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate order Rule 52.08;

b.      An award to Plaintiffs and Class members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven, including, pursuant to class certification, a program of Court-supervised compensation and/or costs of future reasonably necessary diagnostic testing to detect NHL that may develop as a result of exposure to Roundup;

c.      An award of reasonable attorneys' fees and costs incurred in this action, as allowed by law; and

d.      Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of any and all issues in this action triable by a jury.

Dated: February 17, 2026

Respectfully submitted,

*/s/ Eric D. Holland*
Eric D. Holland #39935
Patrick R. Dowd #64820
**THE HOLLAND LAW FIRM**
211 North Broadway
Suite 2625
St. Louis, MO 63102

60

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

eholland@hollandtriallawyers.com
pdowd@hollandtriallawyers.com

*Attorneys for Plaintiffs Robert Koehler,
Michael Merx, and
Proposed Subclass 2 Counsel*

Christopher A. Seeger*
David R. Buchanan*
Steven J. Daroci*
**SEEGER WEISS LLP**
55 Challenger Rd., 6th Floor
Ridgefield Park, NJ 07660
973-639-9100
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
sdaroci@seegerweiss.com

*Attorneys for Plaintiffs Randall King, Scott
Butterfield, and Bruce Waldman and
Proposed Subclass 1 Counsel*

Michael Ketchmark #41018
**KETCHMARK & McCREIGHT, P.C.**
11161 Overbrook Rd. #210
Leawood, KS 66211
mike@ketchmclaw.com

*Proposed Subclass 2 Counsel*

Joseph F. Rice*
Frederick C. Baker*
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
843.216.9000
jrice@motleyrice.com
fbaker@motleyrice.com

Fidelma Fitzpatrick*
**MOTLEY RICE LLC**
40 Westminster St., 5th Floor
Providence, RI 02903

61

401.457.7700
ffitzpatrick@motleyrice.com

*Proposed Subclass 1 Counsel*

John Eddie Williams, Jr.*
John Boundas*
**WILLIAMS HART BOUNDAS, LLP**
8441 Gulf Freeway #600,
Houston, TX 77017
713-497-1729
jwilliams@whlaw.com
jboundas@whlaw.com

*Proposed Subclass 1 Counsel*

Peter A. Kraus #65668
Charles Siegel*
**WATERS KRAUS PAUL & SIEGEL**
3141 Hood Street
Suite 700
Dallas, TX 75219
(214) 357-6244
kraus@waterskraus.com
siegel@waterskraus.com

*Proposed Subclass 1 Counsel*

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM