# Exhibit 5

2622-CC00325

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

**IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
STATE OF MISSOURI**

| | |
|---|---|
| RANDALL KING, SCOTT BUTTERFIELD, ROBERT KOEHLER, MICHAEL MERX AND BRUCE WALDMAN, individually, and on behalf of all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) No. |
| v. | ) Div. ) |
| MONSANTO COMPANY, | ) ) |
| Defendant. | ) ) |

**UNOPPOSED MOTION FOR ENTRY OF THE PRELIMINARY
APPROVAL ORDER AND SUGGESTIONS IN SUPPORT**

1

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......................................................................... 12

BACKGROUND AND SETTLEMENT TERMS ............................................... 14

   A.  History of the Litigation ......................................................................... 14

   B.  Negotiation of the Settlement................................................................. 17

   C.  Material Terms of the Settlement............................................................ 20

      1.  The Settlement Class and Subclasses .............................................. 20

      2.  The Settlement Fund and Compensation Program ........................... 21

      3.  The Claims Process.......................................................................... 27

      4.  Releases, Covenant Not to Sue, and Bar Order ............................... 29

      5.  Settlement Administration ............................................................... 31

      6.  Opt Outs and Exit Rights ................................................................ 32

      7.  Settlement Class Notice and Notice Plan ........................................ 34

      8.  Attorneys' Fees ............................................................................... 38

      9.  Approval Process ............................................................................ 38

LEGAL STANDARD ....................................................................................... 39

ARGUMENT ................................................................................................... 42

I.  THE COURT WILL LIKELY BE ABLE TO APPROVE THE SETTLEMENT AS FAIR, REASONABLE, AND ADEQUATE.................................................. 44

   A.  Class Counsel and Class Representatives have adequately represented the Settlement Class, and their respective Subclasses (Rule 52.08(e)(2)(A)).............. 45

   B.  The Settlement proposal was negotiated at arm's length (Rule 52.08(e)(2)(B)). ... 50

   C.  The relief provided for the Class is adequate (Rule 52.08(e)(2)(C)). .................... 53

      1.  The Settlement fund is sizable and provides meaningful compensation for Settlement Class Members (Rule 52.08(e)(2)(C)). ........................................... 53

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

2. The costs, risks, and delay of trial and appeal support the Settlement (Rule 52.08(e)(2)(C)(i)). ......................................................................... 54

3. The effectiveness of any proposed method of distributing relief to the Class, including the method of processing Class-member claims, also supports the Settlement (Rule 52.08(e)(2)(C)(ii)). ..................................................... 59

4. The terms of any proposed award of attorneys' fees, including timing of payment, further support the Settlement (Rule 52.08(e)(2)(C)(iii)). .............. 60

5. No agreement required to be identified under Rule 52.08(e)(3) weighs against the Settlement (Rule 52.08(e)(2)(C)(iv)). .......................................... 62

D. The Settlement treats class members equitably relative to each other (Rule 52.08(e)(2)(D)). ...................................................................... 64

II. THE COURT WILL LIKELY BE ABLE TO CERTIFY THE SETTLEMENT CLASS AND SUBCLASSES FOR SETTLEMENT PURPOSES. ......................... 68

A. Numerosity (Rule 52.08(a)(1)) ................................................................. 69

B. Commonality (Rule 52.08(a)(2)) .............................................................. 70

C. Typicality (Rule 52.08(a)(3)) .................................................................. 71

D. Adequacy of representation (Rule 52.08(a)(4)) ......................................... 72

E. Predominance and superiority (Rule 52.08(b)(3)) ...................................... 73

F. Ascertainability (Implied Requirement) .................................................... 76

III. THE PROPOSED FORM AND METHOD OF CLASS NOTICE IS THE BEST PRACTICABLE NOTICE. ........................................................................ 77

A. The proposed Settlement Class Notice and Settlement Class Notice Plan satisfy Rule 52.08 as well as Missouri and federal constitutional requirements. ............ 78

B. In particular, the Settlement Class Notice Plan provides full and adequate notice to Settlement Class Members who are not yet diagnosed. ................................. 83

IV. THE PRELIMINARY APPROVAL ORDER PROPERLY FACILITATES THE SETTLEMENT APPROVAL PROCESS. ...................................................... 87

CONCLUSION ................................................................................................ 92

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amchem Prods., Inc.* v. *Windsor,*
521 U.S. 591 (1997) ............................................................................................ *passim*

*Anderson* v. *Monsanto Co.,*
719 S.W.3d 755 (Mo. App. W.D. 2025) ................................................................15 n.6

*Beltran* v. *Olam Spices & Vegetables, Inc.,*
No. 1:18-CV-1676 JLT SAB, 2023 WL 5817577 (E.D. Cal. Sept. 8, 2023) .................61 n.29

*Bert* v. *AK Steel Corp.,*
No. 1:02-cv-467, 2008 WL 4693747 (S.D. Ohio Oct. 23, 2008) ...................................52

*Boatright* v. *Monsanto Co.,*
No. 4:19-cv-208-MW/MAF (N.D. Fla. Jan. 20, 2026) ...................................................90

*Burch* v. *Qwest Corp.,*
No. 06-CV-3523-MJD/AJB, 2012 WL 12978329 (D. Minn. June 6, 2012) .........................64

*Caligiuri* v. *Symantec Corp.,*
855 F.3d 860 (8th Cir. 2017) ....................................................................................65 n.32

*City of Bridgeton* v. *City of St. Louis,*
18 S.W.3d 107 (Mo. App. E.D. 2000) ...................................................................42, 88

*City of O'Fallon* v. *CenturyLink, Inc.,*
491 S.W.3d 276 (Mo. App. E.D. 2016) .........................................................................82

*Clark* v. *Monsanto Co.,*
No. 20STCV46616 (Cal. Super. Ct. Oct. 5, 2021) ....................................................56 n.27

*Cleveland* v. *Whirlpool Corp.,*
No. 20-CV-1906, 2021 WL 5937403 (D. Minn. Dec. 16, 2021)..................................40 n.22

*Cohn* v. *Nelson,*
375 F. Supp. 2d 844 (E.D. Mo. 2005)...........................................................................44

*Collins* v. *Monsanto Co.,*
No. 3:25-cv-06205-ZNQ-TJB (D.N.J. Jan. 26, 2026) .................................................90

*Colton* v. *Monsanto Co.,*
No. 4:20-cv-138-AW-MAF (N.D. Fla. Jan. 21, 2026) .................................................90

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

*Craft* v. *Philip Morris Cos.*,
190 S.W.3d 368 (Mo. App. E.D. 2005) ...................................................................45, 76, 77

*Dale* v. *DaimlerChrysler Corp.*,
204 S.W.3d 151 (Mo. App. W.D. 2006) .................................................................... *passim*

*Doe* v. *Deja Vu Servs., Inc.*,
2017 WL 530434 (E.D. Mich. Feb. 9, 2017) ...................................................................90

*Dominique* v. *Monsanto Co.*,
No. 3:21-cv-00678-JRK (N.D. Ohio Feb. 5, 2026) ........................................................90

*Doyle* v. *Fluor Corp.*,
199 S.W.3d 784 (Mo. App. E.D. 2006) ...........................................................................70

*Doyle* v. *Fluor Corp.*,
400 S.W.3d 316 (Mo. App. E.D. 2013) ........................................................54 n.25, 69, 81

*Elsea* v. *U.S. Eng'g Co.*,
463 S.W.3d 409 (Mo. App. W.D. 2015) ................................................................ *passim*

*Erguera* v. *CMG CIT Acquisition, LLC*,
No. 1:20-CV-01744-JLT-CDB, 2022 WL 16804837 (E.D. Cal. Nov. 8, 2022) .............61 n.30

*Fath* v. *Am. Honda Motor Co.*,
No. 18-CV-1549, 2019 WL 6799796 (D. Minn. Dec. 13, 2019) ...............................42 n.24, 51

*Gage* v. *Monsanto Co.*,
No. 19GE-CC00080 (Cir. Ct. Gentry Feb. 3, 2026) .......................................................90

*Gordon* v. *Monsanto Co.*,
702 S.W.3d 506 (Mo. App. E.D. 2024) ......................................................................15 n.6

*Gulf Oil Co.* v. *Bernard*,
452 U.S. 89 (1981) .....................................................................................................89 n.40

*Hale* v. *Wal-Mart Stores, Inc.*,
231 S.W.3d 215 (Mo. App. W.D. 2007) ...........................................................71, 73, 75

*Hanlon* v. *Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ...............................................................................89, 89 n.40

*Hasemann* v. *Gerber Prods. Co.*,
No. 15-CV-2995 (EK)(JAM), 2025 WL 2979545 (E.D.N.Y. May 2, 2025) .........................63

*Hayes* v. *Integrity Land Title Co.*,
No. 11SL-CC01429 (Mo. Cir. Ct. Feb. 14, 2013) ....................................41 n.23, 82, 89 n.38

5

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

*Holt* v. *CommunityAmerica Credit Union,*
No. 4:19-CV-00629-FJG, 2020 WL 12604383 (W.D. Mo. Sept. 4, 2020) ............................61

*Hopkins* v. *Kan. Teachers Cmty. Credit Union,*
265 F.R.D. 483 (W.D. Mo. 2010) .................................................................................70

*In re Advanced Battery Techs., Inc. Sec. Litig.,*
298 F.R.D. 171 (S.D.N.Y. 2014) .................................................................................58

*In re Am. Italian Pasta Co. Sec. Litig.,*
No. 05-0725-CV-WODS, 2007 WL 927745 (W.D. Mo. Mar. 26, 2007)..............................76

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.,*
Civ. No. 2:23-cv-3147-RMG, 2024 WL 1341122 (D.S.C. Mar. 29, 2024) ..............49, 50, 65

*In re BankAmerica Corp. Sec. Litig.,*
350 F.3d 747 (8th Cir. 2003) ......................................................................................88

*In re CenturyLink Sales Pracs. & Sec. Litig.,*
No. CV 18-296, 2021 WL 3080960 (D. Minn. July 21, 2021)...........................................40

*In re CIGNA Corp. Sec. Litig.,*
No. 02-8088, 2007 WL 2071898 (E.D. Pa. July 13, 2007) ..............................................52

*In re Diet Drugs,*
282 F.3d 220 (3d Cir. 2002)........................................................................................90

*In re Diet Drugs,*
MDL No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000).................................... *passim*

*In re HealthSouth Corp. Sec. Litig.,*
No. 07-11908, 334 F. App'x 248 (11th Cir. 2009).........................................................64

*In re Heartland Payment Sys, Inc. Customer Data Sec. Breach Litig.,*
851 F. Supp. 2d 1040 (S.D. Tex. 2012) ........................................................................80

*In re Lupron Mktg. and Sales Pracs. Litig.,*
228 F.R.D. 75 (D. Mass. 2005).....................................................................................80

*In re N. Dynasty Mins. Ltd. Sec. Litig.,*
No. 20-CV-5917 (TAM), 2023 WL 5511513 (E.D.N.Y. Aug. 24, 2023).....................63 n.31

*In re Nat'l Football League Players Concussion Inj. Litig.,*
821 F.3d 410 (3d Cir. 2016), *as amended* (May 2, 2016)........................................ *passim*

*In re Nat'l Football League Players' Concussion Inj. Litig.,*
301 F.R.D. 191 (E.D. Pa. 2014).................................................................................. *passim*

*In re Oil Spill by Oil Rig Deepwater Horizon,*
  295 F.R.D. 112 (E.D. La. 2013)................................................................50, 59, 67, 87

*In re PPDAI Grp. Inc. Sec. Litig.,*
  No. 18-CV-6716 (TAM), 2022 WL 198491 (E.D.N.Y. Jan. 21, 2022)..........................63

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.,*
  227 F.R.D. 553 (W.D. Wash. 2004) ...........................................................................66

*In re Prudential Sec. Inc. Ltd. P'ships Litig.,*
  164 F.R.D. 362, *aff'd sub nom. In re Prudential Sec. Inc. Ltd. P'ship Litig.,*
  107 F.3d 3 (2d Cir. 1996).....................................................................................63, 80

*In re Resideo Techs., Inc., Sec. Litig.,*
  No. 19-CV-2863, 2022 WL 872909 (D. Minn. Mar. 24, 2022) ...................................61

*In re Roundup Prods. Liab. Litig.,*
  541 F. Supp. 3d 1104 (N.D. Cal. 2021) ......................................................................86

*In re Roundup Prods. Liab. Litig.,*
  No. 3:16-md-02741-VC, Dkt. 12531 (N.D. Cal. Feb. 4, 2021)..............................19 n.8

*In re Roundup Prods. Liab. Litig.,*
  No. 3:16-md-02741-VC, Dkt. 11042 (N.D. Cal. June 24, 2020) ..........................19 n.8

*In re Serzone Prods. Liab. Litig.,*
  231 F.R.D. 221 (S.D. W.Va. 2005).............................................................................65

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.,*
  396 F.3d 922 (8th Cir. 2005) .....................................................................................40

*Jabbari* v. *Farmer,*
  965 F.3d 1001 (9th Cir. 2020) .......................................................................74 n.33, 75

*Juris* v. *Inamed Corp.,*
  685 F.3d 1294 (11th Cir. 2012) ..................................................................................50

*Karen S. Little, L.L.C.* v. *Drury Inns, Inc.,*
  306 S.W.3d 577 (Mo. App. E.D. 2010) ..................................................................70, 75

*Keil* v. *Lopez,*
  862 F.3d 685 (8th Cir. 2017) ...............................................................................74 n.33

*Liles* v. *Del Campo,*
  350 F.3d 742 (8th Cir. 2003) .....................................................................................89

*Love* v. *First Crown Fin. Corp.,*
  662 S.W.2d 283 (Mo. App. W.D. 1983)......................................................................89

*M.W.* v. *St. Louis Univ.*,
   No. 2422-CC00888 (Mo. Cir. Ct. June 26, 2025)..................................................58, 62

*Marshall* v. *Nat'l Football League*,
   787 F.3d 502 (8th Cir. 2015) ....................................................................................40

*McCostlin* v. *Monsanto Co.*,
   718 S.W.3d 435 (Mo. App. E.D. 2025) .............................................................56 n.27

*Meyer ex rel. Coplin* v. *Fluor Corp.*,
   220 S.W.3d 712 (Mo. banc 2007)........................................................................70, 71

*Monsanto Co.* v. *Durnell*,
   607 U.S. ___ (2026) (No. 24-1068, 2025 Term)........................................17, 55, 90

*Mullane* v. *Cent. Hanover Bank & Tr. Co.*,
   339 U.S. 306 (1950)..................................................................................................78

*Ortiz* v. *Fibreboard Corp.*,
   527 U.S. 815 (1999)..................................................................................................47

*Parisot* v. *U.S. Title Guar. Co.*,
   No. 0822-CC09381 (Mo. Cir. Ct. Dec. 17, 2010) ...........................................61 n.29

*Parisot* v. *U.S. Title Guar. Co.*,
   No. 0822-CC09381 (Mo. Cir. Ct. Oct. 15, 2010) ............................................89 n.38

*Petrovic* v. *Amoco Oil Co.*,
   200 F.3d 1140 (8th Cir. 1999) ..................................................................................65

*Phillips Petrol. Co.* v. *Shutts*,
   472 U.S. 797 (1985)............................................................................................69, 78

*Probst* v. *Eli Lilly & Co.*,
   No. 1:22-CV-01986-MKK-SEB, 2023 WL 11051728 (S.D. Ind. Nov. 21,
   2023) .................................................................................................................63 n.31

*Ressler* v. *Clay County*,
   375 S.W.3d 132 (Mo. App. W.D. 2012)...................................................................88

*Skinner* v. *Hunt Mil. Cmtys. Mgmt. LLC*,
   No. SA-22-CV-00799-JKP, 2023 WL 6532670 (W.D. Tex. Jan. 23, 2023)...........40

*Smith* v. *Leif Johnson Ford, Inc.*,
   632 S.W.3d 798 (Mo. App. E.D. 2021) ....................................................................74

*State ex rel. Byrd* v. *Chadwick*,
   956 S.W.2d 369 (Mo. App. W.D. 1997)...............................................42 n.24, 74, 79

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

*State ex rel. Houska* v. *Dickhaner*,
323 S.W.3d 29 (Mo. banc 2010)...........................................................................78

*State ex rel. McKeage* v. *Cordonnier*,
357 S.W.3d 597 (Mo. banc 2012).............................................................69, 73, 75

*Stephens* v. *Monsanto Co.*,
CIVSB2104801 (Cal. Super. Ct. Dec. 9, 2021) ...............................................56 n.27

*Sullivan* v. *DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011).................................................................................75

*Swinton* v. *SquareTrade, Inc.*,
4:18-CV-00144-SMR-SBJ, 2019 WL 617791 (S.D. Iowa Feb. 14, 2019).....................42 n.24

*Thomas* v. *City of St. Ann*,
No. 4:16-CV-1302-SEP, 2024 WL 982292 (E.D. Mo. Mar. 7, 2024)...................61 n.29

*Trentham* v. *Taste of Nature, Inc.*,
No. 18PH-CV00751 (Mo. Cir. Ct. Oct. 24, 2018).........................51, 55 n.25, 61 n.30

*Trentham* v. *Taste of Nature, Inc.*,
No. 18PH-CV00751 (Mo. Cir. Ct. June 18, 2018) .......................41 n.23, 80 n.35, 82

*U.S. Bank, N.A.* v. *Coverdell*,
483 S.W.3d 390 (Mo. App. S.D. 2015) ................................................................88

*White* v. *Nat'l Football League*,
41 F.3d 402 (8th Cir. 1994) ...............................................................................89

*Woodson* v. *Bank of Am., N.A.*,
602 S.W.3d 316 (Mo. App. E.D. 2020)..................................................................44

**Statutes and Rules**

All Writs Act, 28 U.S.C. § 1651(a)......................................................................89 n.39

Fed. R. Civ. P. 23 ......................................................................................... *passim*

Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.* ................17

Mo. S. Ct. R. 52.08 ........................................................................................ *passim*

Mo. S. Ct. R. 55.0275(b) (effective July 1, 2026) ...................................................64

RSMo § 476.070 ........................................................................................... 42, 89

Treasury Regulations Section 1.468B-2(k)(3) .......................................................91

**Other Authorities**

15 Mo. Prac., Civil Rules Practice § 52.08:14 (2025 ed.) .............................................................89

Dennis D. Weisenburger, *A Review and Update with Perspective of Evidence that the Herbicide Glyphosate (Roundup) is a Cause of Non-Hodgkin Lymphoma*, CLINICAL LYMPHOMA, MYELOMA AND LEUKEMIA, Vol. 21, No. 9, 623 (2021) ....................16

EPA, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* (Dec. 12, 2017) .........................................................................................................................14

*IARC Monographs*: Evaluation of Five Organophosphate Insecticides and Herbicides: Vol. 112, 1 (March 20, 2015), https://www.iarc.who.int/wp-content/uploads/2018/07/MonographVolume112-1.pdf...........................................14

Kerry H. Richards, *The Science Behind Roundup and Claims of Link to Non-Hodgkin's Lymphoma*, Univ. of Del. Coll. of Agric. & Nat. Res. (Dec. 4, 2023), https://www.udel.edu/academics/colleges/canr/news/2023/november/roundup .......................................................................................................14 n.4

S.B. 47, 2025 Reg. Sess. (Mo. 2025)...............................................................................41

**MOTION AND SUGGESTIONS IN SUPPORT**

Plaintiffs Randall King, Scott Butterfield, Robert Koehler, Michael Merx, and Bruce Waldman ("Plaintiffs" or "Class Representatives"), individually and as class representatives and subclass representatives on behalf of all similarly situated persons, respectfully request by this motion (the "Motion") that the Court enter the Preliminary Approval Order, and thereby:  (i) preliminarily approve the Settlement reflected in the Settlement Agreement, including the Exhibits attached thereto, which is attached as Exhibit 1[1] to this Motion; (ii) preliminarily certify the Settlement Class for the purposes of the Settlement; (iii) approve the Settlement Class Notice Plan for the dissemination of the Settlement Class Notice; (iv) schedule a Fairness Hearing; (v) appoint Class Representatives and Class Counsel; and (vi) stay the filing and prosecution of Roundup-related actions in the Missouri courts by Settlement Class Members.  A copy of the Preliminary Approval Order has been filed contemporaneously with this Motion and is also attached as Exhibit G to the Settlement Agreement.  The relief sought by this Motion is unopposed by Defendant Monsanto Company ("Defendant" or "Monsanto").[2]

---

[1] Capitalized terms used but not defined in this Motion shall have the meaning ascribed to such terms in the Settlement Agreement, Ex. 1.

