# Exhibit 4

**Pages 1 - 44**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

| | |
|---|---|
| IN RE ROUNDUP PRODUCTS LIABILITY LITIGATION. | ) ) ) **NO. 16-MD-02741-VC** ) ) ) |
| JOSEPH JONES, Plaintiff, VS. MONSANTO COMPANY, Defendant. | ) ) ) ) ) ) **NO. 26-CV-01455-VC** ) ) ) ) ) |
| GLENN SCHRAMM, Plaintiff, VS. MONSANTO COMPANY, Defendant. | ) ) ) ) ) **NO. 26-CV-01461-VC** ) ) ) ) ) |

San Francisco, California
Thursday, April 30, 2026

<u>**TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS**</u>

**(APPEARANCES ON THE NEXT PAGE.)**

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                       Official United States Reporter

**<u>APPEARANCES:</u>**

For Plaintiffs:

WEITZ & LUXENBERG, P.C.
700 Broadway
New York, NY 10003
BY: **ROBIN L. GREENWALD, ATTORNEY AT LAW**

THE MILLER FIRM, LLC
The Sherman Building
108 Railroad Avenue
Orange, VA 22960
BY: **DAVID J. DICKENS, ATTORNEY AT LAW**

WEITZ & LUXENBERG, P.C.
1880 Century Park East, Suite 700
Los Angeles, CA 90067
BY: **ROBERT J. QUIGLEY, ATTORNEY AT LAW**

SINGLETON SCHREIBER LLP
591 Camino de la Reina, Suite 1025
San Diego, CA 92108-3112
BY: **LESLIE A. BRUECKNER, ATTORNEY AT LAW**

SMITH LAW FIRM & LAW OFFICE
3201 Loop 306
#60732
San Angelo, TX 76904
BY: **MARCUS A. SMITH, ATTORNEY AT LAW**

For Defendant:

WILKINSON STEKLOFF LLP
2001 M Street, N.W., 10th Floor
Washington, DC 20036
BY: **RAKESH KILARU, ATTORNEY AT LAW**

GIBSON DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-4504
BY: **DANIEL W. NELSON, ATTORNEY AT LAW**

Also Present:

**CHRISTOPHER A. SEEGER**
**PROFESSOR BRIAN T. FITZPATRICK**
**PETER A. KRAUS**
**DAVID WOOL**
**GERSON SMOGER**
**PROFESSOR NORMAN SILBER**
**PROFESSOR JUDITH RESNICK**

**Thursday - April 30, 2026**                                          **10:33 a.m.**

                          P R O C E E D I N G S

                                ---oOo---

          THE COURTROOM DEPUTY:  Now calling Civil Cases 16-2741, In Re Roundup Products Liability Litigation; and 26-1455, Jones v. Monsanto Company; and, lastly, 26-1461, Schramm v. Monsanto Company.

     Counsel, please state your appearances for the record, starting with the plaintiff.

          MS. GREENWALD:  Good afternoon -- good morning, Your Honor.

          MR. SEEGER:  Good --

          MS. GREENWALD:  Oh, sorry.

          THE COURT:  Go ahead, Ms. Greenwald.

          THE COURT REPORTER:  I think you're muted.  Or we couldn't hear you.

          MS. GREENWALD:  Um...

          THE COURT:  Now we can hear you.

          MS. GREENWALD:  Okay.  I'm sorry.

     Good morning, Your Honor.  Robin Greenwald for the -- co-lead counsel.

          THE COURT:  Hi.

          MS. GREENWALD:  Hi.  Nice to see you.

          MR. DICKENS:  Good morning, Your Honor.  David Dickens, co-lead counsel.

THE COURT:  Morning.

MR. DICKENS:  Morning.

MR. QUIGLEY:  Good morning, Your Honor.  Robert Quiqley with Weitz & Luxenberg, also for plaintiffs.

THE COURT:  Hi.

PROFESSOR RESNIK:  I'm Judith Resnik.  And I'm a panelist available to the plaintiffs at the Court's behest.

THE COURT:  Hi.

MR. SMOGER:  Gerson Smoger.  I'm for amici Dean Chemerinsky and Ann Bloom.

THE COURT:  Hi.

PROFESSOR SILBER:  Norman Silber for amici consumer scholars.

THE COURT:  Hi.

MR. WOOL:  David Wool for amici Fred Birner.

THE COURT:  Hi.

All right.  Is that it for the lead plaintiffs' side?  It looks like it.

MS. GREENWALD:  I believe so, Your Honor.

THE COURT:  Okay.

Defendants?

MR. KILARU:  Good morning, Your Honor.  Rakesh Kilaru from Wilkinson Stekloff for Monsanto.

THE COURT:  Morning.

MR. NELSON:  Good morning, Your Honor.  Dan Nelson

from Gibson Dunn for the defendant, Monsanto.

THE COURT: Hi.

PROFESSOR FITZPATRICK: Brian Fitzpatrick appearing specially for class counsel here, Mr. Seeger.

MR. SEEGER: Good morning, Your Honor.

THE COURT: Hi.

MR. SEEGER: Good morning, Your Honor. Chris Seeger appearing for the King class action pending in Missouri state court.

THE COURT: Morning.

MR. KRAUS: Good morning, Your Honor. Peter Kraus also specially appearing as class counsel in the King matter in Missouri.

THE COURT: Hi.

MR. KRAUS: Hi.

THE COURT: All right. Is that everybody?

MR. SMITH: Hi, Your Honor. Sorry. I think my audio was on mute. This is Marcus Smith for plaintiff Molly Waldrop.

THE COURT: Hi.

MR. SMITH: Hello.

THE COURT: Okay. So I'm very impressed to see all these fancy law professors here and everything. It's an honor to have you all. But I -- I honestly -- I mean, I don't -- I'm not sure how much there is to discuss. And let me say why.

There's this -- there's this class-action settlement -- or

this proposed class-action settlement in Missouri.  It covers two groups of people; right?  One is people who will get NHL in the future, allegedly, from glyphosate.  And the other is people who, I guess, already have NHL and claim that they -- claim that they got it from glyphosate.

