# Exhibit 5

Robert L. Lieff (SBN 037568)
Elizabeth J. Cabraser (SBN 083151)
Steven E. Fineman (SBN 140335)
Kevin R. Budner (SBN 287271)
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: 415.956.1000
ecabraser@lchb.com

William M. Audet (SBN 117456)
Ling Y. Kuang (SBN 296873)
AUDET & PARTNERS, LLP
711 Van Ness, Suite 500
San Francisco, CA 94102-3229
Telephone: 415.568.2555

James R. Dugan, II
TerriAnne Benedetto
David S. Scalia
THE DUGAN LAW FIRM, APLC
One Canal Place
365 Canal Street, Suite 1000
New Orleans, LA 70130
Telephone: 504.648.0180

Samuel Issacharoff
40 Washington Square South
Suite 411J
New York, NY 10012
Telephone: 212.998.6580

*Counsel for Plaintiffs and the Proposed Class*
*(additional counsel listed below)*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Ramirez, et al. v. Monsanto Co.*, Case No. 3:19-cv-02224 | MDL NO. 2741<br><br>Case No. 3:16-md-02741-VC<br><br>**MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT, APPOINTMENT OF INTERIM CLASS AND SUBCLASS COUNSEL, DIRECTION OF NOTICE UNDER FED. R. CIV P. 23(e), SCHEDULING OF A FAIRNESS HEARING, AND STAY OF THE FILING AND PROSECUTION OF ROUNDUP-RELATED ACTIONS BY SETTLEMENT CLASS MEMBERS** |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

    A.    Settlement Negotiations.................................................................................3

    B.    The Settlement Class......................................................................................4

    C.    The Settlement Fund .....................................................................................5

        1.    Immediately Available and Streamlined Registration Process...................5

        2.    Diagnostic Accessibility Grant Program .......................................................6

        3.    Interim Assistance Grants................................................................................8

        4.    Research Funding Program ..............................................................................9

        5.    Allocation of the Settlement Fund .................................................................9

    D.    The Science Panel .......................................................................................10

    E.    Release .........................................................................................................12

    F.    Notice Plan...................................................................................................12

    G.    Attorneys' Fees, Expenses, and Incentive Awards................................15

ARGUMENT........................................................................................................................15

I.    The Court will likely find the Settlement fair, reasonable, and adequate.........................16

    A.    Rule 23(e)(2)(A): Counsel and the Class Representatives have and will continue to zealously represent the Class. ..........................................................16

    B.    Rule 23(e)(2)(B):  The Settlement is the product of months of adversarial negotiation under the supervision of the Court-appointed mediator. ...................18

    C.    Rule 23(e)(2)(C):  The Settlement provides substantial, urgently needed, immediate relief in exchange for a limited release and a short delay....................19

        1.    The Settlement benefits are designed to meet the Class's most critical needs during the litigation standstill. ...........................................19

        2.    In exchange for $1.1 billion in benefits, the Class gives up comparatively little. ...................................................................................22

        3.    Issue-preclusive determination by the Science Panel is a benefit to the Class. .........................................................................................................29

        4.    Class Members are eligible for relief through straightforward processes. ..........................................................................................................30

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

## TABLE OF CONTENTS
### (continued)

| | | | Page |
|---|---|---|---|

5. Counsel will seek reasonable attorneys' fees and costs that pose no obstacle to preliminary approval...............................................................31

6. There are no side agreements relevant to preliminary approval. ...............31

D. The Settlement treats all Class Members equitably relative to one another. .........32

E. The Settlement merits preliminary approval under this District's Procedural Guidance. ......................................................................................33

1. Guidance (1)(a) & (c): The Settlement Class and released claims are consistent with the operative complaint...............................................33

2. Guidance (1)(e): The Settlement is as good or better than what the Class could obtain in individual litigation. ................................................34

3. Guidance (1)(f): The allocation of the Settlement Fund is considered and reasonable. .......................................................................35

4. Guidance (1)(g): Targeted by a massive outreach effort, a substantial number of Class Members are expected to participate in the diagnostic accessibility and interim assistance grant programs...........35

5. Guidance (1)(h) & (8): Under no circumstances will funds revert to Monsanto...............................................................................................36

6. Guidance (6): Attorneys' fees, when requested, will meet all federal and local requirements. ...............................................................36

7. Guidance (7): The requested incentive awards are reasonable and subject to Court approval. ......................................................................37

8. Guidance (9): The Settlement provides a reasonable time for Class Members to exercise their rights............................................................37

9. Guidance (10): The Settlement complies with the Class Action Fairness Act. ........................................................................................37

II. The Court will likely certify the Class.................................................................37

A. The Class and Subclasses meet the requirements of Rule 23(a)..........................37

1. The Class and Subclasses are sufficiently numerous................................37

2. There is at least one common question with a common answer...............38

3. The proposed Class Representatives' claims are typical. .........................39

4. The proposed Class Representatives and Class Counsel have and will adequately represent the Class and Subclasses..................................39

# TABLE OF CONTENTS
## (continued)

**Page**

B.      The Class and Subclasses meet the predominance and superiority requirements of Rule 23(b)(3). ...............................................................40

C.      The Class and Subclasses may be certified as "issues" classes under Rule 23(c)(4). ....................................................................................................44

D.      Certification under Rule 23(b)(2) is also appropriate. ..........................................46

E.      The Court should appoint proposed Class Counsel and Subclass Counsel as Interim Settlement Class Counsel under Rule 23(g)(3).....................................47

III.      The Notice Plan provides the best practical notice.........................................................48

A.      Guidance (2): The Administrators and Notice Agents were selected based on capabilities and experience with large, complex settlements. .........................51

B.      Guidance (3)-(5): The proposed Notice Plan comports with Rule 23, Due Process, and this District's Guidance...................................................................52

IV.      The Court should stay Class Members from filing or prosecuting new Roundup Lawsuits and Related Party Lawsuits. ............................................................................52

V.      Requested Timetable...................................................................................................56

CONCLUSION.....................................................................................................................56

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allen v. Monsanto*,
    No. 13-0418, 2013 WL 6153150 (W.V. Nov. 22, 2013) ....................................................... 25

*Am. Pipe & Constr. Co. v. Utah*,
    414 U.S. 538 (1974) ............................................................................................................. 44

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997) ..................................................................................................... passim

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) ................................................................................................. 38, 40, 42

*Ball v. Union Carbide Corp.*,
    385 F.3d 713 (4th Cir. 2004) ............................................................................................... 27

*Barnes v. Am. Tobacco Co.*,
    161 F.3d 127 (3d Cir. 1998) ................................................................................................ 27

*Betts v. Reliable CollectionAgency, Ltd.*,
    659 F.2d 1000 (9th Cir. 1981) ............................................................................................. 37

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) ............................................................................................................. 27

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) ............................................................................................... 28

*Butler v. Sears, Roebuck & Co.*,
    702 F.3d 359 (7th Cir. 2012) ............................................................................................... 40

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ............................................................................................................. 41

*Celano v. Marriott Int'l, Inc.*,
    242 F.R.D. 544 (N.D. Cal. 2007) ........................................................................................ 38

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*,
    6 F.3d 177 (4th Cir. 1993) ................................................................................................... 46

*Churchill Vill., L.L.C., v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004) ............................................................................................... 48

*Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*,
    532 U.S. 424 (2001) ............................................................................................................. 28

*Cotter v. Lyft, Inc.*,
    193 F. Supp. 3d 1030 (N.D. Cal. 2016) ............................................................................. 25

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Cotter v. Lyft, Inc.*,
  No. 13-4065, Doc. 256 (N.D. Cal. July 1, 2016) ............................................................ 52, 55

*Dunn v. Hovic*,
  1 F.3d 1371 (3d Cir. 1993) ................................................................................................ 29

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ............................................................................................ 39

*Elsea v. U.S. Eng'g Co.*,
  No. 1016-15976 (Mo. Cir. 2018) ...................................................................................... 25

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003) ............................................................................................ 44

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .................................................................................... 52, 55

*Hardeman v. Monsanto Co.*,
  3:16-cv-00525 (N.D. Cal.) ........................................................................................... 23, 28

*Harris v. Vector Marketing Corp.*,
  No. 08-5198, 2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) ............................................. 19

*Haynes v. Logan Assistance Corp.*,
  No. 90-1800, 1994 WL 66701 (E.D. Pa. Mar. 4, 1994) .................................................... 28

*Hefler v. Wells Fargo & Co.*,
  No. 16-05479, 2018 WL 6619983 (N.D. Cal. Dec. 18, 2018), *aff'd*, 802 F. App'x 285 (9th Cir.
  2020) .................................................................................................................................. 32

*In re "Agent Orange" Prods. Liab. Litig.*,
  100 F.R.D. 718 (E.D.N.Y. 1983) ...................................................................................... 29

*In re Citric Acid Antitrust Litig.*,
  145 F. Supp. 2d 1152 (N.D. Cal. 2001) ............................................................................ 35

*In re Corrugated Container Antitrust Litig.*,
  659 F.2d 1332 (5th Cir. 1981) .......................................................................................... 54

*In re Diet Drugs Prods. Liab. Litig.*,
  No. 1203, 2000 WL 1222042 (E.D. Pa. Aug. 28, 2000) ............................................. 26, 27

*In re Diet Drugs*,
  282 F.3d 220 (3d Cir. 2002) .............................................................................................. 53

*In re High-Tech Emp. Antitrust Litig.*,
  No. 11-2509, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) .............................................. 33

# TABLE OF AUTHORITIES
## (continued)

*In re Inter-Op Hip Prosthesis Liability Litigation*,
204 F.R.D. 330 (N.D. Ohio 2001) ................................................................. 25, 26

*In re Nassau Cty. Strip Search Cases*,
461 F.3d 219 (2d Cir. 2006) .................................................................................. 44

*In re Nat'l Football League Players Concussion Injury Litig.*,
307 F.R.D. 351 (E.D. Pa. 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016) ..................... 25

*In re National Football League Players Concussion Inj. Litig.*,
821 F.3d 410 (3d Cir. 2016) ................................................................................. 49

*In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*,
332 F.R.D. 202 (N.D. Ill. 2019), *aff'd*, No. 19-2638, 2019 WL 8058082
(7th Cir. Oct. 25, 2019) ................................................................................. 25, 26

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) .......................................................................... 32, 33

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
No. 05-1720, 2019 WL 359981 (E.D.N.Y. Jan. 28, 2019) ..................................... 16

*In re Roundup Prods. Liab. Litig.*,
390 F. Supp. 3d 1102 (N.D. Cal. 2018) ............................................................... 10

*In re Roundup Prods. Liab. Litig.*,
214 F. Supp. 3d 1346 (J.P.M.L. 2016) .................................................................. 38

*In re School Asbestos Litig.*,
789 F.2d 996 (3d Cir. 1986) ................................................................................. 29

*In re St Jude Med., Inc.*,
522 F.3d 836 (8th Cir. 2008) ................................................................................ 27

*In re Veritas Software Corp. Sec. Litig.*,
No. 03-0283, 2005 WL 3096079 (N.D. Cal. Nov. 15, 2005),
*vacated in part on other grounds*, 496 F.3d 962 (9th Cir. 2007) ........................... 32

*In re Vioxx Prods. Liab. Litig.*,
869 F. Supp. 2d 719 (E.D. La. 2012) ................................................................... 52

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*,
MDL No. 2672, 2016 WL 6091259 (N.D. Cal. Oct. 18, 2016) .............................. 19

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*,
MDL No. 2672, 2017 WL 1047834 (N.D. Cal. Mar. 17, 2017) .............................. 31

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*,
MDL No. 2672, 2017 WL 672727 (N.D. Cal. Feb. 16, 2017) ................................ 19

# TABLE OF AUTHORITIES
## (continued)

**Page**

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liability Litig.*,
229 F. Supp. 3d 1052 (N.D. Cal. 2017) ............................................................... 52, 55

*In re Wells Fargo & Co. Shareholder Deriv. Litig.*,
No. 16-5541, 2020 WL 1786159 (N.D. Cal. Apr. 7, 2020) ...................................... 33

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) ................................................................................. 44

*Johnson v. Monsanto Co. et al.*,
Nos. A155940 and A156706 (Cal. App.) ........................................................... 23, 28

*Juris v. Inamed Corp.*,
685 F.3d 1294 (11th Cir. 2012) .............................................................................. 49

*Levya v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) ................................................................................... 43

*Loughman v. Consol-Pennsylvania Coal Co.*,
6 F.3d 88 (3d Cir. 1993) .......................................................................................... 27

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,
140 S. Ct. 1589 (2020) ............................................................................................ 30

*Martin v. Behr Dayton Thermal Prod. LLC*,
896 F.3d 405 (6th Cir. 2018) ...................................................................... 44, 45, 46

*Mejdrech v. Met-Coil Sys. Corp.*,
319 F.3d 910 (7th Cir. 2003) ................................................................................... 45

*Mullane v. Cent. Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ................................................................................................. 48

*Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*,
No. 13-9116, 2016 WL 3854603 (N.D. Ill. July 15, 2016) ...................................... 26

*Nitsch v. Dreamworks Animation SKG Inc.*,
No. 14-4062, 2017 WL 2423161 (N.D. Cal. June 5, 2017) ...................................... 33

*O'Connor v. Uber Techs., Inc.*,
No. 13-03826, 2019 WL 1437101 (N.D. Cal. Mar. 29, 2019) ................................. 16

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999) ................................................................................................. 41

*Pella Corp. v. Saltzman*,
606 F.3d 391 (7th Cir. 2010) ................................................................................... 44

*Penn. Bureau of Corr. v. U.S. Marshals Serv.*,
474 U.S. 34 (1985) ................................................................................................... 52

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Petrovic v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999) ................................................................................... 28

*Pilliod v. Monsanto Co.*,
  No. A158228 (Cal. App.) ..................................................................................... 23, 28

*Rodriguez v. West Publ'g*,
  563 F.3d 958 (9th Cir. 2009) ................................................................................... 33

*Sandpiper Vill. Condo. Ass'n, Inc. v. La.-Pac. Corp.*,
  428 F.3d 831 (9th Cir. 2005) ................................................................................... 55

