# EXHIBIT A

Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Rd., 6th Floor
Ridgefield Park, NJ  07660
973-639-9100
cseeger@seegerweiss.com

*Lead Counsel for the Putative Missouri Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: ROUNDUP PRODUCTS LIABILITY LITIGATION | MDL No. 2741 |
| | Case No. 16-md-02741-VC |
| This document relates to: ALL ACTIONS | |
| *Jones* v. *Monsanto Co.*, 3:26-cv-01455 *Schramm* v. *Monsanto Co.*, 3:26-cv-01461 [As to ECF No. 21962 Argument Part III] | |

**<u>DECLARATION OF CHRISTOPHER A. SEEGER</u>**

Pursuant to 28 U.S.C. 1746, I, Christopher A. Seeger, hereby declare as follows:

1.      I am a partner at Seeger Weiss LLP and a member in good standing of the Bars of the State of New Jersey and the State of New York, as well as several United States District Courts and United States Courts of Appeals.

2.      I respectfully submit this declaration in support of the Opposition filed herewith to the Joint Motion of MDL Co-Lead Counsel and Wave 10 Plaintiffs Jones and Schramm for Injunctive Relief or, in the Alternative, Declaratory Relief Related to Proposed National Roundup

DECLARATION OF CHRISTOPHER A. SEEGER
NO. 3:16-MD-02741-VC

Settlement [ECF No. 21962] (the "Motion"). The Motion seeks an injunction against Seeger Weiss LLP and other firms in their capacities as Class Counsel in *King v. Monsanto Co.*, No. 2622-CC00325 (Mo. 22nd Jud. Cir.), currently pending in the Circuit Court of the City of St. Louis in the state of Missouri (the "Missouri Action").

3.     My experience and qualifications are set forth in my declaration filed on February 17, 2026, in support of preliminary approval of the class settlement in the Missouri Action. The relevant experience and qualifications of remaining Subclass 1 counsel in the Missouri Action—Joseph Rice, Peter Kraus, and John Eddie Williams—are likewise set forth in Exhibit A to that declaration. A true and correct copy is attached as **Exhibit 1**.[1] Mr. Kraus has also submitted an affidavit providing additional detail regarding the experience of his firm and Mr. Williams's firm litigating Roundup claims. A true and correct copy is attached as **Exhibit 2**. Mr. Rice has also submitted an affidavit describing his firm's experience litigating Roundup claims. A true and correct copy is attached as **Exhibit 3**. The relevant experience and qualifications of Subclass 2 counsel in the Missouri Action—Eric Holland and Michael Ketchmark—are set forth in the declaration filed by Eric Holland on February 17, 2026, in support of preliminary approval of the class settlement in the Missouri Action. A true and correct copy with relevant exhibits is attached as **Exhibit 4**.[2]

4.     Collectively, Counsel for Subclass 1 in the Missouri Action represent thousands of individuals with Roundup claims pending or subject to tolling agreements. Seeger Weiss alone

---

[1] My declaration was filed as Exhibit 3 to the Motion for Preliminary Approval in the Missouri Action.

[2] Mr. Holland's declaration was filed as Exhibit 2 to the Motion for Preliminary Approval in the Missouri Action.

DECLARATION OF CHRISTOPHER A. SEEGER
NO. 3:16-MD-02741-VC

represents over 13,000 such claimants—the single largest group of remaining unresolved Roundup claims.

5. Over the past several years, Missouri has become the location of the overwhelming majority of Roundup litigation. Currently, many tens of thousands of Roundup plaintiffs have cases pending in the Missouri state courts, compared to 301 plaintiffs in the MDL and approximately 75 plaintiffs across other federal courts. Seeger Weiss alone has filed cases on behalf of more than 3,500 plaintiffs in Missouri.

6. The class action settlement proposed in the Missouri Action has broad-based support among firms handling a large majority of the Roundup litigation, including former MDL Co-Lead Counsel Aimee Wagstaff and firms that previously opposed the prior proposed settlements in this Court. In addition to Class Counsel in the Missouri Action, numerous other law firms representing substantial numbers of Roundup claimants have publicly declared their support for the Settlement and/or have agreed to serve on the plaintiffs' steering committee to implement the Settlement. On information and belief, collectively, Subclass 1 counsel and other supporting firms represent approximately 60% of the pending and tolled Roundup claims that remain unresolved—tens of thousands of plaintiffs—including Seeger Weiss LLP (~13,200 plaintiffs), Motley Rice LLC (~3,300 plaintiffs), Waters Kraus Paul & Siegel, LLP (~1,800 plaintiffs), Wagstaff Law Firm (~6,800 plaintiffs), Nachawati Law Group (~4,000 plaintiffs), Napoli Shkolnik PLLC (~1,600 plaintiffs), and Ferraro Law Firm PA (~1,500 plaintiffs), as well as Sbaiti & Company PLLC, Schlesinger Law Offices PA, Simmons Hanly Conroy LLP, Duncan Stubbs, and Levin Papantonio. Other firms are considering doing likewise. Several of these firms, including Nachawati Law Group, Levin Papantonio, and Napoli Shkolnik were opponents of the prior proposed class settlements. Public statements in support from the Wagstaff Law Firm, the

-3-

DECLARATION OF CHRISTOPHER A. SEEGER
NO. 3:16-MD-02741-VC

Nachawati Law Group, Ferraro Law Firm, and Schlesinger Law Offices are attached as **Exhibit 5, Exhibit 6, Exhibit 7** and **Exhibit 8**, respectively.

7. It is my understanding that Weitz & Luxenberg is counsel of record for approximately 130 Roundup plaintiffs, and nearly all of those plaintiffs (approximately 110) have cases pending in Missouri state court. The firm has filed nearly all of its recent Roundup cases in Missouri state court. Further, it is my understanding that the Miller Firm is not counsel of record to any plaintiffs with active MDL cases and is apparently counsel to a single Missouri state case. Both firms have submitted opt out requests to the Settlement Administrator on behalf of clients, with Weitz & Luxenberg having submitted dozens of requests and even having submitted material to cure deficiencies in one opt out request.

8. Thus far, multiple plaintiffs have submitted material to cure deficiencies in their opt out requests. And anyone seeking further clarification on the opt-out instructions can ask follow-up questions to the Settlement Administrator via email or toll-free telephone, staffed in multiple languages. A true and correct copy of the Opt Out Instructions, available on the Settlement website at https://www.weedkillerclass.com/Docs/View_Instructions.pdf, is attached as **Exhibit 9**.

9. Since February 17, 2026, 38 plaintiffs have directly filed in or been transferred to the MDL. Prior to February 17, 2026, 28 plaintiffs with active cases were remanded from the MDL. Counsel for each of these two groups of plaintiffs have been sent an individualized notice via letter from the Settlement Administrator that explains exactly which federal plaintiffs are and are not in the Settlement class. Similar letters will be sent to any plaintiffs who transfer into or directly file in the MDL up until the opt-out deadline. A related letter sent to Weitz & Luxenberg confirming the plain language of the Settlement class definition in response to a question raised in

-4-

DECLARATION OF CHRISTOPHER A. SEEGER
NO. 3:16-MD-02741-VC

a filing in the Missouri Action was sent prior to the signatories receiving the firm's request for a shortened schedule on the Motion. An FAQ has also been added to the Settlement website with the same information that was in the letter to Weitz & Luxenberg.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 21, 2026

*s/ Christoper A. Seeger*
Christoper A. Seeger

DECLARATION OF CHRISTOPHER A. SEEGER
NO. 3:16-MD-02741-VC

# EXHIBIT 1

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

2022-CC00325

# EXHIBIT 3

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

**IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS**
**STATE OF MISSOURI**

|  |  |
|---|---|
| RANDALL KING, SCOTT BUTTERFIELD, ROBERT KOEHLER, MICHAEL MERX AND BRUCE WALDMAN, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MONSANTO COMPANY, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> No. [●] <br><br> Div. [●] |

**DECLARATION OF CHRISTOPHER A. SEEGER IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

I, Christopher A. Seeger, hereby declare as follows:

1.    I am a partner at Seeger Weiss LLP.  I am a member in good standing of the Bars of the State of New Jersey and the State of New York, as well as several United States District Courts and United States Courts of Appeal.  I respectfully submit this declaration in support of the Unopposed Motion (the "Motion") of Proposed Class Counsel for an Order: (1) Granting Preliminary Approval of the Settlement Agreement; (2) Preliminarily Certifying the Settlement Class; (3) Appointing Class Counsel and Subclass Counsel; (4) Approving the Dissemination of Settlement Class Notice; (5) Scheduling a Fairness Hearing; and (6) Staying the Filing and Prosecution of Roundup-Related Actions in the Missouri Courts by Settlement Class Members.  Except as otherwise noted, I have personal

1

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

knowledge of the facts set forth herein and could testify competently to them if called upon to do so.

## I.  Background and Qualifications

2.  I have been practicing law for 35 years and am a founding partner of Seeger Weiss LLP. Since founding the firm in 1999, I have had the privilege of leading some of the most complex, groundbreaking, and high-profile litigations in the United States, in both state and federal courts. Colleagues and members of the judiciary have recognized me as among the most innovative and effective plaintiff attorneys in the country. I am an elected member of the American Law Institute and a Fellow of the International Society of Barristers. The Chambers guide has ranked me a Band 1 lawyer, and the National Law Journal has called me a "trailblazer and pioneer" who has "changed the practice of litigation."

3.  I am principally known for class actions and multidistrict mass torts involving personal injury and economic loss from defective products, pharmaceuticals, and devices. I often serve in leadership roles—selected by my peers or appointed by courts (those administering MDLs or parallel coordinated state-court actions)—to coordinate and steward the mass consolidated or class actions in which the firm is involved, either as Lead Counsel, Co-Lead Counsel, Liaison Counsel, or as a member of Plaintiffs' Executive or Steering Committees. In those roles, I often act as the voice of the plaintiffs on litigation and resolution issues and am often chosen to handle case-defining bellwether trials.

4.  Even when I am not formally selected for a leadership role, courts and peers routinely ask me to serve in "unofficial" roles in leading negotiations and resolutions. For

2

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

example, in *Syngenta*, although I was not appointed to the Plaintiffs' Steering Committee, I was made the chair of the Negotiating Committee by the Hon. John Lungstrum. In the *Yaz* litigation, after a year of unsuccessful negotiation by lead counsel, the Hon. David R. Herndon asked Special Master Stephen A. Saltzburg to meet with me, a member of the Plaintiffs' Steering Committee. Special Master Saltzburg and I developed a settlement framework with Seeger Weiss's cases, creating a model for the broader resolution of the other claims in that litigation.

5. Most recently, in July 2025, I was appointed by the Hon. Rukhsanah L. Singh of the District of New Jersey to serve as Plaintiffs' Lead Negotiating Counsel in the *Johnson & Johnson Talcum Powder Litigation* (an MDL with nearly 60,000 pending cases), with authority to conduct and lead settlement discussions and negotiations on behalf of plaintiffs who developed ovarian cancer after using J&J's Baby Powder and other talcum powder products.

6. Throughout my career, I have remained committed to ensuring maximum recovery for victims. In the *NFL Players' Concussion Injury Litigation*, for example, I helped to secure an unprecedented 65-year uncapped settlement for all retired NFL players. This settlement provided important neurological baseline testing for all retired players and cash awards to injured class members. I have also been committed to pursuing innovative approaches designed to best serve our clients' needs. For example, the *NFL* settlement also included anti-assignment language, in order to address historical abuses by predatory lenders. And when I discovered that the recoveries to which victims were entitled were being cannibalized by predatory lenders, I brought proceedings to enjoin the enforcement

3

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

of financing agreements, and prevailed. I was also able to creatively maximize victim recovery in the *Vioxx*, *Zyprexa*, *NFL*, *3M Combat Arms Earplugs*, and *Philips Recalled CPAP* cases, through the use of a lien-resolution administrator to efficiently resolve government and third-party liens.

7. My ability to successfully bridge divides and broker resolution in complex litigation has been kindly recognized by the judges and courts managing those litigations and settlements. For example, the Hon. Anita Brody wrote that the "successful implementation of the [*NFL*] settlement agreement to date is a credit to the work done by the attorneys at Seeger Weiss." Regarding my work in the *Syngenta* litigation, Special Master Ellen Reisman wrote, "Mr. Seeger served ably as the chair of the [Plaintiffs' Settlement Negotiating Committee], keeping discussions going even when they (frequently) seemed in danger of breaking down. It is the judgment of Special Master Reisman and Special Master Stack that without Mr. Seeger's involvement in the process, a resolution would not have been reached." In adopting Special Master Reisman's report in *Syngenta*, Hon. John Lungstrum wrote that I "contributed more than any other attorney in accomplishing the settlement of the litigation."

8. As mentioned above, I have been appointed to and served in numerous leadership roles in high-profile, complex litigation and have guided many of these cases to successful resolution. A few illustrative examples from the past five years include:

- ***3M Combat Arms Earplug Products Liability Litigation*, MDL No. 2885 (N.D. Fla.)**. I am Co-Lead Counsel and Chair of the Joint Settlement Committee in this MDL regarding personal injury claims arising from defective earplugs that caused hearing loss and tinnitus. A settlement of over

4

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

$6 billion on behalf of more than 250,000 service members and veterans was reached.

- ***Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Products Litigation*, MDL No. 3014 (W.D. Pa.)**. I am Co-Lead Counsel representing individuals and classes asserting economic loss (class), medical monitoring (class), and personal injury (mass tort) claims arising from recalled medical devices. Three settlements were reached: $1.075-billion personal injury settlement, an uncapped $608 million economic loss settlement, and $25 million medical monitoring settlement for patients impacted by the recall.

- ***National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio)**. I served as a Member of the Plaintiffs' Executive Committee, Settlement Committee, and Plaintiffs' Negotiating Committee in multidistrict litigation prosecuting RICO, public nuisance, and related claims on behalf of local governments. I was Co-Lead Counsel for the Negotiation Class. To date, more than $50 billion in settlements have been reached.

- ***Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, MDL No. 3047 (N.D. Cal.)**. I was appointed Counsel to the Co-Leads and settlement counsel in this MDL prosecuting product liability, negligence, nuisance, and other claims against social media platforms concerning mental and physical harm to children and impact on schools.

9. I have played a central role in MDL-wide and class-action settlements in the following matters:

- ***In re National Football League Players' Concussion Injury Litigation*, MDL No. 2323 (E.D. Pa.)**. I served as chief negotiator in this highly visible and contentious multidistrict litigation against the National Football League on behalf of retired National Football League players, who suffered head trauma or injuries during their careers which caused or may cause long-term neurological problems. Under the auspices of a mediator, I obtained an uncapped settlement fund valued at over $1 billion and a medical testing program, which were overwhelmingly supported by the class and received unprecedented media attention. This settlement was approved by the Third Circuit Court of Appeals, and a writ of certiorari was denied by the United States Supreme Court. More than 20,000 plaintiffs were involved in the settlement.