[2] The parties reserve all rights, including the right to propose or oppose class certification of a litigation class or a settlement class in the future, and the right to raise any argument not raised in this Motion concerning any current or future litigated issue, should the Settlement Agreement be terminated or not consummated for any reason, or should any portion of the litigation proceed.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

**PRELIMINARY STATEMENT**

The Settlement before the Court is a tremendous victory for plaintiffs in Missouri and across the nation, many of whom have waited years for compensation for their Roundup-related claims. After more than 18 months of extensive, hard-fought negotiations under the auspices of an experienced mediator, and with the involvement of Judge Glenn Norton (ret.), Plaintiffs were able to secure a settlement of up to $7.25 billion to benefit the Settlement Class.

The Settlement Class includes tens of thousands of individuals who have been Exposed to Roundup Products, and either have or may develop Non-Hodgkin Lymphoma (NHL) as a result of the link between the two.[3] NHL is a cancer that develops in the lymphatic system and can be fatal. This Settlement secures compensation for both those individuals currently diagnosed with NHL and those who have already been Exposed to Roundup Products but are diagnosed with NHL in the future. The Settlement thus delivers meaningful compensation to thousands of individuals who face both significant litigation risk and no prospect of timely recovery on their claims. The litigation risk has become more acute in recent weeks, as the U.S. Supreme Court agreed to decide whether state failure-to-warn claims against the Defendant are preempted by federal law—after the U.S. Solicitor General, at the Supreme Court's invitation, argued that the Supreme Court should grant review and that federal law does preempt such claims. In these circumstances, as Missouri law makes clear, public policy favors settlement.

---

[3] The Defendant disputes the causal link between Roundup and NHL, which is one of the central issues in this litigation.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Not only is the Settlement hugely beneficial to Settlement Class Members, but it will also alleviate an immense burden that has been placed on Missouri courts, where tens of thousands of Roundup cases are currently pending, as well as on other courts around the country.  While the court system has not shied away from that burden—with courts in this State presiding over eight of the 24 trials resulting in a verdict to date, and efficiently overseeing the pre-trial briefing and exchange of discovery in many others—it is simply not designed to address the magnitude of the present and anticipated future litigation.  The precedent that has been generated in courts here and elsewhere, though, has resulted in a robust litigation record upon which Class Counsel and the Court can rely to effectively assess the risks and benefits of the Settlement relative to continued litigation.

Plaintiffs and Class Counsel have concluded that the Settlement is indisputably in the best interest of the Settlement Class.  The Court's consideration of whether to finally approve the Settlement will occur later, at a fairness hearing, and only after notice of the Settlement has been provided to the Settlement Class and Settlement Class Members have had the opportunity to object and be heard.  By this Motion, Plaintiffs are seeking entry of the Preliminary Approval Order, which will begin the approval process.  Among other things, the Preliminary Approval Order will preliminarily approve the Settlement, approve and direct the provision of the Settlement Class Notice to Settlement Class Members, and set a schedule for the Fairness Hearing and any objections to the Settlement.

As set forth in detail in the sections that follow, the Settlement Agreement satisfies all three requirements for the Court to enter the Preliminary Approval Order and direct notice to the Settlement Class.  First, the Court will likely be able to approve the Settlement

as fair, reasonable, and adequate (Point I). Second, the Court will likely be able to certify the Settlement Class (Point II). Third, the proposed Settlement Class Notice, disseminated through the Settlement Class Notice Plan, is the best notice practicable under the circumstances (Point III). In addition, the Preliminary Approval Order's administrative provisions appropriately facilitate the Settlement approval process (Point IV). Thus, Plaintiffs respectfully request that the Court enter the Preliminary Approval Order.

## BACKGROUND AND SETTLEMENT TERMS

### A.    History of the Litigation

In 1974, Monsanto began manufacturing and selling Roundup, an herbicide that contained glyphosate as its active ingredient.[4] Defendant has argued that, for decades, the U.S. Environmental Protection Agency ("EPA"), as well as other leading health regulators, concluded that glyphosate was not likely to cause cancer in humans. EPA, *Revised Glyphosate Issue Paper: Evaluation of Carcinogenic Potential* 12–13 (Dec. 12, 2017). However, in 2015, the International Agency for Research on Cancer ("IARC") announced that it deemed glyphosate to be "probably carcinogenic to humans." *IARC Monographs*: Evaluation of Five Organophosphate Insecticides and Herbicides: Vol. 112, 1 (March 20, 2015), https://www.iarc.who.int/wp-content/uploads/2018/07/MonographVolume112-1.pdf.

---

[4] Kerry H. Richards, *The Science Behind Roundup and Claims of Link to Non-Hodgkin's Lymphoma*, Univ. of Del. Coll. of Agric. & Nat. Res. (Dec. 4, 2023), https://www.udel.edu/academics/colleges/canr/news/2023/november/roundup/.

14

Since IARC's announcement, over 125,000 plaintiffs have filed suit against Monsanto alleging that exposure to the Monsanto-manufactured glyphosate in Roundup Products caused their or their loved one's NHL. *See* Ex. 1 (Settlement Agreement) at 1. In a decade of litigation, however, only 24 cases have been tried to a verdict, *id.*, and only a handful more have otherwise reached trial. Declaration of Eric D. Holland ("Holland Decl."), attached as Exhibit 2 to this Motion, ¶ 56; Declaration of Christopher A. Seeger ("Seeger Decl."), attached as Exhibit 3 to this Motion, ¶ 39.[5] These verdicts, rendered in courts across the nation, have been split with 11 verdicts for plaintiffs and 13 verdicts for Monsanto. *See* Ex. 1 (Settlement Agreement) at 1. Both plaintiff and defense verdicts have largely been upheld on appeal. Ex. 2 (Holland Decl.) ¶ 56.[6] Currently, there are tens of thousands of individuals with Roundup Claims pending (or subject to tolling agreements) who may be eligible for compensation under the proposed Settlement, the large majority of whom have cases pending in the courts of this State. *Id.* In contrast, just a couple of hundred plaintiffs have a trial date for their Roundup Claims, more than a third of which are set for dates beyond this year. *Id.*

---

[5] Roundup Products include a range of weedkillers containing Monsanto-manufactured glyphosate, many of which were sold by Monsanto under the name "Roundup." Ex. 2 (Holland Decl.) ¶ 11; *see also* Ex. 1 (Settlement Agreement) at Ex. A (Product List). Monsanto held a patent on glyphosate for use as an herbicide which expired in 1991, and a second patent which expired in 2000, and remains the largest U.S. manufacturer of glyphosate. U.S. Patent Nos. 3,799,758, 4,405,531A; Ex. 2 (Holland Decl.) ¶ 11.

[6] *See, e.g.*, *Gordon* v. *Monsanto Co.*, 702 S.W.3d 506 (Mo. App. E.D. 2024) (affirming verdict for Monsanto); *Anderson* v. *Monsanto Co.*, 719 S.W.3d 755 (Mo. App. W.D. 2025) (affirming verdict for plaintiffs).

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Absent resolution, the volume of Roundup cases will only grow. Thousands of other individuals have already been Exposed to Roundup Products but—as a result of the latency period between exposure to glyphosate and cancer diagnosis—have not yet been diagnosed with NHL. *Id.* ¶ 24. Monsanto did not remove glyphosate from its residential products until 2023, *id.*, and the latency period for NHL may be 10 years or more, *see* Dennis D. Weisenburger, *A Review and Update with Perspective of Evidence that the Herbicide Glyphosate (Roundup) is a Cause of Non-Hodgkin Lymphoma*, CLINICAL LYMPHOMA, MYELOMA AND LEUKEMIA, Vol. 21, No. 9, 623 (2021). As a result, current and future plaintiffs bringing Roundup Claims are expected to face a significant and growing delay in trying their cases.

Over the course of the litigation, Monsanto's financial footing has also weakened considerably. Declaration of Mediator Fouad Kurdi ("Kurdi Decl."), attached as Exhibit 4 to this Motion, ¶ 9. From December 2017 to December 2025, Monsanto's parent company lost 60 percent of its market value—approximately $63 billion. Ex. 2 (Holland Decl.) ¶ 60. This has led to numerous public reports of a potential Monsanto bankruptcy. *See, e.g.*, Andrew Scurria, *et al.*, *Bayer Seeks New Roundup Settlement While Exploring Monsanto Bankruptcy*, WALL ST. J., May, 15, 2025; *see also* Ex. 4 (Kurdi Decl.) ¶ 9. A Monsanto bankruptcy would ensnare Roundup plaintiffs in lengthy proceedings without a guarantee of any compensation. Ex. 4 (Kurdi Decl.) ¶ 9; Ex. 3 (Seeger Decl.) ¶ 40; Ex. 2 (Holland Decl.) ¶ 61.

Plus, Roundup litigation itself is at a critical juncture. The U.S. Supreme Court recently granted Monsanto's petition for certiorari on the question of whether the Federal

16

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*, preempts state-law failure-to-warn claims. *See Monsanto Co.* v. *Durnell*, 607 U.S. __ (2026) (No. 24-1068, 2025 Term). The Supreme Court had invited the United States to express its views on whether to grant certiorari. In December 2025, the U.S. Solicitor General recommended that the Supreme Court do so and argued that FIFRA does preempt such claims. *See* Brief of United States as Amicus Curiae*, Monsanto Co.* v. *Durnell*, No. 24-1068 at 1, 11 (Dec. 2025). The most commonly asserted claim in the Roundup litigation is that Monsanto failed to warn users of Roundup Products about the risks of NHL. Ex. 2 (Holland Decl.) ¶ 56. The chance that a central claim in the litigation of these cases may be preempted only heightens the ordinary litigation risks to plaintiffs. *See id.*

### B.    Negotiation of the Settlement

Against this backdrop, Class Counsel and Monsanto began the long process of negotiating a potential resolution.[7] Negotiation of the Settlement lasted over 18 months and was overseen by a nationally recognized mediator, Fouad Kurdi, who has significant experience in mediating complex, mass-tort proceedings. Ex. 4 (Kurdi Decl.) ¶¶ 3, 8. Judge Glenn Norton (ret.), who has been serving as settlement master for Roundup cases filed in Missouri courts, was also regularly updated on the progress of the negotiations. Ex. 2 (Holland Decl.) ¶ 30. Proposed Class Counsel include leading national mass-tort law

---

[7] Participants in the mediation executed a confidentiality agreement indicating that the mediation process was to constitute settlement negotiations, protecting disclosure made during such process from later discovery, dissemination, publication, and/or use in evidence. By discussing the arm's-length nature of negotiations in the mediation, the parties do not waive in any way the provisions of the confidentiality agreement or the protections of mediation privilege.

firms and lawyers:  the Holland Law Firm, Ketchmark & McCreight, P.C., Motley Rice LLC, Seeger Weiss LLP, Waters Kraus Paul & Siegel, and Williams Hart & Boundas, LLP.  Negotiations were conducted by counsel separately representing individuals currently diagnosed with NHL (Subclass 1) and those who may be diagnosed in the future (Subclass 2).  Ex. 4 (Kurdi Decl.) ¶ 11; Ex. 2 (Holland Decl.) ¶ 27; Ex. 3 (Seeger Decl.) ¶¶ 12–13.  Counsel for Subclass 1 represent well over 10,000 individuals with Roundup Claims pending or subject to tolling agreements.  Ex. 3 (Seeger Decl.) ¶ 10.

Over the course of the negotiations, the parties attended numerous mediation sessions—in person and over Zoom—and aggressively asserted their respective positions.  *See* Ex. 2 (Holland Decl.) ¶ 27; Ex. 3 (Seeger Decl.) ¶ 13; Ex. 4 (Kurdi Decl.) ¶ 8.  Negotiations were professional, but hard-fought.  Ex. 4 (Kurdi. Decl.) ¶ 7; Ex. 3 (Seeger Decl.) ¶¶ 13, 16; Ex. 2 (Holland Decl.) ¶ 27.

Unsurprisingly, the history of the litigation critically informed the Settlement negotiations.  Ex. 4 (Kurdi Decl.)  ¶ 9.  Monsanto's ability to pay was a central concern for plaintiffs, as was the litigation risk, given the plaintiffs' mixed track record, and the preemption issue in particular.  *See id*. ¶¶ 10, 12.  For its part, Monsanto was insistent on securing a fair and adequate release of Roundup Claims for itself and for parties whose liability might ultimately flow back to the Company, particularly given its experience of resolving numerous Roundup Claims via settlements with individual law firms in the past, only to be faced with as many or more new Roundup Claims filed thereafter.  Ex. 4 (Kurdi Decl.) ¶ 13.  In addition, all sides were aware that in 2020 and 2021, in an earlier attempt to resolve this litigation, Monsanto and other plaintiffs unsuccessfully proposed two

18

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

different and much smaller class settlements centered principally around the creation of a science panel whose decisions regarding the link between glyphosate and NHL would affect future claims.[8]  Accordingly, the parties understood that for both sides' objectives to be met, the Settlement would have to be structured along the lines of a traditional compensation fund that would fit into the framework of prior court-approved mass-tort class settlements.  Ex. 4 (Kurdi Decl.) ¶ 14.

Numerous proposals were made, and countless mediation communications were exchanged.  Ex. 4 (Kurdi Decl.) ¶¶ 8, 13.  Each of the myriad issues addressed by the Settlement received intense consideration from the parties, with both counsel for Subclass 1 and counsel for Subclass 2 separately negotiating certain deal terms.  Ex. 2 (Holland Decl.) ¶ 43; Ex. 3 (Seeger Decl.) ¶ 30; Ex. 4 (Kurdi Decl.) ¶ 16.  Mr. Kurdi often assisted the parties in bridging gaps and reaching reasonable compromises.  Ex. 4 (Kurdi Decl.) ¶ 8.  In parallel, Monsanto negotiated two Additional Roundup Settlements with individual law firms, which redound to the benefit of the Settlement Class.[9]

After extensive negotiations, the parties reached the proposed Settlement Agreement.

---

[8] Mot. for Prelim. Approval of Class Settlement, *In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC, Dkt. 11042 (N.D. Cal. June 24, 2020) (motion for preliminary approval of first proposed settlement); Mot. for Prelim. Approval of Proposed Class Settlement, *In re Roundup Prods. Liab. Litig.*, No. 3:16-md-02741-VC, Dkt. 12531 (N.D. Cal. Feb. 4, 2021) (motion for preliminary approval of second proposed settlement).

[9] Monsanto will facilitate the submission of these Additional Roundup Settlements to the Court for *in camera* review to enable the Court to make certain findings as to these agreements.  Ex. 1 (Settlement Agreement) § 27.5, Ex. H (Proposed Final Order and Judgment) ¶ 31.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

C.    **Material Terms of the Settlement**

The Settlement here is basically a traditional compensation fund.  Monsanto has agreed, pursuant to the terms of the Settlement Agreement, to pay from $6.25 billion up to $7.25 billion into the Settlement Fund across a term of between 17 and 21 years.  These funds will primarily be used to compensate Settlement Class Members who have been diagnosed with NHL.  In exchange, Settlement Class Members will release the Defendant and Related Parties from claims related to Roundup Products and NHL, with important exceptions permitting Settlement Class Members to later exit the compensation program and sue for compensatory damages in the tort system if, among other things, they are Eligible for an Award but do not receive payment in a timely fashion under the program.

Details on the compensation program and its operation, as well as other material terms of the Settlement Agreement, are provided below.

1.    **The Settlement Class and Subclasses**

The Settlement Class is defined in the Settlement Agreement as:  "those U.S. Persons who, prior to the Settlement Date, have been Exposed to one or more Roundup Products *and* who:  (i) Applied any Roundup Products; (ii) purchased or paid for any Roundup Products or for the Application of any Roundup Products; (iii) participated in, directed, or saw the Application of any Roundup Products; or (iv) otherwise had reason to know of their Exposure.  The Settlement Class also includes Derivative Claimants of the foregoing individuals."  *Id.* § 2.1(a) (emphasis added).  An individual has been "Exposed" to a Roundup Product if they have had contact with the product (for example, by inhalation, ingestion, or absorption) while they, or someone nearby, was Applying the product.  *Id.*

20

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

§ 1.1(50).  As the Settlement Class definition makes clear, it covers individuals who have reason to know they were Exposed to a Roundup Product, for example, because they themselves purchased or Applied the Roundup Products.

In addition, the Settlement Agreement defines two Subclasses.  Subclass 1 is Settlement Class Members who have been diagnosed with NHL as of the Preliminary Approval Date, and their Derivative Claimants.  *Id*. § 2.2(a).  Members of Subclass 1 are sometimes referred to as "current Claimants."  Subclass 2 is Settlement Class Members who have not been diagnosed with NHL as of the Preliminary Approval Date, and their Derivative Claimants.  *Id*. § 2.2(b).  Members of Subclass 2 are sometimes referred to as "future Claimants," having been Exposed to a Roundup Product.

The Settlement Class also contains a number of exclusions. *Id*. § 2.1(b).  In addition to several customary exclusions, the Settlement Class excludes those who have claims pending in the federal multi-district litigation, *In re Roundup Products Liability Litigation*, MDL No. 2741 (N.D. Cal.), unless they choose to affirmatively opt into the Settlement. Ex. 1 (Settlement Agreement) § 2.1(b)(iv).  Further, the Settlement Class excludes those who would be a Settlement Class Member solely because they saw the Application of a Roundup Product but have no reason to suspect that the Roundup Product in question was an herbicide. *Id*. § 2.1(b)(vi).  This exclusion ensures that only those Exposed individuals who have reason to be aware of their Exposure are included in the Settlement Class.

### 2.    The Settlement Fund and Compensation Program

The Settlement is designed to ensure that compensation is provided to Claimants based on the nature and extent of their Exposure, their age at the time of NHL diagnosis,

21

and their subtype of NHL, while treating Settlement Class Members fairly and equitably. The principal benefit of the Settlement is the Settlement Fund, which can be up to $7.25 billion. The Defendant's payment obligations are subject to potential credits if there are an excessive number of individuals who Opt Out of the Settlement or reject their Award.[10] *Id.* § 5.

In addition, the Settlement establishes a $1 billion Security Fund, during the principal Settlement term, which protects Settlement Class Members in the event the Defendant enters a bankruptcy proceeding or an involuntary petition for bankruptcy is filed against the Defendant and not dismissed, stayed, or withdrawn within 60 days after its filing and the Defendant defaults on its payment obligations. *Id.* § 4.6. The Security Fund protection was strongly advocated for by Class Counsel and was of notable importance to counsel for Subclass 2. Ex. 4 (Kurdi Decl.) ¶ 18. This protection is another significant benefit to the Settlement Class, given the reports about Monsanto's financial condition.