My job is just to figure out whether anything that's going on in the Missouri case would hinder my ability to exercise jurisdiction over the cases in the MDL.  And so as it relates to the futures class -- right? -- the category of people who have not yet gotten NHL -- there are a lot of people who make a lot of points about, you know, the problems with entering into a class-action settlement agreement that covers those people.  But I'm not sure if that is really any of my business, given that my responsibility is just to adjudicate the cases in the MDL, which consists of people who already have NHL and claim that they got the NHL from glyphosate exposure.

So I just don't see -- you know, there were a number of -- again, it was very enjoyable reading all of your amicus briefs and everything.  But I just don't -- but those briefs mostly articulated arguments for how problematic it would be to bind people who have not yet gotten NHL to this settlement agreement that's being pushed forward in Missouri.  And interesting as those arguments are, I don't know -- I don't know if they are relevant to me.

And then -- so then the question is, well, does this

settlement agreement interfere with my ability to exercise jurisdiction over the cases in the MDL, because it covers -- it also covers people who already have NHL and claim that they got it from glyphosate exposure.  And I haven't figured out a way that it does interfere with my ability to manage this MDL.

I think that it -- I think that the -- it is true that the settlement agreement puts a significant burden on people with claims in this MDL and with claims in other cases -- you know, other state court cases -- you know, this opt-out procedure is bizarre.  I've never seen anything like it.  And it's -- it puts people in a difficult position; right?  Because they could probably -- you know -- they might be able to come to me and say, you know, get -- seek a ruling that says, you're not bound by this settlement agreement, whether you opted out or not, because the settlement agreement is so problematic or the procedures are so problematic or whatever.

But they can't -- if you're a responsible lawyer trying to serve the interests of your client, you have to, nonetheless, go through that burdensome opt-out procedure; right?  Because you can't count on any ruling one way or another from me.  And so, you know, the people who are -- the plaintiffs who have cases before me are required -- you know -- they will have no choice but to opt out or try to opt out from this class-action settlement in Missouri.  And that is a burden on them.  And it seems like a -- it, frankly, seems like an inappropriate

burden.

But it doesn't -- the fact that there is this burden on people who are in my MDL doesn't prevent me from exercising jurisdiction over the cases or managing the cases in a meaningful way.

And, you know, this sort of thing -- I mean, I've certainly never seen a settlement like this before. But this sort of thing happens all the time in the courts; right? Where you have an individual plaintiff who's pursuing a claim in court. And then there's some class-action case that's filed in some other court. And the settlement is reached in the class-action case. And, you know, notice goes out to the class members. And the class members have to decide whether to opt out or not.

And that includes the individual plaintiffs who have already brought individual cases in court. Those plaintiffs have to opt out of the class-action settlement. That's -- it's an inconvenience. It's, I could imagine, policy arguments for why somebody -- you know -- somebody who is already pursuing their own case in court on an individual basis shouldn't have to opt out maybe. But that's -- those are the rules. And that happens with some regularity in our court system.

And so, you know, from the standpoint of affecting my ability to adjudicate the cases in this MDL, when we're talking about the people who already have NHL and claim that it was

caused by Roundup, yes, they have to go through this burdensome opt-out procedure.  But I don't know how different it is from -- it's somewhat different.  It's different in the degree of burden that's imposed on people.  But I don't know if it's different in kind from the standpoint of interfering with my ability to adjudicate these cases.

So that was a long and rambling spilling of my thoughts to you.  But I think the upshot is that whatever problems there are with this settlement agreement -- and there are many -- that is for the appellate courts in Missouri to address and possibly the United States Supreme Court to address.  But it's not -- it's not for me to address.

So I don't know who's taking the lead for the lead plaintiffs in trying to convince me otherwise, but nobody needs to convince me that there are major problems with this settlement agreement; right?  And what you need to convince me is that this settlement interferes with my jurisdiction over these MDL matters.  And I don't really see how it does.  So that's really the only question I need addressed today.

**MS. GREENWALD:**  Your Honor, that would be Mr. Quigley for the plaintiffs.

**MR. QUIGLEY:**  Okay.  I will try.  Thank you, Your Honor.

So, look, I'm going to try to convince you of one point, which I will say at the start was not fully ventilated in the

briefing, but that as we were preparing for this hearing -- rereading all the cases and so forth -- we see as really at the heart of the issue.  I mean, we've talked about the 70 or so cases -- however many cases -- you know, either in the MDL or remanded from the MDL that are subject to these opt-out procedures.  But there's also a much bigger problem of -- you know -- there's the futures class, subclass 2, but there are a lot of people with unfiled cases in subclass 1, which vests as of February 17th, 2026.

And, you know, not to be melodramatic about it, but this literally includes cancer patients in the hospital who are sick, who, you know, might not have a lawyer, might not have a lawsuit, but they purport to be bound by this settlement.

And, you know, apart from some of the issues that could be ventilated in the Missouri appellate courts, to cut to the chase, we think there's just a deeper jurisdictional problem here with the authority of a Missouri state court to bind absent class members based on kind of this double-fiction of it being a nationwide class and of representation and so forth.

And, you know, this isn't intended to be an ambush.  If the other side needs more briefing time or so on, if the Court is receptive --

**THE COURT:**  Well, I mean, I was going to ask that question.

**MR. QUIGLEY:**  Yeah, yeah.

**THE COURT:** I mean, has there ever been a state court class action that foisted upon everybody in the nation a settlement agreement under -- under state law? I mean, I've never heard of one. And I'm -- that was the first thing I thought when I saw the headlines about this settlement, is, can the Missouri state court do that? Can the Missouri state court bind potential plaintiffs -- plaintiffs and potential plaintiffs -- throughout the nation in a settlement agreement?

I don't know. But I just -- I -- that's one of the many potential problems with this settlement agreement. But I just don't know how it's relevant to me. I mean, you're talking about people who haven't brought claims yet. People who -- in class 1, people who have NHL and may believe they got it from Roundup who haven't brought claims yet.