*Satchell v. Federal Express Corp.*,
  Nos. 03-2659, 03-2878, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) .................................. 19

*Schwarzchild v. Tse*,
  69 F.3d 293 (9th Cir. 1995) ...................................................................................... 54

*State ex rel. E.I. DuPont de Nemours & Co.*,
  591 S.E.2d 318 (W. Va. 2003) ................................................................................. 20

*State Farm Mut. Auto Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ................................................................................................. 27

*Staton v. Boeing Co.*,
  327 F.3d 938 (2003) .......................................................................................... 16, 40

*Torres v. Mercer Canyons Inc.*,
  835 F. 3d 1125 (9th Cir. 2016) ................................................................................. 38

*United States v. N.Y. Tel. Co.*,
  434 U.S. 159 (1977) ................................................................................................. 52

*Uppal v. CVS Pharmacy, Inc.*,
  No. 14-2629, 2015 WL 10890652 (N.D. Cal. Sept. 11, 2015) ........................................ 52, 55

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996) .................................................................................... 44

*Vargas v. Ford Motor Co.*,
  No. 12-8388, 2020 WL 1164066 (C.D. Cal. Mar. 5, 2020) .............................................. 32

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................................................... 38, 47

*Williams v. Mohawk Indus., Inc.*,
  568 F.3d 1350 (11th Cir. 2009) ................................................................................ 43

*Wojciechowski v. Kohlberg Ventures, LLC*,
  923 F.3d 685 (9th Cir. 2019) .................................................................................... 30

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Wolin v. Jaguar Land Rover N. Am., LLC*,
  617 F.3d 1168 (9th Cir. 2010) ...................................................................................... 39

*Woods v. Graphic Commc'ns*,
  925 F.2d 1195 (9th Cir. 1991) ...................................................................................... 27

*Zinser v. Accufix Res. Inst., Inc.*,
  253 F.3d 1180 (9th Cir. 2001) ...................................................................................... 47

**Statutes**

28 U.S.C. § 1651 ............................................................................................................. 52

28 U.S.C. § 2283 ............................................................................................................. 54

**Rules**

Fed. R. Civ. P. 23(a)(1) ................................................................................................... 37

Fed. R. Civ. P. 23(a)(2) ................................................................................................... 38

Fed. R. Civ. P. 23(a)(4) ................................................................................................... 39

Fed. R. Civ. P. 23(b)(3) ............................................................................................. 40, 45

Fed. R. Civ. P. 23(b)(3)(B) ............................................................................................. 42

Fed. R. Civ. P. 23(b)(3)(C) ............................................................................................. 42

Fed. R. Civ. P. 23(b)(3)(D) ............................................................................................. 42

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................................ 15, 48

Fed. R. Civ. P. 23(c)(4) .............................................................................................. 37, 44

Fed. R. Civ. P. 23(e) ....................................................................................................... 15

Fed. R. Civ. P. 23(e)(1) ................................................................................................... 15

Fed. R. Civ. P. 23(e)(1)(B) ............................................................................................. 15

Fed. R. Civ. P. 23(e)(2) ................................................................................................... 16

Fed. R. Civ. P. 23(e)(2)(B) ............................................................................................. 18

Fed. R. Civ. P. 23(e)(2)(c)(iv) ........................................................................................ 31

Fed. R. Civ. P. 23(e)(2)(D) ............................................................................................. 32

Fed. R. Civ. P. 23(e)(5) ................................................................................................... 15

Fed. R. Civ. P. 23(e), 2003 Ad. Comm. Notes ............................................................... 31

Fed. R. Civ. P. 23(g)(1)(A) ............................................................................................. 47

Fed. R. Civ. P. 23(g)(3) ................................................................................................... 47

**TABLE OF AUTHORITIES**
(continued)

**Page**

**Other Authorities**

Alexandra D. Lahav, *The Knowledge Remedy*,
98 Tex. L. Rev. 1361 (2020)........................................................................................ 20, 21

William B. Rubenstein et al., *Newberg on Class Actions* (5th ed.) .................................. 41, 42, 43

## NOTICE OF MOTION AND MOTION

TO ALL THE PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on such date and time as the Court may set, in Courtroom 4 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, unless the Court orders proceedings be held by telephone or videoconference, proposed Class Counsel, on behalf of a proposed Settlement Class, will and hereby do move the Court for an order (1) granting preliminary approval of the Class Action Settlement and Settlement Agreement; (2) appointing Interim Class Counsel and Subclass Counsel; (3) approving the dissemination of Settlement Class Notice; (4) Scheduling a Fairness Hearing; and (5) staying the filing and prosecution of Roundup-related actions by Settlement Class Members, pursuant to Rules 23(a), 23(b), 23(c)(2)(B), 23(c)(4), and 23(e) of the Federal Rules of Civil Procedure.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

This Court needs no introduction to the litigation concerning Monsanto's Roundup herbicide and its connection, or lack thereof, to Non-Hodgkin's Lymphoma (NHL). Thousands of individual cases are pending before this Court and various state courts. Absent the recently announced comprehensive settlement of these individual personal injury actions, those cases would be decided through individual trials or settlements, with general causation, specific causation, and damages resolved one-by-one for each plaintiff who has retained counsel and sued Monsanto. For better or worse, that is the system we have for resolving mass personal injury actions.

Piecemeal adjudication will not, however, do anything for the hundreds of thousands or even millions of persons who have been exposed to Roundup, may or may not have manifested NHL symptoms, and have not commenced an individual personal injury action or retained counsel to do so. Those persons, whether knowing or not, live under a cloud of risk and uncertainty given the potential that Roundup in fact causes NHL. As this Court has stated: there is "at least a strong argument that the only reasonable conclusion one could draw right now is that we don't yet know" whether glyphosate-based formulations cause NHL. MDL Doc. 1219, at 5:14-16. It is bad enough if they know of the risk or of this litigation; the tragic reality is that many such individuals are agricultural workers living in rural areas who may have limited or no English skills and are less likely to even be aware of the Roundup controversy.

The grist of the MDL mill—bellwether trials, *Daubert* rulings, protracted appeals—none offers much of anything to those exposed to Roundup who do not have lawyers and have not sued Monsanto. Those people need outreach, notice, and early diagnosis, and they need those things now. They also need an *answer* to whether Roundup can cause NHL, the threshold

- 1 -

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

question central to evaluating their risk for life-threatening disease. And they need to know what level of exposure to Roundup might be associated with the risk of NHL. This "knowledge remedy" will not come from piecemeal individual litigation.

This Settlement fills that gap.[1] Negotiated over many months under the close supervision of Court-appointed mediator Kenneth R. Feinberg, the Settlement provides five pillars of relief:

(1) $1.1 billion in non-reversionary cash paid by Monsanto for the benefit of the Class;

(2) An independent Science Panel to provide a definitive and binding answer on the relationship between Roundup and NHL;

(3) A Diagnostic Accessibility Grant Program offering testing for NHL, with a focus on early diagnosis for the most at-risk and medically-underserved populations;

(4) Interim Assistance Grants to compensate for the delay in litigation; and

(5) A Research Funding Program to fund medical and scientific research into the diagnosis and treatment of NHL.

In exchange, Class Members agree to a litigation standstill for four years—during which time the Settlement programs operate and the Science Panel completes its work—and a release only of claims for medical monitoring and for punitive damages. After issuance of the Science Panel Determination, the stay will be lifted, and Class Members will be released into the tort system, free to pursue their own personal injury claims. The Science Panel Determination of general causation or no general causation will be binding, on both Class Members and Monsanto, in future claims.

The details are many and are set forth below comprehensively. But in a nutshell, that is the Settlement—a litigation pause, $1.1 billion in immediate relief to diagnose or ameliorate

---

[1] Capitalized terms are defined in the Settlement Agreement, which is attached as **Exhibit A** to the Cabraser Declaration, unless otherwise indicated.

- 2 -

NHL and compensate for delay, and a final determination of the central question in this controversy. In addition, by providing (and exceeding) the notice required by Rule 23 and due process, the Settlement corrects any information asymmetry. Knowledge is power, and this Settlement empowers class members to hold Monsanto responsible for their injuries if and when the Science Panel determines that general causation is satisfied.

Here is what the Settlement is not. It does not affect anyone who has filed a lawsuit against Monsanto or retained counsel to do so—they are not in the Class. It does not "pick a winner" in the general causation debate that animates this litigation—that is for the neutral, independent Science Panel to determine. And it does not release anyone's personal injury claim against Monsanto—those claims survive and may be pursued after the Settlement period is over.

This Settlement solves a unique and complex problem. Plaintiffs submit that the requirements of Federal Rule of Civil Procedure 23(e)(1)(B) are satisfied, that the Court likely will be able to certify the Class and approve the Settlement, and that the Court should therefore grant preliminary approval and direct notice to the Class.

## BACKGROUND

### A. Settlement Negotiations

Nearly one year ago, on July 2, 2019, the Court appointed Kenneth R. Feinberg, perhaps the most accomplished and experienced mediator in the area of mass torts and class actions, as mediator in this multidistrict litigation. *See* MDL Doc. 4441. That same month, under his supervision, settlement discussions began in earnest in the *Ramirez* case, which, as filed, sought a single determination on a class-wide basis of common questions including general causation. Cabraser Decl. ¶ 3; *see also Ramirez* Doc. 1.

Those discussions continued between proposed Class and Subclass Counsel and Monsanto for nearly a full year, in person during the fall and winter of 2019-2020, and then

- 3 -

remotely once the COVID-19 pandemic began.  Cabraser Decl. ¶ 3.  Beginning in January 2020,

meetings occurred on a virtually daily basis, nights and weekends not excepted.  *Id.*

Negotiations were intense and included the exchange of dozens of drafts of settlement

documents and memoranda, regular status reports to the mediator, and direct input on Settlement

terms from the expert vendors proposed to administer the programs, as well as other consulting

experts related to science and medicine.  *Id.* at ¶¶ 3, 22.

While the content of the negotiations is confidential, the integrity and arms-length nature

of the process was ensured, and can be attested to by, the mediator.  *Id.* ¶ 4.  Settlements of this

magnitude, providing programmatic benefits this innovative and comprehensive, are never easy,

and the parties have been, at many times, far apart and often at odds.  Each side threatened to

walk away at multiple points, and the mediator's direct resolution of disputes was required, at

times, to prevent the discussions from collapsing altogether.  *Id.*  Nonetheless, after nearly one

year agreement ultimately was reached on the essential terms of a class settlement that is

designed to solve the overarching question of this litigation—general causation—in a way that

benefits as well as binds the class of those not subject to the settlement of the individual cases

making up this MDL.  *Id.*

### B.    The Settlement Class

The Settlement Class is defined as:

those individuals who are either citizens or Residents of the United States as of June 24,
2020 or who claim exposure to Roundup Products through the application of Roundup
Products in the United States and who as of June 24, 2020 both (1) have been exposed to
Roundup Products through the application of Roundup Products and (2) have not
commenced a lawsuit or otherwise retained counsel with respect to any individual actual
or potential personal injury or false advertising claims arising from, resulting from, in any
way relating to or in connection with such exposure; and (ii) all Derivative Claimants.

Settlement § 1.1(a).  In addition, the Settlement defines two Subclasses:

Subclass 1 includes Class Members who have been diagnosed with NHL as of the

- 4 -

Settlement Date, and their Derivative Claimants.

Subclass 2 includes Class Members who have not been diagnosed with NHL as of the Settlement Date, and their Derivative Claimants.

*Id.* § 1.2.  Derivative Claimants include those who have a right to sue by reason of their relationship with a Class Member.  A Class Member may retain counsel to assist with obtaining Settlement benefits while remaining a Class Member.

### C.    The Settlement Fund

A principal benefit of the Settlement is the $1.1 billion Settlement Fund, none of which will revert to Monsanto, and the bulk of which will be used to diagnose NHL and prevent or ameliorate its harms to the class.  To compensate the Class for the pause in their right to file personal injury claims, the Settlement provides what Class Members need now: outreach, diagnostic assistance, and need-based assistance to compensate them for delay.  And it does so under the ongoing supervision of the Court-appointed mediator, Mr. Feinberg, who will also serve as Settlement Administrator.[2]

#### 1.    Immediately Available and Streamlined Registration Process

Within 40 days after the Court directs notice to the Class, the Settlement Class Notice Agents[3] will establish a registration process (both online and hard copy) so that Class Members can identify themselves and establish benefit eligibility, including exposure to Roundup required for class membership and Diagnostic Accessibility Grant Program access and a diagnosis of NHL required for Interim Assistance Grants.  *See* Settlement Art. 5.  Immediately available

---

[2] The Settlement Fund will be paid in stages:  $1 million immediately; $49 million at preliminary approval; $50 million at final approval; $400 million at the Effective Date; and $200 million at the beginning of each subsequent year of the Settlement Period.  Settlement § 7.3.  If necessary, the Settlement Administrator has authority to direct accelerated payment of an additional $100 million in the first year after the Effective Date, to be credited against the three subsequent payments.  *Id.* § 7.3(iv).

[3] The proposed Settlement Class Notice Agents are Kinsella Media and Signal Interactive Media.

registration is critical not only because it will permit prompt dispensation of Settlement benefits after the Settlement is approved and becomes effective, though it will have that important consequence. But in addition, registration both provides the Court with hard evidence at final approval that the notice program has been effective, and also connects class members to this litigation in ways that cannot be undone even in the unlikely event that the Settlement does not become effective. Registration is merely the first of many steps attendant to this Settlement, but by itself provides a valuable benefit to class members.

### 2. Diagnostic Accessibility Grant Program

The Diagnostic Accessibility Grant Program (DAGP) is intended to increase the availability of NHL diagnostic services to Class Members during the litigation standstill. *See* Settlement Art. VIII. The DAGP will be conducted by the Court-appointed DAGP Administrator, under the supervision of the Settlement Administrator. Plaintiffs propose that Wolf Garretson, LLC be appointed DAGP Administrator. Garretson has unparalleled experience in the administration of complex litigation and settlement programs, including the Deepwater Horizon, NFL Concussion, and World Trade Center cases. *See* Cabraser Decl., Ex. B.