- ***In re Syngenta AG MIR162 Corn Litigation*, MDL No. 2591 (D. Kan.)**. This litigation arose out of the injuries suffered by a nationwide group of

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

corn producers who were harmed as a result of Syngenta AG's premature commercialization of genetically modified strains of corn. After a trial and a few years of litigation, the parties had made little headway in settling the case. The Hon. John Lungstrum appointed me to chair the Settlement Committee, with the goal of bringing together class action lawyers, lawyers representing large volumes–often in the tens of thousands–of individual farmer claims, and a tough defendant to settle the case. My work as lead negotiator resulted in a $1.5-billion nationwide class action settlement–the largest agricultural litigation settlement in U.S. history. This matter was pending for approximately three years after its consolidation in 2014 and before the settlement was reached in 2017. More than 650,000 plaintiffs were involved in the settlement.

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, **MDL No. 2672 (N.D. Cal.)**. I served on the Settlement Committee and was one of the lead negotiators of a series of settlements with Volkswagen and Bosch on behalf of consumers who purchased Volkswagen- and Audi-branded diesel vehicles that contained devices designed to cheat emissions tests. Together, these settlements provided more than $10 billion for affected consumers and an additional $4.7 billion to remediate environmental damages caused by the vehicles.

- *In re Vioxx Products Liability Litigation*, **MDL No. 1657 (E.D. La.)**. In my role as co-lead counsel, to which I was appointed by the Hon. Eldon E. Fallon, I secured a settlement of $4.85 billion against Merck & Co. for the more than 30,000 plaintiffs who suffered heart attacks and strokes while taking Vioxx.

- *In re Chinese-Manufactured Drywall Products Liability Litigation*, **MDL No. 2047 (E.D. La.)**. I served as the Chair of the Plaintiffs' Trial Committee, a position I was appointed to by the Hon. Eldon E. Fallon, acting as lead trial counsel in obtaining successful verdicts in a series of bellwether liability and damages trials on behalf of close to 5,000 property owners who used the allegedly toxic drywall, many in rebuilding homes destroyed by Hurricane Katrina. These verdicts served as the precursor to a national settlement valued at approximately $1 billion with worldwide drywall distributor Knauf Plasterboard Tianjin in 2013.

- *In re Zyprexa Products Liability Litigation*, **MDL No. 1596 (E.D.N.Y.)**. I served as Liaison Counsel, a position to which I was appointed by Hon. Jack B. Weinstein, and was one of the chief negotiators of an initial national $700-million settlement, and a second-round $500-million settlement, with Eli Lilly, resolving over 8,000 claims that Zyprexa caused diabetes-related injuries. I was the first to conceive of and use a global lien-resolution

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

administrator in the class or mass-action context to resolve government or third-party liens, resulting in significant savings and quicker payments to class members.

10. Proposed Class Counsel for Subclass 1 include myself, Joseph Rice of Motley Rice LLC, John Eddie Williams of Williams Hart & Boundas LLP, and Peter A. Kraus of Water Kraus Paul & Siegel.[1]  To ensure comprehensive expertise within the Plaintiffs' negotiating group, it was important to assemble a team of attorneys with significant numbers of Roundup cases, as well as attorneys with trial verdicts in Roundup litigation.  Collectively, proposed counsel for Subclass 1 represent well over 10,000 individuals with Roundup Claims pending or subject to tolling agreements.  These attorneys have deep, hard-earned expertise in the Roundup litigation—understanding its intricacies, scientific complexities, legal strengths and weaknesses, and jury dynamics— having investigated, filed, prosecuted, and tried Roundup cases to verdict.  The relevant credentials of proposed counsel for Subclass 1 are provided in Exhibit A.  Proposed Settlement Class/Subclass Counsel have the experience, skill, knowledge, and resources justifying their appointment under Rule 52.08(g).

## II.    Settlement Negotiations and the Settlement Agreement

11. I first began exploring various settlement possibilities with counsel for Defendant in March 2023.

12. My involvement with this Settlement, however, began on February 22, 2024, when I met with counsel for Defendant and began discussing the general contours of a

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Settlement Agreement, which is attached as Exhibit 1 to the Motion.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

potential class-action settlement. Shortly thereafter, in June 2024, Plaintiffs' proposed Class Counsel and Defendant retained Fouad Kurdi of Resolutions LLC, a nationally recognized mediator, to oversee settlement discussions. Separate counsel to represent Subclass 2 (exposed but not-yet-diagnosed Settlement Class Members) was immediately invited to participate in settlement discussions. At that time, Seeger Weiss represented well over 2,000 Roundup claimants in cases filed against Monsanto in Missouri and Pennsylvania, with many additional claimants subject to a tolling agreement with Monsanto.

13. Over the next nearly 18 months, Proposed Class and Subclass Counsel engaged in exceedingly hard-fought and protracted negotiations with Monsanto over the myriad interconnected components of the settlement framework, with each element requiring its own rounds of intensive bargaining. This process included almost daily communications, with negotiations occurring not only between Monsanto and proposed Class Counsel collectively, but also separately between Monsanto and proposed Class Counsel for each of the two Subclasses, as well as among proposed Class Counsel for the Subclasses themselves. This involved numerous exchanges of proposals and drafts, information requests, several presentations, repeated rounds of Zoom sessions, and many days of in-person meetings.

14. From the outset, proposed Class Counsel collaborated closely with medical and scientific experts regarding the design and administration of the settlement.

15. Understanding that the scope of Roundup liability presented risks to Defendant's ability to sustain ongoing operations, proposed Class Counsel engaged

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

financial experts early in the process to analyze Defendant's financial condition and ability to fund a settlement. This analysis was critical to structuring a settlement that would maximize recovery for Settlement Class Members while preserving Defendant's viability as an ongoing concern.

16. The global resolution in these Roundup Claims is the result of many months of intense, hard-fought, arm's-length negotiations between some of the nation's leading plaintiffs' attorneys and highly experienced defense counsel, encompassing collectively thousands of hours of professional time with input from medical, financial, administrative, and other experts.

17. Over the past six months in particular, proposed Class Counsel and Defendant's counsel have worked through multiple iterations of the Settlement Agreement and its many exhibits, reviewing and negotiating the documents line by line. The parties exchanged numerous lists of disputed issues and revisions to the Settlement Agreement, with Mr. Kurdi remaining involved to help the parties resolve disputes as they arose, including during in-person mediation sessions regarding outstanding issues with the draft agreement.

18. The parties did not engage in substantive negotiation about or reach any agreement on attorneys' fees, reimbursement of expenses, or Class Representative service awards (all of which will be subject to future application to the Court) until they had resolved all essential terms of the relief available to the Class.

19. Through my extensive involvement in some of the most consequential litigations over the past two decades, I have developed a thorough grasp of the appropriate

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

and effective structural approaches for resolving complex disputes, including the fundamental legal principles and frameworks that typically govern comprehensive resolutions in mass tort and MDL cases. Additionally, I have cultivated an understanding of how courts, juries, and expert witnesses assess the value of different categories of purported harm, as well as the inherent challenges—including obstacles to establishing liability and causation, procedural delays, and substantial costs—associated with litigating these matters through trial.

20. When engaging in negotiations for a class-wide resolution, there are a number of important considerations to be evaluated and weighed. Initially, assessing the strengths of plaintiffs' claims, both on an individual and aggregate basis, is critically important. This assessment involves: (a) the categories of alleged harm and their typical valuation within the civil justice system (including, for personal injury claims, whether conditions are temporary or permanent, acute or chronic, life-threatening or fatal, the character and severity of any purported physical and mental impairments, and the level of pain and suffering claimed); (b) the scientific evidence supporting the claims— specifically, whether peer-reviewed publications, epidemiological research, or clinical studies establish a connection between the plaintiffs' injuries and the defendant's product or pharmaceutical, and whether the injuries constitute "signature injuries" (e.g., mesothelioma linked to asbestos or adenosis linked to DES exposure) versus conditions prevalent in the broader population; (c) individual risk factors of the plaintiffs; (d) the degree to which the alleged conditions may be reasonably attributable to other factors, alternative exposures, or confounding variables; (e) the scope of the affected population

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

(meaning the size and composition of the proposed class); and (f) outcomes from any bellwether or other trial proceedings and the likelihood of favorable jury determinations, among additional considerations.

21. Likewise significant are the litigation risks should resolution not be reached, including: (a) all available defenses that defendants may assert, such as federal preemption, failure to establish general or specific causation, time-bar provisions, and similar arguments; (b) possible insolvency or bankruptcy of the defendant entity; (c) the inevitable delays—which are particularly daunting for diagnosed individuals living with cancer—in compensating seriously harmed plaintiffs (even following successful jury verdicts), including those stemming from the substantial backlog of pending cases awaiting trial; (d) that large verdicts in favor of a small number of plaintiffs could deplete defendant's resources and compromise its ability to compensate the broader class of claimants; (e) appellate challenges to favorable trial outcomes and the potential for award reduction; and (f) whether the expense of pursuing individual claims would exceed the likely recovery for each claimant, among other considerations.

22. Class Counsel bears the responsibility to evaluate the interests of the entire class when pursuing a comprehensive resolution of plaintiffs' claims and to secure the most favorable outcome achievable given the existing circumstances—one that is fundamentally fair, reasonable, and adequate. Given all of these considerations, I believe the Settlement Agreement meets this standard.

23. If approved, this Settlement will provide substantial benefits to the Class: up to $7.25 billion paid over 17-21 years to compensate those who develop Non-Hodgkin

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Lymphoma ("NHL") after exposure to Roundup Products, as well as their Derivative and Representative Claimants. Under this Settlement, the average Program Award across all Tiers will exceed the per-claim average of other Roundup settlements recently entered into by Defendant.

24. Settlement Class Members must demonstrate Exposure to Roundup Products exceeding a threshold level to receive a monetary award but will not be required to prove their NHL was caused by that Exposure—thereby eliminating a central defense that Defendant consistently raises to dispose of Roundup Claims.

25. The proposed Settlement will provide compensation to Settlement Class Members based on a structured grid system that combines objective tiers with individualized claim scoring. The grid establishes nine Tiers based on three clear, objective factors: (a) type of Roundup Exposure (occupational vs. residential), (b) age at time of NHL diagnosis (under 60, between 60-77, or 78 and older), and (c) type of NHL (aggressive/fast-growing vs. indolent/slow-growing). Tier 9 is composed of all Settlement Class Members diagnosed with NHL at age 78 or older, regardless of their exposure type or NHL classification. The priority of payment is principally determined by the Claimant's respective Tier.

26. The grid sets an average Program Award amount for each Tier, with higher-Tier Claimants receiving higher amounts. Individual Awards may vary from 80% to 120% of the Tier average to account for specific circumstances, such as intensity of treatment, proof and extent of exposure, prior lawsuit status, or pre-existing medical conditions. These percentage adjustments are applied within each Tier's baseline average. The Settlement's

12

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

structured grid system combines objective tiers with individualized claim scoring, ensuring both fairness through well-defined medical criteria and consistency in outcomes for similarly situated Claimants.

27.     The Settlement also separately allocates portions of the settlement payments to an Extraordinary Circumstances Fund and an Extraordinary Residential Exposure Fund to provide additional compensation to Claimants with exceptional circumstances or significant and atypical residential use, which are administered independently from the Tier-based Program Awards.

28.     The Settlement establishes minimum average Program Awards—both within each Tier and across all Tiers—that must be maintained.  These guaranteed minimum average Program Awards will be protected even if the number of Claimants exceeds current estimates or if there is a higher percentage of Occupational Claimants (who fall into higher Tiers).  In such cases, Claimants who are not paid within five years of being deemed eligible may exit the Settlement's compensation program and return to the tort system to sue Defendant for compensatory damages for their injuries and losses.  Conversely, if the number of Claimants, or the percentage of higher-value claims, falls below current estimates, then all Claimants—including those already paid—will receive proportionally higher Awards through Tier average increases and supplemental payments.

29.     In addition, the Settlement establishes a $1 billion Security Fund, which protects Settlement Class Members in the event the Defendant enters a bankruptcy proceeding while its principal obligations remain outstanding.

30.     The Settlement also includes provisions designed to benefit members of Subclass 1.

31.     For example, the Settlement requires Defendant to make front-loaded payments, with nearly $3 billion due in the first five payment years.  This will help ensure sufficient funding to promptly compensate members of Subclass 1 who have already developed NHL after exposure to Roundup Products.

32.     In addition, it was important to proposed Subclass 1 Counsel—recognizing the uncertain number of Class members who may participate in the Settlement and the limited ability to increase the compensation fund—that Subclass 1 members who remained unpaid be able to exercise an exit right to sue the Defendant for compensatory damages in the tort system.  The proposed Settlement does this.  A Claimant will receive $500 and regain the right to sue for their injuries and losses (not punitive damages) if they submit a valid claim but do not receive an Award payment within five years of their claim being deemed eligible and request to exercise their exit right.

33.     Moreover, beginning with the Fifth Annual Payment, the average Tier Awards may be adjusted for inflation up to two-and-a-half percent (2.5%) per year, subject to the judgment of the Settlement Special Master.  This will help preserve the real value of Awards for Settlement Class Members, including those in Subclass 1 who may be paid during later years of the settlement period.

34.     The Settlement also provides for Quick-Pay Awards for certain Subclass 1 Class members in Tiers 5-9 (Residential Claimants and those diagnosed at age 78 or older) who have already filed a Roundup Claim or are on a tolling agreement as of February 13,

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

2026. Quick-Pay Awards offer accelerated access to compensation to individuals who have already asserted a Roundup Claim against Monsanto but who may not be paid until later years of the Settlement.

35.    The Settlement likewise provides Exigency Awards for certain Subclass 1 members facing imminent loss of housing or a terminal illness where they may not survive to receive a standard payment.

36.    Both Quick-Pay and Exigency Awards may be implemented early under the Settlement, with Monsanto obligated to pay up to $240 million in Quick-Pay Awards and up to $60 million in Exigency Awards before the Effective Date, with unused Exigency Award funds being reallocated to Quick-Pay Awards (i.e., $300 million would be available for Quick-Pay Awards if there were no Exigency Awards).  Monsanto is obligated to pay these amounts even if the proposed Settlement never becomes effective.

37.    These meaningful benefits, and others provided for in the proposed Settlement, were secured from Defendant in the face of substantial litigation challenges and the significant risks Settlement Class Members face in pursuing individual claims through continued litigation.

38.    Settlement Class Members face the risk that the U.S. Supreme Court could rule that the Federal Insecticide, Fungicide, and Rodenticide Act preempts state-law failure-to-warn claims because the EPA has approved Roundup's labels.  In connection with Monsanto's *certiorari* petition, the Solicitor General advised the Supreme Court that federal law does preempt state-law failure-to-warn claims about Roundup and recommended that the Court grant Monsanto's petition and rule that Roundup plaintiffs

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

may no longer bring failure-to-warn based claims. The Supreme Court granted *certiorari* on this issue on January 16, 2026, and a decision is expected as early as June 2026. If the Court rules in Defendant's favor, Settlement Class Members' failure-to-warn claims—the primary basis for Roundup liability—would be eliminated, severely compromising Settlement Class Members' ability to recover compensation through litigation.