The Settlement Fund will be paid in stages to ensure funding remains available across the lifetime of the program: $500 million will be paid shortly after Preliminary Court Approval; $500 million will be paid by August 31, 2026; and $5.25 billion will be paid in 16 annual installments following the Effective Date of the Settlement, *i.e.*, when it becomes final and non-appealable. *Id.* § 4.1. In addition, following the Sixteenth Annual

---

[10] The Defendant's payment obligations will be subject to credits if there are more than 650 individuals who Opt Out during the initial notice period, or more than 500 members of Subclass 2 who reject their Award. Ex. 1 (Settlement Agreement) §§ 5.1–5.2, 5.4. Credits will accrue only after the individual triggering the credit files a Roundup Claim, and the credits are based on (and in some cases a multiple of) the Program Award the individual would have received under the Tier system described below. *Id.*

22

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Settlement Payment, up to $1 billion will be paid over the course of four additional years if there are Settlement Class Members who were Exposed to Roundup Products occupationally and who have submitted valid claims but remain unpaid. *Id.* § 4.2.

To ensure similarly situated Claimants are treated similarly, the Settlement establishes a grid that places Settlement Class Members into nine Tiers based on three objective factors, for purposes of determining the amount of the standard compensation award, called a Program Award, to which they are entitled.

- **Occupational vs. Residential Exposure**. The first factor is the nature of the Settlement Class Member's Exposure. The Tier system distinguishes between Occupational Claimants (those who were Exposed to Roundup Products as a result of their employment, for example, as an agricultural worker) and Residential Claimants (those who were Exposed elsewhere). *Id.* §§ 6.6(b)–(c). While Residential Claimants will principally capture those who have been Exposed through personal use, any Claimant who does not meet the requirements to be an Occupational Claimant will be considered a Residential Claimant. *Id.* Moreover, Occupational Claimants are compensated at higher levels, reflecting the greater extent of their Exposure to Roundup Products, with qualification as an Occupational Claimant requiring specific income and Exposure-hour criteria. *Id.*

- **Age at Diagnosis**. The second factor is the Settlement Class Member's age at diagnosis. *Id.* § 6.6(a). Those who were diagnosed at a younger age will receive higher compensation than those diagnosed at an older age. *Id.*

23

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

- **Subtype of NHL**. The third factor is the subtype of NHL with which the Settlement Class Member was diagnosed. *Id.* The Settlement distinguishes between Aggressive NHL and Indolent NHL. *Id.*; Ex. 2 (Holland Decl.) ¶ 50. Those with Aggressive NHL receive higher compensation than those with Indolent NHL. Ex. 1 (Settlement Agreement) § 6.6(a); Ex. 2 (Holland Decl.) ¶ 50; Ex. 3 (Seeger Decl.) ¶ 26.

Each of the nine Tiers has an associated average Program Award amount:

| Tier | Criteria | Tier Average[11] |
|---|---|---|
| 1 | Occupational Claimant; Qualifying Diagnosis at age less than 60; Aggressive NHL | $165,000 |
| 2 | Occupational Claimant; Qualifying Diagnosis at age 60–77; Aggressive NHL | $105,000 |
| 3 | Occupational Claimant; Qualifying Diagnosis at age less than 60; Indolent NHL | $85,000 |
| 4 | Occupational Claimant; Qualifying Diagnosis at age 60–77; Indolent NHL | $60,000 |
| 5 | Residential Claimant; Qualifying Diagnosis at age less than 60; Aggressive NHL | $40,000 |
| 6 | Residential Claimant; Qualifying Diagnosis at age 60–77; Aggressive NHL | $30,000 |
| 7 | Residential Claimant; Qualifying Diagnosis at age less than 60; Indolent NHL | $25,000 |
| 8 | Residential Claimant; Qualifying Diagnosis at age 60–77; Indolent NHL | $20,000 |
| 9 | All Claimants with a Qualifying Diagnosis at age 78+ | $10,000 |

Ex. 1 (Settlement Agreement) § 6.6(a).

---

[11] Awards can be adjusted upwards annually for inflation, beginning five years after the Effective Date, up to 2.5 percent per year, the precise amount subject to the sound judgment

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Under the Settlement Agreement, the average of all Program Awards within a given Tier must equal the Tier Average on an annual basis. *Id.* § 6.10(c). Further, individual Program Awards within a Tier cannot be more than 120 percent or less than 80 percent of the Tier Average. *Id.* These guardrails provide some flexibility to the Allocation Special Master to consider individual circumstances while ensuring fair and equitable treatment of similarly situated Settlement Class Members. Indeed, the Settlement requires that the Allocation Special Master work to ensure similar Claimants are treated similarly. *Id.* § 6.10(b).[12]

These Tier Averages, and the Tier system more broadly, were extensively negotiated with both sides exchanging presentations and proposals. Ex. 4 (Kurdi Decl.) ¶ 15. The Tier Averages were calculated based on conservative assumptions regarding the total number of Claimants who will participate in the Settlement. Ex. 2 (Holland Decl.) ¶ 52. In the event these assumptions prove to be too conservative, the Settlement provides a mechanism to increase the Tier Averages. *See* Ex. 1 (Settlement Agreement) § 6.8. In no circumstances will the per-claim average Program Award across all Tiers fall below $50,000. *See id.* § 6.8(b)(i).

---

of Judge Norton, the proposed Settlement Special Master. Ex. 1 (Settlement Agreement) § 6.6.

[12] Derivative Claimants will be entitled to 1 percent of the Award received by the Settlement Class Member whose relationship is the basis of the derivative claim. Ex. 1 (Settlement Agreement) § 6.1(h). If there are multiple Derivative Claimants, the 1 percent Award will be divided among them based on the laws of the state where the Settlement Class Member to whom they are related is domiciled. *Id.*

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

In addition to the Program Awards, the Settlement provides avenues for additional compensation and alternatives for accelerated compensation, based on Class Counsel's understanding of the particular dynamics of this Settlement Class.

To permit further consideration of individual circumstances and provide additional compensation where particular factors warrant enhancement, the Settlement allocates a percentage of each Annual Settlement Payment to two distinct compensation funds. Awards from these funds are paid in addition to any Program Award. *First*, the Settlement sets aside 5 percent of each Annual Settlement Payment, up to more than $300 million over the lifetime of the Claims Program, for the Extraordinary Circumstances Fund. *See id.* § 6.12(b). The Allocation Special Master will exercise his discretion to make awards from this fund to Claimants providing documentation of exceptional circumstances including, for example, severe disfigurement, loss of organ, or death from NHL prior to age 78. *Id.* § 6.12(a). *Second*, the Settlement sets aside 1.5 percent of each Annual Settlement Payment, up to more than $90 million over the lifetime of the Claims Program, for the Extraordinary Residential Exposure Fund. *See id.* § 6.13(b). The Allocation Special Master will exercise his discretion to make awards from this fund to Claimants who demonstrate significant and atypical residential Exposure. *Id.* § 6.13(a).

The Settlement also provides *entirely voluntary* avenues for certain Settlement Class Members to receive accelerated compensation following Final Court Approval, *i.e.*, even before the Effective Date. *First*, Claimants may seek an Exigency Award. If a Claimant demonstrates either an imminent loss of housing or a terminal condition making it more likely than not that they would not survive until the time they would be paid post-Effective

26

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Date, then the Allocation Special Master has the discretion to award such Claimant the full value of the Program Award they otherwise would have received.  *Id.* § 6.14. *Second*, certain Claimants may elect to seek a Quick-Pay Award.  In exchange for substantially less documentation and faster payment, the value of a Quick-Pay Award for each eligible Tier is lower than the value of a standard Program Award for that Tier.  *See id.* §§ 4.4(d), 6.3(c), 6.7.  Seeking a Quick-Pay Award is at the election of the Settlement Class Member and is available for all Eligible Initial Claimants in Tiers 5 through 9.  *See id.* § 6.7.  Payments for both of these accelerated awards are subject to caps pre-Effective Date, and Quick-Pay Awards are uncapped following the Effective Date.  *Id.* § 4.4(d)–(e). Finally, the Settlement includes robust mechanisms for audits, the prevention of waste, fraud, and abuse, and periodic reviews and supervision by the Settlement Special Master. Ex. 2 (Holland Decl.) ¶ 46.

### 3.     The Claims Process

The claims process is straightforward and clearly delineated in the Settlement Agreement.   Members of Subclass 1 must first register for Settlement benefits by submitting a registration form online, through email, or through U.S. mail, within 180 days of Final Court Approval.  *Id.* § 6.1(a).  Registration is not required for members of Subclass 2. *See id.*  Further, all Settlement Class Members seeking an Award are required to submit a standard application package containing readily available information.  *Id.* § 6.3.  The information required in the Claims Packages—such as proof of Exposure to Roundup Products and medical records reflecting a Claimant's course of treatment for NHL—is a fair way to assess claims and is not overly burdensome.  Ex. 2 (Holland Decl.)

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

¶ 58.  Those applying for a Quick-Pay Award are required to submit substantially less documentation.  *See* Ex. 1 (Settlement Agreement) § 6.3(c).  After their application is submitted, each Settlement Class Member will be informed within a fixed time whether they are Eligible for an Award, and if their application is not sufficient and complete, be provided with reasonable opportunity to cure deficiencies.  *Id.* § 6.5(a).

Each year, the Allocation Special Master will then evaluate applications giving effect to a fixed priority system.  *Id.* § 6.10.  Based on the information provided, the Allocation Special Master will have discretion to make individual Program Awards based on a set of specific factors relating to the claim, including the severity of the injury, the intensity or invasiveness of treatment, the prior progress of the Claimant's lawsuit, if any, and the extent of proof of Exposure to Roundup Products.  *Id.*  For Quick-Pay Awards, the Allocation Special Master will use the information provided to assign the Claimant to a Tier and determine the associated Quick-Pay Award value.  *Id.* § 6.7.

The Administrator and the Allocation Special Master will process and make Award Payments each year out of the Annual Settlement Payment made at the end of the prior year.[13]  To the extent the amount of the Settlement Fund allocated for Award Payments in a given year is insufficient to pay all Eligible Claimants, the Settlement specifies a strict payment priority:  Quick-Pay Awards are given first priority, and then the priority of Program Awards is based principally on the Claimant's Tier.  *Id.* § 6.11.  This ensures that

---

[13] The Settlement Agreement provides that the initial $1 billion in payments will be used to fund Awards in the first year of the Claims Program, less any amounts spent paying Quick-Pay Awards and Exigency Awards prior to the Effective Date and administrative and other costs.  *Id.* § 4.4.

higher-Tier claims receive payment first.  In addition, the Settlement provides for a modest payment priority to Settlement Class Members who have already asserted a claim—either through commencing a suit or by entering into a tolling agreement for their Roundup Claims as of February 13, 2026.  *Id.* §§ 6.5(a), 6.11(c).  They will receive an earlier Claim Eligibility Date (and thus be eligible to be paid sooner), and will be, in any given year, paid earlier than other Claimants in the same Tier.  *Id.*  This ensures that Settlement Class Members who have already been waiting, in some cases for years, receive compensation faster.

In addition, Settlement Class Members have a right to request reconsideration of whether they are entitled to a Program Award or the amount of the Program Award under certain circumstances.  *Id.* § 7.1(a).  Requests will be adjudicated by the Settlement Special Master.  *Id.*[14]

### 4. Releases, Covenant Not to Sue, and Bar Order

In exchange for the significant benefits provided under the Settlement Agreement, Settlement Class Member Parties will release all Roundup Claims against and covenant not to sue the Monsanto Parties and Related Parties for Roundup Claims in this Court and other courts.  *Id.* §§ 3.1(a)–(b).[15]  Roundup Claims encompass all claims relating to both

---

[14] To encourage Settlement Class Members to submit complete applications upfront, the record on reconsideration will be limited to the record before the Allocation Special Master, absent extraordinary circumstances.  *Id.*

[15] Bayer AG, the Defendant's parent, and companies in the Roundup Product supply chain are released.  *Id.* §§ 1.1(76), (100).  Importantly, however, the Settlement does not release manufacturers who have independent liability and are not the beneficiary of a contractual indemnity from the Monsanto Parties.  *Id.* § 1.1(100).

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Roundup Products and NHL, which include all claims for Punitive Damages.  Further, Settlement Class Member Parties with Roundup Claims currently pending in any court covenant to seek a stay of any such proceeding following Final Court Approval of the Settlement and dismiss with prejudice any such Roundup Claim prior to receiving an Award Payment.  *Id.* § 3.1(c).

For Settlement Class Members who elect to exercise a back-end exit right, discussed at pp. 33–34 below, the Releases and Covenant Not to Sue will become null and void, except with respect to Roundup Claims for Punitive Damages.  *Id.* § 8.2.  In other words, the Settlement will remain a bar on their right to assert Roundup Claims for Punitive Damages.[16]  In addition, the Releases and Covenant Not to Sue will become null and void for Settlement Class Members who have not been diagnosed with NHL at the conclusion of the Settlement term; any such Settlement Class Members will not be barred from asserting their claims, including any claim for Punitive Damages.  *Id.* § 8.3.  Thus, undiagnosed Settlement Class Members who do not have an opportunity to seek compensation under the Settlement will not be forever bound by its terms.

As a condition to approval of the Settlement, the parties also intend to move the Court for a bar order and judgment reduction provision, as part of the Final Order and Judgment.  *See* Ex. 1 (Settlement Agreement) § 3.3; Final Order and Judgment, filed contemporaneously with this Motion and also attached as Exhibit H to the Settlement

---

[16] The provisions of the Settlement Agreement were crafted to put the Exiting Class Members and the Monsanto Parties back in the same position as they were in prior to the Settlement Agreement, other than with respect to the bar on Exiting Class Members' Roundup Claims for Punitive Damages.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Agreement, ¶ 40.  The order will bar other parties from seeking indemnification or contribution from the Monsanto Parties for Roundup Claims.  This protection, known as "Claim-Over" protection, is standard in mass-tort settlements.  Ex. 2 (Holland Decl.) ¶ 71.

### 5.    Settlement Administration

Class Counsel is well aware of the important role settlement administration plays in ensuring that the Settlement, in practice, delivers on the program as designed.  *See* Ex. 2 (Holland Decl.) ¶ 58; Ex. 3 (Seeger Decl.) ¶ 42.  The Settlement will be administered by an outstanding team, subject to their appointments being confirmed by the Court.  Subject to the Court's approval, Judge Norton will serve as the Settlement Special Master, handling critical oversight functions such as approving expenses, resolving requests for reconsideration of Awards, and reporting information to the Court.  *See* Ex. 1 (Settlement Agreement) § 16.1.  Subject to the Court's approval, BrownGreer PLC ("BrownGreer"), a highly regarded and well-known complex settlement administrator, will serve as the Administrator; Matthew Garretson of Garretson, LLC, who has extensive experience serving as special master or administrator of other settlement programs, will serve as Allocation Special Master; and Wolf Global Compliance, LLC ("Wolf Global"), one of the preeminent lien resolution specialists, will serve as Healthcare Compliance Administrator. Ex. 2 (Holland Decl.) at ¶¶ 76, 77, 79, Exs. C, D, E (curricula vitae); Ex. 3 (Seeger Decl.) ¶¶ 44–46. Further, Signal Interactive Media, LLC ("Signal Interactive Media"), which possesses significant experience designing and administering notice programs for some of the most complex settlements in recent history, is overseeing the notice program here. Declaration of Dr. Shannon Wheatman ("Wheatman Decl."), attached as Exhibit 5 to this

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Motion, Ex. A (curriculum vitae).  And J.P. Morgan Chase Bank, N.A. ("J.P Morgan Chase Bank"), with experience with similar sized funds, will serve as the Settlement Fund Escrow Agent.[17]  Ex. 2 (Holland Decl.) ¶ 81.  Each has reviewed the Settlement as relevant to their proposed role and is fully prepared to execute on its terms.  *Id.* ¶ 82.

### 6.    Opt Outs and Exit Rights

While Class Counsel and the Class Representatives firmly believe the Settlement to be in the best interests of all Settlement Class Members, the Settlement provides an Opt Out right and other exit rights.  The exit rights include so-called "back-end" exit rights for future Claimants (those Exposed but not yet diagnosed as of the Preliminary Approval Date) so that they have an opportunity to decide whether to accept an Award *after* they are diagnosed with NHL.

A Settlement Class Member may Opt Out of the Settlement during an initial 90-day notice period by following specified procedures.  Ex. 1 (Settlement Agreement) § 12; Preliminary Approval Order ¶¶ 24–30.  The notice period will commence following the posting of the Settlement Class Notice (discussed further below, pp. 34–37) on the Settlement Website and within 10 days of Preliminary Court Approval.  *Id.* ¶ 56.  The procedures to Opt Out are straightforward.  The request must include:  (i) an individual, written, unambiguous request to be excluded; (ii) a personal wet ink signature to ensure the individual, rather than an attorney, is making the decision; (iii) certain personal

---

[17] The parties will separately submit a joint motion to approve the Settlement Fund Escrow Agreement, appoint J.P Morgan Chase Bank as the Settlement Fund Escrow Agent, appoint BrownGreer as the administrator of the Settlement Fund, and establish the Settlement Fund as a qualified settlement fund.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

identifying information; (iv) disclosures certifying to the best of their knowledge whether the Settlement Class Member had filed, tolled, or retained counsel in connection with a Roundup Claim; and (v) a declaration attesting to the Settlement Class Member's Exposure to Roundup Products and NHL diagnosis (if any). Ex. 1 (Settlement Agreement) § 12.2. A Settlement Class Member's decision to Opt Out (or not Opt Out) will be binding on any associated Derivative Claimants. *Id.* § 12.2(d). Opt Outs will not be bound to the terms of nor receive the benefits of the Settlement.

In addition, the Settlement provides several back-end exit rights: *First*, if the payment priority process described above results in a Settlement Class Member not receiving an Award within five years of their Claim Eligibility Date, then the Settlement Class Member may choose to exercise the exit right, receive a $500 payment, and pursue compensatory damage claims in the tort system. *Id.* §§ 8.1(a)(i), 8.2. *Second*, if a Settlement Class Member has not received an Award following the exhaustion of the Settlement Fund, then the Settlement Class Member may also choose to exercise the exit right, receive a $500 payment, and pursue compensatory damage claims in the tort system. *Id.* §§ 8.1(a)(i)–(ii), 8.2. *Third*, members of Subclass 2 that apply for a Program Award and who comply with specified requirements in connection with that application, may, if they so choose, reject their Award, exit the Settlement Class, and pursue compensatory damage claims in the tort system. *Id.* §§ 6.17, 8.1(a)(iv), 8.2. In each case, Settlement Class Members exercising the exit right will retain their compensatory damage claims in the tort system, with the only limitation being the ability to seek Punitive Damages. These

33

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

exit rights are accompanied by additional procedural protections, including, for example, mechanisms for tolling.  *Id.* § 8.2(b).

### 7.    Settlement Class Notice and Notice Plan

The Settlement terms will be explained in clear notices, written in plain language and disseminated very broadly, to the Settlement Class.  Settlement Class Members will thus be apprised of the Settlement and be able to make an informed decision whether to Opt Out of the Settlement.  The initial notice campaign will be supplemented by an extensive annual notice campaign, ensuring, in particular, that members of Subclass 2 are adequately informed of their rights under the Settlement.  Ex. 5 (Wheatman Decl.) ¶ 46. To effectuate such notice, Class Counsel has worked with Signal Interactive Media, which, as noted above, is a firm with deep experience designing and implementing nationwide class action notice programs.  *See id.* ¶¶ 8–17.