I don't have jurisdiction over those people. You know, I don't -- I don't -- I can't do anything -- I can't issue an injunction against a state court that might affect those people. I mean, those people are not plaintiffs in the MDL.

**MR. QUIGLEY:** Well, so --

**THE COURT:** Again, it sounds like the problem you're identifying is a problem that the Missouri appellate courts are going to need to grapple with and probably the U.S. Supreme Court -- or perhaps the U.S. Supreme Court too.

**MR. QUIGLEY:** Well, respectfully, Your Honor, we think you can grapple with those issues too. You know, we've talked

about the "stranger to the litigation" exception and so forth. But, really, I think the important line of cases is those regarding declaratory relief.

If we're just looking for a substantial interference with your authority under *Atlantic Coast Line*, I understand why you might end up at the analytic endpoint that you do. But if we're just seeking a simple declaration, which doesn't tell anyone to do or not do anything, but clarifies the rights of people, whether they're in or out of this court, that whatever -- and, look, I mean, we talk about the burdensome opt-out procedures of the settlement, which we think are real. But if a Missouri state court said, "Hey, everyone. Check this box to keep your rights. And if you don't check the box, you're bound by the settlement."

That wouldn't be burdensome. But we still don't think, under the prevailing law -- and this is covered in my professor, who's more eloquent on these points, Judith Resnik's declaration. But under the kind of minimum context test, we don't think a case like *Phillips Petroleum against Shutts* is controlling. And we just don't think that, you know, the fiction that there are people representing the best interests of those people gives the Missouri state courts sufficient jurisdiction to exercise what's really coercive authority over out-of-state plaintiffs.

Now, it might be --

**THE COURT:** Right. But I just don't --

**MR. QUIGLEY:** Yes.

**THE COURT:** I don't understand why a federal judge in California should step in and fix that problem. I mean, I just don't understand why it's not a problem for the Missouri appellate courts to fix and the Supreme Court -- U.S. Supreme Court to fix, if necessary.

**MR. QUIGLEY:** Well, again, those courts could --

**THE COURT:** I mean, you described a situation --

**MR. QUIGLEY:** Yes.

**THE COURT:** I mean, unfortunately, like, there are -- there are lots of situations where, you know, state courts issue rulings that adversely affect people's rights. And, I mean, we don't usually have other federal courts from other states stepping in to put a stop to that.

**MR. QUIGLEY:** Well, I guess we see a fundamental difference where the reason for that is jurisdictional. It's one thing if the thing the court is doing -- and, you know, this is the *General Motors* case they talk about of -- a federal court says, "We don't like this coupon settlement." And then a state court says, "Yeah, that coupon settlement is fine." Even though the Third Circuit said the federal court can't go in and enjoin that because they didn't like the settlement. And, you know, *Smith* against *Bayer* is a similar case.

But if a court is exercising authority to, you know,

basically, in our view, extinguish both -- you know -- possibly extinguish lawsuits or the right to bring lawsuits, and that's outside of its jurisdiction, we see that as a different kind of infringement.

And even if it's not about the cases currently before you or, you know, the 70 or so cases identified in Mr. Seeger's declaration, it still interferes with people's ability to bring cases to federal court, if they should so choose.

THE COURT:  Why?

MR. QUIGLEY:  Well, because -- again, this relies on the fiction of both notice and opt-out.  I mean, Ms. Greenwald was going to speak maybe, but I can a bit, about -- you know, without going down a rabbit hole -- some of the issues with the notice in this case.  You know, aspects of the notice that refer to the outcome in the *Durnell* against *Monsanto* case, heard by the Supreme Court on Monday, as possibly wiping out essentially all Roundup litigation.

And, you know, as we pointed out in our briefing, the Supreme Court's order granting the case had said this was on a narrow issue.  Monsanto's counsel conceded the issue was narrow and limited to failure to warn.  The U.S. Solicitor General also made the same concession.

So we think the class notice is materially misleading for that reason alone, without even getting into the issue of the allusions to the Monsanto bankruptcy, where we just have no way

of --

THE COURT:  Right.  But you keep --

MR. QUIGLEY:  Yes.

THE COURT:  But you keep spilling over into, you know, a recitation of all of the many problems with the class settlement; right?  And I have told you, I agree.  I mean, I've -- I've never seen anything like this; right?  This is, frankly, mind boggling.  But that's not the question that is before me.  And I just don't -- I don't see how it would be appropriate for me to step in and put a stop to this, simply because I believe that it would adversely affect other people's rights in California or elsewhere.  I mean, that's just -- that's not for -- that's not for random federal courts to do.

MR. QUIGLEY:  Well, I guess, our ask is that --

THE COURT:  That's why we have appellate procedures; right?

MR. QUIGLEY:  I'm sorry, Your Honor.  I guess, our ask is not that you step in and put a stop to it.  This is not like all those cases where someone doesn't like a class settlement and asks a federal court to enjoin it.  If there were a declaration that, hey, this just doesn't work for some group of people, and they can still file in federal court, or even something more along the lines of, you know, an indicative ruling --

THE COURT:  But why -- why -- I mean, what's the

difference?  I'm still making a pronouncement on the validity or invalidity of the class-action settlement that a court is considering in Missouri.  And I just don't -- I mean, if -- I could imagine -- okay.  Let's just say, hypothetically, that we have somebody who, today, doesn't have NHL; right?  And, you know, next year, they get NHL.  And they believe that it's because they were exposed to glyphosate.  And they file a lawsuit.  And that lawsuit ends up in this MDL.

And then Monsanto files a motion to dismiss the lawsuit on the ground that this person is covered by the Missouri settlement agreement.  I mean, the person who filed the lawsuit can articulate all the reasons why it would violate their due process rights to be bound by the Missouri settlement.  And I can consider those arguments at that time.  And as I sit here today, you know, I cannot imagine ruling that that person would be bound by the settlement agreement; right?  Because the settlement agreement seems to be so legally problematic.