The DAGP is a medical outreach and assistance program that will distribute grants to existing medical clinics and healthcare providers that offer diagnostic services to Class Members who have not been diagnosed with NHL (members of Subclass 2). The program will prioritize certain areas of the United States, where high-quality healthcare is not readily available, to expand access to NHL diagnostic evaluation for the most at-risk and medically-underserved populations. The service areas will be identified by the DAGP Administrator using occupational data provided by the Settlement Class Notice Agents, including geographic information regarding where certain Class Members (including farm, landscaping, and groundskeeping workers) reside or work in the greatest concentrations. The DAGP Administrator will then

consider disparities in access to NHL diagnostic evaluation within those areas, as well as cultural and economic barriers to healthcare access. Exhibit 5 to the Settlement sets out the details of this process comprehensively.

The first step of the DAGP is an outreach campaign to inform Class Members of the availability of NHL diagnostic evaluation from medical providers who receive grants, as well as how to conduct initial self-evaluation for NHL indicators. *See* Settlement § 8.2. The DAGP Administrator will design the outreach campaign to best reach both the affected populations in the service areas as well as critical entities that promote health awareness in those communities. The outreach program will also employ communications channels reflecting how Class Members receive and share information. *See* Messina Decl. ¶¶ 12-35 & Ex. B (detailing survey work used to identify communication channels).

To identify grant recipients, the DAGP Administrator will apply a rigorous selection and evaluation process. *See* Settlement § 8.3. The DAGP Administrator will develop procedures for grant awards, with the goal of ensuring grants are distributed only to well-qualified medical providers (including Federally-Qualified Health Centers) and of increasing the availability of NHL diagnostic evaluation to the greatest number of Class Members. All guidelines will be approved by the Settlement Administrator. Grants will be awarded based on, among other things, the provider's capabilities to arrange for or perform NHL Diagnostic Evaluation, the estimated number of DAGP-eligible Settlement Class Members within the provider's service area, and the extent of usage of Roundup Products in the provider's service area.[4] The DAGP Administrator will also monitor the grantees' performance to ensure that the funds are being deployed appropriately and efficiently.

---

[4] The complete list of criteria is provided in the Settlement Agreement at § 8.3(a)(i)-(ix).

### 3. Interim Assistance Grants

The Settlement also provides equitable assistance to compensate those Class Members diagnosed with NHL for the effects of the delay during the litigation standstill on an as-needed basis. *See* Settlement Arts. X & XI. The Interim Assistance Grants will be administered and distributed by the Claims Administrator, under the supervision of the Settlement Administrator, and will command the largest part of the class recovery. Plaintiffs propose that Verus, LLC be appointed Claims Administrator. Verus was selected based on its extensive experience with claims administration in complex settlements, including asbestos trust administration. *See* Cabraser Decl. ¶ 14 & Ex. C. The Claims Administrator will be tasked with maintaining the Settlement Website and telephone system (both as initially set up by the Settlement Class Notice Agents) establishing and administering the registration program, and processing Interim Assistance Grant claims.

The Interim Assistance Grants will be need-based, with diagnosed Class Members presumptively eligible if their income is at or below defined levels relative to the United States Federal Poverty Guidelines in the year of their diagnosis (ranging from 138% in early and late years to 250% in middle years). *See* Settlement, Exs. 6 (qualifying diagnoses and qualified physicians for Interim Assistance Grants) & 7 (Interim Assistance Grant guidelines). All Class Members, whether they are presumptively eligible or not, can apply for a determination that their individual circumstances warrant deviation from the guidelines. Settlement § 10.4. The Claims Administrator is empowered to assess individual requests and, if it determines a deviation is justified by exceptional need during the period of delay, may request approval from the Settlement Administrator for an exception.

To apply for an Interim Assistance Grant, Class Members must submit a claim package including, for example, medical records and physician certification of a qualifying diagnosis of

NHL; proof of class membership, i.e., exposure to Roundup; and information regarding household income. *See* Settlement §§ 11.1-11.3. Claims will be reviewed efficiently, with an initial determination of completeness and sufficiency reached within 45 days of initial submission and a final determination within 60 days of a completed claim package (unless the volume of claims is such that the Settlement Administrator elects to extend the time periods). Class Members whose claims are rejected will be given an opportunity to cure any deficiencies, and shall have the right to appeal the Claims Administrator's eligibility determination or designated amount of the Interim Assistance Grant to the Settlement Administrator. Any appeal will require payment of a modest $50 fee, which is refundable if the appeal is successful and waivable upon a showing of hardship. Class Members can elect to receive funds by check, electronic transfer, or pre-paid debit card.

### 4. Research Funding Program

The Settlement will also fund medical and scientific research into the diagnosis and treatment of NHL. *See* Settlement Art. IX. Following Settlement approval, Class Counsel and Counsel for Monsanto will solicit and evaluate proposals for funding related to medical or scientific research into the diagnosis and treatment of NHL from medical and scientific professionals and entities. Counsel will then submit joint or individual recommendations regarding which proposals should be approved. The Settlement Administrator will then make the final decision as to allocation of funds, taking into consideration the credentials and past effectiveness of the medical and scientific professionals and entities sponsoring the proposal, as well as the potential number of Settlement Class Members that may benefit from the proposal.

### 5. Allocation of the Settlement Fund

After costs of Class Notice, the Science Panel, Settlement Administration, and miscellaneous expenses, the Settlement Fund will be allocated in the following ways: (1) the

DAGP (18%); (2) Interim Assistance Grants (77%); and (3) the Research Funding Program (5%). Settlement § 7.4. After the initial notice costs, subsequent expenses are set at a maximum of $50 million, with any additional such costs requiring Court approval. *Id.* § 7.5. The allocations among the three programs are presumptive and may be altered by the Settlement Administrator as necessary within his discretion, subject to minimum and maximum amounts in each category: (1) between $100 million and $250 million for the Diagnostic Accessibility Grant Program; (2) at least $650 million for the Interim Assistance Grants; and (3) between $25 million and $75 million for the Research Funding Program. Under no circumstances will any of the Settlement Fund revert to Monsanto. The Settlement Administrator will provide annual financial reports to Class Counsel regarding Settlement Fund accounting, and will provide additional reports or information as the Court requests.

### D.    The Science Panel

A central feature of the Settlement is the creation of an independent Science Panel tasked with evaluating the relationship between Roundup exposure and NHL. *See* Settlement Art. VI & Ex. 4 (Science Panel Determination Form). As this Court has recognized, although the evidence regarding the causal link between Roundup and NHL is sufficient to create a genuine issue of material fact for trial, that evidence is conflicting. *See In re Roundup Prods. Liab. Litig.*, 390 F. Supp. 3d 1102, 1151 (N.D. Cal. 2018). A final determination after rigorous, unrushed, and unbiased analysis will promote fairness, by ensuring that individual outcomes of claims do not turn on the luck of the jury pool, and efficiency, by saving Class Members, Monsanto, and the judiciary substantial time and expense.

The Science Panel will be tasked with determining whether, based on the existing body of scientific evidence, it is more likely than not that "exposure to Roundup Products through the

- 10 -

application of Roundup Products can cause NHL in humans." Settlement, Ex. 4.[5] If the answer is "Yes," the Science Panel will determine "at what threshold internal dose level" (calculated as "greater than xx micrograms/day over a lifetime") the causal relationship can exist. *Id.*

The Science Panel will comprise five individuals with expertise in relevant medical and scientific disciplines, including epidemiology, biostatistics, toxicology, hematology, and/or oncology. To preserve the independence of the Panel, it will not include any individual who has been retained as an expert in this MDL, or who has communicated with any expert in the MDL regarding the subject matter of the litigation. Members of the Science Panel will be selected by consent of the parties or, absent agreement, by a third-party entity selected by the parties. If the parties are unable to reach agreement on a third-party entity to select the Science Panel members, each side may select two members of the Science Panel, with the fifth member selected by the other Science Panel members.

The Science Panel will be granted four years to conduct its work, but may petition the Court for an extension if the Panel determines it necessary. At the conclusion of this period, the Science Panel will render a decision regarding the causal link between Roundup and NHL. The Science Panel Determination will be binding, on both Class Members and Monsanto, and have issue-preclusive effect in future Roundup-related litigation between any Settlement Class Member and Monsanto. *See* Settlement § 6.3.

---

[5] The Science Panel's analysis will include (1) published government carcinogenicity assessments; (2) IARC Monograph 112 regarding glysophate; (3) "[a]ll published studies and reviews regarding glyphosate, glyphosate-based herbicides and/or surfactant epidemiology, exposure/dose, animal toxicology, genotoxicity, and chemical structure and activity;" and (4) all relevant registrant-supplied studies and data submitted to the EPA and other regulatory authorities. Settlement § 6.2(d). However, if during the pendency of the Scientific Analysis new evidence becomes available that the Science Panel considers material, it may petition the Settlement Administrator for permission to consider the new evidence. The Science Panel will not conduct any independent scientific research to generate new scientific data.

1984556.13

### E.  **Release**

In exchange for the Settlement benefits, the Class agrees to a release that has two principal components.  *See* Settlement Art. XV.  *First*, the Settlement provides for a standstill period while the Science Panel completes its analysis and the Settlement programs run.  During that time, Settlement Class Members may not file new litigation related to Roundup.  The statutes of limitations for Class Members' claims related to Roundup exposure and NHL will be tolled during the standstill period to ensure that Class Members' claims are preserved.  After issuance of the Science Panel Determination, the standstill period will terminate, and Class Members will be released into the tort system.

*Second*, Class Members release any claims against Monsanto for punitive damages and for medical monitoring related to Roundup exposure and NHL.  The Settlement otherwise preserves Class Members' ability to sue Monsanto for compensatory damages in connection with any other claim not listed above, including but not limited to personal injury, fraud, misrepresentation, negligence, fraudulent concealment, negligent misrepresentation, breach of warranty, false advertising, and violation of any consumer protection or unfair and deceptive acts or practices statute.

### F.  **Notice Plan**

This is an unusual Settlement for an unusual Class.  A garden-variety class notice plan would be manifestly insufficient to reach and inform a Class scattered across two countries, and including large groups of individuals who may be itinerant, lack exposure to traditional media, or do not speak English as a first language.

The chart below summarizes the Notice Plan:

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

| **CLASS NOTICE OVERVIEW** |
|---|
| **Roundup Settlement Class Members** |
| Settlement Class Members are very diverse and geographically widespread. Roundup is used in residential garden and lawn care, large properties such as golf courses, schools, universities and parks, and within the entire agricultural industry. The ubiquity of Roundup requires a comprehensive notice program in the U.S. and Mexico. Yet, those most likely to develop Non-Hodgkin's Lymphoma are those who are subject to repeated exposures through their work. The heavily exposed population will require additional notice through targeted media and community outreach. |
| **Geographic Concentration of Professionally At-Risk Population** |
| A number of different sources were reviewed in order to determine geographic concentration of Settlement Class Members who have the greatest likelihood of exposure to Roundup Products:<br><br>• Pre-Notice Research: In-depth phone survey of 50 agricultural workers and online opinion survey of 656 agricultural workers and landscapers.<br>• The Bureau of Labor Statistics (BLS) county level data on the number of workers employed as: landscaping/groundskeeping workers; farmworkers/laborers (crop, nursery, greenhouse); vegetation pesticide handlers, sprayers, and applicators, ground maintenance workers; and other agriculture workers (inspectors, graders and sorters, and equipment operators).<br>• The United States Department of Agriculture (USDA) county level data on farm labor, migrant workers, farms using pesticides for weed control, and farms that harvested cropland.<br><br>An estimated "At-Risk Population" was created using the BLS and USDA data. Additionally, information from the BLS and the National Agricultural Workers Survey was used to estimate the percent of the At-Risk Population likely to be Hispanic/Latino. These estimations were used to tier local media in counties with the heaviest concentration of Settlement Class Members who may have had the greatest exposure to Roundup Products. |
| **U.S. Direct Notice/Third Party Notice (mail/email)** |
| Mail/Email Notice to approximately 125,000 potential Settlement Class Members and organizations. Includes:<br><br>• Farms in counties w/1,000+ farmworkers,<br>• Businesses/Organizations (e.g., greenhouses, herbicide consultants, weed control, vineyards, farm labor/ management/organizations/services, landscape, grounds maintenance, sports fields, cemeteries, garden centers, golf courses, schools/universities), and<br>• Government entities (building directors, weed supervisors, public works directors).<br><br>Mail posters to approximately 15,000 stores (farming /lawn and garden supplies) asking them to post notice. Send letter to large retailers (e.g., Lowes, Home Depot) asking if they would like to receive posters so they could post notice. Stores can contact the administrator for additional posters. |

| **U.S. National Media (TV/radio/print/online)** | | |
|---|---|---|
| • TV: Broadcast (English)<br>• Radio (English/Spanish) | • 6 Consumer Magazines (5 English/1 Spanish) | • Online: Networks/Facebook |

| **U.S. State Media Targeting At-Risk Population (radio/print/online)** | | |
|---|---|---|
| • Radio: Agricultural (covering 20 states) | • 22 Spanish-language newspapers<br>• 4 Landscaping Magazines | • 21 State Agricultural Magazines<br>• Digital: Ag Network |

| **U.S. Local Broadcast Media Targeting At-Risk Population (TV/radio)** | | |
|---|---|---|
| **Tier 1** (50k+ At-Risk)<br>• 63 counties in 5 media markets covering 7 states<br>• 3-4 weeks TV/Radio | **Tier 2** (25k-50k At-Risk)<br>• 193 counties in 10 media markets covering 13 states + DC<br>• 2-3 weeks TV/Radio | **Tier 3** (15k-25k At-Risk)<br>• 193 counties in 10 media markets covering 14 states<br>• 1-2 weeks TV/Radio |

1984556.13

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

| CLASS NOTICE OVERVIEW |
|---|
| **Media Markets with 50% or more Hispanic/Latino At-Risk Population = Spanish Radio/TV**<br><br>**Media Markets with 50% or more Non-Hispanic/Latino At-Risk Population = English Radio**<br><br>**Indigenous** (CA, AZ): Radio (Mixteco, Zapotec, Triqui) |

| **U.S. Digital Targeting At-Risk Populations** |
|---|

The targeted digital campaign is designed to run for a period of six months, concurrent with due process notice efforts and on-ground outreach. Ads will be focused in areas with the heaviest concentration of At-Risk Population. A variety of ads in different formats and languages (English, Spanish, Mixteco, Zapotec, and Triqui) will be served across a range of platforms. Media targeted to migrant farmworkers will be heavily focused on mobile.