39.     Critically, the sheer volume of pending Roundup cases in Missouri and nationwide has created a significant backlog. Since 2015, more than 52,000 Roundup Lawsuits have been filed against Defendant involving approximately 125,000 plaintiffs; 24 cases involving 31 plaintiffs have been tried to a verdict, resulting in 11 verdicts for plaintiffs and 13 verdicts for Defendant, and recently trending towards more wins than losses for Defendant. Given the number of remaining plaintiffs and the associated backlog, only a tiny fraction of the remaining plaintiffs will receive trial dates or compensation in the foreseeable future absent a nationwide settlement.

40.     Settlement Class Members also face the risk that, absent settlement, Monsanto's financial difficulties due to Roundup and other liabilities could lead to bankruptcy. If that were to occur, Settlement Class Members would face significant delay and receive much less in compensation.

41.     Against this backdrop, the proposed Settlement's substantial benefits provide certainty and meaningful compensation where continued litigation offers only mounting risk, indefinite delay, and the likelihood that many Settlement Class Members will ultimately recover nothing.

**III.     <u>Selection of Recommended Settlement Administrators and Agents</u>**

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

42. Drawing on their extensive experience in mass-tort litigation, proposed Class Counsel and Defendant identified and retained the leading firms in the industry to serve in key administrative roles so as ensure efficient, fair, and professional implementation of the Settlement. Each firm selected has extensive experience in large-scale mass-tort and class-action settlements, proven track records of successful administration, and demonstrated expertise in complex claims processing.

43. Proposed Class and Subclass Counsel selected Signal Interactive Media, LLC ("Signal Interactive Media") as Settlement Class Notice Agents, given their experience developing and directing some of the largest and most complex national notification programs in the country. Signal Interactive Media's qualifications, along with the notice plan, are set out in the accompanying Declaration of Shannon Wheatman, Ph.D.

44. Proposed Class and Subclass Counsel recommend BrownGreer PLC to serve as proposed Administrator based on its considerable experience handling settlements across the largest-ever class actions and MDLs, including settlements in *NFL Players' Concussion Injury Litigation*, MDL 2323 (E.D. Pa.); *In re National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio); *In re Diet Drugs (Phentermine / Fenfluramine / Dexfenfluramine) Products Liability Litigation*, MDL No. 1203 (E.D. Pa.); *In re 3M Combat Arms Earplug Products Liability Litigation*, MDL No. 2885 (N.D. Fla.); *In re Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Products Litigation,* MDL No. 3014 (W.D. Pa.); and asbestos litigations. BrownGreer PLC's qualifications are attached as an exhibit to the Declaration of Eric D. Holland.

17

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

45.     Proposed Class and Subclass Counsel recommend Matthew Garretson of Garretson, LLC to serve as proposed Allocation Special Master to administer, oversee, and execute the operation of the Claims Program set forth in in the Settlement, including but not limited to drafting and modeling the claims evaluation methodology; assigning Tiers to Claim Packages or Quick-Pay Claim Packages; and evaluating and scoring Claim Packages or Quick-Pay Claim Packages; making Awards, (including Program Awards, Quick-Pay Awards, ECF Awards, EREF Awards, and Exigency Awards).  Since October 2024, Mr. Garretson has been involved in evaluating appropriate allocation methodologies to ensure fairness and objectivity through well-defined medical criteria, consistent outcomes for similarly situated Claimants, and an efficient process to adjudicate claims and resolve appeals.  Proposed Class and Subclass Counsel selected Mr. Garretson based on his experience in the design, administration, and oversight of dozens of class action and mass tort resolution programs, including *In re World Trade Center Disaster Site Litigation*, MDL Docket Nos. MC100, 102-03 (S.D.N.Y.), *Deepwater Horizon Litigation*, MDL No. 2179 (E.D. La.), *NFL Players' Concussion Injury Litigation*, MDL No. 2323 (E.D. Pa.), *In re Vioxx Products Liability Litigation*, MDL No. 1657 (E.D. La.), *In re Flint Water Cases*, 5:16-cv-10444 (E.D. Mich.), *In re AFFF Products Liability Litigation*, MDL No. 2873 (D.S.C.), *In re 3M Combat Arms Earplug Products Liability Litigation*, MDL No. 2885 (N.D. Fla.), and *In re Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Products Litigation,* MDL No. 3014 (W.D. Pa.).  Mr. Garrettson's qualifications are attached an exhibit to the Declaration of Eric D. Holland.

18

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

46.     Proposed Class and Subclass Counsel recommend Wolf Global Compliance as Healthcare Compliance Administrator based on its experience in designing programmatic, claim-based, and enrollment-based solutions for mass-tort settlements in *In re 3M Combat Arms Earplug Products Liability Litigation*, MDL No. 2885 (N.D. Fla.), *NFL Players' Concussion Injury Litigation*, MDL No. 2323 (E.D. Pa.); *Deepwater Horizon Litigation*, MDL No. 2179 (E.D. La.), *Vioxx Product Liability Litigation*, MDL No. 1657 (E.D. La.); *In re World Trade Center Disaster Site Litigation*, MDL Docket Nos. MC100, 102-03 (S.D.N.Y.); *In re Zyprexa Products Liability Litigation*, MDL No. 1596 (E.D.N.Y.); and *In re Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Products Litigation,* MDL No. 3014 (W.D. Pa.).  Wolf Global Compliance's credentials are attached an exhibit to the Declaration of Eric D. Holland.

## IV.     Settlement Class/Subclass Representation

47.     At all times during the necessary stages of the negotiations, the Subclasses were also represented by the proposed Representatives for each Subclass, whose claims are typical of the Subclasses they seek to represent, and proposed Subclass Counsel (myself, along with Joseph Rice, John Eddie Williams, and Peter Kraus, for Subclass 1, and Eric Holland and Michael Ketchmark for Subclass 2).

48.     The proposed Representatives of the Class and Subclass 1 include:

a.     Plaintiff Randall King is a resident of the State of Florida.  Plaintiff Randall King is a natural person currently residing in Inverness, Florida.  For more than 30 years, Mr. King worked in the ornamental horticulture industry in Florida, including as the owner of his own nursery, where he routinely used concentrated

19

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Roundup Products. Thereafter, at the age of 72, Mr. King was diagnosed with Follicular Lymphoma. He is a proposed Representative of the Class and Subclass 1.

b.  Plaintiff Scott Butterfield is a natural person currently residing in Palm Springs, California. For years, Mr. Butterfield used concentrated Roundup Products on his properties in Independence, Missouri, and on his family's property Raytown, Missouri, including on the patio and along the fence line. Thereafter, at the age of 56, Mr. Butterfield was diagnosed with Hairy Cell Leukemia. He is a proposed Representative of the Class and Subclass 1.

c.  Plaintiff Bruce Waldman is a natural person currently residing in Boynton Beach, Florida. For more than a decade, Mr. Waldman used Roundup Products for weed control at his residence in Newtown Square, Pennsylvania. Thereafter, at age 78, Mr. Waldman was diagnosed with Follicular Lymphoma. He is a proposed Representative of the Class and Subclass 1.

49.  We were in regular communications with the proposed Subclass 1 Representatives regarding the litigation. As the essential terms of the settlement began to take shape, these proposed Subclass Representatives regularly communicated with proposed Subclass 1 Counsel regarding the Settlement, as well as the allegations in the Class Action Petition. Each reviewed and approved the Class Action Petition. In addition, each Subclass 1 Representative was consulted on the terms of the Settlement Agreement, reviewed the Settlement Agreement before it was signed, and approved of its terms.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

50.     Each proposed Subclass Representative supports the approval of the Settlement Agreement by the Court.  Each has expressed his willingness to protect the interests of Subclass 1 until the Settlement is approved and thereafter.

*    *    *

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 17, 2026     _____
                             CHRISTOPHER A. SEEGER

21

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

2022-CC00325

# EXHIBIT 3. A

Case: 3:16-cv-00812-HEX C Document: 17-2 1986-1 05/06/2021 Filed: 05/26/24 Page: 30 Page 102 Page ID #: 2422

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

# MotleyRice® LLC

# JOSEPH F. RICE

**843.216.9000  jrice@motleyrice.com**

**FOUNDING MEMBER ATTORNEY**



Motley Rice co-founder Joe Rice is recognized as a skillful and innovative negotiator of complex litigation settlements, having served as the lead negotiator in some of the largest civil actions our courts have seen in the last 30 years. *Corporate Legal Times* reported that national defense counsel and legal scholars described Joe as one of the nation's "five most feared and respected plaintiffs' lawyers in corporate America." As the article notes, "For all his talents as a shrewd negotiator ... Rice has earned most of his respect from playing fair and remaining humble." His alma mater, the University of South Carolina School of Law, rebranded in his honor in November 2023, and is now known as the Joseph F. Rice School of Law.

Joe was recognized by some of the nation's best-regarded defense lawyers as being "the smartest dealmaker they ever sat across the table from," *Thomson Reuters* has reported. Professor Samuel Issacharoff of the New York University School of Law, a well-known professor and expert in class actions and complex litigation, has commented that he is "the best strategic thinker on the end stages of litigation that I've ever seen."

Since beginning to practice law in 1979, Joe has continued to reinforce his reputation as a skillful negotiator, including through his involvement structuring some of the most significant resolutions of asbestos liabilities on behalf of those injured by asbestos-related products. He negotiates for the firm's clients at all levels, including in securities and consumer fraud, anti-terrorism, human rights, environmental, and medical drug and device cases, as well as catastrophic injury and wrongful death cases. He is recognized as an AV Preeminent® rated attorney in Martindale-Hubbell®.

### National Prescription Opiate MDL:
Joe is co-lead counsel in the National Prescription Opiate MDL aimed at combatting the alleged over-distribution and deceptive marketing of prescription opioids. Joe, as Chair of the opioid Negotiating Committee, worked with the committee and the Attorney General Committee to reach over $51 billion in settlements for communities nationwide with defendants in the opioid supply chain.  He was a member of the opiates PEC who was awarded the 2024 Steven J. Sharp Public Service Award by the American Association for Justice. Motley Rice continues to represent dozens of governmental entities, including the first jurisdictions to file cases in the current wave of litigation.

### AFFF MDL:
Joe was added in August 2023 as a co-lead counsel in *In re Aqueous Film-Forming Foams Products Liability Litigation,* MDL No. 2873 in U.S. District Court for the District of South Carolina, where he litigates for public water systems and other plaintiffs who allege toxic AFFF contamination of drinking water in hundreds of water providers' water supply, as well as groundwater near military bases, airports, and other sites where firefighting foams were used. Communities near these sites have allegedly suffered a heightened need for medical monitoring, personal

**LICENSED IN:**
District of Columbia
South Carolina

**ADMITTED TO PRACTICE BEFORE:**
U.S. Supreme Court

U.S. Court of Appeals for the Third, Fourth and Fifth Circuits

U.S. District Court for the District of Nebraska and the District of South Carolina

**EDUCATION:**
J.D., University of South Carolina School of Law, 1979 (The Joseph F. Rice School of Law as of 2023)

B.S., University of South Carolina, 1976

**ASSOCIATIONS:**
**American Association for Justice**
**American Bar Association**
**American Inns of Court**
**American Constitution Society for Law and Policy**
**South Carolina Association for Justice**

 * Although they endorse this lawyer, neither *The Legal 500* United States nor Professor Samuel Issacharoff are Motley Rice clients.  Any result this endorsed lawyer may achieve on behalf of one client in one matter does not necessarily indicate similar results can be obtained for other clients.

*Continued...*

PD:09.22.2025

# JOSEPH F. RICE

*Continued...*



Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

injuries, property damage, and economic losses due to the discharge of toxic AFFF chemicals into the environment.

## Marine Corps Base Camp Lejeune:

Joe serves on a court-appointed Resolution Committee that will help keep victim concerns and interests front and center in a multipronged effort to resolve claims filed through the VA and the Department of the Navy, as well as cases pending in the court system. Victims include service members, their families and civilians who lived and worked at Camp Lejeune between Aug. 1, 1953 and Dec. 31, 1987 and were exposed to toxic water sources that are believed to cause birth defects, cancer and other life-altering diseases.

## Vehicle Recalls:

Joe served as a lead negotiator in the $15 billion Volkswagen Diesel Emissions Fraud class action settlement for 2.0-liter vehicles, the largest auto-related consumer class action settlement in U.S. history, as well as for the 3.0-liter settlement. Under his leadership, Motley Rice also helped negotiate a pair of Takata bankruptcy resolutions that secured funds for victims harmed by the company's deadly, explosive airbags. Joe also serves as a member of the Plaintiffs' Executive Committee for *In re General Motors LLC Ignition Switch Litigation*, and was appointed to the Plaintiffs' Steering Committee for *In re Chrysler-Dodge-Jeep Ecodiesel Marketing, Sales Practices, and Products Liability Litigation*.

## Medical Drugs and Devices:

Joe led negotiations on behalf of thousands of women alleging complications and severe health effects caused by transvaginal mesh and sling products, including litigation in five MDLs in West Virginia. He also served as a member of the Plaintiffs' Steering Committee for the Lipitor® MDL, filed for patients who alleged the cholesterol drug caused their Type 2 diabetes.

## BP Oil Spill:

Joe served as a co-lead negotiator for the Plaintiffs' Steering Committee in the two settlements with BP, one of which is the largest civil class action settlement in U.S. history. The Economic and Property Damages Rule 23 Class Action Settlement is estimated to make payments totaling between $7.8 billion and $18 billion to class members. Joe was also one of the lead negotiators of the $1.028 billion settlement reached between the Plaintiffs' Steering Committee and Halliburton Energy Services, Inc., for Halliburton's role in the disaster.

## 9/11:

Joe held a crucial role in executing strategic mediations and/or resolutions on behalf of 56 families of 9/11 victims who opted out of the government-created September 11 Victim Compensation Fund. In addition to providing answers, accountability and recourse to victims' families, the resulting settlements with multiple defendants shattered a settlement matrix developed and utilized for decades. The litigation also helped provide public access to evidence uncovered for the trial.

## Tobacco:

As lead private counsel for 26 jurisdictions, including numerous State Attorneys General, Joe was integral to crafting and negotiating the landmark Master

*Continued...*

# JOSEPH F. RICE

*Continued...*



Settlement Agreement, in which the tobacco industry agreed to reimburse states for smoking-related health costs. This remains the largest civil settlement in U.S. history.

## Asbestos:

Joe held leadership and negotiating roles involving the bankruptcies of several large organizations, including AWI, Federal Mogul, Johns Manville, Celotex, Garlock, W.R. Grace, Babcock & Wilcox, U.S. Gypsum, Owens Corning and Pittsburgh Corning. He has also worked on numerous Trust Advisory Committees. Today, he maintains a critical role in settlements involving asbestos manufacturers emerging from bankruptcy and has been recognized for his work in structuring significant resolutions in complex personal injury litigation for victims injured by asbestos-related products. Joe has served as co-chair of Perrin Conferences' Asbestos Litigation Conference, the largest national asbestos-focused conference.

## Securities and Consumer Fraud:

Investment funds often seek Joe's guidance on litigation strategies to increase shareholder value, enhance corporate governance reforms and recover assets. He was an integral part of the shareholder derivative action against Omnicare, Inc., *Manville Personal Injury Settlement Trust v. Gemunder*, which resulted in a significant settlement for shareholders as well as new corporate governance policies.