The Settlement Class Notice Plan has multiple features to ensure compliance with both Missouri law and due process.  The Settlement Class Notice includes a short-form "Summary Notice" and a long-form "Detailed Notice," which are attached to the Wheatman Declaration as Exhibit B and Exhibit C, respectively.  The notices plainly state the range of compensation available to Settlement Class Members and the nature of the rights being released; the notices clearly advise Settlement Class Members of their rights regarding opting out of or objecting to the Settlement, as well as the consequences of not opting out; the notices clearly describe who is a Settlement Class Member; and the notices point the Settlement Class Members to a public website and toll-free phone line where they

can seek additional information, including obtaining copies of the Detailed Notice.[18]  *See also* Ex. 5 (Wheatman Decl.) ¶¶ 147–49.  As Dr. Wheatman explains, the content of these notices is purposefully written in plain language designed to be understandable to the average Settlement Class Member.  *Id.* ¶ 146.  Both the Detailed Notice and the Summary Notice will be available in English and Spanish.  *Id.* ¶ 150.

To disseminate this notice, Signal Interactive Media, in collaboration with BrownGreer, has developed a comprehensive plan.  As further detailed further below, the proposed Settlement Class Notice Plan will include direct individual notice to thousands of known and potential Settlement Class Members, expansive paid publication notice in various media sources, and extensive outreach to targeted third parties, including medical-lien holders and lawn-and-garden supply stores.  The Settlement Class Notice Plan was developed based on comprehensive demographic research to understand how best to reach the affected population accounting for a diverse set of characteristics and geographic locations.  *See id.* ¶¶ 18–23, 30, 45–47.  It has been purposely designed to reach both Settlement Class Members that have been diagnosed with NHL, and those that have not.  *Id.* ¶ 46.

*First*, direct individual notice will be provided to thousands of known and potential Settlement Class Members.  The Detailed Notice will be sent to Settlement Class Members who have currently filed litigation or who are on tolling agreements  Ex. 5 (Wheatman

---

[18] BrownGreer (which has significant experience maintaining these systems) will establish this website and phoneline, as well as a system of SMS text messaging, through each of which Settlement Class Members can easily obtain additional information.  Ex. 5 (Wheatman Decl.) ¶¶ 141–44.

Decl.) ¶ 54.  The Summary Notice will be sent to individuals identified by Monsanto as customers, as well as members of approximately 240,000 organizations across the country, chosen because they have employees or members who may have been Exposed to Roundup Products.  *Id*. ¶ 52.  These include, for example, farm organizations, schools and universities, golf courses, public works departments, landscape contractors, and garden centers.  *Id*.  The direct individual notices will be sent via first-class mail and/or email.  *Id*. ¶¶ 53–54.

*Second*, the plan includes an expansive paid media campaign.  Print, television, radio, and internet advertisements will be used to reach Settlement Class Members, including their legal representatives, spouses, family members, and heirs.  *Id*. ¶¶ 46–47, 59–114.  Advertisements will be in English, Spanish, and certain Indigenous languages, reflecting the primary languages spoken by agricultural workers.  *Id*. ¶¶ 42, 47.[19]  The plan includes both national advertisements as well as targeted local campaigns for at-risk populations chosen based on thorough demographic research.  *Id*. ¶¶ 21, 47.  Notice will include, for example, 30- and 60-second television advertisements on national broadcast and cable networks, *id*. ¶¶ 61–62, Ex. D (Television Advertisement Scripts), and the Summary Notice published as full-page advertisements in consumer and trade magazines.

---

[19] As the Indigenous languages concerned are primarily spoken languages, *id*. at ¶ 42, there will not be printed notice materials in these languages.

*Id.* ¶¶ 70–72, 112–13.  Overall, an estimated 95 percent of adults over the age of 50, and 83.5 percent of adults over the age of 18, will be reached by the notice program.  *Id.* ¶ 83.[20]

*Third*, the Settlement Class Notice Plan provides for extensive third-party outreach, including:  (a) providing approximately 3,200 lawn-and-garden supply stores with English- and Spanish-language posters modeled after the Summary Notice;  (b) providing notice to approximately 1,000 medical lienholders to share with those who have a diagnosis code for NHL; and (c) providing on-the-ground, grass-roots outreach to targeted communities.  *Id.* ¶¶ 48, 55–57, 116–25.

In addition to the extensive notice campaign planned for the initial 90-day notice period, the Settlement Class Notice Plan includes recurring email notices to remind Settlement Class Members of upcoming registration deadlines, *id.* ¶ 58, and importantly, an ongoing annual campaign each year following Final Approval, *id.* ¶¶ 126–40.  This campaign will include, among other things, a continuation of the paid media campaign, direct notice reminders, and third-party outreach, including to healthcare providers who may treat eligible patients.  *Id.*  It will be informed by the experience with the initial Notice and improvements in technology over the years, and will, at the least, contain substantially similar content to that provided in the Summary Notice, as set forth in Exhibit F to the Settlement Agreement.  *Id.* ¶¶ 128–29, 140; Ex. 1 (Settlement Agreement) § 11.3,  Ex. F (Settlement Class Short-Form Annual Notice).

---

[20] These figures do not include components of the notice program whose reach cannot be measured, including notice through on-the-ground and third-party outreach.  *Id.* ¶ 86.  Thus, the true reach of the notice program may be even greater.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

### 8.   Attorneys' Fees

The award of attorneys' fees has been left solely to the discretion of the Court.  Ex. 1 (Settlement Agreement) § 15.1.  Class Counsel will apply for an award of reasonable attorneys' fees and reimbursement of costs in advance of the deadline to Opt Out of or object to the Settlement.  *Id.* § 14.3.  Settlement Class Members will have an opportunity to comment on or object to this request at the appropriate time.  Any order relating solely to attorneys' fees and costs will not affect or delay the Settlement.  *Id.* § 15.8.  Counsel, other than Class Counsel, who have contributed to the litigation of Roundup Claims or this Settlement, may also apply to the Court for a portion of the Court's award of attorneys' fees following Final Court Approval.  *Id.* § 15.2.  The bulk of any amounts awarded by the Court will be paid from the Settlement Fund in seven distributions after the Effective Date. *Id.* § 15.5.  Less than five percent of the overall fee may be paid prior to the Effective Date. *Id.*  This timeline ensures that the Settlement Fund remains principally available to fund Awards for Settlement Class Members.

### 9.   Approval Process

As detailed above, following Preliminary Court Approval and the dissemination of the Settlement Class Notice, the Settlement provides for a 90-day Opt Out period.  Ex. 1 (Settlement Agreement), § 12.2(a).  During that same time frame, Settlement Class Members may object to the Settlement by following specified procedures, including providing a detailed, written statement of objections, a wet ink signature of the Settlement Class Member making the objection, and proof of the Settlement Class Member's class membership.  Ex. 2 (Holland Decl.) ¶ 68.  The procedures ensure that it is the Settlement

Class Members themselves, and not just the attorneys, who stand behind the objections. To ensure the orderly administration of the approval process, the Settlement provides for all litigation by Settlement Class Members in the State of Missouri to be stayed for the pendency of the proceedings. *Id.* ¶ 92. In addition, the Settlement provides that the Fairness Hearing will be scheduled no sooner than 30 days following the close of the notice period, in order for the parties to respond to any objections. *Id.* ¶ 68. At that Fairness Hearing, the Court will then determine whether to enter the Final Order and Judgment approving the Settlement. *Id.*

## LEGAL STANDARD

Under Rule 52.08 of the Missouri Rules, in order to enter the Preliminary Approval Order, the Court must determine: (i) that it will likely be able to approve the Settlement as fair, reasonable, and adequate and to certify the Settlement Class at final approval, and (ii) that the proposed Settlement Class Notice should be distributed as set forth in the Settlement Class Notice Plan.

Specifically, Rule 52.08(e)(1)(B) sets up a two-part inquiry on preliminary approval. *First*, the Court must determine that it "will likely be able to . . . approve the [Settlement] under 52.08(e)(2)." Mo. S. Ct. R. 52.08(e)(1)(B)(i). Rule 52.08(e)(2), in turn, provides that the Court may approve the Settlement if it finds it to be "fair, reasonable, and adequate" after considering a variety of factors, including whether the proposal was negotiated at arm's length and whether the relief provided for the class is adequate. Mo. S. Ct. R. 52.08(e)(2). *Second*, the Court must determine that it "will likely be able to . . . certify the class for purposes of judgment on the proposal." Mo. S. Ct. R.

52.08(e)(1)(B)(ii). To do so, the Court will consider the requirements for class certification, including numerosity, commonality, typicality, and adequacy under Rule 52.08(a) and predominance and superiority under Rule 52.08(b)(3), as applied to the Settlement Class and Subclasses.

Critically, the question at the preliminary approval stage, as the Rule makes clear, is only whether the Settlement is *likely* to be approved and the Settlement Class *likely* to be certified: the ultimate determination on these issues will occur later, following a Fairness Hearing, in connection with the Court's consideration of the Final Order and Judgment. The Court's review at this stage is thus focused on ensuring "that the agreement is not the product of fraud or collusion and that, taken as a whole, it is fair, adequate, and reasonable to all concerned." *Marshall* v. *Nat'l Football League*, 787 F.3d 502, 509 (8th Cir. 2015) (quoting *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 934 (8th Cir. 2005)). In addition, "[a]t the preliminary approval stage, the fair, reasonable, and adequate standard is lowered," *In re CenturyLink Sales Pracs. & Sec. Litig.*, No. CV 18-296 (MJD/KMM), 2021 WL 3080960, at *5 (D. Minn. July 21, 2021),[21] and the Court puts emphasis on whether "the settlement is within the *range* of possible approval due to an absence of any glaring substantive or procedural deficiencies," *Skinner* v. *Hunt Mil. Cmtys. Mgmt. LLC*, No. SA-22-CV-00799-JKP, 2023 WL 6532670, at *2 (W.D. Tex. Jan. 23, 2023) (emphasis added).[22]

---

[21] Unless otherwise noted, internal citations and quotations are omitted.

[22] "Because class members will subsequently receive notice and have an opportunity to be heard on the settlement, [a] Court need not review the settlement in detail at [the preliminary approval stage]." *Cleveland* v. *Whirlpool Corp.*, No. 20-CV-1906

40

If the Court concludes that it will likely be able to approve the Settlement and certify the Settlement Class, the Rules provide that the Court then "shall direct notice in a reasonable manner to all class members." Mo. S. Ct. R. 52.08(e)(1)(B). In connection with satisfying that directive, "upon ordering notice under Rule 52.08(e)(1) . . . the court shall direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Mo. S. Ct. R. 52.08(c)(2)(B). Thus, the Court must determine that the proposed Settlement Class Notice, distributed though the Settlement Class Notice Plan, is the "best notice that is practicable under the circumstances," consistent with the requirements of due process.[23]

As the Court is aware, the current version of Rule 52.08(e), which clarified the procedure for approving class settlements, came into effect on January 1, 2026. The recent amendments to Rule 52.08(e) were not intended to alter long-standing Missouri policy, but rather to "make[] changes to mirror the Federal Rules." S.B. 47, 2025 Reg. Sess.

---

(WMW/KMM), 2021 WL 5937403, at *6 (D. Minn. Dec. 16, 2021) (alternations in original).

[23] *See, e.g.*, Order Prelim. Approving Class Settlement, Approving Class Notice, and Scheduling Fairness Hearing ¶ 7, *Trentham* v. *Taste of Nature, Inc.*, No. 18PH-CV00751 (Mo. Cir. Ct. June 18, 2018) (finding notice and notice plan "meets the requirements of Mo. R. Civ. P. 52.08(b)(3), 52.08(c)(2) and due process, and is the best notice practicable under the circumstances"); Am. Prelim. Approval Order ¶ 5, *Hayes* v. *Integrity Land Title Co.*, No. 11SL-CC01429 (Mo. Cir. Ct. Feb. 14, 2013) (finding notice and notice plan "will provide the best practicable notice" and "fully satisfies the requirements of Supreme Court Rule 52.08 and due process").

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

(Mo. 2025).[24]  Accordingly, Rule 52.08(e) is to be interpreted in a manner consistent with prior Missouri practice, which followed a similar framework to that above.  *See Byrd*, 956 S.W.2d at 389 (explaining that, at preliminary approval, Missouri courts assess the fairness of a proposed settlement, suitability for certification, and review the contents of the proposed notice).

Finally, in connection with preliminarily approving the Settlement and directing notice to all Settlement Class Members, the Court may exercise its discretion to enter the additional relief enumerated in the Preliminary Approval Order that will facilitate the settlement approval process.  *See City of Bridgeton* v. *City of St. Louis*, 18 S.W.3d 107, 113 (Mo. App. E.D. 2000); § 476.070, RSMo; Mo. S. Ct. R. 52.08(d)(1); *see also, e.g.*, *In re Nat'l Football League Players' Concussion Inj. Litig.*, 301 F.R.D. 191, 207 (E.D. Pa. 2014) ("*NFL*").

## ARGUMENT

The Court should grant the unopposed Motion, preliminarily approve the Settlement, preliminarily certify the Settlement Class, and direct the Settlement Class Notice.  As explained in detail below, the Settlement Agreement is well within the range

---

[24] Missouri courts often rely on federal precedent when interpreting Rule 52.08.  *See State ex rel. Byrd* v. *Chadwick*, 956 S.W.2d 369, 378 (Mo. App. W.D. 1997) (noting in context of prior version of the Rule, that "interpretations of Rule 23 are considered by this Court in interpreting Rule 52.08.").  Federal Rule of Civil Procedure 23(e) was itself amended in 2018, and federal courts apply the amended Federal Rule consistent with prior precedent.  *See, e.g.*, *Fath* v. *Am. Honda Motor Co.*, No. 18-CV-1549 (NEB/LIB), 2019 WL 6799796, at *2 (D. Minn. Dec. 13, 2019); *Swinton* v. *SquareTrade, Inc.*, 4:18-CV-00144-SMR-SBJ, 2019 WL 617791, at *5 (S.D. Iowa Feb. 14, 2019).

of reasonableness of a settlement that could ultimately be given final approval by this Court.

*First*, the Court will likely be able to approve the Settlement as fair, reasonable, and adequate. Settlement Class Members were adequately represented. The Settlement was negotiated at arm's length. And the Settlement provides adequate relief—a Settlement Fund of billions of dollars for the benefit of Settlement Class Members, many of whom might otherwise face extreme delay in obtaining relief, if at all. *See* Point I.

*Second*, the Court will likely be able to certify the Settlement Class. The Settlement Class satisfies all requirements for certification. It meets the numerosity, commonality, and typicality requirements. Representation has been more than adequate in these hard-fought negotiations. Common issues of the Settlement Class predominate over individualized ones. And a class-action settlement is an efficient and reasonable vehicle to resolve the claims of the Settlement Class Members. The Settlement Class is also ascertainable. *See* Point II.

*Third*, the Settlement Class Notice will provide the best practicable notice under the circumstances, consistent with due process. The Settlement Class Notice Plan, designed by a pre-eminent notice expert, provides extensive nationwide notice, through print, digital, and television/radio-based media. It also provides for an ongoing extensive annual notice campaign. And the design of the Settlement Class Notice Plan specifically accounted for providing full and adequate notice to Settlement Class Members who have been Exposed to Roundup Products but have not yet been diagnosed with NHL. *See* Point III.

43

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

*Fourth*, the Preliminary Approval Order will properly facilitate the settlement approval process by providing a fair procedure and orderly schedule for final approval of the Settlement, including a temporary stay of Roundup litigation in the State of Missouri and a timeline for the filing of Opt Outs and objections. *See* Point IV.

For these reasons, the Court's entry of the Preliminary Approval Order is warranted. Doing so is also entirely consistent with, and indeed advances, the State's strong public policy favoring settlement. *See Byrd*, 956 S.W.2d at 377 (the use of "temporary settlement classes is beneficial and has salutary effects on the resolution of class action litigation."); *see also Woodson* v. *Bank of Am., N.A.*, 602 S.W.3d 316, 323 (Mo. App. E.D. 2020) ("Missouri public policy favors settlement."). Indeed, "[t]he law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Cohn* v. *Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005).

## I.    THE COURT WILL LIKELY BE ABLE TO APPROVE THE SETTLEMENT AS FAIR, REASONABLE, AND ADEQUATE.

For purposes of preliminary approval, under Rule 52.08(e)(1)(B)(i), the Court must determine that it "will likely be able to . . . approve the [Settlement] under 52.08(e)(2)," which in turn requires that the Court ultimately find the Settlement "fair, reasonable, and adequate after considering whether:"

(A)    the class representatives and class counsel have adequately represented the class;

(B)    the proposal was negotiated at arm's length;

(C)    the relief provided for the class is adequate, taking into account:
  (i)    the costs, risks, and delay of trial and appeal;

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

    (ii)    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

    (iii)    the terms of any proposed award of attorney fees, including timing of payment; and

    (iv)    any agreement required to be identified under Rule 52.08(e)(3); and

(D)    the proposal treats class members equitably relative to each other.

As detailed below, the Court will likely be able to find that the Settlement satisfies each of the Rule 52.08(e) criteria, supporting preliminary approval of the Settlement.

**A.    Class Counsel and Class Representatives have adequately represented the Settlement Class, and their respective Subclasses (Rule 52.08(e)(2)(A)).**

The Court will likely be able to find that Class Counsel and Class Representatives have adequately represented the Settlement Class, and their respective Subclasses. "[D]ue process requires that absent class members be fairly and adequately represented" by class representatives and class counsel. *Elsea* v. *U.S. Eng'g Co.*, 463 S.W.3d 409, 420–21 (Mo. App. W.D. 2015) (quoting *Dale* v. *DaimlerChrysler Corp.*, 204 S.W.3d 151, 172 (Mo. App. W.D. 2006)). In making this determination, the Court ultimately "must determine whether class counsel or the named representatives have conflicts of interest that will adversely affect the interests of the class." *Craft* v. *Philip Morris Cos.*, 190 S.W.3d 368, 379 (Mo. App. E.D. 2005). Furthermore, the Court should consider whether class counsel has sufficient expertise and interest in the class's underlying claims, and whether the settlement negotiations were hard-fought. *See Elsea*, 463 S.W.3d at 420–21.

Here, the Class Representatives' interests are aligned with those of the Settlement Class and their respective Subclasses. Mr. King, Mr. Butterfield, and Mr. Waldman, proposed representatives of Subclass 1, have been Exposed to Roundup Products (Mr. King

occupationally, and Mr. Butterfield and Mr. Waldman residentially) and are currently diagnosed with NHL. *See* Petition, filed contemporaneously with this Motion, ¶¶ 11–13; Ex. 3 (Seeger Decl.) ¶ 48.  Mr. Merx and Mr. Koehler, proposed representatives of Subclass 2, have been Exposed to Roundup Products (Mr. Merx occupationally, and Mr. Koehler residentially) but have not yet been diagnosed with NHL.  Petition ¶¶ 14–15; Ex. 2 (Holland Decl.) ¶ 94.  As the Class Representatives share an overriding interest in compensation for Roundup Claims, the interests of the named Plaintiffs are thus consistent with those of absent Settlement Class Members.