But I would hear the arguments.  I would hear Monsanto's argument, and I would hear the argument of the plaintiff, and I would make a -- and if there's any new information that I haven't been given yet that might affect my decision, I would consider that.  But I could issue that ruling then.  And it wouldn't -- and if I -- assuming I did rule that this person who didn't have NHL at the time the settlement agreement was reached and at the time, you know, notice went out -- if I

ruled -- I can rule that that person can proceed in their federal lawsuit, and their rights haven't been infringed at all.  So --

MR. QUIGLEY:  No --

THE COURT:  -- I just don't understand why I should be issuing a declaration now that would -- I mean, a declaration is not just an advisory opinion.  A declaration -- a judicial declaration is something that affects the rights of people and allows -- or it allows people to order their affairs based on that declaration.

And so I would be affecting the state court litigation by doing that.  And I just don't see why it would be necessary for me to do that to ensure that I could adjudicate the Roundup cases that I have.  And I don't see how it would be appropriate for me to do that to try to -- you know -- to try to vindicate the rights of somebody who's not before me.

MR. QUIGLEY:  Well, first, I appreciate Your Honor's receptiveness to possibly fully and fairly considering those kinds of cases when they should come before you in the future in that that alone matters in the situation.

I guess, you know, to your points, first, though it's true that a declaration is not -- you know -- it's not a full injunction.  It's not nothing or an advisory opinion either.  This isn't saying, you know, the settlement doesn't work.  It's providing clarification for people's rights now rather than

after some tortured collateral attack process.

THE COURT: Right. But what are you asking me to say? That people don't have to participate in the opt-out process and they're not going to be bound? I mean, that's -- that is interfering with the state court proceedings.

MR. QUIGLEY: Well, I guess it's not interfering with the state court proceedings so much as it would be talking about the consequence and the rights of people right now. It's saying, okay, there's a court out there saying you have to take this action. We think it's really a bad action, but whether it's -- you know -- whether it's excessive or not, the state court doesn't have the authority to ask that of you in the first place.

And, you know, should someone come forth in the future and try to assert section 3 of the settlement agreement -- you know, kind of force dismissal of cases, anti-suit injunction, and so forth -- that that won't have force because -- and, you know, there could be another wrinkle of if you received actual notice or --

THE COURT: That's effectively saying --

MR. QUIGLEY: Yeah.

THE COURT: -- you don't have to participate in this state court process. I, federal court in California, decree that whatever the state court says, you don't have to worry about it.

**MR. QUIGLEY:** Well, first, I will note, I see Professor Resnik has her hand raised. I don't know if the Court would like to hear from her on these issues, or I can continue. But I know she has some thoughts about this, as well.

**THE COURT:** Sure, briefly.

**PROFESSOR RESNIK:** If I can be helpful. You're not a random judge; you're the MDL judge. And what -- what -- I've read the materials more than once. And I would be flummoxed as a lawyer with people or without to try to figure out what they should do.

Holding aside the problems of the potential misrepresentations and the opt-out and the 11 points and the wet and the dry signatures, all of that's tough. It's that I tried to get my head around the idea of how Missouri can tell all of us, "Be here by June or you're done," and how I, if I actually had someone in this position, could wisely say either stay away or not. And you have real people who have to decide whether they jump in or stay out under this regime.

And I keep rereading *Phillips Petroleum* and *Fuld*, the new -- to say -- as I understand the structure from both *Phillips Petroleum* and *Mullane*, there's a structure in which states could, in certain kinds of economic identity of interest kinds of cases, potentially have people from all over come into their court for an adjudication where there is enough

purposeful affiliation.

What we're looking at is a kind of almost revert -- like, *Mullane* was a potential defendant comes in and says settle accounts.  Monsanto, defendant, working with class counsel, says, we want a global peace.  Of course we'd all love global peace.  But it can't say it to everybody who doesn't have any relationship.

And your clients -- "your clients" -- your litigants with whom you have a relationship, in the same way that you've issued statements to transferee judges, would benefit enormously at least from hearing not an injunction, but a declaration, that, as you understand -- as I understand -- whatever you -- I would believe that the law of the jurisdiction over absent plaintiffs is not settled as to this kind of absent plaintiff as distinct from the absent plaintiffs in *Phillips Petroleum*.

It was a pleasure to reread Justice Rehnquist's ode to class actions.  And it's important when the representational structure is identical, and everybody's got an oil and gas lease, and we all know who you are, and --

THE COURT:  So can I just interrupt --

PROFESSOR RESNIK:  Yep, sure.

THE COURT:  -- and ask you just a practical question?

PROFESSOR RESNIK:  Yep.

THE COURT:  What are you asking me that -- what are

you saying that the declaration should say?

PROFESSOR RESNIK:  That as -- that as -- a reading of *Phillips Petroleum*, *Mullane*, and *Fuld* raises grave questions about how a Missouri court could require people -- could tell the world that if you're not in, you would be out, and why you have not adjudicated the merits of the res judicata, collateral estoppel, full faith and credit that may come to pass.  At least as reading now, there hasn't been, in the record so far in Missouri, an understanding -- or an excavation -- of how it is that Missouri can tell the world.

Now, the litigants --

THE COURT:  That doesn't sound like a declaration. That sounds like a law review article.

PROFESSOR RESNIK:  I believe you could declare that the people before you should have the right to understand that a federal judge -- information fiduciary to them -- has reviewed the materials and has grave reservations about it --

THE COURT:  So you want me to declare that I have grave reservations about the validity of this class-action settlement?  I'm willing --

PROFESSOR RESNIK:  No, no, no --

THE COURT:  -- to tell you right now, I have grave reservations about the validity of this class-action settlement and about the effect on the rights of plaintiffs and potential plaintiffs in California.  But that's not a -- that's not what

a declaration is.  That's not what a federal court declaration is.

**PROFESSOR RESNIK:**  I'd step back one and say you do not understand how the Missouri court has jurisdiction.  I'm bracketing the settlement for a minute.

**THE COURT:**  But why should I say that?  I mean --

**PROFESSOR RESNIK:**  Because you've got all these people who are MDL litigants before you who are going to be --

**THE COURT:**  But what are they going to do with that? If I say, "I have grave concerns over whether the Missouri court has jurisdiction over these people," what are they going to do with that information?