| **Farmworkers** | **Landscapers/Groundskeepers** | **NHL Diagnoses** |
|---|---|---|
| • Targeting 919 counties in 38 states.<br>• English, Spanish, and Indigenous (Mixteco, Zapotec, Triqui) | • Targeting 668 counties in 50 states + DC.<br>• English and Spanish | • National level targeting.<br>• Desktop/Tablet/ Mobile<br>• CDC modeled NHL data<br>• English and Spanish |

**Examples of platforms**: Facebook/Instagram, YouTube, Google, Weather apps, etc.

| **On-Ground Outreach** |
|---|

Work with organizations that have contact with the At-Risk Population to communicate information about the Settlement and build trust. Organizations include:

• National, State, and Local Organizations (such as non-profits, labor unions, legal defense funds, community health centers, and churches),
• Government Officials including state and local U.S. elected officials and the Mexican Consulate,
• Businesses (e.g., community centers, gas stations, convenience stores, restaurants and laundry mats),
• Events such as county fairs and sporting events, and
• Schools through organizations like the National Association of State Directors of Migrant Education (NASDM) and the National Migrant Seasonal Head Start Association (NMSHSA)

Contact national organizations as avenues to disseminate information in Mexico including Instituto Mexicano del Seguro Social (IMSS) and The Instituto de Seguridad y Servicios Sociales de los Trabajadores del Estado (ISSSTE), Mexico's public social security and services organization.

| **Earned Media** |
|---|

| | | |
|---|---|---|
| • U.S. Bilingual Multimedia News Release | • U.S. Bilingual Satellite Media Tour | • U.S. Bilingual Pitch Team<br>• Mexico Press Release |

| **Mexico** |
|---|

| **TV/Radio (National/Local)** | **Digital** |
|---|---|
| • Markets in select states with the highest number of migrants to the U.S.<br>• 3-4 weeks<br>• Spanish with some Indigenous radio in select states (Mixteco, Zapotec, Triqui) | • Coverage in metropolitan border areas over 25 weeks<br>• Coverage in select states with the highest number of migrants to the U.S.<br>• Spanish, with some Indigenous in select states (Mixteco, Zapotec, Triqui) |

1984556.13

The full comprehensive and state-of-the-art Notice Plan, including the methodology and research deployed to develop it, are detailed in the Declarations of Shannon Wheatman and James Messina.

### G.    Attorneys' Fees, Expenses, and Incentive Awards

Monsanto has agreed to pay attorneys' fees and costs up to $150 million, and class representative service awards up to $25,000 each (for a total of $100,000), all separate from and in addition to the $1.1 billion Settlement Fund. The amounts were negotiated by counsel only after the parties had agreed to all material terms and conditions of the Settlement, will not reduce payments or benefits to the Class in any way, and are subject to Court approval. The application for fees, costs, and service awards will be made well in advance of the objection/opt-out date, with information provided to the Class in the long-form class notice and posted on the Settlement Website. The Court's approval of any particular amount of fees, costs, or service awards is not a material term of the Settlement.

### ARGUMENT

Fed. R. Civ. P. 23(e) governs a district court's analysis of the fairness of a proposed class action settlement and creates a multistep process for approval. First, a court must determine that it is likely to (i) approve the proposed settlement as fair, reasonable, and adequate, after considering the factors outlined in Rule 23(e)(2), and (ii) certify the settlement class after the final approval hearing. *See* Fed. R. Civ. P. 23(e)(1)(B). Second, a court must direct notice to the proposed settlement class, describing the terms of the proposed settlement and the definition of the proposed class, to give them an opportunity to object to or to opt out of the proposed settlement. *See* Fed. R. Civ. P. 23(c)(2)(B); Fed. R. Civ. P. 23(e)(1), Fed. R. Civ. P. 23(e)(5). Third, after a hearing, the court may grant final approval of the proposed settlement on a finding that the settlement is fair, reasonable, and adequate, and certify the settlement class. Fed. R. Civ.

P. 23(e)(2). In this District, a movant's submission should also include the information called for under the District's Procedural Guidance for Class Action Settlements.

## I.     The Court will likely find the Settlement fair, reasonable, and adequate.

Under the recent amendments to Rule 23(e)(2), a court may approve a settlement as "fair, reasonable, and adequate" after considering whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Those factors are satisfied here.

### A.     Rule 23(e)(2)(A): Counsel and the Class Representatives have and will continue to zealously represent the Class.

Under the first Rule 23(e)(2) factor, courts consider whether the class representatives and class counsel will represent the class adequately. Fed. R. Civ. P. 23(e)(2). Courts analyze this factor in the same manner that they evaluate adequacy under Rule 23(a)(4). *See O'Connor v. Uber Techs., Inc.*, No. 13-03826, 2019 WL 1437101, at \*6 (N.D. Cal. Mar. 29, 2019); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-1720, 2019 WL 359981, at \*15 (E.D.N.Y. Jan. 28, 2019). Adequacy is satisfied when (1) the named plaintiff and counsel have no conflicts with the class; and (2) plaintiff will "prosecute the action vigorously." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (2003).

There are no conflicts here—at all times during the critical stages of the negotiations, the Subclasses were represented by their own proposed Subclass counsel, William Audet for Subclass 1 and TerriAnne Benedetto for Subclass 2. Cabraser Decl. ¶ 6. And Class Counsel and

1984556.13

- 16 -

the Class Representatives have already proven they will represent the Class well. In addition to negotiating the Settlement itself, Class Counsel worked over many months closely with the DAGP and Claims Administrators, as well as the Class Notice Agents, to design the Settlement programs to meet the needs of a unique Class.

The first step was to understand where Class Members—persons exposed to Roundup—live and work. With the Claims Administrator, Class Counsel used demographic and occupational data sourced from various government agencies. The result was reliable estimates of both the population of workers in agricultural and groundskeeping occupations and the distribution of that population throughout the United States. The Claims Administrator refined these estimates using data on per capita spending on gardening and landscaping products, as well as data acquired from Monsanto regarding retail sales of Roundup. The result was visuals—"heat maps"—and tabulations of occupational and residential populations, aggregated at the ZIP Code, County, CBSA, and State levels. The data were further refined using extracts from the USDA's Agricultural Census, which identified the specific geographic regions where Roundup is most commonly used, and the National Agricultural Worker's Survey, which yielded information on the countries of origin of migrant farm labor entering the United States each year. Class Counsel also worked to understand where Class Members diagnosed or likely to be diagnosed with NHL are concentrated using datasets from the National Cancer Institute.

Having found where Class Members live and work, the next step was to talk to them. Class Counsel commissioned Class Notice Agent Signal IM to conduct in-depth, long-form interviews of migrant agricultural workers, non-migrant agricultural workers, and landscapers. Signal also conducted a nationwide survey of individuals likely to fit the Class definition who worked in the key industries most affected by professional Roundup exposure: landscaping and

groundskeeping, agriculture, and farm, ranch, or aquaculture animal operations. These efforts yielded crucial insights on how to design the Class Notice to persuade Class Members to participate in the Settlement, which Notice channels to use to make Notice most effective, and which third-party organizations to target for the DAGP outreach effort. All of those lessons were used to inform the Notice Plan and Settlement programs. Further details on this work are provided in the Declaration of James Messina.

Class Counsel also became well-versed in the science necessary both to design the DAGP and frame the Science Panel inquiry. Class Counsel, working with the DAGP Administrator, reviewed literature on the diagnostic criteria for NHL in order to understand the clinical capability and capacity requirements necessary for DAGP grant recipients. And Class Counsel retained and worked with consulting experts on questions of epidemiology and toxicology to understand how to frame the questions posed to the Science Panel.

These efforts will only intensify with the filing for and grant of preliminary approval. Class Counsel and the Administrators continue to work to identify additional data sources on NHL incidence, as well to design future field studies to make the DAGP and Interim Assistance Grant programs maximally effective, and to develop a predictive model to forecast the demand on the Settlement programs.

**B.** **Rule 23(e)(2)(B): The Settlement is the product of months of adversarial negotiation under the supervision of the Court-appointed mediator.**

Rule 23 instructs the Court to consider whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). This Settlement was. Over the course of nearly a year, the parties negotiated every detail large and small of the $1.1 billion Settlement program. Cabraser Decl. ¶¶ 3-4. Negotiations were contentious and nearly collapsed at multiple times, and the integrity and arms-length nature of the process were ensured by the regular involvement of the

Court-appointed mediator. Such involvement is a plus factor. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*, MDL No. 2672, 2017 WL 672727, at *16 (N.D. Cal. Feb. 16, 2017) (finding approval appropriate where "the parties negotiated the Settlement under the supervision of a court-appointed Settlement Master"); *In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*, MDL No. 2672, 2016 WL 6091259, at *10 (N.D. Cal. Oct. 18, 2016) (same, where the "Court-appointed Settlement Master . . . indicated the Settlement should be submitted to the Court for approval"); *Harris v. Vector Marketing Corp.*, No. 08-5198, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) (finding the fact that the settlement was negotiated with an experienced mediator "suggests that the parties reached the settlement in a procedurally sound manner and that it was not the result of collusion or bad faith by the parties or counsel"); *Satchell v. Federal Express Corp.*, Nos. 03-2659, 03-2878, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) (same).

**C.** **Rule 23(e)(2)(C): The Settlement provides substantial, urgently needed, immediate relief in exchange for a limited release and a short delay.**

**1.** **The Settlement benefits are designed to meet the Class's most critical needs during the litigation standstill.**

This is not a typical Settlement because this is not a typical Class. Class Members, by definition, have been exposed to Roundup, may or may not have NHL, and may or may not develop it going forward. The Settlement meets those Class Members' challenges head-on and provides them exactly what they need: information, increased access to medical diagnosis, and financial assistance when necessary given the delay in their right to sue Monsanto should they have an NHL diagnosis. Class notice, registration, and the DAGP outreach program will educate Class Members about their risk, where they can go to be evaluated, and that they may have a valid claim against Monsanto after the Settlement period is over. The DAGP will increase availability of diagnostic evaluation to Class Members so that they can know whether they have

NHL. The Interim Assistance Grants will protect those in need from the financial devastation that an NHL diagnosis can cause by providing equitable assistance during the period of standstill. And the Research Program will contribute to the state of knowledge in how to diagnose and treat NHL, benefitting any Class Member ever diagnosed in the future. These benefits would be *certain* and *immediate*—as well as accretive of any relief obtained after the standstill period.

The Science Panel is a crucial benefit to Class Members because it provides a "knowledge remedy" ameliorative of the uncertainty on the central litigation issue: whether exposure to Roundup can cause NHL. *See* Alexandra D. Lahav, *The Knowledge Remedy*, 98 Tex. L. Rev. 1361,1364 (2020). As Professor Lahav has explained, a "knowledge remedy," where the defendant pays for the production or analysis of knowledge about the harm it is alleged to have caused, is an appropriate remedy in litigation such as this one.

Although Professor Lahav's scholarship is new, the knowledge remedy is not. It is grounded in "recognized remedial tradition" including equitable remedies of accounting (requiring the defendant to gather information to permit the plaintiff to prove amounts owed), medical monitoring (treating "not preventable scientific uncertainty, but rather the factual uncertainty of disease development and the prevention of harm due to the delay in litigation outcomes"), and civil rights enforcement (such as collecting data on the effects of police practices). *Id.* at 1365, 1375-84.

Defendant-funded research was ordered by the trial court in the Dupont C8 litigation; although that specific order was reversed on appeal, the remedy was incorporated in the settlement subject to judicial approval under a state analogue to Rule 23. *See State ex rel. E.I. DuPont de Nemours & Co.*, 591 S.E.2d 318, 326-27 (W. Va. 2003); Lahav, *supra*, at 1367-68.

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

The company agreed to pay for "an independent study to determine the carcinogenicity of C8," and, if "the study found a 'probable link' between C8 and human diseases," to "concede general causation in subsequent litigation." Lahav, *supra*, at 1368. This "knowledge remedy" was critical: "[w]ithout the studies, it would have been nearly impossible for the plaintiffs to prove their case." *Id.* at 1369. The studies made all the difference: the scientists found the necessary link, triggering thousands of personal injury lawsuits. *Id.*

The knowledge remedy here in the form of the Science Panel's evaluation and finding is a benefit to all parties. If there is no causal link between Roundup and NHL, then there is no cause to sue Monsanto, and Class Members and the public can use Roundup products without fear. If there is such a causal link, then Class Members, activated by the Class Notice and Settlement programs, will be in a strong position to pursue individual litigation with general causation resolved. And Monsanto will face the economic pressure of the tort system either to stop selling the dangerous product or to find mechanisms of protection against potential harmful exposure.

The Science Panel will provide an answer to the common question at the heart of this litigation, and will do so through an objective, well-funded, scientific investigation given the time necessary to reach a right result. The alternative for a Class Member, assuming they file an individual case, is, first, a lottery for a foreseeable trial date in the face of a huge backlog, and second, high-cost, roll-the-dice litigation of general causation, with a significant probability of an adverse jury finding even in a meritorious case, and no recovery at all no matter how horrific the Class Member's injuries and strength of specific causation case. The general causation question (can Roundup cause NHL in humans?) is a common one—one that should have the same answer in every case. But in the absence of a settlement that generates an issue-preclusive, class-wide

determination of this question, both plaintiffs and Monsanto will incur endless expense and

endless risk as that question is posed to different juries for different answers over and over again.