Joe serves on the Board of Advisors for Emory University's Institute for Complex Litigation and Mass Claims, which facilitates bipartisan discussion of ways to improve the civil justice system through the hosting of judicial seminars, bar conferences, academic programs, and research. In 1999 and 2000, he served on the faculty at Duke University School of Law as a Senior Lecturing Fellow, and has taught classes on the art of negotiating at the University of South Carolina School of Law, Duke University School of Law and Charleston School of Law.

In 2013, he and the firm created the Ronald L. Motley Scholarship Fund at The University of South Carolina School of Law in memory and honor of his co-founding Motley Rice member and friend, Ron Motley.

## AWARDS AND ACCOLADES:

*Forbes*
**2024** *America's Top 200 Lawyers– Personal Injury*

*Chambers USA*
**2019–2025**  Product Liability: Plaintiffs – Nationwide, Band 1
**2016, 2018**  Product Liability: Plaintiffs – Nationwide, Band 2

**Best Lawyers®**
**2013**  "Lawyer of the Year" Charleston, SC: Mass tort litigation/class actions – plaintiffs
**2007–2026**  Mass tort litigation/class actions – plaintiffs; Personal injury litigation – plaintiffs
**2024–2026**  Corporate Governance Law; Government Relations Practice; Product Liability Litigation

*South Carolina Super Lawyers®* list
**2008–2021**  Class action/mass torts; Securities litigation; General litigation

**Lawdragon**
**2016, 2018–2022**  Lawdragon 500
**2019–2025**  Lawdragon 500 Plaintiff Consumer Lawyers - Asbestos, Aviation, Terrorism
**2019–2025**  Lawdragon 500 Plaintiff Financial Lawyers - Commercial Litigation, esp. Securities, Consumer Fraud, Anti-Terrorism, Environmental, Human Rights

**South Carolina Association for Justice**
**2018**  Founders' Award

*Continued...*

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

# JOSEPH F. RICE

*Continued...*



*Law360*
**2015 "Product Liability MVP"**

*Benchmark Litigation*
**2012–2013** National "Litigation Star": mass tort/product liability
**2012–2017** South Carolina "Litigation Star": environmental, mass tort/product liability

*The Legal 500 United States*
**2011–2012, 2014–2021** Legal 500 Leading Lawyer list Dispute resolution – product liability, mass tort and class action – toxic tort – plaintiff

**The National Trial Lawyers**
**2020 Elite Trial Lawyers Lifetime Achievement Award**
**2014** Litigation Trailblazers
**2010** Top 100 Trial Lawyers™ – South Carolina

*SC Lawyers Weekly*
**2024** Personal Injury Power List
**2018** Hall of Fame honoree
**2012** Leadership in Law Award

**National Association of Attorneys General**
**1998** President's Award

**University of South Carolina School of Law Alumni Association**
**2011** Platinum Compleat Lawyer Award

**MUSC Children's Hospital**
**2010** Johnnie Dodds Award: in honor of his longtime support of the annual Bulls Bay Golf Challenge Fundraiser and continued work on behalf of our community's children

**University of South Carolina**
**2011** Garnet Award: in recognition of Joe and his family for their passion for and devotion to Gamecock athletics

**SC Junior Golf Association Programs**
**2011** Tom Fazio Service to Golf Award: in recognition of promotional efforts

## COMMUNITY INVOLVEMENT:
**Dee Norton Lowcountry Children's Center**, Co-chair for inaugural Campaign for the Next Child
**First Tee of Greater Charleston**, Board of Advisors
**American Heart Association of the Lowcountry**, 2018 Heart Walk Chair

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

**Peter A. Kraus**

**Founding & Managing Partner**

Waters Kraus Paul & Siegel

Peter A. Kraus is a founding and managing partner of Waters Kraus Paul & Siegel and a nationally recognized leader in **mass tort and toxic tort litigation**, with extensive experience leading complex class and multidistrict proceedings. A Dallas native, he earned his bachelor's degree from Duke University and his law degree from the University of Texas. He began his career as a commercial litigator in Washington, D.C. and has since devoted his practice to complex plaintiff-side litigation, including **toxic torts, pesticide exposure cases, pharmaceutical injury litigation, wildfire litigation, commercial fraud litigation, and False Claims Act whistleblower matters**.

**Roundup Litigation & Class Counsel Qualifications**

Mr. Kraus has played a leading role in **Roundup (Glyphosate) litigation**, both nationally and locally. His firm and co-counsel have:

- Tried Roundup cases to verdict and settlement in **St. Louis, Chicago, Philadelphia, Hawaii, and New Mexico**.
- Taken and defended **hundreds of depositions** of plaintiffs, experts, and fact witnesses.
- Filed and opposed scores of substantive and evidentiary motions.
- Actively opposed prior attempted class action resolutions, demonstrating an ability to protect class interests.
- Managed and coordinated teams of co-counsel across multiple jurisdictions, ensuring consistent, fair, and efficient case handling.

This experience demonstrates Mr. Kraus's ability to **fairly and effectively represent a nationwide settlement class**, organize litigation resources, and oversee class-wide claims administration.

---

**Mass Tort Trial Experience**

Mr. Kraus has tried numerous high-stakes toxic exposure and product liability cases to verdict in state and federal courts across the country, including many multimillion-dollar results. His trial experience includes **asbestos, benzene exposure, and pharmaceutical injuries**, and he has played a leading role in advancing complex mass torts through trial and resolution.

---

**MDL and Steering Committee Leadership**

Mr. Kraus and his firm have held leadership roles in multiple **multidistrict litigations (MDLs) and coordinated proceedings**, including:

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

- Head of the **Plaintiffs' Steering Committee** in the **Zimmer Durom Hip litigation**, trying the only bellwether cases to verdict.
- Steering committee participation in **U.S. and Texas asbestos MDLs**, and service on multiple asbestos bankruptcy creditor and trustee advisory committees.
- Leadership roles in the **Caldera transvaginal mesh litigation, Cook IVC filter litigation, Zostavax litigation, and Exactech MDL**.
- Co-lead counsel in the **Texas Phenylpropanolamine State MDL**.
- Former service on the **ABA Commission on Asbestos Litigation** and **ABA Task Force on Asbestos Bankruptcy Trusts**.

Kraus and/or his partners have testified twice before the United States House of Representatives, numerous times before the Texas Legislature, and before other state legislatures, reflecting his firm's long-standing advocacy on behalf of plaintiffs.

---

**Representative Mass Tort Proceedings**

- **Roundup (Glyphosate) Litigation** — Leadership in trial progression, settlement negotiation, deposition management, and class action protection.
- **Asbestos and Mesothelioma Litigation** — Extensive trial and MDL leadership, including advocacy before legislative and bankruptcy bodies.
- **Silicosis Litigation (California JPML)** — Coordinated occupational disease and toxic exposure proceedings before the California Judicial Panel on Multidistrict Litigation.
- **PCB Litigation (Multi-Jurisdictional, including California JPML)** — Complex environmental toxic exposure litigation, coordinated across multiple jurisdictions.
- **Benzene Exposure Litigation** — Tried significant toxic exposure cases nationwide.
- **Pharmaceutical Injury Litigation** — Trial and MDL experience in complex product liability matters.
- **Zimmer Durom Hip Litigation (MDL)** — Head of Plaintiffs' Steering Committee; tried the only bellwether cases to verdict.
- **Phenylpropanolamine (PPA) Litigation**--- Co lead counsel in the Texas MDL in this pharmaceutical tort. Lead trial counsel on the only plaintiffs' bellwether verdict.
- **Cobb County Electrical Co-Op Litigation**--- Co-lead counsel for a class of thousands of electric cooperative members in Georgia state court.
- **Wildfire Litigation** — Representation in catastrophic loss and environmental tort matters in the **Maui Fire Litigation** and the **Eaton Fire Litigation**.
- **False Claims Act Whistleblower Litigation** — Major fraud and FCA matters.

---

**Appointments and Professional Recognition**

- Appointed by then–Speaker of the U.S. House of Representatives **Nancy Pelosi** to a second five-year term on the **Federal Judicial Center Foundation Board** (2020), serving for the past ten years.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

- Licensed in **Texas, California, Hawaii, Missouri, and Virginia**; elected to the **American Board of Trial Advocates**.
- Recipient of the 2022 **Larry Schoenbrun Jurisprudence Award** from **ADL Texoma**.
- Recognized in **The Best Lawyers in America©** (Plaintiff Personal Injury and Product Liability, 2016–2026), **D Magazine Best Lawyers in Dallas**, and **Thomson Reuters Texas Super Lawyers®** over the last 20 years.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

# John Eddie Williams, Jr.

**Founding & Managing Partner**
**Williams Hart & Boundas, LLP**

8441 Gulf Freeway, Suite 600
Houston, Texas 77017-5051
Direct 713-230-2330
Direct Fax 713-643-6226
jwilliams@whlaw.com

Mr. Williams has been practicing law for over 48 years, graduating first in his class at Baylor Law School in 1978, is board certified by the Texas Board of Legal Specialization in personal injury trial law, has tried over 100 cases to verdict, and has led litigation teams in large, multi-party disputes across the United States and internationally. His extensive experience includes products liability/mass tort cases with a focus on pesticides, pharmaceuticals, and medical devices, complex commercial litigation, catastrophic injury cases, major plant explosions, and large-scale matters involving extensive discovery, expert coordination, and significant motion practice.

Earlier in his career, Mr. Williams was one of only five attorneys retained by the State of Texas to represent the State in its landmark litigation against the tobacco industry, resulting in a $17.3 billion recovery—one of the largest settlements in American history. That representation required sophisticated litigation management, strategic coordination with governmental entities, and oversight of complex, resource-intensive proceedings.

Mr. Williams' career demonstrates sustained success in high-stakes, heavily contested litigation involving complex factual records, sophisticated defense teams, and substantial financial exposure. His trial experience, leadership of large litigation teams, and proven ability to secure extraordinary recoveries position him to effectively serve as class counsel in complex mass tort proceedings.

Page | 1
2/13/2026

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

## Roundup Litigation and Class Counsel Qualifications

Nationally and locally, Mr. Williams and his law firm have played a prominent role in the Roundup (Glysophate) litigation. Along with co-counsel, they have coordinated efforts and taken hundreds of depositions from plaintiffs to expert witnesses to corporate representatives, tried Round-Up cases across the country, undergone extensive motion practice to obtain important evidentiary rulings, and managed cases in multiple jurisdictions. Further, Mr. Williams has played an active role in protecting class interests by opposing unfair prior attempted class resolutions.

Mr. William has demonstrated not only in his leading role in the Roundup Litigation, but also from other high stakes, complex cases that he has the experience and skill set to oversee class-wide claims administration fairly and manage litigation resources effectively.

## Mass Tort Trial and Leadership Experience

Mr. Williams has tried mass tort cases in state and federal courts across the country. From asbestos to pharmaceuticals, Mr. Williams has obtained multimillion dollar verdicts on behalf of those severely injured. Not only does he work tirelessly on behalf of his clients in the courtroom, but he also plays an important and active role in case resolution and settlement to ensure that those he represents are treated and compensated fairly.

Mr. Williams and his firm have decades of experience in a wide range of mass torts. Mr. Williams, specifically, has had leadership roles in many litigations such as being appointed co-lead in the Marlboro Lights class action in Arkansas, the tobacco litigation representing the state of Texas as explained above, was one of the attorneys leading national efforts against Wyeth Pharmaceuticals in the Fen-Phen diet drug litigation, and against Abbott Laboratories in the Depakote birth defect litigation. Presently, Mr. Williams is leading the charge against rideshare companies representing sexual assault victims.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

## Education

Graduated first in class from Baylor School of Law 1978
- Served as editor-in-chief of *The Baylor Law Review*

Baylor University Bachelor of Business Administration 1976
- Graduated cum laude

## Legal Memberships and Professional Affiliations

State Bar of Texas 1978 to present
American Association for Justice
> Board of Governors 2008 to present
> Executive Committee 2008-2012
> Leaders Forum
> Members Founder Circle

Texas Trial Lawyers Association Executive Committee 2012-2013
Certified by the Texas Board of Legal Specialization in personal injury trial law
> 1982 - present

The James A. Baker III Institute for Public Policy at Rice University – Board of
> Advisers 2011 - present

Houston Police Foundation – Board of Directors 2012 – present
Stellar Bank – Board of Directors 2007 – present
> During this time, the bank has grown from $200 million to over $10 billion
> in assets

Houston Astros
> Board of Directors 2011 - present
> World Series Champions – 2017 and 2022

Houston Bar Foundation
> Board of Directors 2009-2017

## Professional Honors

2002 recipient of Baylor University's "Lawyer of the Year" Award
Past president of the Texas Trial Lawyers Association
Past president of the Houston Trial Lawyers Association
Past president of the Houston Trial Lawyers Foundation
Clarence Darrow Award Winner - 2008
David S. Shrager President's Award - 2009
Baylor University "Alumnus of the Year" Award - 2012
Martindale-Hubbell AV Preeminent rating 1985 – present

Named a Super Lawyer® 2003-2018 as selected by practicing attorneys in Texas
Texas' Top Rated Lawyers 2012 Edition
Texas' Best Lawyers 2013
The Best Lawyers in America 2013-present
Best Attorneys in Texas 2006-2009, 2013-present
Top Attorneys in Texas 2013-present
Houston Bar Foundation's James B. Sales 2015 Pro Bono Leadership Award
Inducted into the Trial Lawyer Hall of Fame, located at Beasley School of Law
at Temple University in Philadelphia, PA -  2018
Recipient of Texas Trial Lawyers Association's Lifetime Achievement Award – 2018
AAJ Lifetime Achievement Award 2024

**Licensed to Practice**

All state and federal district courts in Texas

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

# EXHIBIT 2

## AFFIDAVIT OF PETER A. KRAUS

The undersigned, after being duly sworn, alleges and says:

1.      I, Peter A. Kraus, am an attorney duly licensed to practice in the state of Texas since January 1992.  I am also licensed to practice law in California (2011), Hawaii (2018), Missouri (2013), and Virginia (1985). I am a founding partner and the managing partner of Waters Kraus Paul & Siegel, LLP (WKPS), a law firm that maintains its principal office in Dallas, Texas.

2.      I declare under penalty of perjury that the foregoing is true and correct.

3.      I have reviewed the Joint Motion of MDL Co-Lead Counsel and Wave 10 Plaintiffs Junes and Schramm for Injunctive Relief or, In the Alternative, Declaratory Relief Related to Proposed National Roundup Settlement, and Memorandum of Points and Authorities in Support Thereof.   On page 3, the Memorandum states that "Class Counsel had not played significant roles in the Roundup litigation (with some playing no role at all)."  In a footnote, the Memorandum refers to the "plaintiffs' law firms behind the [class action] settlement," stating that "[n]one of these firms have played a significant role in the Roundup MDL, nor did they consult MDL leadership regarding the settlement."

4.      As the principal of one of those "plaintiffs' law firms," I can confirm that neither WKPS, Williams Hart & Boundas (WHB), nor Allen Stewart, P.C. (ASPC) *did* play a significant role in the MDL and that was by intention.  As explained below, when the joint venture our three firms would form together began to file Roundup claims against Monsanto in 2019, we made the deliberate choice to file our cases in state court, particularly in Missouri—on Monsanto's home turf.  Our cases were therefore never transferred to the MDL.  Having decided to litigate our cases ourselves in state courts, we certainly did not "consult MDL leadership regarding the [class action] settlement"—there was no reason to do so.