In addition, each proposed Class Counsel is highly competent, with significant experience in litigating and resolving mass-tort class actions, Roundup Claims, or both. Ex. 2 (Holland Decl.) ¶¶ 4, 6–7, 14–15; Ex. 3 (Seeger Decl.) ¶¶ 3, 5, 6, 8–10.  For instance, the Holland Law Firm, one of the two firms proposed to represent Subclass 2, led by Eric Holland, has previously brought and resolved thousands of Roundup Claims.  Ex. 2 (Holland Decl.) ¶ 14–15.  In addition, Mr. Holland is a noted trial lawyer more generally, having tried and resolved some of the largest mass-tort cases (including asbestos and talcum powder-related cases) in Missouri and nationwide.  *Id.* ¶ 6.

The four firms proposed to represent Subclass 1, Seeger Weiss LLP, Motley Rice LLC, Waters Kraus Paul & Siegel, and Williams Hart & Boundas LLP, are well-known, experienced firms with named partners whom courts around the nation have appointed as lead counsel in the largest and most important mass-tort litigations.  Ex. 3 (Seeger Decl.) ¶ 10.  These firms also have substantial experience in this litigation:  together, they are counsel to well over 10,000 individuals with pending or tolled Roundup Claims.  *Id.*  The

46

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

two firms proposed to represent Subclass 2, the Holland Law Firm and Ketchmark & McCreight P.C., are leading Missouri firms that also boast extensive experience in mass-tort litigation and Roundup cases specifically.  Ex. 2 (Holland Decl.) ¶ 40.  Importantly, they do not have current clients with pending or tolled Roundup Claims, and therefore do not have a conflict of interest in representing Subclass 2, *i.e.*, those not yet diagnosed with NHL.  *Id*. ¶ 41.  Together, Class Counsel have vigorously represented the Settlement Class and their respective Subclasses, as described further below.  Ex. 4 (Kurdi Decl.) ¶ 13; *see also* Point I.B, *infra*.

Finally, as the Settlement includes individuals who have not yet been diagnosed with NHL, the parties ensured there were structural protections for future Claimants embodied in the Settlement Agreement, further supporting a finding of adequate representation.  Ex. 2 (Holland Decl.) ¶¶ 63, 69.  This is because where a class settlement includes current claimants as well as "anticipated future claimants" (*i.e.*, those who have been previously exposed but whose disease has not yet manifested), "structural assurance of fair and adequate representation" is necessary.  *See Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 601, 626–27 (1997).  Such structural protection includes the use of discrete subclasses to represent differently situated subsets of class members, *see id.*, as well as "separate representation" for those subclasses "to eliminate conflicting interests of counsel," *Ortiz* v. *Fibreboard Corp.*, 527 U.S. 815, 856–57 (1999).

Here, the parties have employed subclasses for "current" and "future" claimants, with separate Class Representatives and Class Counsel for each Subclass, *i.e.*, those Exposed and diagnosed with NHL, and their Derivative Claimants (Subclass 1) and those

47

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Exposed but not yet diagnosed with NHL, and their Derivative Claimants (Subclass 2). Ex. 4 (Kurdi Decl.) ¶ 10; *see also* Mo. S. Ct. R. 52.08(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this Rule 52.08."). This ensures adequate representation for both current and future Claimants by curing any antagonism that may exist between the interests of those Settlement Class Members who have already been diagnosed with NHL and those who have not. *See Amchem*, 521 U.S. at 625–27; *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 432 (3d Cir. 2016), *as amended* (May 2, 2016) (decision to create subclasses for current and future claimants "guarded against any *Amchem* conflict of interest").

In addition, the Settlement provides Subclass 2 members an exit right after they are diagnosed with NHL and know what their Award under the Settlement would be. *See* pp. 33–34, *supra*; *see also Amchem*, 521 U.S. at 627 (discussing "back end" protections for future claimants); *In re Diet Drugs*, MDL No. 1203, 2000 WL 1222042, at *39, *49 (E.D. Pa. Aug. 28, 2000) (approving settlement with back-end rights).

The Settlement also provides further protection for future Claimants by preserving settlement funds over an extended time. *See In re Diet Drugs*, 2000 WL 1222042, at *49 (noting settlement mechanism that "protects against fund depletion" as "structural protections" for future claimants). This includes a long funding period, which requires the Company to make payments over the course of 17 to 21 years. In particular, up to $1 billion may be paid to fund Awards for claimants who were Exposed to Roundup Products occupationally and have submitted valid claims but remain unpaid following the exhaustion of the Sixteenth Annual Payment. *See* Ex. 1 (Settlement Agreement) § 4.2.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Any such Claimants at that late date are most likely to be future Claimants.  Moreover, the Settlement provides for a $1 billion Security Fund, during the principal Settlement term, in the event the Defendant enters a bankruptcy proceeding or an involuntary petition for bankruptcy is filed against the Defendant and not dismissed, stayed, or withdrawn within 60 days after its filing and the Defendant does not perform its payment obligations under the Settlement.  The Security Fund is a significant benefit to future Claimants.  *See id.* § 4.6; Ex. 4 (Kurdi Decl.) ¶ 18; *see also In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, Civ. No. 2:23-cv-3147-RMG, 2024 WL 1341122, at *13 (D.S.C. Mar. 29, 2024). Indeed, the Security Fund was a particular point of focus for counsel for Subclass 2 during negotiations.  Ex. 2 (Holland Decl.) ¶¶ 60–61, 63; Ex. 4 (Kurdi Decl.) ¶ 18.  Finally, the Settlement further ensures fund protection through robust mechanisms for audits and the prevention of waste, fraud, and abuse.  Ex. 2 (Holland Decl.) ¶ 46.

Furthermore, all Settlement Class Members are compensated according to an objective Tier system and evaluation process, which is based on simple, factual criteria that relate to the individual's Roundup Claim.  *See* pp. 23–26, *supra*.  As a result, the Settlement compensation structure does not unduly favor Settlement Class Members who are current Claimants over future ones, further demonstrating that the Subclasses were adequately represented.  The Tier Averages also help ensure that similarly situated Claimants in the future are compensated at the same levels as those receiving compensation earlier in the program, with an inflation adjustment to help ensure equity over the long term.  *See* Ex. 1 (Settlement Agreement) § 6.6; *see also* Ex. 3 (Seeger Decl.) ¶ 33.  This feature of the Settlement similarly demonstrates that future Claimants were adequately represented.

By including these features, this Settlement is like those approved in other mass-tort class settlements that included future claimants. Building on the guidance of *Amchem* and *Ortiz*, those settlements included protections for future claimants—many of which protections are found in the Settlement Agreement. *See, e.g., NFL*, 821 F.3d at 432 (affirming the approval of a settlement with subclasses with separate class representatives and counsel, noting this was a "significant structural protection for the class that weighs in favor of finding adequacy," and "[t]he most important distinction is that class counsel here took *Amchem* into account by using the subclass structure to protect the sometimes divergent interests of the retired players [future claimants]"); *In re Diet Drugs*, 2000 WL 1222042, at *39 (approving settlement with "back-end opt out right[ ]"); *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 140 (E.D. La. 2013) ("*Deepwater Horizon*") (approving settlement where class members retained "the right to sue for Later–Manifested Physical Conditions under the Back–End Litigation Option"); *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, Civ. No. 2:23-cv-3147-RMG, 2024 WL 1341122, at *13 (approving settlement with provision that decreased risk of bankruptcy, benefitting future claimants); *Juris* v. *Inamed Corp.*, 685 F.3d 1294, 1324–25 (11th Cir. 2012) (affirming the approval of a settlement where separate class representatives in the negotiations "understood that their role was to advocate on behalf of their respective subgroups").

**B.    The Settlement proposal was negotiated at arm's length (Rule 52.08(e)(2)(B)).**

The Court will likely also be able to find that the Settlement, reached after more than a year and a half of hard-fought negotiations, was the product of arm's-length

50

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

negotiations. *See generally*, pp. 17–19, *supra* (describing negotiation of the Settlement); Ex. 4 (Kurdi Decl.) ¶ 7. The participation of a mediator in the negotiation process supports this factor, as does the involvement of experienced and capable counsel in extensive negotiations. *See* Final Approval of the Settlement Agreement ¶ 11, *Trentham* v. *Taste of Nature, Inc.*, No. 18PH-CV00751 (Mo. Cir. Ct. Oct. 24, 2018) (finding that settlement was negotiated at arm's-length where "experienced counsel who were fully informed of the facts and circumstances of the action and of the strengths and weaknesses of their respective positions . . . engaged in extensive negotiations and formal mediation"); *Fath*, 2019 WL 6799796, at \*3 (finding "the proposed settlement was the result of arm[']s-length negotiation" because "it was negotiated between experienced, capable counsel knowledgeable in complex class action litigation. And an experienced, capable mediator was also involved").

Such is the case here, with the negotiation of the Settlement being overseen by a nationally recognized mediator, Fouad Kurdi, and with the involvement of Judge Norton. Mr. Kurdi has successfully mediated numerous high-stakes complex disputes, such as multiple settlements in the national opioid litigation and has specifically mediated disputes involving future claimants, like those related to the ongoing Johnson & Johnson Talcum Powder Multidistrict Litigation and Takata's airbag litigation. Ex. 4 (Kurdi Decl.) ¶ 3. In addition to his mediation practice, Mr. Kurdi specializes in mass-tort trust administration. *Id*. Judge Norton has had an illustrious career, including serving on the Missouri Court of Appeals as Chief Judge. Critically, for purposes of the Settlement, he has served as settlement master for Roundup cases filed in Missouri courts and is intimately familiar with

51

the substance and circumstances of the Roundup litigation.  Ex. 2 (Holland Decl.) ¶¶ 30, 75.

Mr. Kurdi's and Judge Norton's involvement strongly supports a determination that the negotiations were arm's length.  *See Bert* v. *AK Steel Corp.*, No. 1:02-cv-467, 2008 WL 4693747, at *2 (S.D. Ohio Oct. 23, 2008) ("The participation of an independent mediator in settlement negotiations virtually [e]nsures that the negotiations were conducted at arm's length and without collusion between the parties."); *see also* p. 51, *supra* (noting cases which found that a mediator's involvement supported a finding of arm's-length negotiations); *In re CIGNA Corp. Sec. Litig.*, No. 02-8088, 2007 WL 2071898, at *3 (E.D. Pa. July 13, 2007) ("[I]t is clear that negotiations for the settlement occurred at arm's length, as the parties were assisted by a retired federal district judge.").

Mr. Kurdi guided the parties, represented by highly experienced counsel, through a mediation period of over 18 months.  As discussed above, pp. 17–19, this included not only exchanges between Plaintiffs as a group and the Defendant, but also separate negotiations between each of the two Subclasses and the Defendant, as well as negotiations between the two Subclasses themselves.  Among other things, the parties negotiated the contours of significant deal terms, explained their positions on litigation risks and Monsanto's ability to pay, and exchanged relevant background information.  Although professional, the discussions were at times contentious, and both sides often required Mr. Kurdi's input in order to resolve contested issues.  In the end, the parties arrived at an agreement in principle after hard-fought, arm's-length negotiations.  Ex. 4 (Kurdi Decl.) ¶ 7; Ex. 3 (Seeger Decl.) ¶ 16; Ex. 2 (Holland Decl.) ¶ 27.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

The Court therefore will likely be able to find that the negotiations of the Settlement satisfy the arm's-length standard.

## C.  The relief provided for the Class is adequate (Rule 52.08(e)(2)(C)).

The Court will also likely conclude that the relief provided by the Settlement for the Settlement Class is adequate.  In assessing that factor, Rule 52.08(e)(2)(C) instructs that the Court take into account: "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney[s'] fees, including timing of payment; and (iv) any agreement required to be identified under Rule 52.08(e)(3)."

As detailed below, the Court will likely be able to find that the relief is adequate, and that all four subfactors of Rule 52.08(e)(2)(C) weigh in favor of granting approval.

### 1.  The Settlement fund is sizable and provides meaningful compensation for Settlement Class Members (Rule 52.08(e)(2)(C)).

The Settlement establishes a massive Settlement Fund of $6.25 billion to $7.25 billion, as well as a $1 billion Security Fund.  For Settlement Class Members in Tier 1, the average Program Award is $165,000, while even for Settlement Class Members in Tier 9, who were diagnosed with NHL at age 78 or older, the average Program Award is $10,000. *See* Ex. 1 (Settlement Agreement) § 6.6.  Moreover, Settlement Class Members have the opportunity to recover even more:  up to more than $400 million is earmarked for providing, via the Extraordinary Circumstances Fund and the Extraordinary Residential Exposure Fund, additional compensation to Claimants with special circumstances.  *See*

53

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Ex. 1 (Settlement Agreement) §§ 6.12–6.13; *see also* Ex. 3 (Seeger Decl.) ¶ 27.  And while the Settlement Awards are not of the magnitude of the damages in the handful of cases litigated to verdict in which the plaintiffs were successful, they are infinitely greater than the cases litigated to verdict in which plaintiffs recovered nothing.  *See* Ex. 2 (Holland Decl.) ¶ 57.  Further, to receive an Award, Settlement Class Members are not required to prove that their NHL was caused by their Exposure to Roundup Products—thereby eliminating a central defense that Defendant has consistently raised to dispose of Roundup Claims in litigation.  Ex. 3 (Seeger Decl.) ¶ 24; pp. 55–56, *infra*.

Class Counsel is confident that the Settlement provides meaningful compensation to Settlement Class Members.  Ex. 2 (Holland Decl.) ¶ 57.  In comparison, only a relative handful of Settlement Class Members would realistically be able to get trial dates and recover anything through the litigation process for many years, if ever.  Compounding this risk, if the litigation continues unabated, Defendant may file for bankruptcy, leaving compensation of Settlement Class Members, especially future Claimants, even more uncertain.  *See* p. 16, *supra*.

### 2. The costs, risks, and delay of trial and appeal support the Settlement (Rule 52.08(e)(2)(C)(i)).

The significant challenges Settlement Class Members face should the litigation continue weigh in favor of preliminary approval, as the Court will likely be able to find that the costs, risks, and delay of trial and appeal support the Settlement.[25]  Whether

---

[25] *See Doyle* v. *Fluor Corp.*, 400 S.W.3d 316, 322 (Mo. App. E.D. 2013) (affirming approval of class settlement where "if the case were to proceed to trial, there was no guaranty that the Plaintiffs would succeed or recover as much as the settlement offered

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Settlement Class Members could effectively litigate their claims when faced with the numerous challenges summarized below was a significant consideration in Plaintiffs' agreement to the proposed Settlement.  Ex. 2 (Holland Decl.) ¶ 56; Ex. 3 (Seeger Decl.) ¶ 21.

**Uncertain Legal Outcomes**.  Were they to litigate their claims, Settlement Class Members would face a looming legal hurdle.  Their principal legal theory—state-law based failure-to-warn claims—faces significant risk of federal preemption.  On January 16, 2026, the U.S. Supreme Court granted Monsanto's petition for certiorari on this issue.  *Monsanto*, 607 U.S. __ (2026) (No. 24-1068, 2025 Term).  If the Supreme Court rules as the Solicitor General advises—namely, that federal law does preempt Roundup failure-to-warn claims under state law—it would bar plaintiffs' principal legal theory.  *See* pp. 16–17, *supra*.  And while plaintiffs may find other viable legal theories, such a substantial legal risk makes the certain relief provided by the Settlement all the more adequate.

Even putting preemption to one side, the track record of litigated claims has been mixed, with Monsanto having won a majority of cases tried to verdict, and recently trending towards more wins than losses.  *See* Ex. 2 (Holland Decl.) ¶ 56; Ex. 3 (Seeger

---

them"); *see also* Final Approval of the Settlement Agreement ¶ 21, *Trentham*, No. 18PH-CV00751 (in final approval order's discussion of benefits of settlement for purposes of award of attorneys' fees, finding "[h]ad the Settlement not been achieved, there would remain a significant risk that the Settlement Class may have recovered less or nothing from the Defendant, and that any recovery would have significantly been delayed" given "further lengthy proceedings and uncertain resolution of [complex] issues").

Decl.) ¶ 39.[26]  In particular, Class Counsel and Subclass Counsel took into consideration the challenges Settlement Class Members face in proving general and specific causation, *see* Ex. 2 (Holland Decl.) ¶ 56, Ex. 3 (Seeger Decl.) ¶ 21, which has been a key issue in Roundup trials plaintiffs have lost.[27]  In order to win at trial, each Settlement Class Member would have to prove that exposure to Monsanto-manufactured glyphosate was the legal cause of their injuries.  Class Counsel recognizes the risk this poses because whether exposure to glyphosate can cause NHL is a contested scientific question, and an individual's NHL may be attributed to other factors, including, for example, genetics. *See* Ex. 2 (Holland Decl.) ¶ 56.

**Delay of Payment**.  In the absence of a settlement, most Settlement Class Members face a near certainty of substantial delay before they can obtain any compensation, if ever.  As described above, p. 15, in the last 10 years, over 125,000 plaintiffs have filed Roundup Claims against Monsanto in 52,000 lawsuits, but only 24 of those lawsuits have been tried to a verdict, Ex. 1 (Settlement Agreement) at 1, and only a handful more have otherwise reached trial, Ex. 2 (Holland Decl.) ¶ 56.  While some individuals have resolved their Roundup Claims through other settlements, the number of individuals that have actually been able to try their Roundup Claims has been a small fraction of filed cases. *Id*.  As of

---

[26] Moreover, even when plaintiffs have won, their awards have been reduced at times by trial and appellate courts. *See* Ex. 3 (Seeger Decl.) ¶ 21.

[27] *See, e.g.*, *McCostlin* v. *Monsanto Co.*, 718 S.W.3d 435, 444 (Mo. App. E.D. 2025) (lack of specific causation); Verdict Form at p. 6, *Stephens* v. *Monsanto Co.*, CIVSB2104801 (Cal. Super. Ct. Dec. 9, 2021) (lack of general causation); Verdict Form ¶ 1, *Clark* v. *Monsanto Co*., No. 20STCV46616 (Cal. Super. Ct. Oct. 5, 2021) (finding plaintiff's exposure to Roundup was not a substantial factor in causing his cancer).

56

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

January 2026, there are approximately 200 plaintiffs who have a trial date for their Roundup Claims, more than a third of which are set for dates beyond this year. *Id.* Thus, only a tiny minority of Settlement Class Members will be able to try their Roundup Claims in the near future. To be clear, this delay is not due to a lack of diligence by Missouri or sister courts. Instead, court systems were simply not set up to process claims in the volumes involved here.

And Settlement Class Members' interests in receiving prompt compensation are real. Diagnosed individuals are living with cancer. The prospect of waiting many years for a day in court is a daunting one. *See* Ex. 3 (Seeger Decl.) ¶ 21. Indeed, for this very reason, Class Counsel negotiated for Exigency Awards, allowing Settlement Class Members who have a special need to receive payment prior to the Effective Date, and Quick-Pay Awards, allowing for accelerated payment with reduced documentation. *See* pp. 26–27, *supra*; Ex. 4 (Fouad Decl.) ¶ 16.

In addition, should litigation continue, Monsanto may file for bankruptcy, further impeding the adjudication of the Settlement Class Members' Roundup Claims and delaying potential payment for an indeterminate number of years, if ever. For example, Purdue Pharma L.P.'s bankruptcy took six years to reach a resolution, and payments to tort claimants have not yet begun, while subsidiaries of Johnson & Johnson, which hold all of its talc-related liability, have filed three separate times for bankruptcy over the past five years, and each time had their attempt at a reorganization plan rejected by a court.[28] This

---

[28] Purdue Pharma L.P., *Bankruptcy Court to Confirm Purdue Pharma's Plan of Reorganization* (Nov. 14, 2025), https://www.purduepharma.com/news/2025/11/14/

is not an idle concern.  As mentioned above, there has been recent press discussion of a potential Monsanto bankruptcy.  *See* Ex. 2 (Holland Decl.) ¶¶ 60–61; Ex. 3 (Seeger Decl.) ¶ 40; *see also* p. 16, *supra*.  Indeed, Monsanto's ability-to-pay was a topic during negotiations and is specifically addressed in the Settlement Agreement via the $1 billion Security Fund.  *See* Ex. 1 (Settlement Agreement) § 4.6; *see also* p. 49, *supra*.