**PROFESSOR RESNIK:**  It would inform their lawyers on how they should advise them about whether they should walk into the Missouri courts at all or not.  And I see there are others who are hoping to add to this.

It's -- I think, of all these people -- as I said in the declaration, a quarter of people who file in the federal courts don't have lawyers at all.  We have people before you with lawyers not of whom are as astute as the group that's assembled here.  How would they know how to advise their clients without some form of information from you?  I understand we're on the record, and people will read that there's a very --

**THE COURT:**  Maybe they should talk to Professor Resnik.

PROFESSOR RESNIK:  I --

THE COURT:  I mean, because that seems to be what you're asking me to do, is, like, play the role of a law professor and express some doubts and concerns about, you know, whether the Missouri court has jurisdiction over people in California.

PROFESSOR RESNIK:  I would suggest that you could declare that it is -- as you understand it, that the Missouri court wouldn't have this extraordinary exercise of jurisdiction, at least as the people before you.  And remember that --

THE COURT:  But why is that a question for me as opposed to a question for the Missouri appellate courts and the United States Supreme Court?

PROFESSOR RESNIK:  Because -- because you --

THE COURT:  Or a question for me if Monsanto tries to bind an existing plaintiff in my case to the settlement agreement, the existing plaintiff in my case is able to seek relief.  And then -- then I've -- then it's not an advisory opinion.  Then I'm being presented with an actual motion to adjudicate somebody's rights.

PROFESSOR RESNIK:  The motion, I think, before you asked to adjudicate that the rights of the people who are before you on bracketing the futures are at risk of being -- that they will potentially feel either the fear of bankruptcy

or the fear of inclusion/exclusion indeterminacy.  And you're stating that, as far as you understand it, there is less to fear, because it is unclear that it is -- it is clear that this Court doesn't have, under current law, the ability for people who have not purposefully availed themselves as absent plaintiffs to be bound by Missouri.

And I see there's another hand up, so I need to be sure that others come in, as well.

**THE COURT:**  Okay.  Thank you, Professor Resnik.

Maybe I can go to the King counsel and see if they want to say anything at this point.  And then the -- you know -- the lead plaintiffs and the people associated with them can have the last word.

**PROFESSOR FITZPATRICK:**  Well, you know, I just wanted to say, Judge, that I asked the question that the movants put before you on my federal courts final exam this year.  And --

**THE COURT:**  What question is that?

**PROFESSOR FITZPATRICK:**  That is the question of whether we should upend 250 years of federalism by allowing a federal judge to tell a state court judge how they adjudicate their class-action settlements.

I'm sorry that Professor Resnik got an F, but it sounds like you're going to get an A.  And so, you know, I don't know if there's anything more that I need to say on this.  I think you've researched this and are up on all of the issues.  But,

you know, if you have any particular questions, I'm happy to try to answer them.

I will add just one little point.  And that is, on pages 13 and 14 of our brief, we cite a bunch of cases where federal judges said, hey, I know I've got a class member in front of me, and I know there's a state court class action that's going to resolve their claim if they don't opt out.  I can't issue some kind of injunction.  In I believe three out of four of those cases, those were state court nationwide class-action settlements.

THE COURT:  Really?

PROFESSOR FITZPATRICK:  Products liability cases -- *GM* was a design defect products liability case.  There's another case -- I think it was *RB2* [sic] -- toys product liability cases.  These are nationwide class cases.

So this -- this is not something that's never happened before.  This happens.  We have a federal system.  The federal judges and the state judges are substitutes.  They're equals.  Some of the Supreme Court cases say this.  There's no rank or superiority here.  And they have the ability to resolve claims just like federal judges do.

And so I don't think this is as crazy as I think the movants do.  I think there's plenty of nationwide class-action settlements going on, even in state courts.

THE COURT:  Okay.  Well, thank you for the A.  I've

never gotten an A before in my post-high school -- actually, I'm not sure I got any A's in high school either.  But having gone to UC Santa Cruz, where they had written evaluations, and Berkeley Law, where they didn't have letter grades, I've never gotten an A before.  So thank you.

I guess I have one question for you, Mr. Fitzpatrick.  Are you here -- I know that you're here to argue that I don't have the authority to issue an injunction or a declaration relating to this class-action settlement in Missouri.  Are you also here to argue that the class-action settlement in Missouri is legally sound?

**PROFESSOR FITZPATRICK:**  No.  That's going to be for Judge Boyer in Missouri to sort out.  And the appellate process there, as you noted -- listen, you've raised great questions.  And you've raised great questions several years ago when you considered one of these before.  And those questions are going to have to get fully aired in Missouri and sorted out there with full appeal up and maybe to the U.S. Supreme Court, as you noted.  So I think those are tough questions, but this is just not the time and place for it.

**THE COURT:**  Okay.  And then another question -- this is more just out of curiosity.  And, Professor Fitzpatrick, I'm not sure this is for you, because I'm guessing you weren't involved in the state court -- the Missouri state court proceedings.

But just -- it's just something I was curious about for Mr. Seeger or whoever.  Was there a -- so the -- so the timing of this -- so there was a motion -- there was a complaint filed, and a motion for preliminary approval of the class-action settlement was filed on the same day; is that right?

MR. SEEGER:  Yes, Your Honor.

THE COURT:  Okay.  So that -- and that's what happened in my case too, way back when.

MR. SEEGER:  Yeah.

THE COURT:  And so that was -- and what date was that -- when was that filed?

MR. SEEGER:  I think it was February 17th, Your Honor. And I think the preliminary approval order followed two or three weeks after that.

THE COURT:  Okay.  So the motion for preliminary approval was filed on around February 17th.  And the Judge preliminarily approved the settlement agreement two or three weeks later, you say.  How long was the -- how long is the settlement agreement?  How many pages is it?

MR. SEEGER:  Oh, boy.  Is it about 80 pages?  90 pages.

THE COURT:  90 pages?  And was there a public hearing on this motion for preliminary approval?