### 2. In exchange for $1.1 billion in benefits, the Class gives up comparatively little.

In exchange for these substantial benefits, the ask from Class Members is modest.  The

Settlement preserves Class Members' right to bring almost any claim, class or individual, for

compensatory damages or equitable relief after the litigation standstill period, including but not

limited to claims for personal injury, fraud, misrepresentation, negligence, fraudulent

concealment, negligent misrepresentation, breach of warranty, false advertising, and violation of

any consumer protection or unfair and deceptive acts or practices statute.  By contrast, the scope

of the releases is narrow: Class Members refrain from pursuing litigation for four years, and

waive only claims for medical monitoring and punitive damages.  And Class Members face

adverse preclusive effect from the Science Panel findings only if the Science Panel concludes no

causal link has been shown.  It bears emphasis that the Class comprises only individuals who

have not initiated any legal process, nor even retained counsel for a personal injury or false

advertising suit.  Given the current lack of trials amid the COVID-caused dislocations, it is

unlikely that many class members could meaningfully expect litigated outcomes during this

period anyway.  When courts do reopen, there will be significant backlogs in civil cases,

particularly jury trials.

### a. The litigation standstill is a small concession on the part of Class Members who have not filed a claim or retained counsel to do so.

The temporary stay of claims during the litigation standstill period amounts to a minor

concession given the litigation posture of Class Members' claims, as confirmed by the cases

litigated thus far.  Class Members, by definition, "have not commenced a lawsuit or otherwise

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

retained counsel with respect to any individual actual or potential personal injury or false advertising claims" relating to Roundup exposure. As a practical matter, they would not be able to obtain relief for years. Of the thousands of plaintiffs with Roundup-related lawsuits pending in federal and state court, not one has collected on a judgment. For example, the only federal Roundup personal injury case to go to trial, *Hardeman v. Monsanto Co.*, 3:16-cv-00525 (N.D. Cal.), was filed in February 2016, did not go to trial until May 2019, and remains on appeal and cross-appeal in the Ninth Circuit. *See Hardeman v. Monsanto Co.*, Nos. 19-16636, 19-16708 (9th Cir.). The two cases that have gone to verdict in state court are also pending on appeal. *See Johnson v. Monsanto Co. et al.*, Nos. A155940 and A156706 (Cal. App.); *Pilliod v. Monsanto Co.*, No. A158228 (Cal. App.). That is the *best* case scenario—most claims, after four years, remain in the early stages of litigation.

It also bears emphasis that Class Members' claims are effectively stayed only in part. An analogue to a key part of any individual case—discovery and decision on the general causation issues—will proceed to conclusion during the standstill period through the Science Panel process. At the end of four years, Class Members will have tangible litigation progress: a binding finding on general causation. And during the standstill period, the statutes of limitations for Class Members' claims related to Roundup exposure and NHL will be tolled, and Class Members' ability to file claims after the litigation standstill will be preserved.

No doubt, the litigation standstill is a significant benefit for Monsanto, which has preemption and other defenses to this litigation that will take years to work out in the appellate system while Monsanto is given respite from the deluge of new cases. But a compromise that provides something important for one party (Monsanto) that is a small give for the other (the Class) is a sign of a good Settlement rather than cause for concern.

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

#### b. The release of medical monitoring claims is reasonable in light of the Settlement benefits.

Class Members are well compensated for the waiver of medical monitoring claims. The Settlement promises a comprehensive, $1.1 billion package for Class Members—including the DAGP, an expansive diagnostic program with a presumptive value of nearly $200 million and a minimum value of $150 million. The DAGP, a form of tailored diagnostic intervention, will constitute one of the largest diagnostic funds in history. And unlike benefits obtained after long-fought litigation, this program would be available to Class Members *immediately* upon the Effective Date. The timing is critical: the most at-risk Class Members are predominantly agricultural workers from rural and otherwise under-served communities, many of whom would be unable to otherwise afford or access diagnostic services. Learning about an NHL diagnosis in a matter of months versus years could be the difference between life and death for some.

The remaining relief ensures that the NHL-related long term health needs of all Class Members—including those who might have had valid medical monitoring claims—are met during the litigation standstill. If, for example, a Class Member develops NHL during the Settlement period, she would be eligible based on income to receive an Interim Assistance Grant to assist her during the standstill period. A medical monitoring litigant who received an NHL diagnosis mid-litigation, on the other hand, would be required to begin the litigation process anew with personal injury claims. Additionally, if a Class Member develops NHL after the standstill period, she is still entitled to pursue past and future medical costs through traditional tort damages—claims that would be resolved more quickly than without the Settlement, due to the Science Panel's determination of the general causation issue.

The substantial benefits provided in the Settlement compare favorably to what Class Members could expect to receive through litigation of the released medical monitoring claim.

*See Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1038 (N.D. Cal. 2016) (Chhabria, J.) (granting preliminary approval to settlement, in part based on consideration of "whether the settlement as a whole is reasonable in light of the strength and value of all the claims being released"). Most centrally, the diagnostic interventions will be triggered by specific clinical assessments of individuals (supported by an outreach program that informs individuals about how to conduct initial self-evaluation for NHL indicators) rather than efforts to screen the entire universe of Roundup users. The latter approach risks dissipating funds.

Even in terms of more diffuse medical monitoring programs, the size and sophistication of this Settlement stands out. The largest federal medical monitoring settlement fund in over a decade was recently approved in the NCAA concussion lawsuit, after six years of litigation. *See In re Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, 332 F.R.D. 202, 218 (N.D. Ill. 2019), *aff'd*, No. 19-2638, 2019 WL 8058082 (7th Cir. Oct. 25, 2019).[6] That settlement established a fifty-year, $70 million medical monitoring fund, reduced by $14 million for attorneys' fees and costs. Other major medical monitoring settlements have offered similar relief, also won after years of costly litigation. *See, e.g.*, *Allen v. Monsanto*, No. 13-0418, 2013 WL 6153150 (W.V. Nov. 22, 2013) (approving preliminary fund of $21 million for medical monitoring, with up to $63 million in additional money, dependent upon the level of dioxin found in residents); *Elsea v. U.S. Eng'g Co.*, No. 1016-15976 (Mo. Cir. 2018) (approving $80 million medical monitoring fund, with up to $24 million allocated for attorneys' fees and costs); *In re Inter-Op Hip Prosthesis Liability Litigation*, 204 F.R.D. 330, 351 (N.D. Ohio 2001)

---

[6] The uncapped NFL concussion settlement included medical monitoring components, but is not a useful comparator to the alternatives to this Settlement because it included medical monitoring primarily as a means of calculating damages awards, anticipated injuries developing over a 65-year timeframe, and required a fulsome release of all claims for damages rather than a limited litigation stay. *See In re Nat'l Football League Players Concussion Injury Litig.*, 307 F.R.D. 351 (E.D. Pa. 2015), *aff'd*, 821 F.3d 410 (3d Cir. 2016).

(approving $20 million medical monitoring fund).  The Settlement here—nearly $200 million for diagnostic evaluation services, *plus* nearly $800 million for Interim Assistance Grants—dwarfs these amounts.

It also must be recognized that a medical monitoring claim is difficult to win.  Some states do not permit such claims "in the absence of present physical injury."  *Nat'l Collegiate Athletic Ass'n Student-Athlete Concussion Injury Litig.*, No. 13-9116, 2016 WL 3854603, at *6 (N.D. Ill. July 15, 2016); *see also NCAA*, 332 F.R.D. at 218 ("[T]he strength of the Settlement Class's claims for medical monitoring depends upon myriad factors, including: whether the state in which the class member resides recognizes medical monitoring claims as an independent cause of action; whether the state recognizes medical monitoring as a form of injunctive relief at all; and whether the state allows medical monitoring as a form of relief in the absence of actual, present physical injury.").  Even where available, medical monitoring claims are expensive to litigate, and typically depend on complex scientific proof and expert testimony.  *See NCAA*, 2016 WL 3854603, at *6 (describing medical monitoring claims as "extremely complex, very costly, and sure to be protracted").  This would be particularly true here, as there is no standardized "test" for NHL that can be specifically requested in litigation.

Such claims, although undoubtedly important to individuals, are not valuable enough to justify individual litigation, and so require class treatment to proceed at all.  *See In re Diet Drugs Prods. Liab. Litig.*, No. 1203, 2000 WL 1222042, at *56 (E.D. Pa. Aug. 28, 2000) ("[T]he small monetary amount involved with a medical monitoring claim makes an individual claim for monitoring prohibitive in the absence of class treatment."); *see also In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. at 348 (same).  But class certification is no guarantee even in the best case, a reality that applies to a medical monitoring claim as any other.  *See, e.g.*, *Barnes*

*v. Am. Tobacco Co.*, 161 F.3d 127, 138-49 (3d Cir. 1998); *Ball v. Union Carbide Corp.*, 385 F.3d 713, 728 (4th Cir. 2004); *In re St Jude Med., Inc.*, 522 F.3d 836, 840 (8th Cir. 2008).

### c.        The release of punitive damages is reasonable.

The release of punitive damages is also reasonable.  There is no due process right to punitive damages—nor any individual right to punitive damages at all.  *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996) ("Punitive damages may properly be imposed to further *a State's* legitimate interests in punishing unlawful conduct and deterring its repetition.") (emphasis added).  Rather, punitive damages perform deterrent and exemplary functions for society as a whole—not any individual or class of plaintiffs.  *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) ("It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence."); *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1206 (9th Cir. 1991) (noting that punitive damages are awarded because "society has an interest in deterring and punishing all intentional or reckless invasions of the rights of others") (internal quotation marks omitted); *Loughman v. Consol-Pennsylvania Coal Co.*, 6 F.3d 88, 100 (3d Cir. 1993) ("[U]nlike compensatory damages, which have as their purpose the desire to make the plaintiff whole, the purpose of imposing punitive damages is to punish the wrongdoers and to defer future conduct.").

Applying these principles, courts regularly approve settlements that release Class Members' claims for punitive damages without providing settlement funds specifically reflecting such damages.  *See, e.g.*, *Diet Drugs*, 2000 WL 1222042 , at \*49 n.22 ("In sum, the court finds that Class Counsel's agreement to waive punitive damage claims on intermediate and back-end opt-outs in exchange for protection against statute of limitations and claim-splitting defenses

represents a fair and wholly appropriate trade-off. These provisions do not represent an improper allocation, nor do they affect the procedural fairness of the settlement."); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999) (speculative possibility of punitive damages was not enough to conclude that district court abused its discretion in approving settlement that released punitive damage claims).

The availability of punitive damages is also highly uncertain, both as a general matter and specific to this case. *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 346 (4th Cir. 1998) (stating that award of punitive damages is always "necessarily uncertain"); *Haynes v. Logan Assistance Corp.*, No. 90-1800, 1994 WL 66701, at *8 (E.D. Pa. Mar. 4, 1994) (stating that even where jury awards punitive damages, "it is always speculative as to how much a jury will award in punitive damages"). Any punitive damages awarded may be reduced by the trial judge, as has occurred in each of the three successful Roundup verdicts to date,[7] and would be subject to additional challenge on appeal.[8]

Here, the uncertainty is compounded by a risk that significant early trial victories will mean future plaintiffs recover lower punitive damages, or none at all. The Supreme Court subjects due process challenges to *de novo* review on appeal in part because the inquiry calls for "a broad legal comparison" to "the civil penalties authorized or imposed in comparable cases," a task "suited to the expertise of appellate courts." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 440 (2001). The appellate courts performing this function, when faced with a

---

[7] *Hardeman v. Monsanto Company et al*, No. 16-525 (N.D. Cal.) (punitive damages reduced from $75 million to $20 million); *Johnson v. Monsanto Co. et al.*, No. GC16550128 (Cal. Super.) (punitive damages reduced from $250 million to $39.25 million); *Pilliod v. Monsanto Co.*, No. RG17862702 (Cal. Super.) (punitive damages for two plaintiffs reduced from $1 billion each to $24.5 million and $44.8 million)

[8] Indeed, every Roundup verdict has been challenged on appeal, in part for excessive punitive damages. *Johnson v. Monsanto Co. et al.*, Nos. A155940 and A156706 (Cal. App.); *Hardeman v. Monsanto*, No. 19-16636 (9th Cir.); *Pilliod v. Monsanto Co.*, A158228 (Cal. App.).

---

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

wave of Roundup verdicts with large punitive damages will face argument that, at some point, Monsanto has been punished and deterred enough, such that any additional punitive damages awards would violate due process. *See Dunn v. Hovic*, 1 F.3d 1371, 1388 (3d Cir. 1993) (en banc) (finding arguments against multiple punitive damage awards "powerful"); *In re School Asbestos Litig.*, 789 F.2d 996, 1005 (3d Cir. 1986) (stating that "as a matter of constitutional law or substantive tort law, the courts shoulder some responsibility for preventing repeated awards of punitive damages for the same acts or series of acts"); *In re "Agent Orange" Prods. Liab. Litig.*, 100 F.R.D. 718, 728 (E.D.N.Y. 1983) (stating that, in theory, "when a plaintiff recovers punitive damages against a defendant, that represents a finding by the jury that the defendant was sufficiently punished for the wrongful conduct" and that "[t]here must, therefore, be some limit either as a matter of policy or as a matter of due process, to the amount of times defendants may be punished for a single transaction"). And the Class, consisting as it does of persons who have not even filed lawsuits or retained lawyers to do so, would be losers in the race to the courthouse.

Finally, the release of punitive damages is well-compensated for by the Settlement. In contrast to litigation over punitive damages—in which a very small number of Class Members might get large amounts—under the Settlement all Class Members get Monsanto's agreement to a definitive determination of general causation, with Monsanto bound by a Science Panel conclusion that a causal link exists in any follow-on Roundup tort litigation Class Members bring, and Class Members generally get the benefit of the $1.1 billion Monsanto will pay to fund the Diagnostic Accessibility Grant Program, the Interim Assistance Grants, and the Research Funding Program.

### 3. Issue-preclusive determination by the Science Panel is a benefit to the Class.

As part of the Settlement, the Class agrees to be bound by the Science Panel's general

causation determination. Issue preclusion, which applies here, is distinct from claim preclusion, which does not. Claim preclusion "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding" in any subsequent suit involving "the same transaction" or "common nucleus of operative facts." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020) (citations omitted). Conversely, issue preclusion narrowly "precludes a party from relitigating an issue actually decided in a prior case and necessary to the judgment." *Id.* The Settlement assigns the Science Panel's determination issue-preclusive effect on the question of general causation. *See Wojciechowski v. Kohlberg Ventures, LLC*, 923 F.3d 685, 689 (9th Cir. 2019) (looking to the terms of a settlement agreement to determine which species of preclusion applied).