5. As for Co-Lead counsel's statement that our firms have played no meaningful role in the Roundup litigation generally, Co-Lead counsel is deliberately or badly misleading the Court.

6. In 2010, WKPS joined with WHB and ASPC to form a joint venture (JV), the purpose of which was to prosecute tort claims against Monsanto.

7. The JV would go on to litigate against Monsanto for at least seven years. As this Court is aware, in 2015, the International Agency for Research on Cancer ("IARC") announced that it deemed glyphosate to be "probably carcinogenic to humans."

8. After investigating their merits, the JV began filing Roundup cases against Monsanto in 2019. We were aware that federally-filed cases had been consolidated in this MDL, and that California-filed state court cases had been consolidated under that state's procedures. Monsanto's principal place of business was in St. Louis, Missouri, however, so that is where the JV began filing its Roundup cases.

9. Not only did the JV decline to park its cases in the MDL for others to work up, but—unlike some plaintiff's counsel in the MDL—it never entered into tolling agreements with Monsanto on its Roundup cases.

10. By September 2019, the JV had filed cases for approximately 800 plaintiffs in the St. Louis City and County courts, and would later file them in Cole County, Missouri.

11. We also would later file cases in the state courts of Hawaii, Illinois, Pennsylvania, and New Mexico. In all, the JV filed at least 116 cases on behalf of 2,456 individual plaintiffs.

12. Our complaints included allegations not stated in the complaints filed in the MDL litigation, allegations derived from the facts about Monsanto's business practices—information developed in our prior litigation against Monsanto.

13.     The JV would ultimately force Monsanto to trial in five states—Missouri, Hawaii, Pennsylvania, New Mexico, and Illinois.  Many cases were settled the day before trial began. Some were tried to verdict.  Two cases resulted in appellate decisions as well. See *Martel v. Nouryon Chemicals LLC,* 343 A.3d 237 (Pa. Super. 2025) and *Evard v. Monsanto Co.*, __ N.E.3d __, 2025 WL 3171381 (Ill. App. 4th Dist., Nov. 13, 2025).

14.     The JV would obtain trial settings for at least 83 of its plaintiffs, requiring that both sides work them up for trial.  Each of these settings generated substantial motion practice regarding many issues, such as choice of law, statute of limitations and/or repose, Monsanto's preemption defense, and numerous expert witness challenges. The JV invested more than $20 million in the prosecution of its cases, including substantial fees paid to expert witnesses, travel, court reporters, etc.

15.     Monsanto was not, however, content to focus its forces on the cases with trial settings.  Instead, one of its stratagems was to insist that the plaintiffs also conduct discovery in cases far down the docket—those not likely to go to trial for years.  This strategy was intended to test the JV's mettle and commitment to the litigation.

16.     Thus, over the course of the litigation, the JV would serve at least 1,538 answers, objections, and responses to written discovery (including a small number of subpoena responses and disclosures), prepare and produce at least 2,275 Plaintiff Fact Sheets, and would take or defend 767 depositions, of which 128 were depositions of experts or Monsanto corporate witnesses.

17.     As of 2026—right before the class action settlement was finalized—we were still actively prosecuting cases for approximately 1111 plaintiffs in the City of St. Louis courts and 752 plaintiffs in the St. Louis County courts.

18. The JV—together with the other firms that are Class Counsel representing either the present or future subclasses—employed its substantial experience litigating Roundup cases against Monsanto to craft a global settlement that would obtain preliminary approval from the Missouri court.

19. In conclusion, Co-Lead Counsel's characterization of the efforts of Class Counsel, in other state court cases in which Co-Lead Counsel had no involvement, is entirely inaccurate and misleading.

Further, affiant sayeth not.

Executed this 20th day of April, 2026.

PETER A. KRAUS

Sworn to and subscribed before me, this the 30th day of April, 2026.

Notary Public Signature

Printed Name: SHELI C HUDSON

My Commission Expires: 08-20-26

SHELI O. HUDSON
NOTARY PUBLIC
STATE OF TEXAS
ID 8511418
EXP. 08-20-2026

# EXHIBIT 3

## AFFIDAVIT OF JOSEPH F. RICE

The undersigned, after being duly sworn, alleges and says:

1.     I, Joseph F. Rice, am an attorney duly licensed to practice in the state of South Carolina since 1979.  I am also licensed to practice law in District of Columbia (2011).  I am a founding partner of Motley Rice LLC, a law firm that maintains its principal office in Mount Pleasant, South Carolina.

2.     I declare under penalty of perjury that the foregoing is true and correct.

3.     I have reviewed the Joint Motion of MDL Co-Lead Counsel and Wave 10 Plaintiffs Junes and Schramm for Injunctive Relief or, In the Alternative, Declaratory Relief Related to Proposed National Roundup Settlement, and Memorandum of Points and Authorities in Support Thereof.   On page 3, the Memorandum states that "Class Counsel had not played significant roles in the Roundup litigation (with some playing no role at all)."  In a footnote, the Memorandum refers to the "plaintiffs' law firms behind the [class action] settlement," stating that "[n]one of these firms have played a significant role in the Roundup MDL, nor did they consult MDL leadership regarding the settlement."

4.     As the principal of one of those "plaintiffs' law firms," I can confirm that Motley Rice LLC *did not* play a significant role in the MDL and that was by intention.  As explained below, we made the deliberate choice to file the majority our cases in state courts, particularly in Missouri, California and New Jersey.  Most of our cases were therefore never transferred to the MDL.  .

5.    As for Co-Lead counsel's statement that our firms have played no meaningful role in the Roundup litigation generally, Co-Lead counsel is deliberately or badly misleading the Court.

6.    In 2022, Motley Rice was brought on as trial counsel in *Gordon v. Monsanto Co.*, Case No. 17SL-CC02721 in Cole County, Missouri. Motley Rice helped try the case to verdict in May of 2023.

7.    Motley Rice began filing Roundup cases against Monsanto and the Bayer entities in 2023 in Missouri, California, and New Jersey.

8.    In December 2023, Motley Rice first filed cases in New Jersey Superior Court.

9.    On January 22, 2024, Daniel Lapinski, a Member of Motley Rice LLC, submitted a letter to the Supreme Court of New Jersey requesting that New Jersey Roundup cases be designated for Multicounty Litigation (MCL). The request was jointly submitted on behalf of Motley Rice and Weitz & Luxenberg, P.C., the MDL leadership firm that filed this Petition.

10.    During the pendency of the MCL application, Motley Rice corroborated with attorneys from Weitz & Luxenberg to advance the cases pending in New Jersey Superior Court.

11.    On February 27, 2025, a renewed request for MCL designation of New Jersey Roundup cases was jointly filed by Motley Rice, Sbaiti & Company, Weitz & Luxenberg, and Napoli Shlolnick.

12.     On May 28, 2025, The Supreme Court of New Jersey designated Roundup as an MCL. The Roundup cases were assigned to Bergen County and Superior Court Judge Gregg A. Padovano for centralized case management.

13.     On November 24, 2025, Motley Rice Member Daniel Lapinski was appointed Liaison Counsel in the New Jersey Roundup MCL.

14.     Motley Rice's complaints in New Jersey included allegations not stated in the complaints filed in the MDL litigation, allegations derived from the facts about Monsanto's business practices and corporate structure.

15.     Motley Rice has also brought in new expert witnesses to Roundup litigation nationally in the areas of business ethics, history with a focus on science and industry-funded impacts on literature, and non-Hodgkin lymphoma development. These three experts were new to the litigation which required the drafting of reports, depositions, and substantial motion practice related to challenges on the admissibility of testimony.

16.     Motley Rice has obtained trial settings for at least 4 of its plaintiffs, requiring that both sides work them up for trial. Each of these settings generated substantial motion practice regarding many issues, such as choice of law, statute of limitations and/or repose, Monsanto's preemption defense, and numerous expert witness challenges. To avoid trial with Motley Rice clients, Monsanto has offered significant and meaningful settlements.

17.     In addition, Motley Rice has engaged in case specific discovery for many other clients in the pre-trial stages of the litigation.

18.     As of 2026—right before the class action settlement was finalized—Motley Rice was still actively prosecuting cases for approximately 300 plaintiffs in the MDL and state courts, including Missouri, California, and New Jersey.

19.     Motley Rice—together with the other firms that are Class Counsel representing either the present or future subclasses—employed its substantial experience litigating Roundup cases against Monsanto to craft a global settlement that would obtain preliminary approval from the Missouri court.

20.     In conclusion, Co-Lead Counsel's characterization of the efforts of Class Counsel, in other state court cases in which Co-Lead Counsel had no involvement, is inaccurate and misleading.

Further, affiant sayeth not.

Executed this 21st day of April, 2026.

_____
JOSEPH F. RICE

Sworn to and subscribed before me,
this the 21st day of April, 2026.

_____
Notary Public, Charleston County, SC
Printed Name: Gwendolyn Worthington

My Commission Expires: 01/03/2029

GWENDOLYN WORTHINGTON
Notary Public, State of South Carolina
My Commission Expires 1/3/2029

# EXHIBIT 4

2622-CC00325

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

# EXHIBIT 2

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

**IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS**
**STATE OF MISSOURI**

| | |
|---|---|
| RANDALL KING, SCOTT BUTTERFIELD, ROBERT KOEHLER, MICHAEL MERX AND BRUCE WALDMAN, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> MONSANTO COMPANY, <br><br> Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     No. [●] <br><br> Div. [●] |

**DECLARATION OF ERIC D. HOLLAND IN SUPPORT OF MOTION FOR**
**PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

I, Eric D. Holland, hereby declare as follows:

## I. INTRODUCTION AND QUALIFICATIONS

1. I submit this declaration in support of the unopposed Motion (the "Motion") of Proposed Class Counsel for an Order in the above-captioned matter: (1) Granting Preliminary Approval of the Settlement Agreement; (2) Preliminarily Certifying the Settlement Class, (3) Appointing Class Counsel and Subclass Counsel; (4) Approving the Dissemination of Settlement Class Notice; (5) Scheduling a Fairness Hearing; and (6) Staying the Filing and Prosecution of Roundup-Related Actions in the Missouri Courts by Settlement Class Members.

2. I have personal knowledge of the facts set forth in this declaration and, if called upon to testify, could and would competently testify thereto.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

3.      I am the Founder, President, and Managing Partner of The Holland Law Firm, LLC, and am a member in good standing of the State Bar Associations of Missouri, Illinois, and Michigan, as well as several United States District Courts and United States Courts of Appeal.  Our principal offices are in St. Louis, Missouri, and Edwardsville, Illinois.  We focus our practice on complex mass-tort and class-action litigation.

4.      In the negotiations with Defendant Monsanto Company ("Defendant" or "Monsanto") leading up to this proposed Settlement, I have served as proposed Counsel for Subclass 2, representing Settlement Class Members who have been exposed to Roundup Products but who have not yet been diagnosed with Non-Hodgkin Lymphoma ("NHL").[1]  Moreover, as described below, prior to my involvement in this proposed Settlement, my firm had brought and resolved thousands of claims against Defendant for personal injuries suffered as a result of exposure to Roundup Products.

## II.     PROFESSIONAL BACKGROUND AND EXPERIENCE

5.      I have dedicated my career to representing individuals who have been injured or killed due to toxic substances, product defects, and train crashes.

6.      The Holland Law Firm has successfully handled some of the most significant and complex mass-tort matters in the country, including major settlements and complex trials involving pharmaceuticals, medical devices, consumer products, pesticides, and asbestos.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Settlement Agreement, which is attached as Exhibit 1 to the Motion.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

7.      Since 1991, my firm and I have successfully led cases in Missouri state courts, including in state courts around the St. Louis area, against some of the largest corporations in the world, including Monsanto, Bayer, Johnson & Johnson, Medtronic, Abbott Laboratories, and Norfolk Southern, as well as in state and federal courts across the country.

8.      I am regularly invited to speak to and teach other attorneys and judges across the country, particularly in the areas of mass-tort litigation, class-action procedure, and complex settlement structures.  My speaking engagements have spanned nearly two decades and include invitations from state bar associations, nationally recognized law schools, and various legal organizations nationwide.  Recent examples include 2025 presentations at Texas Tech Law School regarding resolution strategies, Northwestern University Law School regarding the mechanics of mass-tort litigation, and Epiq Global regarding current issues in mass tort litigation.

9.      I have practiced law continuously in the City of St. Louis since 1991, when I graduated from the St. Louis University School of Law, where I was a member of the *Saint Louis University Law Journal*.

10.      In recent years, I have received St. Louis' Quality of Life Award in recognition of my work in the community, St. Louis University's Excellence in Pro Bono Award, and am a recent inductee into St. Louis University's Fleur De Lis Society's Hall of Fame.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

## III.    ROUNDUP CASE INVESTIGATION AND DEVELOPMENT

11.    Roundup Products include a range of weedkillers containing Monsanto-manufactured glyphosate, many of which were sold by Monsanto under the name "Roundup." Monsanto held a patent on glyphosate for use as an herbicide, which expired in 1991, and a second patent which expired in 2000, and remains the largest U.S. manufacturer of glyphosate.

12.    My involvement in the Roundup litigation began in 2015 following the release of the International Agency for Research on Cancer's Monograph classifying glyphosate, the active ingredient in Roundup Products, as "probably carcinogenic to humans."

13.    I was first hired as local counsel by numerous out-of-state law firms who wished to file cases in Missouri, where Monsanto's headquarters is located.

14.    In addition to my work as local counsel, I was retained as primary counsel by over 3,000 clients, asserting that Monsanto failed to warn users of Roundup Products of the risks of NHL.

15.    I entered into an aggregate settlement agreement with Monsanto in 2020 to resolve the claims of my firm's Roundup clients. Following that settlement, I wound down my involvement in the Roundup litigation.

16.    Beginning in the summer of 2024, I began to investigate the possibility of pursuing new litigation against Monsanto on behalf of individuals exposed to Roundup Products, but who have not yet been diagnosed with NHL. This work has required extensive investigation, research, and analysis spanning multiple years.

4

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

17. Prior to agreeing to serve as proposed Class Counsel for Subclass 2, I conducted a fresh and thorough investigation into:

  a. The scientific literature regarding glyphosate exposure and NHL risk;

  b. Epidemiological studies examining the alleged causal relationship between Roundup exposure and cancer development;

  c. The regulatory history of glyphosate-based herbicides;

  d. Monsanto's knowledge of potential health risks of glyphosate and glyphosate-based Roundup Products;

  e. The litigation history, including bellwether trials and verdict outcomes; and

  f. The corporate structure and financial condition of the Defendant, in order to assess settlement viability.

18. My investigation included consultation with:

  a. Medical experts specializing in oncology and NHL;

  b. Epidemiologists with expertise in pesticide-exposure studies;

  c. Toxicologists qualified to opine on glyphosate's carcinogenic potential; and

  d. Economic and financial experts to assess damages methodologies for Subclass 2 members and the Defendant's ability to pay.

19. I have personally reviewed extensive confirmatory discovery materials, trial transcripts, expert reports, and scientific literature to understand the strengths and

5

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

weaknesses of both the plaintiffs' and Defendant's respective positions with respect to Roundup Claims.