Thus, this factor counsels in favor of preliminary approval of the Settlement.  *See* Final Approval Order ¶ 4, *M.W.* v. *St. Louis Univ.*, No. 2422-CC00888 (Mo. Cir. Ct. June 26, 2025) (noting "the complexity, expense, risks and probable protracted duration of further litigation" in approving settlement); *see also In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 175 (S.D.N.Y. 2014) ("Courts consistently recognize that the complexity, expense, and likely duration of litigation are critical factors in evaluating the reasonableness of a settlement.").

In sum, the benefits of the Settlement weighed against the merits of the Settlement Class Members' claims, as well as the uncertainty, complexity, and delay of further litigation, support preliminary approval.

---

bankruptcy-court-to-confirm-purdue-pharmas-plan-of-reorganization/; Reuters, *US Judge Rejects J&J's $10 Billion Baby Powder Settlement* (Apr. 1, 2025), https://www .reuters.com/sustainability/boards-policy-regulation/us-judge-rejects-jjs-10-billion-baby-powder-settlement-2025-04-01/; Reuters, *J&J Effort to Resolve Talc Lawsuits in Bankruptcy Fails a Second Time* (July 28, 2023), https://www.reuters.com/legal/jj-effort-resolve-talc-lawsuits-bankruptcy-fails-second-time-2023-07-28/.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

**3.      The effectiveness of any proposed method of distributing relief to the Class, including the method of processing Class-member claims, also supports the Settlement (Rule 52.08(e)(2)(C)(ii)).**

The proposed method for distributing relief to the Settlement Class also weighs in favor of preliminary approval. The Settlement proposes an effective distribution method, comparable to other large mass-tort settlements. *See NFL*, 821 F.3d at 424 (approving a class settlement which included a tiered system tied to diagnoses as a method to distribute awards); *Deepwater Horizon*, 295 F.R.D. at 121 (approving class settlement with compensation based on a matrix); *In re Diet Drugs*, 2000 WL 1222042, at *20–21 (same).

The process to participate in the Claims Program is simple and straightforward. Ex. 1 (Settlement Agreement) § 6.1. In addition, the application materials that Settlement Class Members must provide in connection with their Claim Packages and Quick-Pay Claim Packages are materials that the Administrator and Allocation Special Master will need in order to properly place them in a Tier and determine the amount of their Award. *Id.* §§ 6.3, 6.6; *see also* pp. 27–28, *supra*.

The Settlement provides for orderly claims processing that accounts for objective factors relevant to the strength of the Claimant's claim, *e.g.*, the nature and extent of the Claimant's Exposure to Roundup Products (occupational or residential), whether the NHL is Aggressive ("fast growing") or Indolent ("slow growing"), and the Claimant's age at the time of NHL diagnosis. Ex. 2 (Holland Decl.) ¶¶ 58–59; Ex. 1 (Settlement Agreement) §§ 6.6, 6.10–6.11. Following the determination of an Award, the Settlement Class Member is promptly notified of the amount of their Award and their right to request reconsideration. *Id.* § 6.15. And that notice is followed by prompt payment. *Id.* § 6.16.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Moreover, the Administrator and the Allocation Special Master here have significant experience in administering and processing claims for large-scale mass-tort settlements.  In fact, they had the opportunity to provide feedback on the process during finalization of the Settlement Agreement to ensure it functioned as designed and served the best interests of the Settlement Class.  Ex. 2 (Holland Decl.) ¶ 78; *see also* pp. 31–32, *supra*.

**4.     The terms of any proposed award of attorneys' fees, including timing of payment, further support the Settlement (Rule 52.08(e)(2)(C)(iii)).**

The Settlement Agreement leaves the amount of the attorneys' fees awarded to the Court's discretion and does not provide for a specific percentage fee.  Ex. 1 (Settlement Agreement) § 15.1.  Class Counsel will make an application for fees and costs before the Fairness Hearing.  *See id.* § 14.3.  The size of the award requested is expected to be within the percentage range of other class-action settlements, in particular mass-tort settlements, given the significant work required both in connection with the underlying litigation, and in negotiating an appropriate settlement agreement.  Ex. 2 (Holland Decl.) ¶ 73.  Further, the Court has discretion to award a portion of the attorneys' fees to counsel other than Class Counsel who apply to the Court following Final Court Approval.  Ex. 1 (Settlement Agreement) § 15.2.  Because the Court is empowered to fashion the award as appropriate, this factor weighs in favor of preliminary approval of the Settlement.

In addition, the Settlement terms governing attorneys' fees have features that are protective of Settlement Class Members' interests.  For instance, Settlement Class Members will have an opportunity to object to the requested attorneys' fees before the

Court rules. *See* Preliminary Approval Order ¶ 58; *see Holt* v. *CommunityAmerica Credit Union*, No. 4:19-CV-00629-FJG, 2020 WL 12604383, at *2 (W.D. Mo. Sept. 4, 2020) (granting preliminary approval of settlement in which "motion for attorneys' fees will be made prior to [c]lass [m]embers' deadlines to object to or exclude themselves from the [s]ettlement.").[29]

Furthermore, to ensure the benefits obtained for Settlement Class Members are not undermined by any issue respecting fees, the Settlement Agreement provides that any order or proceeding solely relating to attorneys' fees shall not terminate or otherwise affect or delay the finality of the Final Order and Judgment. Ex. 1 (Settlement Agreement) § 15.8. Courts look approvingly at similar provisions which make clear that a settlement is not conditional on the fee award. *See, e.g.*, *In re Resideo Techs., Inc., Sec. Litig.*, No. 19-CV-2863 (WMW/BRT), 2022 WL 872909, at *3 (D. Minn. Mar. 24, 2022). In addition, the Settlement provides that attorneys' fees will be paid over several years. Ex. 1 (Settlement Agreement) § 15.5.[30] Finally, that the award of attorneys' fees shall be paid from the

---

[29] *See also* Final Approval Order and Judgment ¶ 7, *Parisot* v. *U.S. Title Guar. Co.*, No. 0822-CC09381 (Mo. Cir. Ct. Dec. 17, 2010) ("The Court has determined that full opportunity has been given to the Class Members to . . . object to . . . Class Counsel's request for attorneys' fees and expenses, and otherwise participate in the Final Approval Hearing."); *Thomas* v. *City of St. Ann*, No. 4:16-CV-1302-SEP, 2024 WL 982292, at *2 (E.D. Mo. Mar. 7, 2024) (weighing in favor of approval the fact that there were "no objections by Class Members to the amount of attorneys' fees").

[30] *See* Final Approval of the Settlement Agreement ¶ 20, *Trentham*, No. 18PH-CV00751 (awarding class counsel fees to be paid out over five years); *Erguera* v. *CMG CIT Acquisition, LLC*, No. 1:20-CV-01744-JLT-CDB, 2022 WL 16804837, at *10 (E.D. Cal. Nov. 8, 2022) ("Class Counsel will receive payment in the same period of time as class members."); *see also Beltran* v. *Olam Spices & Vegetables, Inc.*, No. 1:18-CV-1676 JLT SAB, 2023 WL 5817577, at *12 (E.D. Cal. Sept. 8, 2023) (same).

61

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Settlement Fund does not counsel against the fairness of the Settlement.  *See* Final Approval Order ¶ 22, *M.W.*, No. 2422-CC00888 (granting approval of a settlement where the attorneys' fees would be paid from the settlement fund).

In sum, the terms governing attorneys' fees align with prior approved settlements and the Court will likely be able to conclude that this factor weighs in favor of Settlement approval here.

**5.      No agreement required to be identified under Rule 52.08(e)(3) weighs against the Settlement (Rule 52.08(e)(2)(C)(iv)).**

The Rules also require consideration of "any agreement required to be identified under Rule 52.08(e)(3)," Rule 52.08(e)(2)(C)(iv), which covers "any agreement made in connection with the proposal," *id*. at 52.08(e)(3).  The federal counterpart to this provision, Rule 23(e)(2)(C)(iv) of the Federal Rules of Civil Procedure, is aimed at revealing "undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others," namely, the representative plaintiffs or their attorneys.  Fed. R. Civ. P. 23 Advisory Committee's note to 2003 amendment.

Here, there are no agreements made in connection with the Settlement proposal that need to be identified.  *See* Rule 52.08(e)(2)(C)(iv).  For the avoidance of doubt, however, Plaintiffs note that the Settlement Agreement contains what is known as a "blow provision"—a provision giving Monsanto the option to terminate the Settlement if Opt Outs exceed a specified level.  Ex. 1 (Settlement Agreement) § 12.5.  While the parties do not believe that Rule 52.08(e)(3)'s reference to an "agreement made in connection with the

[settlement] proposal" is meant to encompass the blow provision, which is part of the Settlement Agreement itself, to the extent it can be viewed as falling within the ambit of the Rule, courts have previously found that such "[b]low up provisions are regularly permitted." *Hasemann* v. *Gerber Prods. Co.*, No. 15-CV-2995 (EK)(JAM), 2025 WL 2979545, at *8 (E.D.N.Y. May 2, 2025).[31] This is because such provisions encourage settlement by ensuring defendants are not deprived of the value of finality via a settlement through a large number of opt outs. *See In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 164 F.R.D. 362, 365–66, *aff'd sub nom.*, *In re Prudential Sec. Inc. Ltd. P'ship Litig.*, 107 F.3d 3 (2d Cir. 1996). "Given the specific function of" the blow provision, the Court will likely be able to find that "it does not appear to bear upon the overall fairness of the [S]ettlement [A]greement itself . . . because 'in the event that Defendant['s] termination right is activated, and that Defendant[ ] exercise[s] such right, Plaintiffs would be still be [*sic*] in a position to pursue relief through litigation.'" *See In re PPDAI Grp. Inc. Sec. Litig.*, No. 18-CV-6716 (TAM), 2022 WL 198491, at *13 (E.D.N.Y. Jan. 21, 2022).

Plaintiffs, in a forthcoming motion to seal, will request that the Settlement Agreement Exhibit containing the precise Opt Out threshold referred to in the blow provision be filed under seal. *See* Ex. 1 (Settlement Agreement) § 12.5, Ex. I (Termination Right). This is because the blow-provision threshold "has no legitimate bearing on a class member's decision to opt-out of the settlement, object, or file a claims form"—rather,

---

[31] *See also Probst* v. *Eli Lilly & Co.*, No. 1:22-CV-01986-MKK-SEB, 2023 WL 11051728, at *4 (S.D. Ind. Nov. 21, 2023) (noting blow provisions "do not prevent a barrier to approval"); *In re N. Dynasty Mins. Ltd. Sec. Litig.*, No. 20-CV-5917 (TAM), 2023 WL 5511513, at *9 (E.D.N.Y. Aug. 24, 2023) (same).

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

"[s]ealing this provision will encourage settlement." *Burch* v. *Qwest Corp.*, No. 06-CV-3523-MJD/AJB, 2012 WL 12978329, at *1 (D. Minn. June 6, 2012). Indeed, disclosing the blow provision could encourage gamesmanship and undermine the Settlement. Thus, the opt-out threshold "is typically not disclosed and is kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out." *In re HealthSouth Corp. Sec. Litig.*, No. 07-11908, 334 F. App'x 248, 250 n.4 (11th Cir. 2009). Therefore, there is a "compelling justification" to keep the Exhibit under seal. Mo. S. Ct. R. 55.0275(b) (effective July 1, 2026).

\* \* \*

Thus, taking into account all of the benefits provided by the Settlement, preliminary approval is warranted because the Court will likely be able to conclude that all four subfactors of Rule 52.08(e)(2)(C) weigh in favor of approving the Settlement.

**D.     The Settlement treats class members equitably relative to each other (Rule 52.08(e)(2)(D)).**

The Court likely will also be able to determine that the Settlement treats class members equitably relative to each other. Settlement Class Members are compensated according to a fair, transparent, and administrable Tier and scoring system, with any additional compensation from the Extraordinary Circumstances Fund or the Extraordinary Residential Exposure Fund also awarded according to objective criteria. *See* Ex. 1 (Settlement Agreement) §§ 6.6, 6.10, 6.12–6.13. The Award system here is based on Class Counsel's experience litigating and resolving Roundup Claims. Ex. 2 (Holland Decl.) ¶ 56; *see also* Ex. 3 (Seeger Decl.) ¶¶ 10, 12.

Compensation funds are typical structures for mass-tort settlements, and the fact that Settlement Class Members may receive differing payments according to whether they meet specified criteria does not render their treatment inequitable. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, Civ. No. 2:23-cv-3147-RMG, 2024 WL 1341122, at *12 (noting use of "objective criteria"); Fed. R. Civ. P. 23(e)(2)(D) advisory committee's note to 2018 amendments (noting that "[m]atters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims"); *see also Petrovic* v. *Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999) ("[A]lmost every settlement will involve different awards for various class members."); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 239 (S.D. W.Va. 2005) ("By nature of the settlement, the parties have negotiated values to assign to claims based on the severity of physical injury. [The Court] do[es] not consider the assignment of a lower value to claims where injuries are less serious to be evidence of conflict.").

Specifically, all Settlement Class Members are treated similarly in that the amount of their Awards is tied directly to evaluation of objective factors in respect to their claims and their circumstances.[32] The Tier system provides higher Program Awards to Claimants

---

[32] Class Counsel may also apply for service awards for the Class Representatives, the application for which shall be filed not less than 20 business days before the deadline for objections. Ex. 1 (Settlement Agreement) § 14.3. The amount of any such service award shall be in the discretion of the Court. *Id.* at § 15.1. Courts routinely approve service awards for class representatives and do not find them inequitable. *See, e.g.*, *Caligiuri* v. *Symantec Corp.*, 855 F.3d 860, 867 (8th Cir. 2017) ("Courts often grant service awards to named plaintiffs in class action suits to promote the public policy of encouraging individuals to undertake the responsibility of representative lawsuits.").

with higher dollar value claims, and lower Awards to those with lesser dollar value claims. *See* Ex. 2 (Holland Decl.) ¶¶ 50, 52–54; Ex. 3 (Seeger Decl.) ¶¶ 25–27; pp. 23–26, *supra*.

Similarly situated Claimants, *i.e.*, those within the same Tier, are treated equitably relative to each other because there is a Tier Average that must be adhered to and bands of compensation around the average that cannot be exceeded. *See* Ex. 1 (Settlement Agreement) §§ 6.6, 6.10. In addition, within that band of compensation, the Allocation Special Master will take into account objective factors relevant to the Settlement Class Members' circumstances, and the Settlement instructs him to "take reasonable steps to ensure that substantially similar Claimants receive substantially similar Program Awards." *Id.* § 6.10(a)–(b). The Settlement also provides for Awards to and release of claims by Derivative Claimants, whose claims derive from their relationship with a Settlement Class Member that was Exposed. *See* p. 25 n.12, *supra*. Such derivative claims are routinely resolved in mass-tort settlements. *See NFL*, 821 F.3d at 425, 448 (affirming settlement that included derivative claimants); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 227 F.R.D. 553, 556–57 (W.D. Wash. 2004) (approving same).

The Settlement Agreement also ensures members of Subclass 2 are treated equitably with members of Subclass 1. This is accomplished through the fact that the Tier Averages and Tier criteria, along with other Award criteria, remain constant over time (with Tier Averages adjusted for inflation). As a result, similarly situated future Claimants will be treated the same as current Claimants. *See* pp. 23–26, *supra*; Ex. 2 (Holland Decl.) ¶ 53. So too with the funding provisions of the Agreement, which benefit future Claimants by

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

"protect[ing] against fund depletion" during the settlement period. *In re Diet Drugs*, 2000 WL 1222042, at \*49. *See* pp. 47–50, *supra* (detailing protections for future Claimants).

In addition, the Settlement provides an exit right that is unique to future Claimants: once diagnosed, they may apply for a Program Award and choose to reject that Award in order to pursue compensatory damages in the tort system. Ex. 1 (Settlement Agreement) §§ 6.17, 8.1; *see also* p. 33, *supra*. It is equitable to provide this exit right only to future Claimants as they must make the decision whether to Opt Out prior to receiving a diagnosis, unlike current Claimants. *See* Point III.B, *infra*. While those who choose to exercise their exit rights under the Settlement do not regain the right to bring Roundup Claims for Punitive Damages, *see* Ex. 1 (Settlement Agreement) § 8.2, this does not suggest inequity, inadequate representation, or notice or fairness issues. Rather, the waiver of Punitive Damages reflects a "fair and wholly appropriate trade-off" during the negotiating process. *In re Diet Drugs*, 2000 WL 1222042, at \*49 n.22 (approving a waiver of punitive damages on back-end exit rights); *see also Deepwater Horizon*, 295 F.R.D. at 125, 155 (same).

Finally, Claimants who have already filed or tolled Roundup Claims as of February 13, 2026 receive priority in the Award payment timeline. Ex. 1 (Settlement Agreement) §§ 6.5(a), 6.11. The structure is equitable given that such Claimants have articulated claims but have already been waiting for compensation, in some cases for many years. *See* Ex. 4 (Kurdi Decl.) ¶ 16.

\*          \*          \*

In sum, weighing the Settlement against the factors listed in Rule 52.08(e)(2), the Class Representatives and each of Class Counsel have adequately represented the Class

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

and Subclasses; the parties agreed to the Settlement after hard-fought and arm's-length negotiations before a mediator; the risks, costs, and delay of trial would be significant, especially as compared to the certain Settlement consideration; the proposed method for distributing relief to the Settlement Class is effective, and comparable to other large mass-tort settlements; the allocation of attorneys' fees counsel in favor of the Settlement; Monsanto's termination right based on excessive Opt Outs is typical; and finally, Settlement Class Members are compensated according to standard and objective criteria and treated equitably relative to each other.  As a result, the Court will likely be able to approve the Settlement as fair, reasonable, and adequate following notice to the Class and Subclasses and the final Fairness Hearing.

## II.    THE COURT WILL LIKELY BE ABLE TO CERTIFY THE SETTLEMENT CLASS AND SUBCLASSES FOR SETTLEMENT PURPOSES.

To preliminarily approve the Settlement, the Court also must conclude that it will likely be able to certify the Settlement Class and Subclasses for settlement purposes.

The Court can comfortably conclude at this preliminary stage that it will be likely to certify the Settlement Class because the Settlement Class meets the requirements of Rules 52.08(a) and 52.08(b)(3) and is ascertainable.  Rule 52.08(a) requires that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  In addition, Rule 52.08(b)(3) requires that "questions of law or fact common to class members predominate over any

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

Further, the Court is granted broad discretion in making the certification determination. *See Doyle*, 400 S.W.3d at 321. And where the requirements for class certification are met, Missouri courts have the authority to certify a nationwide class. *See Phillips Petrol. Co.* v. *Shutts*, 472 U.S. 797, 811–12 (1985); *State ex rel. McKeage* v. *Cordonnier*, 357 S.W.3d 597, 601 (Mo. banc 2012).

Here, as detailed below, the Court will likely be able to find that the Settlement Class and Subclasses can be certified for settlement purposes.