MR. SEEGER:  No.  I mean, counsel for the class -- the

plaintiffs' lawyers and the defense lawyers -- were there in court that day -- answered some questions --

THE COURT:  Which day?

MR. SEEGER:  On the -- February 17th.

THE COURT:  Okay.

MR. SEEGER:  Judge Boyer had some questions he asked both sides.  But that's really all that occurred that first day.

THE COURT:  So could I ask a couple clarifying questions about that?  So you file a motion -- you file a complaint.  And you file a motion for preliminary approval of a class-action settlement on February 17th.  And you have a meeting with -- a private meeting -- with the Judge to discuss it on February 17th.

MR. SEEGER:  When you say "private," Your Honor, it was in open court.  So I'm not sure if I'm reading your question right.  But it was in court.

THE COURT:  Was it transcribed?

MR. SEEGER:  I don't -- I don't know.  I don't know. I don't -- I don't know.  I really just don't know the answer to that.

THE COURT:  Okay.

MR. SEEGER:  I don't think so.  I haven't seen the transcript from that day.

THE COURT:  So -- but nobody knew about it before that

day, because you hadn't filed it --

MR. SEEGER:  That's right.

THE COURT:  -- before that day; right?

MS. GREENWALD:  That's right.

THE COURT:  So I gather you prearranged a meeting with the Judge to take place on the day that you filed the complaint and the motion for preliminary approval?  Because, otherwise, all you know, the Judge might have been on vacation that day; right?

MR. SEEGER:  Yeah.

THE COURT:  So you -- you had communications with the Judge in advance of even filing the complaint --

MR. SEEGER:  I did not, Your Honor.  We have -- we have local counsel for both sides.

THE COURT:  Okay.  Right.  But the --

MR. SEEGER:  Bayer has local counsel --

THE COURT:  But the parties -- right? -- Bayer and the plaintiffs sort of prearranged with the Judge this meeting to talk about this preliminary approval motion and complaint that was being filed on February 17th; right?  And when you say you had -- it was a meeting in open court, does that mean, like, the door to the courtroom was unlocked?

MR. SEEGER:  Yes.

THE COURT:  What does that mean?

MR. SEEGER:  It means that it was in the courtroom

and -- you know --

THE COURT: It was in the courtroom, and the courtroom was not locked.

MR. SEEGER: Yeah. It was in the courtroom.

THE COURT: So --

MR. SEEGER: Correct.

THE COURT: -- if by some miracle somebody had been aware of this filing on that day, they could have come into the courtroom and participated in the meeting you had with the Judge?

MR. SEEGER: Well, you know, Your Honor, I'm not trying to tell you that there was widespread notice that this was --

THE COURT: Right. I'm just asking --

MR. SEEGER: Yeah. Yeah.

THE COURT: -- some questions.

MR. SEEGER: Yeah. I mean --

THE COURT: So there was -- I'm just trying to understand how this went down --

MR. SEEGER: Yeah.

THE COURT: -- right?

MR. SEEGER: Yeah.

THE COURT: So the lawyers for Bayer and for the plaintiffs got in touch with the Judge privately and said, we've got this big nationwide settlement coming, and we're

going to file it on the 17th, and we'd like to meet with you about it on the 17th in your courtroom with the door unlocked.

**MR. SEEGER:** Well, as I said before, Your Honor, I had no -- I did not reach out to chambers. The local people did. But, yes, we knew we were going to go in that day and file the agreement.

**THE COURT:** And the Judge knew that you were coming in that day --

**MS. GREENWALD:** That, I don't know. I don't know if the Judge was in the courtroom or he came out as a result of it. I really --

**THE COURT:** You just surprised the Judge that day and said, we want to talk to you about this?

**MR. SEEGER:** Well, I --

**THE COURT:** I can't imagine that happened.

**MR. SEEGER:** No. But you're asking questions --

**THE COURT:** Okay. So -- and then -- so you have a --

**MR. SEEGER:** -- that would be better asked of the local --

**THE COURT:** You have a meeting with the Judge --

**MR. SEEGER:** Yes.

**THE COURT:** -- on the day you filed it -- presumably a prearranged meeting with the Judge on the day that you filed it -- in his courtroom. You say that the courtroom -- it was in open court, but it was not transcribed, and nobody was aware

that this was happening.

And then there's no hearing at which anybody has an opportunity to discuss with the Judge these concerns that all of these people are raising now.  And the Judge preliminarily approves the settlement, which all of a sudden imposes all these significant obligations on people all over the country, including people who don't even have NHL and may never have heard of Roundup.  And they -- and he did that without giving the other side an opportunity to be heard?

MR. SEEGER:  Well, okay.  So if you don't mind, Your Honor, if I could take ten seconds on this.  I'm not pushing back on any suggestions by you about how this was done.  It was not transcribed, as far as I know, and nobody knew about it. Having said that --

THE COURT:  In other words, it was filthy.

MR. SEEGER:  Having said that, Your Honor, the day it was filed -- it went up on the website -- the Weitz & Luxenberg firm started filing motions that look a lot like what you have in front of you.

All of -- I think the intent is to deal with all of that through the process that will go between now and the final approval hearing.  They're going to have an opportunity -- they've been filing objections on a weekly basis, much of which is before you right now.  And there's going to be a final approval hearing.  We will brief those objections.  They will

be fully heard.  And it will be dealt with at the final approval by Judge Boyer.  I have no idea how those objections will stand up or not.

But you're right.  If the question is, was there a preliminary approval hearing, I wouldn't call it a hearing.

**THE COURT:**  No.  It was a private meeting -- it was a private arrangement between Bayer's counsel and the plaintiffs' counsel and the Judge to get this -- to tee this up really quickly; right?

**MR. SEEGER:**  We went in to file the agreement.  Judge came out.  Had a couple questions.  We answered them and moved on.  That was it.  The whole thing was 30 minutes.

**THE COURT:**  30 minutes for this -- for a settlement of this magnitude?

**MR. SEEGER:**  Well, I've been involved in a number of class actions where there are no hearings before the preliminary approval order is entered.  This wouldn't be the first.