This is a benefit to the Class, for, as explained above, a single careful and considered scientific evaluation is superior to the delay and arbitrary nature of one-off trials. And there is no downside. The Science Panel will provide the right answer to the threshold question in this litigation. If there is a causal link between Roundup and NHL, then Class Members will be in a significantly stronger position to pursue individual litigation with the expensive and difficult general causation issue resolved in their favor. A determination of no causation does not preclude or dismiss such claims, but provides essential and cautionary information, up front and at no cost, that prosecuting them is not rationally feasible, and that the best treatment for NHL lies outside litigation.

### 4. Class Members are eligible for relief through straightforward processes.

The registration and Interim Assistance Grant claims processes have been designed to be as streamlined as possible given the sensitivity and complexity of the medical information

involved. Class Members are guaranteed prompt determinations on both their registration submissions and Interim Assistance Grant claim packages.

### 5. Counsel will seek reasonable attorneys' fees and costs that pose no obstacle to preliminary approval.

Class Counsel will seek no more than $150 million for fees and reimbursement of out-of-pocket costs. Nothing about the fee request raises any red flags precluding preliminary approval. There was no agreement on fees until the Class Settlement agreement was had on the essential terms of the Class relief. Cabraser Decl. ¶ 5. That agreement on fees came only after the terms of the Class Settlement were presented to the mediator. The Class will be fully notified of the fee request in accordance with Fed. R. Civ. P. 23(h). And any award will not reduce the benefits to the Class by one cent. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*, MDL No. 2672, 2017 WL 1047834, at \*4 (N.D. Cal. Mar. 17, 2017) (approving fee award where "no attorneys' fees negotiations occurred prior to the parties' reaching a settlement in the case [and] any awarded fees will be paid by Volkswagen separate and distinct from the Funding Pool created for the benefit of Class Members").

### 6. There are no side agreements relevant to preliminary approval.

No side agreements requiring scrutiny under Rule 23(e)(2)(c)(iv) exist. This provision is aimed at "related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." Fed. R. Civ. P. 23(e), 2003 Ad. Comm. Notes. Plaintiffs have not entered into any such agreements. There are three documents in addition to the Settlement, but none trigger scrutiny. There is an agreement containing the opt-out threshold that would trigger Monsanto's right to terminate the Settlement; such agreements are not controversial, and are typically confidential and not filed in the public record. *See, e.g.*, *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d

934, 948 (9th Cir. 2015) (recognizing that an opt-out threshold may be kept confidential "for practical reasons"). The parties will also enter into an Escrow Agreement, subject to Court approval, the form of which is attached as **Exhibit I** to the Cabraser Declaration. Finally, Bayer Corporation has executed a financial guarantee of Monsanto's obligations under the Settlement.

### D. The Settlement treats all Class Members equitably relative to one another.

Fed. R. Civ. P. 23(e)(2)(D) requires the Court to consider whether the Settlement Agreement "treats class members equitably relative to each other." In so doing, "the Court considers whether the Settlement improperly grants preferential treatment to class representatives or segments of the class." *Hefler v. Wells Fargo & Co.*, No. 16-05479, 2018 WL 6619983, at \*7 (N.D. Cal. Dec. 18, 2018), *aff'd*, 802 F. App'x 285 (9th Cir. 2020) (internal quotation marks and alteration omitted). The relief granted need not be identical—just equitable and rationally apportioned. *See, e.g.*, *In re Veritas Software Corp. Sec. Litig.*, No. 03-0283, 2005 WL 3096079, at \*9 (N.D. Cal. Nov. 15, 2005), *vacated in part on other grounds*, 496 F.3d 962 (9th Cir. 2007) (options trader class members were sufficiently different from in-and-out traders "to justify their differential treatment in the plan of allocation of settlement proceeds"); *Vargas v. Ford Motor Co.*, No. 12-8388, 2020 WL 1164066, at \*10 (C.D. Cal. Mar. 5, 2020) ("[W]hile the Settlement was structured to deliver the most complete relief to those Class Members that experienced persistent defects (e.g., those with more service visits will receive a greater cash payment), this is an objective and logical explanation for the variations in monetary recovery.").

Here, the Settlement treats all Class Members equitably according to need. Eligibility for the DAGP depends on a Class Member's need for evaluation. Awards of Interim Assistance Grants to those suffering from NHL are based solely on financial need, with Class Members who do not meet the presumptive need-based eligibility criteria able to seek individual review of their circumstances. And every single Class Member will benefit from the Science Panel's studied

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

work and conclusion on the common question of general causation, and from the funds for research into NHL treatments and diagnosis.

Class Counsel will request incentive awards of $25,000 for the Class Representatives, in recognition of their service to the Class and the benefit created. Such awards "are fairly typical in class action cases . . . and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. West Publ'g*, 563 F.3d 958, 958-59 (9th Cir. 2009). The requested awards do not make the Settlement inequitable: they are subject to Court approval, will be noticed to the Class, will be paid separate from the Class benefits, and fall within the normal range. *See, e.g.*, *In re Wells Fargo & Co. Shareholder Deriv. Litig.*, No. 16-5541, 2020 WL 1786159, at *18 (N.D. Cal. Apr. 7, 2020) (awarding $25,000 each to two class representatives); *Nitsch v. Dreamworks Animation SKG Inc.*, No. 14-4062, 2017 WL 2423161, at *14 (N.D. Cal. June 5, 2017) ($100,000 service awards to each of three named plaintiffs); *In re High-Tech Emp. Antitrust Litig.*, No. 11-2509, 2015 WL 5158730, at *17 (N.D. Cal. Sept. 2, 2015) ($100,000 each for four representatives, and $140,000 for a fifth). The total service award—$100,000—is also less than .01% relative to the Settlement Fund. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 94 ("[T]he $45,000 in incentive awards makes up a mere .17% of the total settlement fund of $27,250,000, which is far less than the 6% of the settlement fund in [an earlier settlement approval].").

### E. The Settlement merits preliminary approval under this District's Procedural Guidance.

#### 1. Guidance (1)(a) & (c): The Settlement Class and released claims are consistent with the operative complaint.

The Settlement Class and Subclasses are as defined in the First Amended Class Action Complaint. The released claims—medical monitoring and punitive damages—are a subset of

those pleaded in the Complaint.  The difference is "appropriate in the instant case" because the Settlement does not release any individual claims other than the two identified.  Class Members retain their right to assert virtually any other claim after the standstill period is over.

### 2. Guidance (1)(e): The Settlement is as good or better than what the Class could obtain in individual litigation.

This Court's Guidance requests identification of "[t]he anticipated class recovery under the settlement [and] the potential class recovery if plaintiffs had fully prevailed on each of their claims, and an explanation of the factors bearing on the amount of the compromise."  First and foremost, the Class is defined as comprising only individuals who have not filed suit nor retained counsel in anticipation of filing a personal injury or false advertising claim.  In the absence of this Settlement, Class Members are not before the legal system at all.  In a time of national distress over COVID-19, courts in most of the country are not functioning fully and do not have the capacity to move litigation forward, let alone offer jury trials to newly-filed cases.  In the absence of this Settlement, Class Members who seek to file suit presently are unlikely to be able to prosecute their cases within the four-year period that the Settlement sets aside for the Science Panel to do its work.

Second, the anticipated class recovery is $1.1 billion and a binding determination on general causation.  The potential class recovery on the released claims is full medical monitoring relief and punitive damages of some uncertain amount.  But punitive damages would have to be pursued in individual cases, perhaps exceeding $1.1 billion, but unlikely to be realized any time soon.  Moreover, as explained above in Section I.C.2, the DAGP is likely bigger, better and more efficacious than what the Class could expect by litigating medical monitoring claims to judgment, and certainly much faster.  Awards of punitive damages approaching or exceeding $1 billion would be allocated arbitrarily to the few Class Members who reached final judgment the

fastest.  And all Class Members retain their individual compensatory damages claims in full.

### 3. Guidance (1)(f): The allocation of the Settlement Fund is considered and reasonable.

Approval "of a plan for the allocation of a class settlement fund is governed by the same

legal standards that are applicable to approval of the settlement: the distribution plan must be

'fair, reasonable and adequate.'"  *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154

(N.D. Cal. 2001) (citation omitted).  The allocation of the Settlement Fund between the Funded

Class Benefits—specifically, the DAGP, Research Funding Program, and Interim Assistance

Grants—is a fair and reasonable distribution of relief.  The bulk of the funding is committed to

the Interim Assistance Grants, because that relief goes to the Class Members most in need, those

diagnosed with NHL.  And a sizable amount, no less than $100 million, is set for the DAGP.

Thus, recovery is apportioned to align with Plaintiffs' theory of injury and the relative harms

endured by each Class Member.  *See id.* ("A plan of allocation that reimburses class members

based on the type and extent of their injuries is generally reasonable.").  Critically, the Settlement

Administrator retains discretion to adjust the presumptive allocations within broad limits as

necessary, ensuring ongoing reasonableness in light of any unexpected circumstances.

### 4. Guidance (1)(g): Targeted by a massive outreach effort, a substantial number of Class Members are expected to participate in the diagnostic accessibility and interim assistance grant programs.

It is difficult to forecast precisely how many Class Members will partake in the Class

benefits, but the Class will benefit from a multi-faceted outreach effort designed to maximize

participation.  Class Notice is the first, but not the only step.  The Class will also be informed of

the Settlement through the DAGP outreach campaign, which will target both the affected

populations in the service areas as well as critical entities that promote health awareness in those

communities.  The outreach program, informed by the extensive pre-notice survey and

investigative work, will employ communications channels reflecting how Class Members receive and share information. The existence of the DAGP grants will also promote awareness because medical providers will be encouraged to find "customers" for their newly-funded diagnostic services (and the grants will be awarded based in part on how many Class Members are in the provider's service area).

### 5. Guidance (1)(h) & (8): Under no circumstances will funds revert to Monsanto.

The Settlement Fund is non-reversionary. The Settlement expressly provides for a four-year duration during which the Science Panel will conduct its investigation, and during which Monsanto will be obligated to pay the entire $1.1 billion. Should a court order that the Science Panel may complete its work sooner—a directive the Class and Monsanto do not seek and believe would undermine the Science Panel process by suggesting to the Panel that it cut corners in its evaluation—Monsanto's payment obligation will continue unabated. If such an order is issued, and if the Science Panel then does render its conclusion in less than four years, Monsanto's payment obligation would remain the entire $1.1 billion, and any unexpended funds will be used to satisfy judgments or settlements arising out of subsequent lawsuits filed by Class Members. Settlement § 30.1(c). The entirety of the $1.1 billion will be used for the benefit of the Class; in no event will Monsanto retain or recover any of the Fund.

### 6. Guidance (6): Attorneys' fees, when requested, will meet all federal and local requirements.

Because Class Counsel's fee request will include projected future work administering the Settlement (understanding the Court's practice of withholding a portion of fees), Class Counsel have not included in this motion the lodestar analysis discussed in the Guidance. But this motion sets forth, at length, the "benefit conferred on the class," and the maximum fee request of $150 million is within the range of reason relative to the $1.1 billion Settlement fund.

7. **Guidance (7): The requested incentive awards are reasonable and subject to Court approval.**

As discussed above in Section I.D, the requested incentive awards are reasonable, subject to Court approval, properly noticed to the Class, and fall within the typical range of such awards.

8. **Guidance (9): The Settlement provides a reasonable time for Class Members to exercise their rights.**

The Guidance requires that class members have at least 35 days to opt out or object to a settlement, including the fee motion. This Court's Standing Order clarifies that class members must have at least 14 days to object after the fee motion is filed. The proposed schedule in this Settlement gives Class Members 150 days to opt out, and requires the fee motion be filed at least 35 days before the deadline to object.

9. **Guidance (10): The Settlement complies with the Class Action Fairness Act.**

Under the Settlement, Monsanto will complete CAFA notice. The substantive provisions of CAFA are not implicated here.

## II. The Court will likely certify the Class.

A class must satisfy the four requirements of Fed. R. Civ. P. 23(a), and one of the three prerequisites of Fed. R. Civ. P. 23(b). In addition, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). Each "subclass must independently meet the requirements of Rule 23." *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).

### A. The Class and Subclasses meet the requirements of Rule 23(a).

#### 1. The Class and Subclasses are sufficiently numerous.

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although no strict numerical test defines numerosity,

courts in this Circuit find the requirement typically met with at least 40 class members. *See, e.g.*, *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007). The Class includes all persons exposed to Roundup who have not yet filed litigation or retained counsel to do so, and is divided into subclasses of those who have been diagnosed with NHL and those who have not. It takes no great leap to conclude that the number in each subclass far exceeds 40. *See* Settlement, Ex. 5 (identifying large numbers of potential Class Members).

### 2. **There is at least one common question with a common answer.**

Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality requires only one common question such that "a classwide proceeding [can] generate common *answers* apt to drive the resolution of the litigation." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011)). A common question need not be one that "will be answered on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013). It only "must be of such a nature that it is *capable* of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims." *Wal-Mart*, 564 U.S. at 350 (emphasis added).

In this case, Rule 23(a)(2) is easily satisfied by the common question of whether exposure to Roundup can cause NHL. *See In re Roundup Prods. Liab. Litig.*, 214 F. Supp. 3d 1346, 1347 (J.P.M.L. 2016) (identifying general causation as "an overarching query" common to "all the actions"). All Class Members must establish general causation to prevail on their individual personal injury claims. A "yes" answer would advance every Class Member past the general causation stage, no small feat given that resolving that issue required two weeks of trial and six witnesses in the *Hardeman* bellwether. Conversely, a "no" answer would defeat every Class Member's claim across the board. *See* MDL Doc. 1596, at 1 ("If the answer is yes, the

case moves to the next phase, which addresses whether each particular plaintiff's NHL was caused by glyphosate. If the answer is no, none of the plaintiffs' cases may proceed."). At the same time, nothing about proving general causation varies from one Class Member to another: Roundup can, or does not, cause NHL, and does or does not do so at certain exposure levels. The issue is plainly one susceptible to common proof that will resolve an issue central to the validity of each one of the claims.