20. I re-assembled a team of attorneys and paralegals familiar with our past Roundup litigation to assist with the development and prosecution of this potential action.

21. Over the past two years, I, along with my firm partner, Patrick Dowd, have devoted substantial time to this Settlement, including in-person attendance at mediation sessions across the country, dozens of video conferences, mediation negotiations, review and editing of case documents, expert consultations, firm meetings, and meetings and consultations with outside vendors.

22. The investigation phase required substantial resource investment and out-of-pocket expenditures by my firm, including expert consultations, scientific research, and case development—all undertaken at considerable financial risk without any guarantee of compensation or recovery.

## IV. CHALLENGES OF REPRESENTING SUBCLASS 2

23. Subclass 2 includes individuals who have been exposed to Roundup Products but have not yet been diagnosed with NHL. Representing Subclass 2 members who have not yet been diagnosed with NHL presents distinct legal and practical challenges that set this subclass apart from Subclass 1 members who have been exposed to Roundup Products and have already been diagnosed with NHL. Subclass 2 members must be diagnosed with NHL in the future to be Eligible for any Award under the Settlement's Claims Program, thereby creating uncertainty regarding:

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

a. Whether any individual Subclass 2 Class member will ultimately develop NHL;

b. The timing of any future diagnosis;

c. The severity of disease if it develops;

d. Changes in medical science and treatment over time; and

e. The continued financial viability of the Settlement Fund structure.

24. These contingencies required development of a settlement structure that would:

a. Protect the interests of thousands of individuals who may not develop NHL in the near term—and, since Monsanto did not remove glyphosate from its residential products until 2023, possibly not for many years—due to the latency period for NHL;

b. Ensure adequate funding remains available for Subclass 2 members diagnosed with NHL in the future;

c. Provide objective, scientifically sound criteria for claim evaluation;

d. Fairly balance the interests of Subclass 2 members against those of Subclass 1 members

e. Ensuring clear and robust notice to Subclass 2 members, including a mechanism for annual notice throughout the Settlement so that Subclass 2 members would receive additional notice after being diagnosed; and

f. Account for inflation and changing economic conditions over the Settlement term of 17-21 years.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

25.     I have worked extensively to ensure the terms of the Settlement adequately protect Subclass 2 members' interests, including advocating for appropriate funding levels, a long-term Claims Program, and fair compensation structures.

## V.     SETTLEMENT NEGOTIATION PROCESS

26.     With respect to this proposed Settlement, I became involved in June 2024 following a conversation with representatives of Monsanto during which I explained that I represented potential future claimants who had been exposed to Roundup Products but who had not yet been diagnosed with NHL and, further, that I was interested in exploring a potential resolution framework for future claimants generally.  This conversation led to an initial in-person meeting in September 2024.

27.     Ultimately, after more than 18 months of extensive, arm's-length negotiations involving experienced counsel on all sides, the Settlement was reached.  These negotiations were fierce and acrimonious, with almost daily communications between and among proposed Class Counsel and Defendant.  This included not only exchanges between Plaintiffs as a group and the Defendant, but also separate negotiations between each of the two Subclasses and the Defendant, as well as negotiations between the two Subclasses themselves.  At times, it was unclear whether a deal could be struck.

28.     I participated actively in every aspect of negotiations, attended every mediation session, and participated in and led working group discussions focused specifically on the needs and interests of Subclass 2 members.

29.     Throughout negotiations, I maintained my focus on securing the best possible outcome for Subclass 2 members who have been exposed to Roundup Products but not yet

8

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

diagnosed with NHL, recognizing that their interests diverged in certain respects from those of Subclass 1 members.

30.     The negotiation process included:

a.     Multiple mediation sessions overseen by an experienced and nationally recognized mediator, Fouad Kurdi;

b.     Correspondence with Judge Glenn Norton (ret.), the settlement master for Roundup cases filed in Missouri courts, including regular updates on the progress of negotiations;

c.     Detailed financial analysis of proposed structures funding the Settlement Fund, as well as investigation into Defendant's corporate structure and finances;

d.     Modeling to assess the adequacy of the Settlement Fund over the extended payout period of 17-21 years; and

e.     Consultation with medical and scientific experts regarding claim criteria.

31.     I have evaluated the Settlement terms against the realistic alternatives to class-wide resolution, including the risks, costs, and delays of continued litigation. Based on my independent judgment and 35 years of experience, I firmly believe that this Settlement is in the best interests of Subclass 2, as it satisfies all requirements of Rule 52.08 and is fair, adequate, and reasonable.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

## VI.     RESOURCES AND CAPABILITIES OF CLASS COUNSEL

32.     My firm has dedicated substantial resources to this litigation and is well-positioned to continue serving as Class Counsel and Subclass 2 Counsel throughout the life of the Settlement and administration process.

33.     The Holland Law Firm maintains the financial resources necessary to fund complex litigation and see the Settlement process through to the end.  The firm currently employs 18 attorneys and over 30 additional staff members with deep experience in complex litigation, settlements, and settlement administration.  The firm is committed to deploying all necessary resources in service of this important matter.

34.     Our firm has invested significant capital in:

         a.     Expert witness retention and consultation;

         b.     Scientific and medical research;

         c.     Case investigation and development;

         d.     Legal research on novel issues affecting Subclass 2 members; and

         e.     Technology systems for case management and class member communication.

35.     We have assembled a team of attorneys and support staff with expertise in:

         a.     Class-action litigation and settlement administration;

         b.     Mass-tort case management, including in Roundup cases;

         c.     Medical and scientific evidence evaluation;

         d.     Claims processing and verification; and

         e.     Client communication and education.

10

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

36.     My firm operates state-of-the-art, sophisticated case-management systems capable of handling the administrative demands of a settlement affecting potentially tens of thousands of Subclass 2 Claimants over an extended period.

37.     We have know-how and established relationships administering settlements with qualified settlement administrators, medical experts, and other professionals necessary to implement these settlement terms effectively.

## VII.    ADEQUACY OF REPRESENTATION

38.     Throughout this negotiation, I have prioritized the interests of Subclass 2 members and my clients, the named Class Representatives for Subclass 2, recognizing that Subclass 2 members face distinct challenges and risks.

39.     I have maintained open lines of communication with my clients who serve as the Class Representatives for Subclass 2, including meeting with them, apprising them of developments, explaining their responsibilities as class representatives, and obtaining their feedback regarding the terms of the Settlement and the approval process.  If the Class Representatives for Subclass 2 are diagnosed with NHL in the future during the term of the Settlement, they will seek an Award under the Settlement.

40.     In addition to The Holland Law Firm, Ketchmark & McCreight P.C., another leading Missouri firm that possesses extensive experience in mass-tort litigation and Roundup cases specifically, is proposed as Subclass 2 Counsel.  Their relevant experience and credentials are set forth in Exhibit A.

41.     Importantly, neither The Holland Law Firm nor Ketchmark & McCreight P.C., represent any Class Members who have already been diagnosed with NHL, and

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

therefore do not have a conflict of interest in representing the interests of Subclass 2 members.

42. Members of Subclass 1 are likewise adequately represented by proposed Subclass 1 Counsel—Christopher A. Seeger of Seeger Weiss LLP, Joseph Rice of Motley Rice LLC, Peter Kraus of Waters Kraus Paul & Siegel, and John Eddie Williams of Williams Hart & Boundas LLP—all well-known, highly experienced attorneys whom courts around the country have appointed as lead counsel in some of the largest and most important mass-tort litigations over the past decades. These firms also have substantial experience in the Roundup litigation: together, they are counsel to over 10,000 individuals with filed or tolled Roundup Claims.

43. I have worked collaboratively with proposed Subclass 1 Counsel while maintaining my independent judgment and advocacy on behalf of Subclass 2. At multiple points throughout the negotiations, I requested separate sessions to discuss critical issues for Subclass 2 and, ultimately, obtained Settlement terms that were specifically important to the interests of Subclass 2.

## VIII. ANALYSIS OF SETTLEMENT TERMS

### A. Settlement Fund Structure

44. If approved, this Settlement will provide substantial benefits to the Settlement Class through a Settlement Fund of up to $7.25 billion, which will be funded by way of up-front and annual payments by Defendant over 17-21 years. Currently, there are over 30,000 cases filed in the Missouri courts alone, and there are tens of thousands of

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

individuals with Roundup Claims pending in courts around the country or subject to tolling agreements who would be eligible for compensation under this proposed Settlement.

45.     The Settlement Fund Amount was the subject of vigorous, arm's-length negotiations informed by historical claims data and modeling, consultation with medical experts, and analysis of the Defendant's financial constraints as documented in company financial statements reviewed and analyzed by financial experts.

46.     The Settlement includes provisions to ensure fund adequacy over time, including inflation adjustments for Subclass 2 members, a financial security escrow, and robust mechanisms for audits, the prevention of waste, fraud, and abuse, and periodic reviews and supervision by the Settlement Special Master.  These provisions will preserve the Settlement Fund to pay the settlement claims of Subclass 2 members.

### B. Settlement Term and Eligibility

47.     The Settlement provides for a Claims Program extending up to 17-21 years. Given the latency period associated with NHL, as well as Monsanto's discontinuation of glyphosate-based herbicides in the residential lawn and garden market in the United States, this extended term allows time for Subclass 2 members who have been Exposed to Roundup Products and are hereafter diagnosed with NHL to apply for an Award. Moreover, the Releases and Covenant Not to Sue will become null and void for any Subclass 2 members who have not been diagnosed with NHL by the conclusion of the Settlement term.

13

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

48.     As confirmed by medical experts, this extended Settlement term is critical for Subclass 2 members, as NHL may not develop for many years after first exposure to Roundup.

49.     Eligibility criteria have been carefully designed to ensure that qualifying claims are compensated employing objective, verifiable standards for claim evaluation.

## C. Compensation Methodology

50.     The Settlement establishes a nine-tier compensation structure (the "Tier System"), which considers three objectively verifiable criteria:  a Class Member's (a) type of exposure (occupational vs. residential), (b) age at time of NHL diagnosis (under 60, between 60-77, or 78 and older), and (c) type of NHL (Aggressive/fast-growing vs. Indolent/slow-growing).  Tier 9 is composed of all class members diagnosed with NHL at age 78 or older, regardless of their exposure type or NHL classification.  Those with Aggressive NHL receive higher compensation than those with Indolent NHL.

51.     Base compensation levels are established for nine tiers based on objective criteria that are applied uniformly across current and future Claimants.

52.      Each of the nine Tiers has an associated average Program Award amount, which was calculated based on conservative assumptions regarding the total number of Claimants who will participate in the Settlement Program.  Individual Awards, however, may vary from 80 percent to 120 percent of the Tier average to account for Claimant-specific circumstances, such as intensity of their treatment, proof and extent of exposure, prior lawsuit status, or pre-existing medical conditions.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

53.     To ensure that Subclass 2 members will be treated the same as similarly situated Subclass 1 members, Tier averages and criteria, along with other Award criteria, remain constant over time (with a provision to adjust Tier averages for inflation).

54.     The average Program Award is $165,000 at the high end, while the average Program Award for Claimants diagnosed with NHL at age 78 or older is $10,000.

55.     The Settlement separately allocates funds to an Extraordinary Circumstances Fund and an Extraordinary Residential Exposure Fund to provide additional compensation to Claimants with exceptional circumstances or significant and atypical residential use, which are administered independently from the tier-based Program Awards.

56.     This compensation methodology is based on proposed Class Counsel's experience litigating and resolving Roundup Claims and was developed in consultation with medical experts and financial modeling professionals and represents, in my independent judgment, fair value for the claims, considering:

a.     The risks of litigation, especially in light of the United States Supreme Court's recent grant of certiorari in *Monsanto Company v. Durnell* on the question of whether the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*., preempts state-law failure-to-warn claims. *See Durnell* v. *Monsanto Co.*, 707 S.W.3d 828 (Mo. App. E.D. 2025), *cert. granted in part sub nom., Monsanto Co.* v. *Durnell*, 607 U.S. (2026) (No. 24-1068, 2025 Term). Based on my substantial experience in Roundup litigation, failure-to-warn claims are the most commonly asserted theory of liability in Roundup litigation. Such claims, however, face significant risk, as a Supreme Court ruling in favor of preemption

15

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

could render them non-viable, and those that are not fully preempted would, if litigated individually, subject the Settlement Class Members to decades of litigation, with the potential for conflicting rulings. Moreover, to date, of the Roundup claims that have been tried, only 45% have returned a verdict in favor of the plaintiff;

b. The delays resulting from the current status of the Roundup docket in Missouri and across the country. Over the last decade, more than 52,000 Roundup lawsuits have been filed against the Defendant involving approximately 125,000 plaintiffs, but only 24 cases involving 31 plaintiffs have been tried to a verdict and only a handful more have otherwise reached trial. In these cases, there have been 11 verdicts for plaintiffs and 13 for the Defendant, with verdicts recently trending in favor of Defendants. Currently, there are over 30,000 cases filed in the Missouri courts alone, and tens of thousands of individuals with Roundup Claims pending in courts around the country or subject to tolling agreements. Only approximately 200 plaintiffs have a trial date scheduled, more than a third of which are set for dates beyond this year. As such, individuals may need to wait years for a day in court;

c. The appellate risk, as both plaintiff and defense verdicts have largely been upheld on appeal;

d. The likelihood that Class Members could successfully meet their burden of proof when faced with numerous challenges, including the potential hardship of establishing causation between exposure to glyphosate and development of NHL considering the status of scientific literature and the scientific debate over whether exposure to glyphosate can cause NHL;

16

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

e.      The financial condition of the Defendant and the risk of insolvency or inability to pay over time; and

f.      The probability of thousands of individual lawsuits being filed absent a resolution.

57.      We are confident that the Settlement provides meaningful compensation to Settlement Class Members.  Moreover, should projections of the number of Claimants or the percentage of Occupational Claimants prove to be overly conservative, the Settlement provides a mechanism for the Allocation Special Master to increase the Tier averages.

### D. Claims Administration Process

58.      The Settlement establishes a fair and efficient claims administration process overseen by an independent, professional Administrator and supervised by the Settlement Special Master—a  structure that reflects proposed Class Counsel's collective recognition that effective administration is critical to ensuring the Settlement delivers on the program as designed.

59.      The claims process includes:

a.      Clear and robust notice to potential  Class Members and continuing annual notice targeted to Subclass 2 members;

b.      Registration for members of Subclass 1 (which involves submission of a registration form within 180 days of Final Court Approval);

c.      Submission of standardized Claims Packages;

d.      Medical verification requirements;

e.      Exposure documentation protocols;

17

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

f.      Independent medical review when necessary; and

g.      Appeal procedures for denied or reduced claims.

### E. Protection Against the Defendant's Insolvency

60.     A critical concern for Subclass 2 members is the continued financial viability of the Defendant over the extended Claims Program.  This is especially true considering that, between December 2017 and December 2025, the Defendant's parent company lost 60 percent of its market value—a loss of approximately $63 billion.  This loss stemmed, in part, from Roundup litgation, as a result of which over $1.2 billion in punitive damages (even after reductions) were awarded against the Defendant.