### A.    Numerosity (Rule 52.08(a)(1))

The Court is likely to be able to find that the Settlement Class satisfies the numerosity requirement. Numerosity "does not require that joinder of all the members of a class be impossible, only that it be impracticable." *Dale*, 204 S.W.3d at 167. "A plaintiff does not have to specify an exact number of class members to satisfy the numerosity prerequisite for class certification, but must show only that joinder is impracticable through some evidence or reasonable, good faith estimate of the number of purported class members." *Elsea*, 463 S.W.3d at 418 (emphasis omitted). Numerosity may be a "common sense" determination. *Dale*, 204 S.W.3d at 167.

The Settlement Class is nationwide, consisting of everyone who has been Exposed to Roundup Products prior to the Settlement Date and their Derivative Claimants, with specified exclusions. Ex. 1 (Settlement Agreement) §§ 2(a)–(b). Proposed Class Counsel is counsel to over 10,000 such individuals. Ex. 3 (Seeger Decl.) ¶ 10. Tens of thousands

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

of individuals have pending or tolled Roundup Claims.  Ex. 2 (Holland Decl.) ¶ 56.  Given the widespread sale of Roundup Products and the latency period of NHL, many more claims are expected in the future.  *Id.* ¶ 47.  Numerosity will clearly be satisfied.  *See, e.g.*, *Doyle* v. *Fluor Corp.*, 199 S.W.3d 784, 792 (Mo. App. E.D. 2006) (400 class members or even fewer satisfies numerosity).

### B.      Commonality (Rule 52.08(a)(2))

The Court will also likely be able to find that the commonality requirement is satisfied.  Commonality requires only that there be "questions of law or fact common to the class."  Mo. S. Ct. R. 52.08(a)(2).  Commonality can be found even if there are "numerous remaining individual questions," *Meyer ex rel. Coplin* v. *Fluor Corp.*, 220 S.W.3d 712, 716 (Mo. banc 2007), as the significance of individual issues relative to common issues typically goes to the separate "predominance" inquiry, *see* Point II.E, *infra*.  A common question means that "the same evidence will suffice for each [class] member to make a prima facie showing as to a given question." *Karen S. Little, L.L.C.* v. *Drury Inns, Inc.*, 306 S.W.3d 577, 581 (Mo. App. E.D. 2010).  Further, a common question of fact is demonstrated "if the class members' claims derive from a common nucleus of operative facts." *Hopkins* v. *Kan. Teachers Cmty. Credit Union*, 265 F.R.D. 483, 487 (W.D. Mo. 2010).

Here, there are common questions of law and fact.  Settlement Class Members have been Exposed to the same product:  Monsanto-manufactured glyphosate.  Ex. 2 (Holland Decl.) ¶ 11.  And Settlement Class Members' claims relate to the same disease:  NHL.  *Id.* ¶ 47.  At core, the claims of Settlement Class Members arise from the same common

70

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

nucleus of operative facts:  the manufacture and sale of Monsanto-manufactured glyphosate and Exposure to Roundup Products.  Further, in litigation Settlement Class Members would have to establish general causation, that glyphosate can in fact cause NHL. The same type of expert testimony would be required for all Settlement Class Members to make a prima facie showing on general causation, and the same legal question would arise with respect to whether the testimony sufficed to make such a showing.  While individual circumstances (for example, the nature and extent of Exposure) may differ, these "individual questions" do not override commonality.  *Meyer ex rel. Coplin*, 220 S.W.3d at 716.  Any "individual questions" remaining, including variations in state tort law, do not undermine certification, especially in a settlement context.  *See* Point II.E, *infra*.

### C.    Typicality (Rule 52.08(a)(3))

The Court is likely to be able to find the typicality requirement satisfied as well. Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Mo. S. Ct. R. 52.08(a)(3).  "Typicality means that the class members share the same interest and suffer the same injury" as the class representatives.  *Hale* v. *Wal-Mart Stores, Inc.*, 231 S.W.3d 215, 223 (Mo. App. W.D. 2007).  It is satisfied where all claims "arise[ ] from the same event or course of conduct of the defendant," even if there are "individual variances in the underlying" claims.  *Elsea*, 463 S.W.3d at 420.  While commonality asks whether class members have common claims, typicality asks whether the class representatives share those common claims.  Thus, "[t]he typicality requirement tends to merge with the commonality requirement."  *Id.*

71

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

The Court will likely be able to conclude that Plaintiffs share claims that are common to the Settlement Class, and those claims are typical of the Settlement Class Members they represent.  As detailed in Point I.A, *supra*, Mr. King, Mr. Butterfield, and Mr. Waldman (proposed representatives of Subclass 1) and Mr. Merx and Mr. Koehler (proposed representatives of Subclass 2) share common claims with members of their respective Subclass.  They all have sued Monsanto seeking redress for their injuries.  Petition § VII.b.  In particular, Mr. King, Mr. Butterfield, and Mr. Waldman have sued Monsanto seeking compensation for their NHL, and Mr. Merx and Mr. Koehler have sued seeking compensation including the costs of reasonably necessary diagnostic testing.  *See id.*  If Mr. Merx and Mr. Koehler are diagnosed with NHL in the future, they will seek an Award under the Settlement.  Ex. 2 (Holland Decl.) ¶ 47.

All of the Subclass Representatives seek to hold the Defendant liable for injuries arising from the same course of conduct:  the manufacture and sale of glyphosate by Monsanto to which the Subclass Representatives were subsequently Exposed.  Further, their claims all relate to the same disease caused by Exposure to Roundup Products, NHL, whether diagnosed now or in the future.  Just as with the commonality analysis, "individual variances" do not undermine typicality.  *Elsea*, 463 S.W.3d at 420.

**D.    Adequacy of representation (Rule 52.08(a)(4))**

"[A]bsent class members [must] be fairly and adequately represented" by class representatives and class counsel.  *Elsea*, 463 S.W.3d at 420 (quoting *Dale*, 204 S.W.3d at 172).  As discussed in Points I.A–B, *supra*, representation has been more than adequate, and negotiations have been hard fought, making it likely that the Court will be able to find

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

that this factor is satisfied as well.  Ex. 3 (Seeger Decl.) ¶¶ 13, 16; Ex. 2 (Holland Decl.) ¶¶ 28, 43.

**E.       Predominance and superiority (Rule 52.08(b)(3))**

The Court will also likely be able to find the Settlement Class meets the "predominance" and "superiority" requirements.  Rule 52.08(b)(3) requires that questions common to the class "predominate over any questions affecting only individual members" and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  In evaluating these factors, the Court must consider "(A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Typically, the first three factors go to the superiority inquiry, and the fourth factor goes to the predominance inquiry.

**Predominance**.  Predominance requires that individual issues are outweighed in the balance by the common ones.  *State ex rel. McKeage*, 357 S.W.3d at 600.  The predominance requirement "does not demand that every single issue in the case be common to all the class members, but only that there are substantial common issues which predominate over the individual issues."  *Hale*, 231 S.W.3d at 224.  Indeed, "[a] single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions."  *Id*. at 224–25.  "The fundamental question is whether the group aspiring to class status is seeking to remedy a common legal

grievance." *Smith* v. *Leif Johnson Ford, Inc.*, 632 S.W.3d 798, 808 (Mo. App. E.D. 2021). *See also NFL*, 301 F.R.D. at 201 (the federal equivalent "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation") (quoting *Amchem*, 521 U.S. at 624).

Moreover, the fourth factor listed in Rule 52.08(b)(3), "the likely difficulties in managing a class action," which courts consider in assessing predominance and which courts typically focus on when certifying litigation classes, is inapplicable here. As the U.S. Supreme Court has explained, "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems." *Amchem*, 521 U.S. at 620. *See also State ex rel. Byrd*, 956 S.W.2d at 377 ("[T]he requirements for certification may be easier to meet in the settlement context."). Accordingly, courts have regularly found the predominance requirement met for settlement classes even in cases where it would not be met for litigation.[33]

Here, given the settlement context and numerous questions of law and fact common across the Settlement Class, *see* Point II.B, *supra*, the Court is likely to be able to find predominance satisfied. In particular, questions regarding whether exposure to glyphosate

---

[33] *See, e.g.*, *Keil* v. *Lopez*, 862 F.3d 685, 695 (8th Cir. 2017) (approving a class settlement while noting that "it is uncertain whether, if the case proceeded to trial, this multistate class of consumers would have created 'intractable management problems' requiring the district court to decertify it"); *Jabbari* v. *Farmer*, 965 F.3d 1001, 1006–07 (9th Cir. 2020) (noting that "[t]he criteria for class certification are applied differently in litigation classes and settlement classes," and therefore, "predominance is easier to satisfy in the settlement context") (alteration in original).

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

can cause NHL and what evidence suffices to establish that causation are "common issues[s]. . . overriding . . . in the litigation." *Hale*, 231 S.W.3d at 224.  Indeed, there are "predominate factual questions regarding [Defendant's] knowledge and conduct as well as common scientific questions regarding causation." *See NFL*, 821 F.3d at 434; *see also In re Diet Drugs*, 2000 WL 1222042 at *43, 55.  Moreover, variations in state tort laws do not destroy predominance, given the settlement context.  *See id.* (noting that "differences in state [tort] law . . . do not destroy class cohesion" in the settlement context); *Jabbari*, 965 F.3d at 1007 ("For purposes of a settlement class, differences in state law do not necessarily, or even often, make a class unmanageable."); *Sullivan* v. *DB Invs., Inc.*, 667 F.3d 273, 303 (3d Cir. 2011).  In addition, "individual issues relating to causation, injury and damage also disappear" where the class settlement provides for an "objective scheme of compensation" based on "objective criteria" and gives each class member a choice whether to participate in the compensation with sufficient notice of what it is.  *In re Diet Drugs*, 2000 WL 1222042 at *43.  Here, the Settlement is structured to do just that.  *See* pp. 23–26, 32–33, *supra* and p. 81, *infra*.

**Superiority**.  Superiority requires that a class action is "superior to other available methods for the fair and efficient adjudication of the particular controversy in question." *Dale*, 204 S.W.3d at 181.  In general, class actions are considered to provide "an economical means for disposing of similar lawsuits while simultaneously protecting defendants from inconsistent obligations and the due process rights of absentee class members." *State ex rel. McKeage*, 357 S.W.3d at 601; *Karen S. Little, L.L.C.*, 306 S.W.3d at 583.

75

Here, the interest of proposed Settlement Class Members in individually controlling litigation, the extent of such litigation already commenced, and the concentration of litigation in the Missouri courts all weigh in favor of concluding that the Court is likely to find the requirement of superiority satisfied as to this Settlement Class.  *See* Mo. S. Ct. R. 52.08(b)(3)(A)–(C).  Given the enormous volume of Roundup Claims, any interest in individually controlling litigation is outweighed by the significant delay faced in reaching trial.  *See Dale*, 204 S.W.3d at 181–83 (weighing "efficiency" in assessing a class action compared to individual litigation); *In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-0725-CV-WODS, 2007 WL 927745, *7 (W.D. Mo. Mar. 26, 2007) (finding class action superior to individual prosecution because it would be "more efficient for [both] the parties and the judiciary").

Considerations of judicial economy and prompt resolution of claims underscore the superiority of the class action in this case.  Settlement Class Members' claims might not be viable at all if the Supreme Court holds that they are preempted, and if those that are not preempted were litigated individually, the parties could face decades of litigation.  Ex. 2 (Holland Decl.) ¶ 56.  By contrast, a class-action settlement here allows Plaintiffs to aggregate their claims to secure maximum benefits from the Defendant.

**F.     Ascertainability (Implied Requirement)**

Ascertainability is generally considered an implied requirement of class certification in Missouri.  *Craft*, 190 S.W.3d at 387.[34]  Here, the Settlement Class is ascertainable and

---

[34] Missouri courts have not expressly addressed the application of this requirement in the context of a settlement class, as opposed to a litigation class.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

"capable of legal definition." *Id.* Class membership is defined based on objective criteria, principally Exposure to Roundup Products prior to the Settlement Date. Ex. 1 (Settlement Agreement) § 2.1. And individuals Exposed to Roundup Products must also have reason to be aware of their Exposure in order to be included in the Settlement Class. *See* pp. 20–21, *supra*. Similarly, an individual will know whether or not they have been diagnosed with NHL, the factor delineating Subclass 1 and Subclass 2. It is therefore "administratively feasible to determine whether a given individual is a member of the class." *Craft*, 190 S.W.3d at 387.

\*      \*      \*

As the Court at this juncture need only consider whether it is *likely* that the Court will be able to certify the Settlement Class and Subclasses pursuant to Missouri Rule 52.08, the Settlement Class easily meets that standard.

## III. THE PROPOSED FORM AND METHOD OF CLASS NOTICE IS THE BEST PRACTICABLE NOTICE.

Under Missouri Rule 52.08(e)(1), if the Court determines it will likely be able to approve the Settlement and certify the Settlement Class, the Court must "direct notice in a reasonable manner to all class members who would be bound by the proposal." Settlement Class Members must receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Mo. S. Ct. R. 52.08(c)(2)(B).

Rule 52.08(c)(2)(B) provides that the "notice shall clearly and concisely state in plain, easily understood language:  (i) the nature of the action; (ii) the definition of the class

certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 52.08(c)(3)."

Rule 52.08(c)(2)(B)'s directive that the Court order the best notice practicable echoes and implements the requirements of due process. Federal due process requires that the "best practicable" notice be provided, which must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Phillips Petrol. Co.*, 472 U.S. at 812 (quoting *Mullane* v. *Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314–15 (1950)). The notice must also "describe the action and the plaintiffs' rights in it." *Id*. Missouri due process "parallels" its federal counterpart. *State ex rel. Houska* v. *Dickhaner*, 323 S.W.3d 29, 33 n.4 (Mo. banc 2010).

**A.** **The proposed Settlement Class Notice and Settlement Class Notice Plan satisfy Rule 52.08 as well as Missouri and federal constitutional requirements.**

The form and content of the Settlement Class Notice satisfy all requirements of Missouri and federal law. *See* Ex. 5 (Wheatman Decl.) at Ex. C (Detailed Notice). The Settlement Class Notice Plan provides for both a robust initial notice campaign and extensive ongoing annual notice campaigns. *See* pp. 34–37, *supra*. In crafting the Settlement Class Notice and the Settlement Class Notice Plan, both Class Counsel and the proposed Settlement Class Notice Agent, Signal Interactive Media, drew on their extensive

78

experience, including in creating many notice plans approved by other courts. *See* Ex. 5 (Wheatman Decl.) ¶¶ 3, 10–11; Ex. 2 (Holland Decl.) ¶ 83; Ex. 3 (Seeger Decl.) ¶ 43. Indeed, Dr. Wheatman, while serving with the Federal Judicial Center, played an integral role in the development of model forms of notice designed to satisfy the plain language requirements of Federal Rule of Civil Procedure 23(c)(2)—the federal equivalent of Missouri Rule 23(c)(2). Ex. 5 (Wheatman Decl.) ¶ 15. Here, she has leveraged her experience to develop a Settlement Class Notice that clearly communicates the rights of Settlement Class Members under the proposed Settlement.

The comprehensive Settlement Class Notice Plan readily satisfies the requirements of Rule 52.08 and due process. The Settlement Class Notice is written in plain and straightforward language, and at a 9th-grade reading level. Ex. 5 (Wheatman Decl.) ¶¶ 146, 152. It has been designed to, and will communicate, the terms of the Settlement in language "understood by the average absentee class member." *State ex rel. Byrd*, 956 S.W.2d at 385; Ex. 5 (Wheatman Decl.) ¶¶ 146–49.

In addition, the Settlement Class Notice Plan's media strategy is carefully tailored to the demographics of the Settlement, which encompass different types of Roundup users (*i.e.*, Occupational Claimants and Residential Claimants), with targeted outreach designed to reach each population through the media they are most likely to consume. *Id.* ¶¶ 20–23. In particular, the Settlement Class Notice Plan was designed based on comprehensive demographic research and designed to reach the populations most affected by this Settlement, accounting for a diverse set of characteristics and geographic locations. *See* Ex. 5 (Wheatman Decl.) ¶¶ 18–22, 30, 45–47.

79

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

It includes direct mail to thousands of individuals and organizations that include known and potential Settlement Class Members, and an extensive multi-lingual advertisement campaign. *Id.* ¶¶ 47–48, 52–54. While it may not be possible to direct mail a postcard to every Settlement Class Member, the Settlement Class Notice Plan is designed, based on extensive demographic research, to facilitate the best practicable notice here.[35] Indeed, the Settlement Class Notice Plan as designed will reach an estimated 95 percent of adults over the age of 50 and 83.5 percent of adults over the age of 18. *Id.* ¶ 83.[36] This reach is comparable to other nationwide mass-tort notice programs. *Id.* ¶ 84. Due process does not require that every class member receive actual notice. *See In re Prudential*, 164 F.R.D. at 368 ("It is widely recognized that for the due process standard to be met it is not necessary that every class member receive actual notice, so long as class counsel acted reasonably in selecting means likely to inform persons affected."); *In re Heartland Payment Sys, Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1061 (S.D. Tex. 2012) (notice plan estimated to reach 81.4 percent of class was sufficient); *In re Lupron Mktg. and Sales Pracs. Litig.*, 228 F.R.D. 75, 96 (D. Mass. 2005) (notice plan predicted to reach 80 percent of class was sufficient). Rather, it requires the best

---

[35] *See, e.g.*, Final Approval Order and Judgment ¶ 5, *Parisot*, No. 0822-CC0938 (approving settlement when, among other things, "notice was provided via direct mail and was widely publicized" and "was posted on a dedicated website created by the Settlement Administrator"); Order Prelim. Approving Class Settlement, Approving Class Notice, and Scheduling Fairness Hearing ¶ 8, *Trentham*, No. 18PH-CV00751 (preliminarily approving settlement agreement providing for settlement website and publication of notice in both digital and print media).

[36] The reach may be even greater; these figures do not account for unmeasured components of the notice program including on-the-ground and third-party outreach. Id. ¶ 86.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

practicable notice under the circumstances, which the Settlement Class Notice Plan is designed to provide.

In accordance with Rule 52.08(c)(2)(B), the Settlement Class Notice objectively and neutrally apprises Settlement Class Members of the nature of the action; the definition of the Settlement Class sought to be certified for purposes of the Settlement; the Settlement Class claims and issues; that Settlement Class Members may enter an appearance through an attorney before the Court at the Fairness Hearing (in accordance with the procedures set forth in the Settlement Class Notice); the date, time, and location of the Fairness Hearing; that the Court will exclude from the Settlement anyone who validly elects to Opt Out of the Settlement (and sets forth the procedures and deadlines for doing so); and the binding effect of a class judgment on Settlement Class Members under Rule 52.08(c)(3)(B). *See* Ex. 5 (Wheatman Decl.) at Ex. C (Detailed Notice). Further, the Settlement Class Notice objectively describes the total Settlement Fund; the estimated Awards to Settlement Class Members and their method of calculation (including the minimum Program Award by Tier); and that proposed Class Counsel will seek attorneys' fees to which Settlement Class Members will have an opportunity to object. *See id.*; *see also Doyle*, 400 S.W.3d at 320, 324 (upholding validity of notice which "described the lawsuit, identified the Class and its Representatives, summarized Class members' rights, explained members' participation options, and provided instructions for opting out of the action"). These disclosures are complete and should be approved by the Court.