**THE COURT:**  Okay.  So -- all right.  Do -- I'm sorry, did you -- Mr. Seeger, was there anything else that you wanted to say -- or Professor Fitzpatrick?

**MR. SEEGER:**  I think that's it, unless you have questions for me, Your Honor.

**THE COURT:**  Okay.  All right.  Let's give the people on the other side the -- a chance to have the last word.

**MR. SMOGER:**  Your Honor, this is Gerson Smoger.  I'm mostly interested in subclass 2, which is the futures, and that's what I wrote on behalf -- with Dean Chemerinsky.

The question -- people mistake what the *Shutts* holding is.  It's not an authorization for other jurisdictions.  What it is, is a condition of when other jurisdiction have to give res judicata.  And if the elements of due process are not found, then the foreign jurisdiction does not have to give res judicata to a class-action settlement.

The only place -- and I think that you expressed that of -- one case came to you.  I would urge that it's a lot more than one.  The state of Missouri has no power outside of Missouri.  They cite a long-arm statute that is only -- that is particularly only for defendants.

So the process will be that every time a case gets filed in any state court outside of Missouri or any federal court outside of Missouri, that they have to -- Monsanto will have to bring a motion to get res judicata.

What happened -- what places this court differently is the vast majority of those state courts are likely to -- if you file in state court -- and a lot of people won't have state court jurisdiction -- they'll have to go to federal court.  This court is the transferor court for the MDL.  So those cases filed not just in California, but in 49 other states, are going to be transferred to this court.

Individually, then, this Court will have to weigh on the *Shutts* factors of due process inadequacy.  So while it's not now, all futures that file will end up before the MDL court.  So --

THE COURT:  Well, not all, because there are a lot of -- there are way more cases in various state courts around the country than there are in this MDL.  Because there's no --

MR. SMOGER:  Future filings --

THE COURT:  Because there's no diversity.

MR. SMOGER:  Excuse me.  Future filings, if they don't file in the state of Missouri, are mostly likely -- except New Jersey -- I guess there's jurisdiction in New Jersey because of Bayer's headquarters.  But, otherwise, if it's in federal court, it's going to go to this MDL court.  If it's in state court and removed -- and I think it's likely the most of these will be filed in federal court -- then, for 48 states, the likelihood is they're going to end up in the transferor court.  And then the -- then the motion -- the collateral attack motion -- and I'd speak on this because I think *Stephenson* has been raised to you, and I argued *Stephenson* in the Second Circuit -- that will end up being this Court's to decide.

THE COURT:  Right.

MR. SMOGER:  To the extent this Court has given an opinion about where that is -- and I think it should be heard

by the plaintiffs that it's -- that that's going -- that I would imagine that will happen in great degree to the futures.

Now, I don't disagree with that right this minute, this Court doesn't have jurisdiction over people that don't even have NHL, and they're going to file in the future. But I would weigh that this will be a continuing source of a lot of plaintiffs that attempt to file -- because they want to preserve the ability to have punitive damages in their complaint -- those people are going to file in federal court.

THE COURT: Okay. But -- so what -- I mean, but -- and I can adjudicate it at that time. So what's the --

MR. SMOGER: That's why --

THE COURT: Why do I -- why does any of that argue in favor of me issuing an injunction or a declaration now?

MR. SMOGER: It argues in favor of the declaration, because their -- their -- the procedure they're having -- and they assume that there's nothing in their procedure that assumes their ability to control this settlement from the City of St. Louis outside of that. And it's going to, at some point, be infirm. And if there's a declaration that says there's an infirmity -- because it's going to end up for this subclass 2 -- so those filings are going to be before this Court before all of this effort and work is done in the Missouri courts. And in going forward, I think there's a fundamental infirmity for the vast majority of people, because

they're going to end up before this Court.

Now, this Court --

THE COURT: Okay. I understand the argument. Thank you.

MR. SMOGER: Thank you.

THE COURT: All right. Mr. Silber -- Professor Silber?

PROFESSOR SILBER: Thank you, Your Honor.

Earlier in the conversation, you provided a hypothetical that I think precisely defines the justification for 62.1 on indicative rulings in the federal rules.

Essentially, in the future, it is more than likely that somebody will come to your court seeking -- seeking -- for relief. And Monsanto or the defendants will use the settlement agreement. And you will have to, at that time, issue a ruling. And it may be after a fairness hearing.

I think that the purpose -- if not a declaratory judgment, an indicative ruling would be precisely in order in this situation. Because, in fact, there are attorneys right now who are trying to advise their clients about --

THE COURT: Wait, I'm sorry. I just pulled up 62.1, because I wasn't sure how that related to this situation. That's --

PROFESSOR SILBER: Well --

THE COURT: That's for relief pending appeal. If a

timely motion is made for relief that the court lacks

authority -- that the district court -- lacks authority to

grant because of an appeal that has been docketed and is

impending -- is pending -- the court can issue an indicative

ruling.  What does that have to do with --

**PROFESSOR SILBER:**  I would argue that it's by analogy,

Your Honor.  I'm not suggesting that that empowers you.  It's

designed for situations in which the district court has no

longer got jurisdiction.

But it does seem to me this is a situation in which it

would be important to offer indicative guidance to parties

right now who are trying to decide what to do.  And it may be

in the future that you're -- in fact, it's more than likely

that in the future you're going to have to consider just that

question.  And your guidance would be very helpful to attorneys

who are considering, right now, whether to -- how to steer

their clients.

**THE COURT:**  Okay.

Ms. Greenwald, do you want to wrap things up for us?

**MS. GREENWALD:**  I do.  I know this has been a long

afternoon.  I just wanted to clarify a couple of issues on what

happened in the state court.

So preliminary approval was 15 days after they went before

Judge Boyer on -- in March.  And -- and -- I'm sorry -- in

February -- on February 17th.

The settlement agreement is 690 pages because there are a lot of exhibits attached to the settlement agreement.  But most importantly, we didn't file notices.  We filed a motion to intervene.  And we had over a dozen law firms that joined us to try to be heard.  We didn't try to change anything.  We just expressed to the Court what our concerns were.  And we never even got a response.