### 3. The proposed Class Representatives' claims are typical.

Rule 23(a)(3)'s typicality standard is met when the class representative's claims rest on the same legal or remedial theory as those of absent class members. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011). The claims of named plaintiffs and class members need not be identical, and "different factual circumstances" do not defeat typicality. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). Plaintiffs' claims are typical of those held by the other members of the Class in that each of them was exposed to Roundup, and none has commenced an individual personal injury lawsuit against Defendant or retained counsel to do so. The claims on which Plaintiffs seek certification arise from the same course of conduct and are based on the same legal theories. Additionally, the claims of each Subclass representative are typical of the Subclass: Plaintiff Ramirez's claims are typical of those held by other members of Subclass 1, in that he has been diagnosed with NHL. The claims of Plaintiffs Agtarap, Owens, and Elko are typical of those held by other members of Subclass 2, in that they have not been diagnosed with NHL. Cabraser Decl. ¶¶ 7-10.

### 4. The proposed Class Representatives and Class Counsel have and will adequately represent the Class and Subclasses.

Rule 23(a)(4) requires class representatives to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy is satisfied when (1) the named plaintiff and

counsel have no conflicts with the class; and (2) plaintiff will "prosecute the action vigorously." *Staton*, 327 F.3d at 957. Plaintiffs have no interests in this action that are adverse or antagonistic to the interests of the Class. Each of the proposed Class Representatives is a member of the Class and each shares the same overriding interests as absent Class Members. Plaintiffs have also retained trial counsel highly experienced in complex litigation, including complex class action litigation involving toxic exposures, and Plaintiffs already have and will continue to vigorously prosecute this litigation. *See* Section I.A, supra.

**B.     The Class and Subclasses meet the predominance and superiority requirements of Rule 23(b)(3).**

Fed. R. Civ. P. 23(b)(3) provides for class certification if "the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Rule points the Court to four "matters pertinent to these findings[:] (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Id.*

Individually and together, the factors direct the predominance and superiority inquiry to a comparison between the proposed aggregate procedure and the alternative of purely individual adjudication. *See Amgen*, 568 U.S. at 460 ("[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case rather it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'") (quoting Fed. R. Civ. P. 23(b)(3)); *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 362 (7th Cir. 2012) ("Predominance is a question of efficiency. Is it more

1984556.13                                    - 40 -

efficient, in terms both of economic and judicial resources and of the expense of litigation to the parties, to decide some issues on a class basis or all issues in separate trials?") (citations omitted). That comparison demonstrates that Rule 23(b)(3) is satisfied here for purposes of certification of a settlement class.

Consider the first factor—class members' interest in controlling their own actions. The Settlement preserves those interests: Class Members will depart the standstill period with their claims fully intact, except for waivers of medical monitoring and punitive damages claims, for both of which they are adequately compensated. *See* Section I.C.2. The only portion of the individual actions resolved by the aggregate proceeding is the question of general causation, a question which Class Members have no interest in litigating in delayed, piecemeal proceedings that inevitably will result in inconsistent results for similarly situated persons. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 860 (1999) ("One great advantage of class action treatment of mass tort cases is the opportunity to save the enormous transaction costs of piecemeal litigation."); *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979) ("[T]he class action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every social security beneficiary to be litigated in an economical fashion under Rule 23.").

Another way to think about this factor is the oft-quoted formulation of predominance as asking "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This "class cohesion . . . legitimizes representative action," *id.*, because if as to the critical issues the class rises or falls together, then for individual class members "litigation by others will achieve their ends without the need for their involvement." William B. Rubenstein et al., *Newberg on Class Actions* § 4:69 (5th ed.). The Class Representatives have every incentive to ensure that

aggregate litigation of the common issue, as well as the decision and mechanism to submit that issue for determination by the Science Panel, is done right, for a win or loss applies to them in identical measure as it does to their absent fellows. *See Amgen*, 568 U.S. at 468 (finding predominance met where "[a] failure of proof on the *common* question of materiality ends the litigation").

The second factor instructs the Court to consider "the extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3)(B). This factor too supports a finding that predominance and superiority are met. By definition, there is no litigation begun by Class Members—anyone who has filed a lawsuit is not in the Class. No present individual litigation will be displaced by class treatment; and the nature of the Settlement means that any Class Members who wish to file in the future face a maximum delay of four years during which the common question is adjudicated. Again, the comparison to the alternative is no contest: no class certification means those Class Members who surmount the information gap and file individual lawsuits must litigate the expensive, time-consuming, and, to some extent arbitrary, general causation question one-by-one.

Third, the Rule identifies as relevant "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). No Court is more suited to commission the Science Panel's work and endorse the preclusive effect of its results than this one, which has supervised years of discovery into the general causation question, heard and decided critical pretrial issues, and presided over one of only three jury trials nationwide. *See* Newberg § 4:71 ("Courts have found that class actions in a particular forum are particularly appropriate when that court has already made several preliminary rulings.").

Finally, Rule 23(b)(3)(D) evaluates "the likely difficulties in managing a class action."

The general rule for settlement classes is that manageability is not a pertinent concern because "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620 (citation omitted). The Court thus need not confront the manageability and related issues that might be presented if the general causation issue were to be tried in court on a classwide, nationwide basis. Moreover, this, of course, is not a settlement of entire causes of action, but only of the common question of general causation. Whatever questions, manageability or otherwise, presented by a settlement class that resolves a host of individual issues (such as individual damages amounts) are not presented here.

At bottom, the manageability inquiry, like predominance and superiority generally, is comparative: "the question that courts consider when they analyze manageability is not whether a class action is manageable in the abstract, but how the problems that might occur in managing a class suit compare to the problems that would occur in managing litigation without a class suit." Newberg § 4:72; *see also, e.g.*, *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 515 (9th Cir. 2013) (reversing where the "district court concluded that class certification is not the superior method of adjudication but did not suggest any other means for putative class members to adjudicate their claims"); *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1358 (11th Cir. 2009) ("[W]e are not assessing whether this class action will create significant management problems, but instead determining whether it will create relatively more management problems than any of the alternatives.") (citation omitted). The inquiry properly framed, the answer is clear: class certification for purposes of settlement is better and more "manageable" than the status quo. If the common question is answered in the Class's favor, then each individual trial will be more manageable with the core issue determined. If the common question is answered in Monsanto's

1984556.13

- 43 -

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

favor, then there will likely be no individual litigation to manage. Either way, certification here advances "efficiency and economy of litigation which is a principal purpose of the procedure." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974).

### C. The Class and Subclasses may be certified as "issues" classes under Rule 23(c)(4).

Fed. R. Civ. P. 23(c)(4) provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." This means "a court may employ Rule 23(c)(4)[] to certify a class as to an issue regardless of whether the claim as a whole satisfies the predominance test." *In re Nassau Cty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006); *see also, e.g.*, *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) ("A district court has the discretion to split a case by certifying a class for some issues, but not others, or by certifying a class for liability alone where damages or causation may require individualized assessments."); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 439 (4th Cir. 2003); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (9th Cir. 2014) (affirming a district court order that took this approach, without explicitly citing Rule 23(c)(4)); *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

Courts understand Rule 23(c)(4) certification to be "appropriate" when the requirements of Rule 23(b)(3)—that common issues predominate over individual issues, and that class adjudication be superior to individual adjudication—are satisfied as to a specific issue. In particular, "application of Rule 23(b)(3)'s superiority requirement ensures that courts will not rely on issue certification where there exist only minor or insignificant common questions, but instead where the common questions render issue certification the superior method of resolution." *Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 411-12 (6th Cir. 2018) (following *Pella*, *Nassau County*, and other Rule 23(c)(4) decisions to affirm the district court's

certification of specific common issues in toxic chemical exposure case for issue-preclusive class treatment).

If any case justifies Rule 23(c)(4) treatment for purposes of settlement class certification, this one does. *See Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) ("If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, clamant-specific issues to individual follow-on proceedings."). The question of general causation is hotly disputed, difficult and expensive to litigate, and essential to each and every claim in this controversy.

*First*, as to this issue, common questions predominate over individual ones. *See* Fed. R. Civ. P. 23(b)(3). In the context of an issue class, which should involve no individual issues at all, the inquiry is whether the identified issue is truly common and stand-alone. *See Martin*, 896 F.3d at 414 (affirming certification where "the certified issues do not overlap with actual injury or causation," which required "individualized inquiries"). That is the case here. As this Court has already determined in bifurcating pretrial proceedings, general causation is an isolated issue with no entanglement with any individual questions of specific causation or damages. *See* MDL Docs. 2282, 2302. As there are no individual issues, predominance is met.

*Second*, as to this issue, "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Litigating general causation in this case is no small feat, requiring the marshalling of documents produced over years of discovery, and the testimony of six witnesses over two weeks in the *Hardeman* bellwether trial. Resolving the "issue in one fell swoop would conserve the resources of both the

court and the parties." *Martin*, 896 F.3d at 416. Individual adjudication is also unpredictable.

Even the best trial lawyer admits that no case, perfectly presented, will always come back with

the same verdict. Class Members, left to their own devices, could put on the same evidence with

the same witnesses as Mr. Hardeman did, and take nothing upon a defense verdict on general

causation. Centralized, patient, and expert determination is superior to the expensive and time-

consuming gambit of trial. *See Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 185 (4th

Cir. 1993) (certifying 24(c)(3) issue class in asbestos case where "[s]ignificant economies may

be achieved by relieving [plaintiffs] of the need to prove over and over when defendants knew or

should have known of asbestos' hazards, or whether defendants engaged in concerted efforts to

conceal this knowledge, or even whether certain of defendants' products crumble and release dust

under hand pressure.").

Moreover, as noted above, in assessing the superiority factor here in the settlement

context, the Court need not confront the manageability and related issues that might be presented

if the general causation issue were to be tried in court on a classwide, nationwide basis. *See

Amchem*, 521 U.S. at 620.

    **D.**    <u>**Certification under Rule 23(b)(2) is also appropriate.**</u>

The Settlement provides programmatic benefits, rather than compensatory damages, to

the Class. While not necessary for the Settlement or class certification to proceed, the Court may

also appropriately certify the settlement class under Rule 23(b)(2) in addition to Rule 23(b)(3)

and Rule 23(c)(4). Rule 23(b)(2) authorizes class certification where "the party opposing the

class has acted or refused to act on grounds that apply generally to the class, so that final

injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole." Certification of claims for equitable relief is appropriate under Rule 23(b)(2) unless "the

primary relief sought is monetary," *Zinser v. Accufix Res. Inst., Inc.*, 253 F.3d 1180, 1195 (9th

Cir. 2001), or the claims require "individualized relief," *Wal-Mart*, 564 U.S. at 360 (emphasis

omitted); *see also id.* ("The key to the b(2) class is the indivisible nature of the injunctive or

declaratory remedy warranted") (internal quotation marks omitted).

**E.      The Court should appoint proposed Class Counsel and Subclass Counsel as Interim Settlement Class Counsel under Rule 23(g)(3).**

Although the Court will not appoint class counsel until the Class is certified at final

approval, the Court has the authority "to designate interim counsel to act on behalf of a putative

class." Fed. R. Civ. P. 23(g)(3). In determining whether to appoint counsel, the Court must

examine:

> (i) the work counsel has done in identifying or investigating potential
> claims in the action; (ii) counsel's experience in handling class actions,
> other complex litigation, and the type of claims asserted in the action; (iii)
> counsel's knowledge of the applicable law; and (iv) the resources that
> counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A).

As explained above and in the Cabraser Declaration, proposed counsel dedicated

extensive time and resources to investigating, designing, and negotiating the Settlement and will

continue to do so during the four-year standstill period. Counsel are also among the most

experienced in class and mass tort litigation and resolution. Interim appointment is appropriate.

The Court should appoint Robert L. Lieff, Elizabeth J. Cabraser, and Steven E. Fineman of Lieff

Cabraser Heimann & Bernstein, LLP; Samuel Issacharoff; James R. Dugan, II of the Dugan Law

Firm, APLC, William M. Audet of Audet & Partners, LLP, and TerriAnne Benedetto of the

Dugan Law Firm, APLC, as Class Counsel; William Audet as Subclass 1 Counsel; and

TerriAnne Benedetto as Subclass 2 Counsel. *See* Cabraser Decl. ¶¶ 25-33 & Exs. D-H

(describing qualifications).

## III.    The Notice Plan provides the best practical notice.

Fed. R. Civ. P. 23(e)(1)(B) requires that before a proposed settlement may be approved, the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." The Court must "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and come forward and be heard.'" *Churchill Vill., L.L.C., v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citation omitted).

The Notice Plan here will be one of the most comprehensive and well-designed programs ever utilized in a class settlement. The program was based on "unprecedented" and intensive research and information-gathering on the Class, including a survey, long-form interviews, and analysis of U.S. government data. Wheatman Decl. ¶ 30. It is multifaceted—utilizing multiple communications channels to reach Class Members including direct mail to employers, organizations, and government entities with direct connections to Class Members, and print, radio, digital, and television. It is granular—selecting communications channels (and languages) specific to different segments of the Class, including homeowners, farmworkers, landscapers, and persons disproportionally likely to be diagnosed with NHL. And it is multinational—extending television, radio, and digital outreach to Mexico, recognizing that a portion of the Class spend part of the year there. Full details are in the Wheatman Declaration.

This is not a standard Class or standard Settlement. It is not possible to mail a postcard to a large portion of the Class, and buy a print ad in USA Today for the rest. The Plan does not gloss over those challenges, but embraces them, and, using data gathered over many months, overcomes them. The content of the Notice is also exemplary, including all of the information required by Fed. R. Civ. P. 23(c)(2)(B), giving the Class everything it needs to know about the central features of the Settlement, how to opt out or object, and where to get more information. *See* Settlement Ex. 2 (forms of notice).

Finally, the comprehensive Notice Plan provides full and adequate notice to Class Members with latent disease. Courts have approved current notice as adequate for class members with latent disease where—as here—the notice plan is comprehensive and designed with those class members in mind. *See, e.g.*, *In re National Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 425, 435-36 (3d Cir. 2016) (current notice adequate for class settlement of latent injury claims for ALS and other serious diseases); *Juris v. Inamed Corp.*, 685 F.3d 1294, 1305 (11th Cir. 2012) (current notice adequate for class settlement of silicone breast implant claims, including those of "future injury claimants" whose implants had not yet malfunctioned). Indeed, no court has ever held that current notice cannot be adequate where a class settlement resolves latent injury claims.