61.     A Monsanto bankruptcy would ensnare Roundup plaintiffs in lengthy proceedings without a guarantee of any compensation.  To address this risk, proposed Class Counsel negotiated a $1 billion Security Fund to be funded within 30 days of the Effective Date.  This fund will compensate Class Members in the event Defendant files for bankruptcy and fails to perform its obligations—a protection that is particularly valuable to Subclass 2 members given the multi-year duration of the Claims Program.

62.     Importantly, Settlement Class Members who do not receive an Award Payment in the full amount of their Award are not required to release their claims against the Defendant.  These Claimants retain their rights to pursue the Defendant in the appropriate forum even after recovering from the Security Fund, creating a strong incentive for the Defendant to perform its obligations, even in bankruptcy.

63.     Additional protections for Subclass 2 members include: (a) up to $1 billion available at the end of the Settlement term for any Occupational Claimants who have

18

applied but not received Awards following the exhaustion of the Settlement Fund after the Sixteenth Annual Payment, and (b) inflation adjustments to Program Awards to account for the time value of money over the extended Settlement term.

64.    I have analyzed the Defendant's financial condition with the assistance of financial experts and believe these protections adequately safeguard Subclass 2 members' interests against insolvency risk.

### F. Release and Opt-Out Provisions

65.    The Settlement requires Settlement Class Members to release Roundup Claims against the Defendant and related parties in exchange for settlement benefits.

66.    The Releases are appropriately tailored to cover Roundup Claims that relate to both Roundup Products and NHL,while preserving other unrelated legal rights.

67.    All Settlement Class Members, both Subclass 1 and 2, retain the right to Opt Out of the Settlement during an initial 90-day notice period should they prefer to pursue individual litigation.

68.    The Settlement also provides for a 90-day period during which Settlement Class Members may object to the Settlement following specified procedures, including providing a detailed, written statement of objections with a  wet-ink signature and proof of the Settlement Class Member's membership.  In response to the objection, Class Counsel may seek reasonable discovery from any objectors and, no later than 30 days after the objection deadline and the close of the opt-out period, file a response to the objections. The Court will then consider submissions at a Fairness Hearing to be held not sooner than 30 days following the objection deadline and the close of the Opt Out Period.  At the

19

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Fairness Hearing, the Court will then determine whether to enter the Final Order and Judgment approving the Settlement.

69.     Subclass 2 members are provided with additional protections in the form of back-end exit rights.  Pursuant to this structural protection, once diagnosed, and after having applied for a Program Award and complying with certain specified requirements, a Subclass 2 member can then decide whether to accept the Award or to reject the Award and exit the Settlement to pursue compensatory damages against the Defendant in the tort system.  Additionally, if Settlement Class Members are not paid within five years of being deemed eligible, they may exercise their exit right and return to the tort system to sue Defendant for their injuries and losses.

70.     As a condition of the Settlement's approval, the parties also intend to seek a bar order and judgment reduction provision as part of the Final Order and Judgment (the "Claim-Over" protection).   The order will prohibit third parties from seeking indemnification or contribution from the Monsanto Parties for Roundup Claims; which is standard in mass-tort settlements.  Prohibiting these indemnification or contribution claims also bolsters Monsanto's ability to fund the Settlement fund, which benefits Subclass 2 members.

71.     The release terms, including the aforementioned "Claim-Over" protection, are consistent with industry standards and best practices for mass-tort settlements and are fair given the compensation provided.  And the other requirements to Opt Out contained in the Preliminary Approval Order, for example, requiring an attestation as to class

20

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

membership, ensure the fair application and efficient administration of this Settlement and approval process.

**G. Attorneys' Fees**

72.     The award of attorneys' fees has been left to the Court's sole discretion, with no specific percentage fee provided for in the Settlement.

73.     Instead, under the Settlement, Class Counsel will submit an application for an award of reasonable attorneys' fees and reimbursement of costs in advance of the deadline to Opt Out of or object to the Settlement.  The size of the fee award requested is expected to be within the percentage range of other class-action settlements, in particular mass-tort settlements, given the significant work required both in connection with the underlying litigation, and in negotiating an appropriate Settlement Agreement.   The Settlement provides that attorneys' fees will be awarded over several years, with less than five percent of the overall fee paid prior to the Effective Date.  This timing is designed to ensure that the Settlement Fund remains principally available to pay Claimants.

74.     Settlement terms concerning attorneys' fees also offer important protections for Settlement Class Members' interests:   Settlement Class Members will have an opportunity to object to the requested attorneys' fees before their approval, consistent with terms previously approved by courts; and, to ensure the benefits obtained for Settlement Class Members are not undermined by any determination on fees, any order or proceeding solely relating to attorneys' fees shall not terminate or otherwise affect or delay the finality of the Final Order and Judgment.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

## IX. PROPOSED SETTLEMENT ADMINISTRATORS AND AGENTS

75. Proposed Class Counsel recommend Judge Norton, who has extensive experience serving as the settlement master for Roundup cases filed in Missouri courts, to serve as Settlement Special Master. He will be responsible for handling critical oversight functions such as approving expenses, resolving requests for reconsideration of Awards and reporting information to the Court. Judge's Norton's qualifications are attached as Exhibit B.

76. Proposed Class Counsel recommend BrownGreer PLC, to serve as Settlement Administrator given its unparalleled experience in handling complex class-action and mass-tort settlements. BrownGreer PLC's qualifications are attached as Exhibit C.

77. Proposed Class Counsel recommend Matthew Garretson of Garretson, LLC, who has extensive experience serving as special master or administrator of other settlement programs, to serve as Allocation Special Master. He will be responsible for administering, overseeing, and executing the operation of the claim programs set forth in the settlement. Mr. Garretson and Garretson, LLC's qualifications are attached as Exhibit D.

78. To ensure the Settlement functions as designed and serves the best interests of the Settlement Class, both the Administrator and Allocation Special Master had the opportunity to provide feedback during finalization of the Settlement Agreement.

79. Proposed Class Counsel recommend Wolf Global Compliance, LLC to serve as Healthcare Compliance Administrator, given its extensive experience in designing enrollment-based solutions for mass-tort settlements and its reputation as one of the

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

preeminent lien-resolution specialists.  Wolf Global Compliance, LLC's qualifications are attached as Exhibit E.

80.    Proposed Class Counsel recommends Signal Interactive Media, LLC ("Signal"), which has substantial experience in developing and directing some of the largest and most complex national notification programs, to serve as the Settlement Class Notice Agents.  Signal's qualifications, along with the Settlement Class Notice Plan, are set out in the accompanying Declaration of Shannon Wheatman, Ph.D.

81.    Finally, Proposed Class Counsel recommend J.P. Morgan Chase Bank, N.A. ("J.P Morgan Chase Bank"), with experience with similar sized funds, to serve as the Settlement Fund Escrow Agent.

82.    Each of the above administrators and agents have reviewed the Settlement and are fully prepared to execute on its terms.

## X.    NOTICE PROGRAM

83.    In crafting the Settlement Class Notice Program, proposed Class Counsel and Signal drew on their collective extensive experience to ensure the notice program was comprehensive, adequate, and sufficient to reach potential Class Members.

84.    The Notice Program includes the best notice practicable as detailed in the Declaration of Dr. Shannon Wheatman, with whom I have worked extensively in this matter and whose Declaration I have personally reviewed.

85.    Importantly for Subclass 2 members, the notice materials repeatedly emphasize that the proposed Settlement affects them even if they have not been diagnosed with NHL.  In addition to providing current notice, the Settlement also provides for a robust

23

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

annual notice campaign through a broad range of channels. The annual notice will remind Subclass 2 members about the availability of Settlement payments and the requirements to obtain those payments.

86. The proposed notice fairly and accurately describes the Settlement terms, the Claims Program, the right to Opt Out, and the right to object.

87. I have reviewed the proposed notice materials and believe they provide clear, understandable information enabling Settlement Class Members to make informed decisions about their participation in the Settlement.

## XI. RECOMMENDATION FOR PRELIMINARY APPROVAL

88. Based on my extensive experience in complex litigation and class actions, my thorough investigation of this matter, my analysis of the Settlement terms, and my evaluation of the risks and benefits, I believe the proposed Settlement is fair, reasonable, and adequate.

89. The Settlement provides substantial benefits to Subclass 2 members while avoiding the significant risks, costs, and delays of continued and future litigation.

90. I respectfully recommend that the Court enter the Preliminary Approval Order, granting preliminary approval of the Settlement and directing that notice be provided to the Class in accordance with the proposed notice program.

91. To ensure the orderly administration of the settlement approval process, among other things, the Preliminary Approval Order also sets a schedule for approval. The Order also stays all litigation by Settlement Class Members in the courts of the State of Missouri during the pendency of the proceedings. I am prepared to continue serving as

24

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

Class Counsel for Subclass 2 throughout the Settlement approval process and subsequent claims administration.

92.     I will continue to advocate vigorously for the interests of Subclass 2 members and ensure faithful implementation of the Settlement terms.

## XII.     Settlement Class/Subclass Representation

93.     At all times during the necessary stages of the negotiations, the Subclasses were also represented by the proposed Representatives for each Subclass, whose claims are typical of the Subclasses they seek to represent, and proposed Subclass Counsel (myself, along with Michael Ketchmark for Subclass 2, and Chris Seeger, Joseph Rice, John Eddie Williams, and Peter Kraus for Subclass 1).

94.     The proposed Representatives of the Class and Subclass 2 include:

a.     Plaintiff Robert Koehler is a natural person currently residing in the City of St. Louis, Missouri. Mr. Koehler sprayed Roundup Products around his residence in the City of St. Louis for weed control beginning in 1991 several times each year during the spring and summer months. Mr. Koehler has not been diagnosed with NHL as of this date, but he has an increased risk of developing NHL in the future due to his Exposure to Roundup Products. Mr. Koehler is a proposed Representative of the Class and Subclass 2.

b.     Plaintiff Michael Merx is a natural person currently residing in St. Louis, Missouri. Plaintiff Merx worked for Growing Green, Inc. as a landscaping technician from 2018 through 2022. A significant part of his landscaping work involved spraying Roundup Products from a backpack sprayer at various

25

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

commercial properties in and around the St. Louis area. Mr. Merx has not been diagnosed with NHL as of this date, but he has an increased risk of developing NHL in the future due to his Exposure to Roundup Products. Mr. Merx is a proposed Representative of the Class and Subclass 2.

95. I was in regular communications with the proposed Subclass 2 Representatives regarding the litigation. As the essential terms of the settlement began to take shape, these proposed Subclass Representatives regularly communicated with proposed Subclass 2 Counsel regarding the Settlement, as well as the allegations in the Class Action Petition. Each reviewed and approved the Class Action Petition. In addition, each Subclass 2 Representative was consulted on the terms of the Settlement Agreement, reviewed the Settlement Agreement before it was signed, and approved of its terms.

96. Each proposed Subclass Representative supports the approval of the Settlement Agreement by the Court. Each has expressed his willingness to protect the interests of Subclass 2 until the Settlement is approved and thereafter.

## XIII. CONCLUSION

97. The Settlement represents the culmination of extensive investigation, litigation, and negotiation on behalf of those individuals in Subclass 2 who have been exposed to Roundup Products but who have not yet been diagnosed with NHL.

98. It provides fair compensation, procedural protections, and certainty for all Class Members, notably including a class of yet-to-be-diagnosed Claimants who would otherwise face significant challenges in pursuing individual claims.

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

99.   The Settlement terms reflect the distinct needs of Subclass 2 members and provides adequate protection for their interests over the extended Settlement term.

100.   I respectfully submit that the Court should grant preliminary approval of the Settlement in accordance with the proposed Preliminary Approval Order.

\*      \*      \*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: February 15, 2026

Eric D. Holland

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

2022-CC00325

# EXHIBIT 2. A

Electronically Filed - City of St. Louis - February 17, 2026 - 10:44 AM

## Michael S. Ketchmark

**Ketchmark & McCreight, P.C.**
**11161 Overbrook Rd. #210**
**Leawood, KS 66211**

Michael S. Ketchmark is the President and Managing Partner of Ketchmark & McCreight, P.C., a plaintiffs' law firm based in the Kansas City area specializing in personal injury and complex class action litigation. With over 35 years of experience as a civil trial attorney, Mr. Ketchmark has secured billions of dollars in verdicts and settlements for his clients.

Ketchmark & McCreight and Mr. Ketchmark's expertise in class actions and complex litigation is exemplified by his leadership in high-profile cases. As lead counsel in the 2023 *Sitzer v. Burnett* antitrust class action, he secured a landmark $1.78 billion jury verdict against the National Association of Realtors (NAR) and major real estate brokerages for anticompetitive practices that inflated commissions, resulting in nationwide industry reforms and additional settlements exceeding $1 billion. Earlier, in 2001, he represented over 275 plaintiffs in wrongful death lawsuits against pharmacist Robert Courtney for diluting chemotherapy drugs, achieving a $2.2 billion verdict that drove significant reforms in pharmaceutical practice leading to a class action settlement with various insurance companies. Other notable successes include a $78 million verdict against Ford Motor Company in a wrongful death product liability case and hundreds of millions of dollars of settlements in a wide variety of mass tort cases.

# EXHIBIT 5

Case 4:23-cv-00081-HEA Document 172-1 Filed 05/26/04 Page 84 of 102 PageID #: 2476
Case 3:16-md-02741-VC Document 17986-5 Filed 04/21/26 Page 1 of 5



📞 303-376-6360

## WAGSTAFF LAW FIRM BLOG

# WAGSTAFF LAW FIRM DROPS OPPOSITION TO ROUNDUP CLASS RESOLUTION:

Posted by Joe Marchelewski | Mar 23, 2026

"While I generally oppose using the class action vehicle to resolve personal injury litigation, I have determined not to object to the class resolution as proposed by class counsel last month in the McCall matter. I have been in this litigation since its inception 12 years ago and I know this litigation and defendant better than most anyone. Under the unique circumstances of this particular litigation, I will be recommending to my clients that they remain in the class resolution."

## SHARE

Share          Post          Share

## ABOUT THE AUTHOR

Wagstaff Law Firm Drops Opposition to Roundup Class Resolution: Wagstaff Law Firm

JOE MARCHELEWSKI

## CONTACT OUR FIRM

---

**NAME** *

This field is required.

**PHONE** *

This field is required.

**EMAIL** *

This field is required.

**TYPE OF CASE/TORT** *

This field is required.

**DATES** *

This field is required.

**MESSAGE** *

This field is required.

**CONSENT TO E-COMMMUNICATION** *

☐  **I CONSENT TO RECEIVE ELECTRONIC COMMUNICATION FROM WAGSTAFF LAW FIRM**

This field is required.

Submit

---

# CONTACT US TODAY

Wagstaff Law Firm is committed to answering your questions about Defective Products, Defective Pills, and Pesticide Exposure law issues in Colorado.

We offer a free consultation and we'll gladly discuss your case with you at your convenience. Contact us today to schedule an appointment.