The Settlement and the Settlement Class Notice Plan also adequately protect the right of Settlement Class Members to Opt Out of the Settlement Class. Settlement Class

81

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Members may Opt Out within the initial 90-day notice period. Ex. 1 (Settlement Agreement) § 12. This period is more than adequate and exceeds the length of notice periods previously found acceptable to Missouri courts. *See, e.g., City of O'Fallon* v. *CenturyLink, Inc.*, 491 S.W.3d 276, 279 (Mo. App. E.D. 2016) (noting that trial court preliminarily approved settlement which afforded claimants "45 days to opt out of the entire proceeding"); Order Prelim. Approving Class Settlement, Approving Class Notice, and Scheduling Fairness Hearing ¶ 14, *Trentham*, No. 18PH-CV00751 (granting preliminary approval to settlement with 75-day opt out period); Am. Prelim. Approval Order ¶ 15, *Hayes*, No. 11SL-CC01429 (same with an approximately 30-day opt out period). And it is comparable to the length of the notice period in other complex nationwide settlements. *See NFL*, 301 F.R.D. at 203 (approving a settlement involving approximately 90-day opt out period); *see also id.* ("It is well-settled that between 30 and 60 days is sufficient to allow class members to make their decisions to accept the settlement, object, or exclude themselves.").

Likewise, the Settlement Agreement's requirement that Claimants sign their request to be excluded with personal wet ink signature, Ex. 1 (Settlement Agreement) §§ 1.1(87), 12.2, has also been previously approved in mass-tort settlements. *See, e.g.*, Class Action Settlement Agreement § 14.2(a), *NFL*, 301 F.R.D. 191, No. 2:12-md-02323-AB (E.D. Pa. Feb. 13, 2015). And the other requirements to Opt Out contained in the Preliminary Approval Order, for example, requiring an attestation as to class membership, ensure the fair application and efficient administration of this Settlement and approval process. Ex. 2 (Holland Decl.) ¶ 71; Preliminary Approval Order ¶ 26.

In brief, the Settlement Class Notice, the Settlement Class Notice Plan, and the Settlement's Opt Out procedures work together to provide the best notice practicable under the circumstances, robustly protecting the due process rights of Settlement Class Members.

**B.      In particular, the Settlement Class Notice Plan provides full and adequate notice to Settlement Class Members who are not yet diagnosed.**

Courts have approved current notice for class members that are future Claimants where the notice plan is comprehensive and designed with those class members in mind. *See, e.g.*, *NFL*, 821 F.3d at 421, 423–24, 435–36 (current notice adequate for class settlement of latent injury claims for ALS and other serious diseases); *In re Diet Drugs*, 2000 WL 1222042, at \*39 (current notice adequate for current and future claimants where settlement "employed an expansive notice plan to inform class members of their initial opt out right").

Here, the Settlement Class Notice Plan has been designed with Subclass 2 Settlement Class Members in mind.  Ex. 5 (Wheatman Decl.) ¶¶ 148–49; *see also id*. ¶ 156 ("In 22 years of designing class action notice programs, I have not seen a notice effort that devotes this level of attention to ensuring future claimants understand why they should pay attention.").  For example, the headings of both the Detailed Notice and Summary Notice are entitled, in large, bolded font: "**Attention:  Farmers, Landscapers, Groundskeepers, Gardeners and Others Exposed to Weed Killers**."  Just below, the subtitle states that those diagnosed "Now or in the Future" could receive compensation.  And then, in bold red italic reads the statement:  "*This settlement will affect you even without a cancer diagnosis — unless you exclude yourself*."  *See* Ex. 5 (Wheatman Decl.) at Exs. B

83

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

(Summary Notice), C (Detailed Notice).  Thus, both draw the attention of any individual who has been Exposed, including those not yet diagnosed.  *See* Ex. 5 (Wheatman Decl.) ¶ 148–49.

The Summary Notice also succinctly summarizes the two paths open to future Claimants:  after filing a claim within six years of diagnosis, they may accept or reject their award.  *See id.* at Ex. B (Summary Notice).  The Detailed Notice expands on these explanations of future Claimants' rights.  *See id.* at Ex. C (Detailed Notice).  For example, the Detailed Notice explains:  "If you are diagnosed with NHL in the future . . . you must submit a claim through this settlement first; you cannot sue in court unless you complete the claims process and choose to 'exit' the program later." *Id.*

Finally, in addition to providing robust current notice, the Settlement also boasts an extensive annual notice campaign.  The Settlement provides for supplemental notice on an annual basis through a broad range of channels.  Ex. 1 (Settlement Agreement) § 11.3, Ex. F (Settlement Class Short-Form Annual Notice); Ex. 5 (Wheatman Decl.) ¶¶ 126–40.  These annual notices will span 16 years, such that they account for the NHL latency period and reach those who may receive an NHL diagnosis in the future.[37]  Ex. 5 (Wheatman Decl.) ¶¶ 46, 127; *see* p. 37, *supra*.  Further, through targeted outreach to healthcare providers, the annual notice will ensure that those newly diagnosed with NHL have

---

[37] The annual notice program lasts 16 years because the four potential additional years of funding under the Settlement do not go towards fulfilling new claims.  *See* Ex. 1 (Settlement Agreement) §§ 1.1(104), 4.2.

adequate and sufficient notice of their rights under the Settlement. Ex. 5 (Wheatman Decl.) ¶ 132.

In addition to the tailored language and messaging of the current and annual notices, the Settlement also protects Subclass 2 members who have been Exposed but not yet diagnosed by including them in the Settlement Class only if they have reason to be aware of their Exposure. Ex. 1 (Settlement Agreement) §§ 2.1(a)(i)–(iv) (defining criteria for Exposed individuals to be included in the Settlement Class, including, for example, because they themselves purchased or Applied the Roundup Products or "otherwise had reason to know of their Exposure"), (b)(vi). In particular, the Settlement Class expressly excludes Exposed individuals who otherwise would be Settlement Class Members because they saw a Roundup Product being Applied, if they had no reason to suspect that the product was an herbicide. *Id.* § (b)(vi). This is in stark contrast to the rejected settlement class in *Amchem*, where the Supreme Court was concerned that a settlement covering anyone who "some day may be . . . adversely affected by past exposure to asbestos products" would risk binding those who "may not even know of their exposure" to asbestos and would lack "the information or foresight needed to decide, intelligently, whether to stay in or opt out" of the class. 521 U.S. at 597, 628.

In *Amchem*, potential future claimants faced the prospect of determining where they had been exposed to an undifferentiated product like asbestos, which can be woven into building materials, automotive parts, and even hair dryers. *See* 521 U.S. at 600. As the criteria for inclusion in the class there was merely exposure (along with the lack of a filed lawsuit), many of the purported class members would not have been aware of their

85

exposure until years later, following a diagnosis with an asbestos-related disease.  This led the Court to question whether notice could suffice for "legions so unselfconscious and amorphous."  *Id.* at 628.  Here, by contrast, the Settlement Class definition requires not only Exposure to Roundup Products, but also some further indication from the circumstances that would give rise to the Settlement Class Member's awareness.  Ex. 1 (Settlement Agreement) § 2.1(a).

Further, the Settlement is substantially different from a prior proposed Roundup settlement found to be inadequate by the Northern District of California and thus does not raise the same notice concerns.  *See In re Roundup Prods. Liab. Litig.*, 541 F. Supp. 3d 1104, 1008–09 (N.D. Cal. 2021) (denying preliminary approval in part due to notice concerns).  The present Settlement is a straightforward, large compensation fund, as opposed to that prior novel and "exceedingly complex" settlement, *id.*, which featured a science panel whose decisions would implicate the rights of future claimants on the key issue of causation, *id.* at 1007.  While it also included a compensation fund, among other things, the fund was significantly smaller.  *See id.* at 1008.  The present Settlement, as Dr. Wheatman explains, "is less complex" than the prior settlement, and the notice program "is more robust."  Ex. 5 (Wheatman Decl.) ¶ 6; *see also id.* ¶ 156 ("For the those who have been exposed but remain healthy, special care was taken not only to reach them, but to explain—clearly and thoroughly—why this settlement affects their legal rights now.").

Whether or not undiagnosed class members could fully appreciate the risks and benefits of the prior, more complex proposal, Plaintiffs here have negotiated for a very simple, very large compensation fund from which claims are paid, the implications of

86

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

which Settlement Class Members can clearly comprehend and assess. Plus, the robust annual notice campaign discussed above, *see* pp. 37, 81–85, is designed to reach Settlement Class Members after they are diagnosed, which should further address the notice concerns the District Court raised with respect to the prior settlement proposal.

Finally, because some courts in other cases have raised concerns as to opt out rights and future claimants, the Settlement provides them additional structural protection through back-end exit rights. *See* Point I.A, *supra*. Once diagnosed, and after having applied for a Program Award, a Settlement Class Member can make the decision whether to accept the Award or exit the Settlement Class to pursue compensatory damages in the tort system. Ex. 1 (Settlement Agreement) §§ 6.17, 8.2. Other settlements with similar back-end exit rights have previously been approved. *See, e.g.*, *In re Diet Drugs*, 2000 WL 1222042, at *20, *55; *Deepwater Horizon*, 295 F.R.D. at 125; *see also* Point I.A, *supra*; p. 50, *supra*.

Because the proposed Settlement Class Notice, as disseminated through the Settlement Class Notice Plan, is the best practicable notice, and fulfills the requirements of Rule 52.08 and due process, it should be approved by the Court.

## IV. THE PRELIMINARY APPROVAL ORDER PROPERLY FACILITATES THE SETTLEMENT APPROVAL PROCESS.

The Preliminary Approval Order includes additional provisions aimed at facilitating the settlement approval process, allowing for objectors to be heard and for the Court to make a fully informed determination in connection with entry of the Final Order and Judgment following a Fairness Hearing.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

*First*, the Preliminary Approval Order, in addition to providing for a schedule to Opt Out, provides a process and schedule by which Settlement Class Members can file objections to the Settlement.  A Settlement Class Member who wishes to object to any aspect of the Settlement Agreement has a sizable period of time—up until 90 days following the commencement of the Settlement Class Notice Plan—to file with the Court a written statement of the objections.  *See* Preliminary Approval Order ¶ 34.  Then, the Court will consider submissions regarding the proposed Settlement Agreement, including any objections and responses thereto at a Fairness Hearing to take place on a date no sooner than 30 days following the deadline to file an objection and the close of the Opt Out Period. *Id.* ¶ 41.  This proposed schedule is reasonable and provides sufficient time for Settlement Class Members to object and the parties to respond.

*Second*, the Preliminary Approval Order provides for a stay of the instant litigation and any other Roundup litigation pending in Missouri state courts, unless and until the plaintiffs pursuing such litigation have been excluded from the Settlement Class and pending the Court's consideration of and entry of a Final Order and Judgment.  *Id.* ¶ 42. The Court is well within its authority to issue such a stay of its own docket.  *See U.S. Bank, N.A.* v. *Coverdell*, 483 S.W.3d 390, 401 (Mo. App. S.D. 2015).  This stems from the Court's inherent power to control its docket, *City of Bridgeton*, 18 S.W.3d at 113, and discretion to manage its docket with regard to class actions, *see Ressler* v. *Clay County*, 375 S.W.3d 132, 136–37 (Mo. App. W.D. 2012); *In re BankAmerica Corp. Sec. Litig.*, 350 F.3d 747, 752–53 (8th Cir. 2003), which the Court can use to provide for an efficient resolution of

the present case by staying the current proceeding and related proceedings in this Court. Such stays are routine in class-action settlements.[38]

The Court may also exercise its discretion to stay existing lawsuits and bar litigation by class members pending final approval, and courts often do so in the context of preliminarily approving class-action settlements.  The Court has authority to do so under Section 476.070 of the Revised Statutes of Missouri, which grants the Court "power to issue all writs which may be necessary in the exercise of [its] jurisdiction[ ], according to the principles and usages of law."[39]  *See also* Mo. S. Ct. R. 52.08(d)(1); 15 Mo. Prac., Civil Rules Practice § 52.08:14 (2025 ed.) (discussing court authority under Rule 52.08(d)(1) to make procedural orders in the conduct of class actions);[40] *NFL*, 301 F.R.D. at 203–04; *Hanlon*, 150 F.3d at 1025; *White* v. *Nat'l Football League*, 41 F.3d 402, 406–07, 409 (8th Cir. 1994); *Liles* v. *Del Campo*, 350 F.3d 742, 746–47 (8th Cir. 2003); *Love* v. *First Crown Fin. Corp.*, 662 S.W.2d 283, 286 (Mo. App. W.D. 1983) (recognizing another court's

---

[38] *See, e.g.*, Am. Prelim. Approval Order ¶ 11, *Hayes*, No. 11SL-CC01429 (ordering that "[a]ll discovery and other pretrial proceedings in this action are stayed and suspended until further order of this Court"); Prelim. Approval Order ¶ 11, *Parisot* v. *U.S. Title Guar. Co.*, No. 0822-CC09381 (Mo. Cir. Ct. Oct. 15, 2010) (same).

[39] The language of the Missouri statute is similar to that of the federal All Writs Act.  *See* 28 U.S.C. § 1651(a) (granting federal courts the power to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law"); *see also, e.g.*, *NFL*, 301 F.R.D. at 203–04 (applying the All Writs Act to issue a stay and injunction of related proceedings pending final settlement approval).

[40] The federal counterpart to Rule 52.08(d)(1), Federal Rule of Civil Procedure 23(d), "vests a district court with the authority and discretion to protect the interests and rights of class members and to ensure its control over the integrity of the settlement approval process," including by staying competing class actions.  *See, e.g.*, *Hanlon* v. *Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998) (citing *Gulf Oil Co.* v. *Bernard*, 452 U.S. 89, 100 (1981)).

89

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

order, issued prior to class notice, enjoining class members from pursuing duplicative proceedings). Such a stay is all the more warranted when, as here, a court grants preliminary approval of a class-action settlement that resolves a complex matter—in such circumstances, "the challenges facing the overseeing court are such that it is likely that almost any parallel litigation in other fora presents a genuine threat to the jurisdiction of the [overseeing] court." *In re Diet Drugs*, 282 F.3d 220, 236 (3d Cir. 2002).

A stay of the instant proceeding and related cases is also in the interest of judicial economy because the final approval of the Settlement would obviate further litigation, conserving judicial resources. In addition, Monsanto has requested stays in several currently proceeding Roundup Lawsuits in light of the recent grant of *certiorari* in *Durnell*, 607 U.S.__, and most courts have granted those applications given the potential for the Supreme Court's ruling to alter the litigation landscape. *See, e.g.*, Order, *Dominique* v. *Monsanto Co.*, No. 3:21-cv-00678-JRK (N.D. Ohio Feb. 5, 2026); Order, *Gage* v. *Monsanto Co.*, No. 19GE-CC00080 (Cir. Ct. Gentry Feb. 3, 2026); Order, *Collins* v. *Monsanto Co.*, No. 3:25-cv-06205-ZNQ-TJB (D.N.J. Jan. 26, 2026); Order, *Colton* v. *Monsanto Co.*, No. 4:20-cv-138-AW-MAF (N.D. Fla. Jan. 21, 2026); Order, *Boatright* v. *Monsanto Co.*, No. 4:19-cv-208-MW/MAF (N.D. Fla. Jan. 20, 2026). To similarly conserve judicial resources, the Court should also grant a stay here.

Moreover, an injunction "will not cause harm to others." *Doe* v. *Deja Vu Servs., Inc.*, 2017 WL 530434, at *2 (E.D. Mich. Feb. 9, 2017) (enjoining related proceedings against defendants pending final approval of the class-action settlement). Rather, the parties will provide notice of the proposed Settlement to Settlement Class Members who

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

will have the opportunity to Opt Out of the proposed Settlement Class with the understanding that the Court may enter a permanent injunction if the Settlement is approved.  A stay will permit Settlement Class Members to receive and consider the Settlement Class Notice materials, without the distraction and confusion that would be occasioned by competing actions.  And an injunction "serves the public interest" because it will facilitate "bring[ing] finality to the dispute, eliminate the risk of duplicative proceedings, decrease the cost of litigation, eliminate the risk of conflicting results, and allow the parties to implement the negotiated class-wide settlement." *Id.*

*Third,* the Court should preliminarily appoint BrownGreer as the Administrator, Matthew Garretson of Garretson, LLC as the Allocation Special Master, Wolf Global as the Healthcare Compliance Administrator, and Judge Glenn A. Norton (ret.) as the Settlement Special Master.  Each is jointly recommended by Class Counsel and the Defendant.  Ex. 1 (Settlement Agreement) §§ 1.1(5), 1.1(9), 1.1(64), 1.1(125).  Each is well-respected and knowledgeable, with BrownGreer, Wolf Global, and Mr. Garretson each having particular experience in large-scale mass-tort settlements.  Ex. 2 (Holland Decl.) at ¶ 76–77, 79, Exs. B, C, D (curricula vitae); Ex. 3 (Seeger Decl.) ¶ 44–46.  Further, the Court should appoint Signal Interactive Media as the Settlement Class Notice Agent, and BrownGreer as administrator of the Settlement Fund within the meaning of Section 1.468B-2(k)(3) of the Treasury Regulations.  Signal Interactive Media and BrownGreer each have significant experience, with BrownGreer having served in a similar capacity for similar-sized funds.  *See* Ex. 2 (Holland Decl.) ¶ 80, Ex. C; Ex. 3 (Seeger Decl.) ¶¶ 43–44; Ex. 5 (Wheatman Decl.) at Ex. A (curriculum vitae).

91

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' Motion and enter the Preliminary Approval Order.

Dated:    February 17, 2026

Respectfully submitted,

/s/ Eric D. Holland

Eric D. Holland (MO Bar No. 39935)
Patrick R. Dowd (MO Bar No. 64820)
**HOLLAND LAW FIRM**
211 North Broadway
Suite 2625
St. Louis, MO  63102
eholland@hollandtriallawyers.com
pdowd@hollandtriallawyers.com

*Attorneys for Plaintiffs Robert Koehler and Michael Merx and Proposed Subclass 2 Counsel*

Christopher A. Seeger*
(pro hac vice forthcoming)
David R. Buchanan*
(pro hac vice forthcoming)
Steven J. Daroci*
(pro hac vice forthcoming)
**SEEGER WEISS LLP**
55 Challenger Rd., 6th Floor
Ridgefield Park, NJ  07660
973-639-9100
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
sdaroci@seegerweiss.com

*Attorneys for Plaintiffs Randall King, Scott Butterfield, and Bruce Waldman and Proposed Subclass 1 Counsel*

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Michael Ketchmark (MO Bar No. 41018)
**KETCHMARK & McCREIGHT, P.C.**
11161 Overbrook Rd. #210
Leawood, KS  66211
mike@ketchmclaw.com

*Proposed Subclass 2 Counsel*

Joseph F. Rice*
(pro hac vice forthcoming)
Frederick C. Baker*
(pro hac vice forthcoming)
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
843.216.9000
jrice@motleyrice.com
fbaker@motleyrice.com

Fidelma Fitzpatrick*
(pro hac vice forthcoming)
**MOTLEY RICE LLC**
40 Westminster St., 5th Floor
Providence, RI 02903
401.457.7700
ffitzpatrick@motleyrice.com

*Proposed Subclass 1 Counsel*

John Eddie Williams, Jr.*
(pro hac vice forthcoming)
John Boundas*
(pro hac vice forthcoming)
**WILLIAMS HART BOUNDAS, LLP**
8441 Gulf Freeway #600,
Houston, TX  77017
713-497-1729
jwilliams@whlaw.com
jboundas@whlaw.com

*Proposed Subclass 1 Counsel*

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Peter A. Kraus (MO Bar No. 65668)
Charles Siegel*
(pro hac vice forthcoming)
**WATERS KRAUS PAUL & SIEGEL**
3141 Hood Street
Suite 700
Dallas, TX  75219
(214) 357-6244
kraus@waterskraus.com
siegel@waterskraus.com

*Proposed Subclass 1 Counsel*