Monsanto and class counsel opposed our motion to intervene, and then we learned that we didn't have -- that our motion to intervene was denied the same time preliminary approval was granted.  I just wanted to give you that procedural history, Your Honor.

**THE COURT:**  Okay.  And, of course, what they would say is, look, the reason that we teed this up -- the reason that we are trying to ram this through so quickly is that we're trying to get the settlement finally approved before the Supreme Court issues a ruling on preemption in the case that was argued on Monday.

And so, you know, on the surface, it might seem highly unorthodox that this is being rammed through so quickly and through this -- you know -- these private communications between the Judge and the lawyers on both sides before the lawsuit is even filed.  But, you know, we have an emergency here, because the Supreme Court is poised to rule that these failure to warn claims are preempted by federal law, and we

need to get this through before that happens.

Just curious what your -- what is your response to that? And I don't know if that's -- Ms. Greenwald, I don't know if that's your territory or somebody else's territory.

MS. GREENWALD:  I can do a couple on that.  So the final approval is in July, which will be after the Supreme Court rules.  So the timing wouldn't even work on that for them.

THE COURT:  I see.

MS. GREENWALD:  So it's July 9th is the final approval hearing.  And, in addition, the Solicitor General -- I'm sorry -- the counsel for Monsanto, at oral argument, acknowledged in a response from Justice Barrett that design defect claims are not impacted by a reversal of *Durnell* --

THE COURT:  Yes.  Although, he did -- he did add that while design defect claims are not preempted, claims that are labeled "design defect claims," but are actually failure to warn claims in disguise, would be preempted; right?

MS. GREENWALD:  He did.  But he also went on to distinguish it from the medical device situation.  And he says the preemption clause in the Medical Device Amendment sweeps in design defect claims.  And here -- FIFRA -- it's really just on the labeling.

THE COURT:  Right.

MS. GREENWALD:  And so he says that.  And we have a

lot of allegations -- as you know -- you've sat through a trial -- there are a lot of allegations that don't have anything to do with the labeling.  And we have a copy of the transcript of the -- the Supreme Court -- if you would like us to provide that to you.

THE COURT:  No, that's okay.  I happened to listen to it yesterday.

MS. GREENWALD:  Okay.

THE COURT:  But it's interesting -- this question has nothing to do with the current motion.  But, I guess, what we're going to have to do -- if the Supreme Court rules that the failure to warn claims are preempted, I guess, we're going to have to sift through all the pending cases in the MDL and see, like, which of them have design defect claims and try and figure out whether those are true -- those are legitimate design defect claims or just disguised failure to warn claims. Is that what my job is going to be?

MS. GREENWALD:  Well, I think that -- maybe if that -- I'm -- hope breeds eternal in my world.  So --

THE COURT:  Yeah, yeah.  No, I'm not -- I'm not predicting an outcome.  I'm just --

MS. GREENWALD:  I know.  I know.

THE COURT:  I'm just saying, if that happens -- if the Court rules that the failure to warn claims are preempted.

MS. GREENWALD:  I would say that's one way that

co-lead counsel can help the Court.  And we can figure out who is in the -- still have active cases in the MDL that have not yet been transferred -- or remanded back.  And we can at least have a suggestion of whether these various complaints have failure to warn claims that are not based on the label.  And we can work with the Court or your clerk or whoever you'd like us to, to figure out how we can assist with the group.

We get a lot of calls from lawyers now.  We have a pretty good working relationship with them.  We know most of the people in the MDL now, at least by voice or email.  And so we could try to assist in that.

And then we I also guess would talk about whether they could amend their complaint if there's not a clear statement about what type of design defect if is to have a clarification of the allegations.  But these are things that we probably have to talk to our counsel who have cases before you, before I go too far down the road.

THE COURT:  Right.  And also curious -- also not relevant -- you know, relevant to the motion that's in front of me now -- but I know that Ken Feinberg has reached out to plaintiffs saying, hey, you know, there is this Supreme Court case, and there is at least -- the Court granted cert in the case.  There's at least a possibility the Court will rule that your failure to warn claims are preempted.  You know, you have an opportunity -- even if you rejected my settlement offer

before, you have an opportunity to reconsider that.  And for anybody who hasn't participated in my program yet, now's the time to do it.

Have you been able to kind of communicate anything along those lines to plaintiffs in the MDL?

MS. GREENWALD:  About -- so we have not.

THE COURT:  In other words, hey, there's this Supreme Court decision coming down the pike.  And, you know, we want to remind you all that there is this program that Ken Feinberg has for settling these cases.  And, you know, maybe you want to sort of revisit whether it would be a good idea to engage with Mr. Feinberg.

MS. GREENWALD:  We have not done that.  And I think I would be reluctant to do it in that fashion, because if they have a design defect claim, the only question the Supreme Court took was a label-based preemption question.

THE COURT:  Right.

MS. GREENWALD:  And so I think the -- it would really matter whether they allege a design defect claim or a negligence claim.  It's not dressed as a failure to warn.  I understand that issue.

So I don't know that I could think of a general question that will go across all lines.  Perhaps we should have asked people to consider asking for permission to amend their complaint if it didn't have that.

**THE COURT:** No. I mean --

**MS. GREENWALD:** Those are great questions.

**THE COURT:** I was just curious.

**MS. GREENWALD:** Yeah.

**THE COURT:** I mean, I wasn't suggesting you should have done it or anything like that. I was just curious.

**MS. GREENWALD:** No, I had not.

**THE COURT:** Okay.

All right. Anything else?

Does Monsanto have anything to say for itself?

**MR. KILARU:** Your Honor, I don't think we need to add to anything that's been said here.

**THE COURT:** Okay. All right. Sorry, was there -- was there anyone else who wanted to say anything? I don't -- I'm not seeing any hands up.

Okay. All right. Thank you very much.

**ALL:** Thank you, Your Honor.

**THE COURTROOM DEPUTY:** Court is adjourned.

(Proceedings adjourned at 11:31 a.m.)

---oOo---

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, May 1, 2026

_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court