To be sure, the Supreme Court raised a question in *dicta* in *Amchem*, 521 U.S. 591, whether current notice under the circumstances there would have been sufficient for "exposure-only" class members. But this case is different on multiple levels.

First, *Amchem* involved asbestos, an undifferentiated product woven into buildings such that people may not even be aware of their exposure until they are diagnosed with an asbestos-related disease year later. The Court's question was thus whether notice would suffice for "legions so unselfconscious and amorphous." *Id.* at 628. Here, Roundup is a consumer product.

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

People buy it and apply it. Indeed, the large majority of plaintiffs that have brought suit to date have been "home and garden" users of Roundup products. And landscaping and agricultural workers know they are using herbicides, of which Roundup is a prominent example. The class here is thus not comprised of "legions" of "unselfconscious" people; class members here know or have reason to know of their actual or potential exposure.

Moreover, the settlement here is very different from the one in *Amchem*. In *Amchem*, the class settlement fully resolved individual claims (including specific causation and individual damages) and decreed that individuals would receive specific dollar amounts as compensatory awards. It thus asked class members with latent injuries to decide based on current notice whether a particular compensatory award would satisfy them if and when they become sick. Here, by contrast, the Settlement does not resolve any individualized issues, much less individual damages. It addresses only the common question of general causation by submitting it for expert determination. Class Members are thus not put to the decision what compensatory damages they would deem adequate before they actually become sick. If the determination is in favor of the class, all Class Members benefit—and then remain free to litigate their individual claims and individual damages in the tort system. If the determination is otherwise, there was no scientific basis for them to sue Monsanto to begin with.

Finally, *Amchem*'s actual holding was not based on lack of notice; it was that the class there could not be certified because it did not meet the Rule 23 requirements, including structural protections like subclasses for class members with latent diseases, and because it made "essential allocation decisions" that disfavored "exposure-only" class members even though they were likewise required to release their damages claims. *Amchem*, 521 U.S at 619-22, 625-27. By contrast, as set forth above, the class here meets Rule 23's requirements, subclasses *were* employed

to protect class members with latent injuries, no injured person—present or future—releases their damages claims, and all class members share the same interest regarding the general causation issue. As the post-*Amchem* cases cited above make clear, where the Rule 23 structural protections are employed, current notice can be adequate for class members with latent injuries if sufficiently comprehensive. And the notice here will be among the most comprehensive ever.

### A. Guidance (2): The Administrators and Notice Agents were selected based on capabilities and experience with large, complex settlements.

The Settlement Administrator was appointed by the Court as mediator. The DAGP Administrator was selected based on Wolf Garretson's experience with complex settlements, including those specifically involving medical-related relief. *See* Cabraser Decl. ¶ 13 & Ex. B. The Claims Administrator was similarly selected based on Verus's experience, including in asbestos litigation. *See id.* at ¶ 14 & Ex. C.

The Settlement Class Notice Agents were selected after a competitive bidding process that resulted in detailed bids from four providers. *Id.* at ¶ 15. Kinsella and Signal were selected based on their capabilities and experience, specifically with regards to how well their notice proposals accounted for the unique nature of the Settlement and the Class. *Id.*

The Settlement Class Notice Amount is based on the budget drawn up by the Settlement Class Notice Agents. The DAGP Administrator, Claims Administrator, and Science Panel will submit annual budgets to the Settlement Administrator for review and approval, subject to challenge for reasonableness by Class Counsel or Counsel for the Defendant. Settlement §§ 6.7(a), 12.2(c), 12.3(c). The total administration costs, after initial costs of notice, are capped at $50 million, with Court approval required for any additional costs. *Id.* § 7.5. At all times the Court retains authority to deem any administration costs unreasonable and order they not be paid. *Id.* § 12.4.

**B.** **Guidance (3)-(5): The proposed Notice Plan comports with Rule 23, Due Process, and this District's Guidance.**

For the reasons explained above, the carefully-designed and comprehensive Notice Plan satisfies all requirements.

**IV.** **The Court should stay Class Members from filing or prosecuting new Roundup Lawsuits and Related Party Lawsuits.**

It is well established that when a court preliminarily approves a class settlement, the All Writs Act permits the court to stay existing lawsuits and bar new litigation by class members pending final approval. *See, e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liability Litig.*, 229 F. Supp. 3d 1052, 1072-73 (N.D. Cal. 2017) (Breyer, J.); *Uppal v. CVS Pharmacy, Inc.*, No. 14-2629, 2015 WL 10890652, at \*3 (N.D. Cal. Sept. 11, 2015) (Chhabria, J.); *Cotter v. Lyft, Inc.*, No. 13-4065, Doc. 256 at 4 (N.D. Cal. July 1, 2016) (Chhabria, J.); *In re NFL Players' Concussion Injury Litig.*, 301 F.R.D. 191, 203-04 (E.D. Pa. 2014); *In re Vioxx Prods. Liab. Litig.*, 869 F. Supp. 2d 719, 726 (E.D. La. 2012).

The All Writs Act expressly authorizes federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651. The Act permits the Court "to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977). It "fill[s] the interstices of federal judicial power when those gaps threate[n] to thwart the otherwise proper exercise of federal courts' jurisdiction." *Penn. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 41 (1985). This is especially so when a federal court grants preliminary approval of a class action settlement that resolves a complex matter—in those circumstances, "the challenges facing the overseeing court are such that it is likely that almost

any parallel litigation in other fora presents a genuine threat to the jurisdiction of the federal court." *In re Diet Drugs*, 282 F.3d 220, 236 (3d Cir. 2002).

The Court's power to enter, and the appropriateness of, the stay and bar order here is particularly clear for several reasons. Unlike in class actions designed to resolve the entirety of potential claims by class members, this Settlement aims to resolve the issue of general causation without compromising the underlying ability to bring individual suit, if Class members so choose. The Class definition includes only individuals who are not in litigation and have taken no steps toward any litigation. The stay request only freezes the status quo between the time of Preliminary Approval and Final Approval so that the Court and the parties can determine the propriety of classwide resolution of the common issues. Moreover, the stay will cause no prejudice to Class Members eager to file a lawsuit and not wanting the benefits of the Settlement: to do so—all they need do is opt out of the Settlement. The preliminary stay is thus sought only to protect the Court's evaluation of the proposed Settlement in the period between Preliminary and Final Approval. If the Court approves the Settlement, then the standstill will go into effect for all Class Members, defined as those who have not opted out.

The order is further justified by the unique nature of this Settlement. Class Members, by definition, have not filed any lawsuit against Monsanto. As consideration for $1.1 billion of relief and Monsanto's agreement to aggregate determination of the general causation issue through the Science Panel process, Class Members agree to refrain from filing any lawsuit against Monsanto until after the Science Panel completes its work, a litigation standstill is critical to the deal. If Class Members file lawsuits during the period in between preliminary approval and final approval being effective (after any appeals), it will frustrate the Court's approval of the Settlement. New lawsuits will undermine the basic bargain, for litigation will exist on the part of

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

people who are in the Class and will benefit from the $1.1 billion only on the condition that they have not filed lawsuits.  And without a stay, Class Members can have it both ways, electing to remain in the Settlement and be eligible for its benefits, and then suing Monsanto upon receiving an NHL diagnosis.  *Cf. Schwarzchild v. Tse*, 69 F.3d 293, 295 (9th Cir. 1995) (discussing the problem of "one-way intervention," where poor case management or improper notice result in a class member being able to join or opt out of a class only after learning the result of the merits adjudication).

This Court's power under the All Writs Act is also fully consistent with the Anti-Injunction Act, 28 U.S.C. § 2283.  Although the Anti-Injunction Act contains a similar provision allowing injunction where "necessary in aid of [the Court's] jurisdiction" and is thus generally not an obstacle to issuance of a stay order upon preliminary approval, the matter is even clearer here.  Under the Class definition, this Court is not being asked to enjoin any ongoing proceedings in state or federal court.  By definition, there are no such proceedings.  This is not the same as an order enjoining parallel litigation "based on conduct covered by the release," an order subject to the Anti-Injunction Act, and which this Court has explained requires "extraordinary circumstances."  Standing Order for Civil Cases, at 13; *see also, e.g.*, *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1332, 1334 (5th Cir. 1981) ("This statute [the Anti-Injunction Act] does not apply to those parts of the multidistrict court order that relate to state court actions that have not yet been filed.").  And here, Class Members do not "release" their claims against Monsanto's "conduct."  Class Members' own "conduct"—not filing a lawsuit during the litigation standstill—*is* the "release."

To be sure, there may be a few Class Members who initiate litigation during the time between the filing of this motion and the entry of the preliminary approval order.  For those

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741

Class Members, if any, the order would operate to restrain "parallel" litigation, but only during the time of the litigation standstill. Any Class Member of diverse citizenship from Monsanto would likely, by the processes of removal to federal court and multidistrict consolidation, end up subject to this Court's case management authority anyway. And this Court and the Ninth Circuit have recognized that the stay of parallel litigation during the Settlement approval process is appropriate, authorized by the All Writs Act, and not prohibited by the Anti-Injunction Act. *See Hanlon*, 150 F.3d at 1025; *Uppal*, 2015 WL 10890652, at \*3; *Copper*, Doc. 256 at 4; *see also, e.g.*, *Sandpiper Vill. Condo. Ass'n, Inc. v. La.-Pac. Corp.*, 428 F.3d 831, 845 (9th Cir. 2005) (explaining that *Hanlon* "recognized that a temporary stay pending settlement of the nationwide class action was appropriate under the All Writs Act and the Anti-Injunction Act because concurrent state proceedings at such a sensitive stage in the federal proceedings would have threatened the jurisdiction of the district court"); *Volkswagen*, 229 F. Supp. 3d at 1072-73 ("A stay of all state court actions relating to Released Claims . . . is necessary to preserve the Court's jurisdiction.").

Prejudice to Class Members offended by the stay is minimal. The opt-out period begins upon preliminary approval, and no stay is sought for any relief prior to that date. As a practical matter, Class Members who seek to pursue individual litigation can opt out on day one and thereby be relieved of the effect of the stay in short order. The opt-out process is a simple affair and much less demanding than filing suit, requiring only written notice to the Claims Administrator, and is effective 21 days after receipt (or the resolution of any challenge to the validity of the request). Settlement § 4.2(a).

A stay is an important piece of what Monsanto bargained for in exchange for $1.1 billion. It works no harm to Class Members, who, despite years of public controversy about Roundup,

have not filed lawsuits or even retained counsel.  The few Class Members who want nothing to do with the Settlement need only opt out, and retain their full bundle of rights, including the right to sue Monsanto immediately.  For these reasons, the Court should exercise its authority under the All Writs Act and stay Class Members from filing covered actions.

## V.     Requested Timetable

| Event | Proposed Date |
|---|---|
| Preliminary Approval Hearing | The parties request a preliminary approval hearing within 30 days of this filing |
| Commencement of Notice Plan | 21 days after entry of Preliminary Approval Order |
| Deadline to Opt Out | 150 days after Commencement of Notice Plan |
| Motion for Attorneys' Fees, Costs, and Class Representative Incentive Awards | As ordered by the Court |
| Deadline to Object | As ordered by the Court |
| Motion for Final Approval and Response to Objections | As ordered by the Court |
| Fairness Hearing | As ordered by the Court |

## CONCLUSION

Plaintiffs respectfully request that the Court (1) grant preliminary approval to the Settlement; (2) appoint Interim Class Counsel and Subclass Counsel; (3) direct Notice to the Class; (4) schedule a Fairness Hearing; and (5) stay the filing and prosecution of Roundup-related actions by Settlement Class Members.

Dated: June 24, 2020     Respectfully submitted,

            */s/ Elizabeth J. Cabraser*
            Robert L. Lieff (of counsel) (SBN 037568)
            Elizabeth J. Cabraser (SBN 083151)
            Kevin R. Budner (SBN 287271)
            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
            275 Battery Street, 29th Floor
            San Francisco, California 94111-3339
            Telephone: 415.956.1000
            Facsimile: 415.956.1008
            rlieff@lchb.com
            ecabraser@lchb.com
            kbudner@lchb.com

            Steven E. Fineman (SBN 140335)
            Wendy R. Fleishman
            Rhea Ghosh
            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
            250 Hudson Street, 8th Floor
            New York, NY 10013
            Telephone: 212.355.9500
            sfineman@lchb.com
            wfleishman@lchb.com
            rghosh@lchb.com

            Andrew R. Kaufman
            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
            222 2nd Avenue South, Suite 1640
            Nashville, TN 37201
            Telephone: 615.313.9000
            akaufman@lchb.com

            James R. Dugan, II
            TerriAnne Benedetto
             *Proposed Subclass 2 Counsel*
            David S. Scalia
            THE DUGAN LAW FIRM, APLC
            One Canal Place
            365 Canal Street, Suite 1000
            New Orleans, LA 70130
            Telephone: 504.648.0180
            jdugan@dugan-lawfirm.com
            tbenedetto@dugan-lawfirm.com
            dscalia@dugan-lawfirm.com

William M. Audet (SBN 117456)
 *Proposed Subclass 1 Counsel*
Ling Y. Kuang (SBN 296873)
AUDET & PARTNERS, LLP
711 Van Ness, Suite 500
San Francisco, CA 94102-3229
Telephone: 415.568.2555
waudet@audetlaw.com
lkuang@audetlaw.com

Samuel Issacharoff
40 Washington Square South
Suite 411J
New York, NY 10012
Telephone: 212.998.6580
si13@nyu.edu

*Counsel for Plaintiffs and the Proposed Class*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on June 24, 2020, service of this document was accomplished

pursuant to the Court's electronic filing procedures by filing this document through the ECF

system.


      /s/ *Elizabeth J. Cabraser*
      Elizabeth J. Cabraser

MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT
MDL NO. 2741, CASE NO. 3:16-MD-02741