# OFFICE LOCATION

940 N. Lincoln Street,
Denver, CO 80203

303-376-6360

Copyright © 2026 Wagstaff Law Firm

Terms of Use | Privacy Policy | Anti-spam

# EXHIBIT  6

# Nachawati Law Group Supports $7.25B Settlement Class-Action to Resolve Roundup Cancer Litigation

NEWS PROVIDED BY
**Nachawati Law Group** ➞
Feb 20, 2026, 16:00 ET

*Framework represents 'meaningful and constructive step' toward justice for exposure victims*

DALLAS, Feb. 20, 2026 /PRNewswire/ -- Nachawati Law Group, which represents more than 4,200 individuals who have developed non-Hodgkin lymphoma following exposure to Monsanto's Roundup herbicide, today expressed support for a recently announced $7.25 billion class-action settlement framework.

The proposed settlement filed in the 22nd Judicial Circuit Court in the City of St. Louis, creates a comprehensive resolution for both existing and future claims involving Roundup exposure and non-Hodgkin lymphoma (NHL), a cancer affecting the body's white blood cells.

Nachawati Law Group views the proposed framework as a meaningful and constructive step toward resolving years of complex litigation on behalf of families impacted by glyphosate-based herbicides.

"Given the tens of thousands of hours our firm has devoted to this struggle for justice, no one is more familiar with the hardships the drawn-out nature of this litigation has imposed on our clients," said Nachawati Law Group Founding Partner **Majed Nachawati**. "Recognizing their need for a fast and fair resolution of their claims, we approached the proposed national class settlement with an open mind and are cautiously optimistic that the framework laid out in the documents filed this week might finally deliver the type of compensation our Roundup clients deserve. Of course, much work remains to be done before a plan is actually approved by the St. Louis City Court, and there is always the possibility that provisions of the plan will be altered. Thankfully, we believe the class approval process that lays ahead will provide the clarity we need to reach a final determination that this proposed settlement is in the best interests of our clients."

Over the past several years, Roundup litigation has produced significant jury verdicts in favor of plaintiffs, as well as defense verdicts, leaving tens of thousands of claims pending nationwide. At the same time, Monsanto has pursued legislative and appellate strategies aimed at limiting liability, contributing to an increasingly uncertain legal environment for victims seeking recovery. In January 2026, the U.S. Supreme Court agreed to hear a Monsanto appeal at the heart of the litigation: whether individual states can impose warning labels on products more stringent than federal labels.

The proposed $7.25 billion framework is designed to provide a structured process for resolving pending claims and establishing a mechanism to address future cases. Importantly, class members would retain the right to opt out and pursue their claims individually.

Nachawati Law Group will continue to carefully evaluate the details of the proposed settlement to ensure it delivers fair compensation and meaningful protections for its clients.

**About Nachawati Law Group**

Nachawati Law Group is a national plaintiffs' law firm dedicated to representing individuals and families harmed by dangerous products, environmental toxins, corporate misconduct, and catastrophic negligence. The firm has extensive experience in complex mass tort and product liability litigation and is committed to securing justice for clients nationwide. Visit **www.Ntrial.com**.

SOURCE Nachawati Law Group

**21**% more press release views with  **Amplify**™

Request a Demo



# EXHIBIT 7



# EXHIBIT  8



# EXHIBIT  9

**Weed Killer Class Settlement**

If you do not want benefits from this settlement, but you want to keep the right to sue Monsanto on your own about the legal issues in this case, you must take steps to exclude yourself from (or "Opt Out" of) the Settlement Class. Follow these instructions if you wish to Opt Out from the Settlement Class. These instructions also cover how to revoke an Opt Out.

Any defined terms (meaning terms with capital letters) that are not defined below are defined in the Settlement Agreement, which can be found on the home page of the settlement website, www.WeedKillerClass.com.

## OPTING OUT OF THE SETTLEMENT CLASS

A. <u>Required Elements of an Opt Out Request</u>.

You must complete each of the steps in these instructions fully and correctly to request to Opt Out from the Settlement Class. If you do not follow these 10 steps, your request will be considered invalid and you will remain in the Settlement Class.

1. **Written Request:** Your request to Opt Out must be a written or typed document, which you will then mail or email as an attachment to the Administrator, or upload through the settlement website (see Step 4 below). You cannot Opt Out just by saying the request or writing it in the body of an email.

2. **Individual Request:** Only you (or an authorized Representative Claimant who is acting on behalf of a deceased, minor, or legally incapacitated Class Member) may request to Opt Out on your behalf.

   No "mass," "class," "group," or otherwise combined Opt Out will be valid. One Settlement Class Member may not Opt Out on behalf of another Settlement Class Member, and any Opt Out request simultaneously submitted on behalf of two or more Settlement Class Members will be deemed invalid as to all such individuals. However, a Class Member or Representative Claimant's action or inaction will be binding on any Derivative Claimants associated with that person.

   **NOTE:** Your lawyer may handle submitting an Opt Out request to the Administrator on your behalf, but that *lawyer may not sign the request* on your behalf. See Step 9 below.

3. **Required Statement:** Your request to Opt Out must include the following statement:

   "I wish to exclude myself from the Settlement Class in the 22nd Judicial Circuit Court, City of St. Louis, Missouri."

**Weed Killer Class Settlement**

If you are the **Representative Claimant** of a Settlement Class Member, your statement must indicate that it relates to that Settlement Class Member.

4. **Submission to the Administrator:** You must submit your request to Opt Out to BrownGreer, the Administrator, in one of these three ways:

   (a) **Mail** your request to:

   **Weedkiller Settlement Administrator**
   PO Box 26303
   Richmond, Virginia 23260

   (b) **Email** a scan or photo of your complete and signed request to Info@WeedKillerClass.com.

   (c) **Online**, you can upload or scan a photo of your signed request on the Opt Out page of the settlement website, available at www.WeedKillerClass.com.

   Do not try to submit an Opt Out request in any other way or to the Court, the Defendant, Class Counsel, or anyone other than the Administrator. Opt Outs submitted to incorrect locations will be invalid.

5. **Opt Out Deadline:** You must submit your written request to Opt Out to the Administrator by **June 4, 2026**. That is the "Opt Out Deadline." Any request submitted after the Opt Out Deadline will be late and invalid.

6. **How to Meet the Opt Out Deadline:**

   (a) **Requests Submitted by Mail** must be postmarked on or before the Opt Out Deadline. If for some reason mail arrives without any postmark, then it will be considered submitted on the date it arrives at the Administrator's PO Box.

   Be aware that the U.S. Postal Service ("USPS") postmark now reflects the date that mail is processed at a facility, rather than the date it was deposited or collected. That processing date could be two or three days after you place the item in the mail. So, plan ahead and mail two or three days before the Opt Out Deadline.

   (b) **Requests Sent Attached to an Email** must be sent no later than 11:59 p.m. CT on the Opt Out Deadline.

561858                                    2                        Opt Out Instructions

**Weed Killer Class Settlement**

(c) **Requests Uploaded to the Settlement Website** must be uploaded no later than 11:59 p.m. CT on the Opt Out Deadline.

7. **Identifying Information:** Your written request to Opt Out must contain your:

(a) printed full name (if you are the **Representative Claimant** of a Settlement Class Member, you must include both your name and the Settlement Class Member's name);

(b) full mailing address (if you are the **Representative Claimant** of a Settlement Class Member, you must include both your mailing address and the mailing address of the Settlement Class Member (or the last known mailing address if the Settlement Class Member is deceased));

(c) full telephone number;

(d) email address, if any; and

(e) full date of birth (if you are the **Representative Claimant** of a Settlement Class Member, you must provide only the Settlement Class Member's date of birth).

8. **Proof of ID:** Your request to Opt Out must include a copy of your government-issued identification or other proof of identity. Examples include a driver's license, state-issued non-driver photo ID, a U.S. passport, or military ID card.

If you are the **Representative Claimant** of a Settlement Class Member, you must provide only a copy of that Settlement Class Member's government-issued identification or other proof of identity.

9. **Personal Signature:** Your request to Opt Out must contain your Personal Signature with an actual, "wet-ink" signature and the date. That means your actual "wet-ink" signature on hard copy, or an image (PDF, photo, or other electronic scan) of your "wet-ink" signature. Your Personal Signature cannot be an electronic typed-in name, an electronically created signature (such as DocuSign), or a signature electronically drawn (by finger or mouse movement). You must sign the request yourself. Your attorney cannot sign for you, and an unsigned request is not valid. No lawyer, paralegal, claims agent, or anyone else can sign for a Settlement Class Member, even with a power of attorney. The only exception to this rule is when an authorized Representative Claimant signs for a deceased, minor, or legally incapacitated Class Member.

## Weed Killer Class Settlement

10. **Required Disclosures and Declarations:** Your request to Opt Out must contain the following disclosures. If you are the Representative Claimant of a Settlement Class Member, these disclosures must state whether and how they are applicable to that Settlement Class Member. These disclosures do not require a formal notarization or other sworn statement, but you must include a response to each of these disclosures:

(a) **Tolling:** A statement indicating, to the best of your knowledge, whether you (or your attorney) have entered into an agreement to toll (pause) the statute of limitations for your Roundup Claims.

(b) **Lawsuits:** A statement indicating, to the best of your knowledge, whether you have filed a Roundup Lawsuit against Monsanto or a Related-Party Lawsuit.

(c) **Attorney:** List the attorney's name and law firm representing you in connection with your Roundup Claims (if any).

(d) **Exposure:** A statement that you were exposed to Roundup Products.

(e) **Diagnosis:** If you have been diagnosed with NHL as of March 4, 2026 (and thus are a member of Subclass 1), you must also state your diagnosis and the date of diagnosis.

NOTE: The Settlement Agreement provides that:

(a) The Administrator will provide copies of all requests to Opt Out to Class Counsel and the Defendant within seven days of receipt of each such Opt Out request. Class Counsel or the Defendant may challenge the validity of an Opt Out to the Court, which will establish procedures in consultation with Class Counsel and the Defendant to receive information and evaluate such challenges. Any such challenge must be made no later than seven days after the Opt Out Deadline and must be resolved by the Administrator within seven days of the receipt of the challenge.

(b) Within seven days of the Opt Out Deadline, the Administrator will provide Class Counsel and the Defendant with a complete list of all Opt Outs that the Administrator believes to be timely and Valid under the requirements of the Settlement Agreement.

(c) A Valid Opt Out from the Settlement Class will become effective as of the later of 21 days of receipt by the Administrator or the resolution of any challenge to the validity of the request brought by Class Counsel or the Defendant, pursuant to the Settlement Agreement.

561858          4          Opt Out Instructions

**Weed Killer Class Settlement**

B. <u>Protocol for Deficient Opt Out Requests</u>.

All Opt Out Requests must satisfy the opt out requirements (steps 1 through 10 in Section A above) by the Opt Out Deadline (June 4, 2026). It is the sole responsibility of each class member (or their attorney) to ensure their Opt Out is timely, complete, and compliant.

The Administrator will review all timely submitted Opt Out Requests to determine whether they meet the requirements. Though not required by the Court's Order, as a courtesy only, if the Administrator finds that your Opt Out Request did not comply with the requirements, it may send to you (or your attorney) a single Deficiency Notice that identifies any deficiencies it found in its review of your Opt Out Request. The notice will be sent solely to the email address or mailing address you provided on your Opt Out Request (or to the attorney if you listed one).

**All deficiencies listed in a courtesy Deficiency Notice must be cured no later than the June 4, 2026 Opt Out Deadline.** You are strongly encouraged to submit your Opt Out Request well before the deadline to allow time for corrections. Regardless of when you submit your Opt Out Request, you should not rely on receipt of a courtesy Deficiency Notice to determine whether your Opt Out Request meets the requirements.

Note these important limitations on the courtesy Deficiency Notice process:

1. Only one courtesy Deficiency Notice will be issued per opt-out request.

2. The Administrator will not send follow-up courtesy Deficiency Notices or reminders.

3. If you do not provide a valid mailing address or email address in your Opt Out Request, or if you provide inaccurate contact information, you will not receive a courtesy Deficiency Notice.

4. Opt Out Requests submitted to anyone other than the Administrator may not receive a courtesy Deficiency Notice.

5. Opt Out Requests submitted close to the Opt Out Deadline on June 4, 2026 may not receive a courtesy Deficiency Notice before the June 4, 2026 deadline (or at all).

6. The lack of a Deficiency Notice does not mean your Opt Out Request is fully compliant with the requirements.

7. Curing all deficiencies identified in a courtesy Deficiency Notice does not necessarily mean an Opt Out Request is complete or compliant; class members (or their attorney) are solely responsible for ensuring their opt-out is timely, complete, and compliant.

## Weed Killer Class Settlement

### REVOKING AN OPT OUT

If you submitted an Opt Out but change your mind and instead want to participate in the benefits of the Settlement, you may ask to revoke that Opt Out by following these 7 steps. Many of these rules are the same as those above for how to make an Opt Out.

1. **Written Request:** Your request to revoke an Opt Out must be a written or typed document. You cannot revoke your Opt Out just by saying the request or writing it in the body of an email.

2. **Individual Request:** Only you (or an authorized Representative Claimant acting on behalf of a deceased, minor, or legally incapacitated Class Member) may request to revoke an Opt Out on your behalf. No "mass," "class," "group," or otherwise combined requests to revoke Opt Outs will be valid. However, a Class Member or Representative Claimant's action or inaction will be binding on any Derivative Claimants associated with that person.

3. **Required Statement:** Your request to revoke an Opt Out must include the following statement:

   "I wish to revoke my request to be excluded from the Settlement Class in the 22nd Judicial Circuit Court, City of St. Louis, Missouri."

4. **Submission to the Administrator:** You must submit your request to revoke your Opt Out to BrownGreer, the Administrator, in one of the same three ways the Opt Out was submitted:

   (a) **Mail** to:

   Weedkiller Settlement Administrator
   PO Box 26303
   Richmond, Virginia 23260

   (b) **Email** a scan or photo of your complete and signed request to Info@WeedKillerClass.com.

   (c) **Online,** you can upload or scan a photo of your signed request on the Opt Out page of the settlement website, available at www.WeedKillerClass.com.

## Weed Killer Class Settlement

Do not try to submit your request to revoke an Opt Out in any other way or to the Court, the Defendant, Class Counsel, or anyone other than the Administrator. Requests submitted to incorrect locations will be invalid.

5. **Revocation Deadline:** A request to revoke an Opt Out must be submitted to the Administrator **before the Court grants final approval**. Any request to revoke submitted after final approval will be late and invalid.

   Be aware that the USPS postmark now reflects the date that mail is processed at a facility, rather than the date it was deposited or collected. That processing date could be two or three days after you place the item in the mail. So, plan ahead and mail two or three days before the Revocation Deadline.

6. **Personal Signature:** A request to revoke an Opt Out must contain your Personal Signature and must match the signature of the Settlement Class Member who made the Opt Out. The same rules set out above in Instruction #9 for the Personal Signature on an Opt Out apply to a request to revoke an Opt Out, including that it must be a "wet ink" signature on a mailed document or in the scanned image or photo of that document.

7. **Identify the Class Member:** Your request to revoke your Opt Out must also contain your printed name, address, phone number, and date of birth.

**NOTE:** Your request to cancel your exclusion will be effective only if Monsanto provides written consent (which it may grant or deny) or if the Court orders it. You may assume that your revocation was valid and approved by the Defendant or the Court unless the Administrator notifies you (or your lawyer) otherwise.