**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

RANDALL KING, SCOTT BUTTERFIELD,
ROBERT KOEHLER, MICHAEL MERX,
and BRUCE WALDMAN,

        Plaintiffs,

v.

MONSANTO COMPANY,

        Defendant,

JANE DOES 1, 2, and 3,

        Proposed Intervenors.

Case No. 4:26-cv-00813-HEA

**PUTATIVE CLASS MEMBERS' MOTION TO INTERVENE TO STAY DEADLINES IN THE SETTLEMENT AGREEMENT PENDING RULING ON TRANSFER TO MULTIDISTRICT LITIGATION, AND SUGGESTIONS IN SUPPORT**

Come now Proposed Intervenors Jane Does 1, 2 and 3, and hundreds of other similarly situated putative class members (Intervenors) in the proposed *King* class settlement which was granted preliminary approval in the Circuit Court of the City of St. Louis on March 4, 2026, who need more time to make a decision whether to opt out of the class or to object to the settlement, and respectfully move to intervene in this action in support of a stay pending the JPML's final ruling on transfer to the MDL.[1] For a 600+-page complex and convoluted settlement and associated exhibits that seeks to extinguish the rights of millions people who are suffering, or will suffer, from a serious, often deadly cancer, a temporary stay of the deadlines pending the Judicial Panel on Multidistrict Litigation's (JPML)  final ruling on transfer to the Roundup MDL is necessary to

---

[1] The JPML granted conditional transfer of the *King* case to the Roundup MDL court on May 28, 2026.  *In re Roundup Prods. Liab. Litig.*, MDL 2741, Dkt. No. 4170 (Conditional Transfer Order No. 578)(J.P.M.L. May 28, 2026).

provide putative class members their fundamental due process rights.[2]

Objector Defendants filed a motion to stay all proceedings pending ruling on transfer to multidistrict litigation on May 22, 2026, Objector Defendants' Motion to Stay All Proceedings Pending Ruling on Transfer to Multidistrict Litigation, Doc. #3, filed May 22, 2026, Exhibit 1. Intervenors support that motion and do not repeat arguments made there. Rather, Intervenors seek intervention to supplement the record with additional, client specific, reasons the current settlement deadlines violate putative class members' due process rights warranting a stay.

Intervention is necessary, to (1) protect the rights of putative class members who have not received notice of the proposed settlement (which remains elusive, at best); (2) permit putative class members who received notice sufficient time to consult with their attorneys and decide whether to opt out, object, and/or participate in the settlement; (3) provide putative class members sufficient additional time to submit the arduous opt out package necessary to opt out; and (4) otherwise protect putative class members' due process rights before they are trapped in a settlement they are not aware of or do not comprehend. Good cause exists for a stay.

**<u>INTRODUCTION & SUMMARY OF SUGGESTIONS</u>**

On March 4, 2026, the Circuit Court of the City of St. Louis granted preliminary approval of the class settlement. Preliminary Approval Order, *King et al., v. Monsanto Co.*, No. 2622-CC00325 (City of St. Louis, March 2, 2026), Exhibit 2. Prior to the issuance of that order, many law firms that had not previously seen or been informed about the *King* settlement filed a motion to intervene, including counsel for the present Intervenors. The prior intervention motion asked the court to slow down the preliminary approval deadline to allow putative class members and

---

[2] A stay of the deadlines will not resolve all objectional provisions of this settlement agreement, which, absent a stay, will be addressed in objections currently due on June 4, 2026.

their counsel sufficient time to fully and adequately review the settlement agreement and its accompanying preliminary approval motion papers and to be heard about certain troubling provisions. Class Counsel and Monsanto (the "Settlement Proponents") opposed intervention, and the state court did not rule on the intervention motion, essentially shutting intervenors out of the preliminary process, while at the same time granting all of the Settlement Proponent's requests, including their request for an unconscionably short and inadequate 90-day period for putative class members to opt out or submit objections to the settlement, both of which entail onerous and unnecessary procedural hurdles. There is no cognizable basis for forcing putative class members - - likely 200-plus million Americans,[3] to decide these significant issues in a three-month period.

What's more, three months is far too short of a time period for attorneys who represent hundreds, let alone thousands, of Roundup clients with NHL to provide adequate advice to their clients about the settlement: that is simply not enough time to explain the settlement to them, to provide advice on the best course of action based on their individual circumstances, and to help them maneuver the onerous opt out and objection requirements if they choose one of these paths. Given the magnitude of the proposed putative class, which includes a disparate and nationwide population that is difficult if not impossible to reach through notice, and to prevent the manifest deprivation of putative class members' due process rights, the Court should stay the settlement deadlines, including those due this week for opting out of and objecting to the settlement.

---

[3] *See King* Class Action Settlement (filed Feb. 17, 2026) at § 2.1(a) (defining settlement class as all "U.S. Persons who, prior to the Settlement Date, have been Exposed to one or more Roundup Products and who (i) Applied any Roundup Products; (ii) purchased or paid for any Roundup Products or for the Application of any Roundup Products; (iii) participated in, directed, or saw the Application of any Roundup Products; or (iv) otherwise had reason to know of their Exposure. The Settlement Class also includes Derivative Claimants of the foregoing individuals."). Ex. 3.

3

This Court should grant the stay for another important reason: judicial economy and efficiency. Objector Defendants set forth the numerous reasons why this Court should issue a stay pending transfer to the MDL as the issues to be resolved in this class settlement, including issues of removal and remand, have been regularly overseen by the Honorable Vince Chhabria in the Northern District of California for ten years. *See* Ex. 1.  As co-lead counsel of that MDL from its inception, the undersigned counsel has first-hand knowledge of Judge Chhabria's familiarity with every aspect of the Roundup litigation, including a similar class action settlement that was filed in his court in 2020, as well as MDL-specific considerations of removal and remand.

What's more, in the absence of a stay, all defendant objectors will have to file their objections in this Court by June 4, 2026, flooding this Court with complex Roundup-specific filings with issues that the MDL judge has spent ten years overseeing.[4] Judicial economy and efficiency strongly favors staying the deadlines in the preliminary approval order to allow the court intimately familiar with these issues to consider and resolve them.

In sum, as the JPML has conditionally ordered that the matter be transferred to the MDL court because it is related to the proceedings that Judge Chhabria presides over, as well as the MDL court's familiarity with both the previous MDL proposed class action settlement and the class action settlement currently before this court, the MDL court is best positioned to entertain Monsanto's motion to remand.  Accordingly, this Court should grant a stay of the settlement deadlines to allow the JPML the opportunity to finally decide the conditional transfer.

---

[4] By way of example, when Judge Chhabria remands a Roundup case to the transferor court after ruling on specific causation, he transfers the case with a memorandum to familiarize the transferor court about myriad issues he has decided over the past decade. See, e.g., Suggestion on Remand To Transferor Court, *Mendoza v. Monsanto*, Case No., 16-md-02741-VC, Doc. #151, Exhibit 4.

4

**STATEMENT OF FACTS SUPPORTING STAY**

On February 17, 2026, Class Counsel and Monsanto simultaneously filed and settled a class action lawsuit in the Circuit Court of the City of St. Louis, Missouri (*King v. Monsanto Co.*, No. 2622-CC00325 (Cir. Ct. City of St. Louis, Mo.)).  Declaration of Robin Greenwald in Support of Motions to Intervene and for Extension of Time of the Opt Out and Objection Deadline (Greenwald Decl.), Exhibit 5 at ¶ 3. The next day, on February 18, 2026, Weitz & Luxenberg (WL) staff sent an email to all of WL's Roundup clients regarding the *King* settlement. It is unknown how many of our clients actually received and read the email. *Id.* at ¶ 4. WL also sent mailings via FedEx and/or USPS to clients who had previously stated that they prefer physical mailings, as well as to the clients for whom we did not have valid email addresses. *Id.* at ¶ 4 n.1.

On March 4, 2026, the Court issued an Order granting Preliminary Approval of the proposed class action settlement. WL again wrote to our Roundup clients to keep them informed of the key Court-Ordered deadlines and to coordinate informational webinars for clients who wanted to learn about the class settlement. *Id.* at ¶ 5.

On March 16, 2026, WL staff sent additional correspondence to all our clients regarding informational webinars to be hosted by WL attorneys throughout the month of March. *Id.* at ¶ 6. To maximize participation, WL sent reminder messages to clients who registered for a webinar 24 hours prior to when each webinars was set to begin. *Id.* at ¶ 7.

By March 29, 2026, 861 WL clients had attended one of these initial webinars. Following each webinar, attendees received an email seeking their decision about how they would like to proceed: whether to participate, opt-out, or consult individually with an attorney. *Id.* at ¶ 8. By April 6, 2026, 68% of the 861 webinar attendees had responded to the follow-up emails. Of these, 327 requested to opt out, 104 wanted to participate, and 155 requested to speak with an attorney

5

about the settlement and how best to proceed. *Id*. at ¶ 9.

Following the first set of webinars, WL contacted (via email, FedEx/USPS, and text message) more than 1,000 clients who had not yet attended a webinar, offering dates for additional webinars in April. *Id.* at ¶10. In total, to date, WL's attorneys have held eighteen webinars to inform clients about the *King* settlement. WL attorneys scheduled each of the eighteen webinars on different days of the week, including many on weekends, and at different times of the day to accommodate clients across different time zones and their pre-scheduled obligations (such as work, doctor's appointments, childcare). *Id*. at ¶ 11.

In addition to the above efforts to reach clients, beginning on the date of WL's first webinar, WL paralegal staff commenced individual outreach, starting with webinar attendees who indicated they wanted to opt out. This process has entailed: (1) successfully connecting with the client (which sometimes took several attempts made over weeks); (2) confirming all of the information required in an opt-out declaration with the client; (3) sending drafted declarations to an attorney for their review and approval; (4) sending the approved declaration to the client for a "wet" signature by email and/or mail (which adds significant turnaround time); (5) collecting photos, scans, or mailings of government-issued photo ID from clients and representatives (sometimes requiring a new scanned copy to be sent through the mail if the first was illegible)[5]; (6) final review of the completed declaration and supporting identification; and (7) one-by-one submission through the settlement website. WL's paralegal staff, which is large in number and very experienced in the Roundup litigation, has been engaged in this process with hundreds of WL clients for at least eight to ten hours per day, every day, since mid-March. *Id.* at ¶12.

---

[5] Representative claimants often do not have government issued photo IDs available for deceased class members, which are required to opt out; as such, searching for deceased class members' IDs has proven to be fairly time consuming. Greenwald Decl. at ¶ 12 n.2.

By April 10, 2026 – approximately five weeks after final approval and less than two months from the close of the opt out period – approximately 91 opt-out declarations (roughly 28% of those requested by WL clients) had been prepared, internally approved, and sent to clients for review and to obtain their wet signature and photo ID. *Id*. at ¶ 13.

On April 21, 2026, WL paralegal staff sent additional letters about the settlement to approximately 900 clients who had not attended a webinar, via email and mail. *Id*. at ¶14. By April 29, 2026, approximately 300 opt-out declarations had been drafted by WL paralegal staff, approved by attorneys, and sent out to clients for review and to obtain wet signature and ID. Approximately 222 of those had been returned completed, reviewed, and formally submitted through the settlement website. *Id.* at ¶ 15.  By May 4, 2026, 728 clients had notified WL (through post-webinar questionnaire responses, phone calls, or email) that they wanted to opt out, and 237 clients indicated they wanted to participate. That left over half of WL's clients who had not yet finalized their decision whether to participate or opt out, with just one month remaining before the opt out and objection deadlines. *Id*. at ¶ 16.

Beginning in early May, WL implemented additional means to reach all clients and/or assist them in making a decision how to proceed, including sending follow up letters via email, mail, and text message and seeking the assistance of WL's call center to try to reach clients by telephone who had not yet responded. *Id*. at ¶ 17. By May 11, 2026, approximately 797 clients had decided to opt out, 268 clients had decided to participate, and dozens sought to speak with an attorney. Approximately 491 opt-out declarations had been drafted by WL paralegal staff, approved by attorneys, and sent out to clients to obtain wet signature and ID. Approximately 370 of those had been returned completed, reviewed, and formally submitted through the settlement website. Over 800 clients still had not responded with a participation decision.

As of May 18, 2026, WL had received a decision from 1,176 clients as to whether they would like to participate or opt out of the settlement, with approximately 72% of the clients wishing to opt out. As of the same date, WL had only received and submitted 493 finalized opt out packages (about 58% of those clients who requested to opt out at that time).

Without a stay, it is near certain that many clients who for various reasons have not yet responded with their decision, or who have not yet returned executed opt out declarations and IDs, risk being bound by a class settlement without their knowledge or against their will. *Id.* at ¶ 19.

In some instances, our multiple attempts to reach a non-responsive client led to the discovery that we had outdated contact information (not uncommon in a population of clients who in some instances have already been waiting years for a trial date). Other clients were discovered to have passed away (often from their NHL or secondary conditions) since our last contact, which then requires tracking down heirs who may not have known about the litigation. Still others are undergoing health problems and/or cancer treatment that delays their ability to receive and/or respond to our litigation-related communications. *Id*. at ¶20.

The putative class members we represent, by definition, have a serious and, in many cases, deadly cancer that requires debilitating treatment to save their lives. They are not consumers deciding whether to participate in a class action regarding mispriced consumer goods or data breach victims being offered a year of free credit monitoring. Rather, putative class members here are often undergoing chemotherapy, radiation, surgery, stem cell transplants, and/or other treatment; attorneys' inquiries about their litigation are often put on the back burner because, understandably (to us, at least), their priority is staying alive. *Id.* at ¶ 20.

The following examples are a sampling of reasons our clients have provided to us for being unavailable to discuss the settlement, make a decision about how to proceed with their claims, and

8

for being non-responsive generally:

- A client left a message that he did receive our initial letter back in February, but he has not been able to respond because he is undergoing regular and debilitating radiation that is affecting his mental state and memory. He stated that he wishes he could write down his wishes and thoughts but his mind is too infirm at the moment to do so. He did state that he wants to continue with his lawsuit but we have not been able to get the paperwork necessary to opt him out and likely will not be able to do so before June 4.

- A client had been undergoing surgeries and in and out of hospital for his NHL for over a month. While we recently were able to reach him, he had to return to the hospital for additional surgery and does not have the mental or physical capacity to learn about the settlement and make a decision before June 4.

- A client was in the hospital at the time of preliminary approval and then passed away. His wife is dealing with her grief, her family's grief, and life after decades of marriage. She is not able to focus on the opt out process right now but told us that continuing his lawsuit was one of her husband's dying wishes.

- A client is blind and unable to access the settlement systems himself or read our communications to make an informed decision and wants to read the papers before he makes a decision. While we can and have explained it to him, he also wants to review the materials. He wants to wait until his daughter returns from college so that she can read the class settlement papers to him, but that might not be before June 4.

- A client has been in and out of the hospital and is dying from his NHL and secondary leukemia diagnosis. He and his daughter need more time to make a decision because he will not be alive at the time of the settlement claim process or litigation if he opts out and

9

needs assurances that his daughter will have rights under the class action lawsuit, confidence that he has if he opts out and continues with the lawsuit.  He needs more time to consider his options while at the same time facing his imminent death.

These client stories are just of few of many of WL clients who have informed us that their ongoing treatment makes it difficult to prioritize and digest the settlement in a truncated time frame or that the recent death of their family member is all consuming and they cannot meet the opt out demands and timeframe at the moment until they are past the pain of losing their loved one. Many surviving family members of recently deceased clients tell us that, although their loved one's dying wishes were for their surviving family members to continue the lawsuit, they cannot make a decision until they are past the grieving period. *Id.* at ¶ 21.

Unfortunately, the settlement makes no provisions regarding putative class members facing these circumstances, which are by no means unique to our clients. If these examples, and many others like them, are not good cause for staying the settlement deadlines, it is difficult to imagine that one could ever satisfy good cause.

<u>**ARGUMENT**</u>

**INTERVENORS HAVE A RIGHT TO INTERVENE AS OF RIGHT UNDER FEDERAL RULE OF CIVIL PROCEDURE RULE 24.**

**I.      Standard for Intervention of Right**

Rule 24(a) of the Federal Rules of Civil Procedure governs intervention of right, which is granted when (1) the proposed intervenor claims an interest relating to the property or transaction that is the subject matter of the action; (2) the disposition of the action may impair or impede the proposed intervenor's ability to protect that interest; (3) the motion is timely; and (4) the proposed intervenor's interest is inadequately represented by the existing parties to the action. *National Parks Conservation Association v. U.S. Environmental Protection Agency*, 759 F.3d 969, 975 (8th

10

Cir. 2014).  When assessing a motion to intervene, a court "must accept as true all material allegations" and "construe the motion in favor of the prospective intervenor." *Id.* at 973.  The rule should be "construed liberally, with all 'doubts resolved in favor of the proposed intervenor.'" *Id.* at 975 (quoting *Turn Key Gaming, Inc. v. Oglala Sioux Tribe*, 164 F.3d 1080, 1081 (8th Cir. 1999).

In a putative class action, a class member *must* intervene in order to obtain standing to appeal certain portions of the trial court's settlement-approval decisions, including adequacy of class counsel.  *Smith v. SEECO, Inc.*, 865 F.3d 1021, 1025 (8th Cir. 2017) ("[A] member of a class should have the right to intervene in a class action if he can show the inadequacy of the representation of his interest by the representative parties before the court." (quoting Fed. R. Civ. P. 24 advisory committee's note to 1966 amendment)).

## II. Intervenors Satisfy Intervention of Right

### A. Intervenors Have an Interest in the Subject Matter of the Action.

The proposed Intervenors have an interest in the subject matter of the putative class action and readily meet the standard for intervention as of right.  At the outset, they are indisputably members of the putative class: they are U.S. persons who, prior to the settlement date, were exposed to Roundup and diagnosed with cancer as a result. *See* Class Action Settlement, Exhibit 3 at § 2.1. None of the carve-outs to the class definition apply to them. *See id.* Intervenors will, by definition, be legally bound by the proposed settlement agreement if they are not given additional time to learn about the settlement and/or decide whether to opt out or to file objections. Indeed, their interest in receiving notice of and having time to properly consider the settlement is consonant with due process and basic concepts of procedural fairness.

Despite our firm's in-depth knowledge of this litigation, sizable team of attorneys and paralegals dedicated to the Roundup litigation, and our extensive experience in managing mass tort aggregate settlements and class action settlements, it is not possible for firms with many

hundreds or thousands of clients to adequately inform clients about the settlement, answer clients' individual questions, and then prepare opt out packages – which the settlement agreement makes intentionally onerous -- for those who wish to opt out and objections (also procedurally onerous) for those who want to improve the settlement in three months. The short opt out period is insufficient and risks binding people who are not aware of or do not wish to participate in this settlement, and forcing them to waive their legal rights without their consent.

In sum, a stay of the class settlement's June 4th opt out and objection deadlines is insignificant given the short period of time they were given to evaluate this first-of-its-kind and highly complex settlement – which seeks to bind plaintiffs who are already represented in pending or soon to be filed lawsuits and need time to evaluate their options with their counsel (not to mention people who have not even been diagnosed with lymphoma yet and, of course, will therefore not have counsel to help advise them about their rights and what they will be giving up as a class member of this settlement). The process established in this class settlement, including its unnecessarily short opt out and objection period, is fatally deficient and deprives potentially tens of millions of Americans basic due process rights.

### B. Intervenors' Interests Will Be Impaired by this Action.

For many of the same reasons, Intervenors' interests will be impaired by this action if intervention is not granted. As explained *supra*, Intervenors' rights to be adequately represented by the counsel of their choice will be surrendered absent intervention, as well as the risk of being bound by a class settlement that they wish to exit.

### C. Intervenors' Interests Are Not Adequately Represented by an Existing Party to this Action.

Intervenors satisfy their burden of showing that their interests are not "adequately represented by existing parties." Indeed, Rule 24 was amended in 1966, "the advisory committee

specifically contemplated that 'a member of a class should have the right to intervene in a class action if he can show the inadequacy of the representation of his interest by the representative parties before the court.'" *Id.* (citing Fed. R. Civ. P. 24 advisory committee's note to 1966 amendment); *see* Mo. R. Ct. 52.08(d)(1)(B)(iii) (in conducting a proposed class action, the court may issue orders "giving appropriate notice to some or all class members of . . . the members' opportunity to signify whether they consider the representation fair and adequate, ***to intervene and present claims or defenses***, or to otherwise come into the action") (emphasis added).

Fundamentally, the Settlement Proponents of the *King* class settlement are fully aligned, so much so that Class Counsel filed an amicus brief ***on Monsanto's behalf*** to support Monsanto's motion to stay a Roundup trial imminently set to begin. Amended Motion for Leave to File Amicus Brief, *McCall et al., v. Monsanto Co.*, No. 22AC-CC00974 (Mo. Cir. Ct. Cole Cnty., March 10, 2026), Exhibit 6. Many of the other actions the Settlement Proponents have taken demonstrate that not only do they not represent the interests of Intervenors, but that they are adverse to their interests. See generally Objector Defendants' removal and stay briefing detailing the alignment of Monsanto and Class Counsel. Objector Defendants' Notice of Removal, *King et al, v. Monsanto*, No. 4:26-cv-813 (E.D.Mo. May 22, 2026), Exhibit 7; Objector Defendants' Reply ISO Motion to Stay All Proceeding Pending Ruling on Transfer to Multi District Litigation, *King et al, v. Monsanto*, No. 4:26-cv-813-HEA (E.D.Mo. May 29, 2026), Exhibit 8.

### D. Intervention Is Timely and Would Not Result in Any Undue Delay or Prejudice.

Intervenors' motion is timely: they have made best efforts to meet the opt out and objector deadline but, for the reasons explained in the facts above, a three-month period to reach thousands of people has proven inadequate. Intervenors meet the factors the Eighth Circuit considers in assessing timeliness: "(1) the extent the litigation has progressed at the time of the motion to

13

intervene; (2) the prospective intervenor's knowledge of the litigation; (3) the reason for the delay in seeking intervention; and (4) whether the delay in seeking intervention may prejudice the existing parties." *Am. Civil Liberties Union of Minnesota v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1094 (8th Cir. 2011).

With regard to the first factor, there was no actual litigation here; rather the King settlement is the culmination of Monsanto and Class Counsel designing a lengthy, complex, and overreaching class settlement agreement that favors Monsanto in nearly every material term over class members. It was rushed through the preliminary approval process phase, only then to increase the burden on putative class members and their counsel with an oppressively short period to opt out or object to the settlement. Granting a stay of the opt out and settlement objection deadline pales in comparison to the harm to putative class members suffering from lymphoma, who do not know about the settlement yet or need additional time to decide what course of action to take. A stay protects putative class members from the risk of being trapped in a settlement that they are not aware of or do not wish to be part of. Considering that the Roundup litigation for over ten years, there is no harm in the Court granting Intervenors' stay request pending transfer to the Roundup MDL.

As to the second factor, although Intervenors' counsel has extensive knowledge of the underlying Roundup litigation – and in fact filed the first Roundup case in the United States in 2015 – Intervenors and their counsel were not involved in the negotiation of this putative class action. Intervenors brought this motion when it became apparent that the opt out and objection period is insufficient for many putative class members, and after their Counsel's initial attempt to intervene was rejected.

The third factor does not apply.

Finally, as to the fourth factor, in examining whether there is prejudice to the original

14

parties from a proposed intervention, courts look at the prejudice from any delay in moving for intervention rather than prejudice caused by the intervention itself. *In re Auto. Parts Antitrust Litig., End-Payor Actions*, 33 F.4th 894, 905 (6th Cir. 2022). Here, there has been no delay in filing Intervenors' motion and there is no prejudice against the original parties.[6]

There are other reasons that run counter to opposing a stay: the Settlement Proponents spent nearly two years negotiating this deal. Decl. of Christopher A. Seeger, Exhibit 3 to the Settlement Agreement Papers, *King et al.*, *v. Monsanto Co.,* No. 2622-CC00325 (City of St. Louis, Feb. 17, 2026), Exhibit 9, at ¶12–13. If it took that long to retool a settlement that is eerily similar to the 2021 failed Roundup MDL proposed class settlement, they cannot credibly contend harm by a short stay to ensure that putative class members are not trapped in a settlement they don't want. And for those who have not yet reviewed communications from their attorneys – as WL attorneys learn daily from clients, who are delayed in responding (or have not yet responded) because they are undergoing cancer treatment or the client recently died – a stay gives them the extra time they need – and deserve.

## CONCLUSION

For the foregoing reasons, Intervenors respectfully request that the Court grant their motion to intervene and their contemporaneous motion to stay the class settlement's opt out and objections deadlines pending the JPML's final transfer decision.

---

[6] Monsanto contends "harm" from a stay only in paragraph 5 of its motion for expedited consideration of its remand motion. But the examples do not support their position. According to Monsanto, the "nationwide notice program costing millions of dollars *is ongoing*." Doc. #20 at ¶5. Thus, a stay could provide more time for the tens of millions of class members who would be trapped in this settlement to learn about it. And it also contends that even a short stay might interfere with settlement payments, but that defies logic as the payment for the vast majority of class members spans 17 years, and could extend as far out as 21 years. Ex. 3. at 164, 168, 171, 176. These illusory "harms" pale in comparison to the harm the short opt out and objection period causes to thousands, if not millions, of putative class members.

15

Respectfully submitted,

**NIEMEYER, GREBEL & KRUSE, LLC**

By:    */s/ Mark R. Niemeyer*
       Mark R. Niemeyer   #42437(MO)
       Michael Kruse      #57818(MO)
       211 N. Broadway, Suite 2950
       St. Louis, MO 63102
       314-241-1919 phone
       niemeyer@ngklawfirm.com
       kruse@ngklawfirm.com

       – and –

**WEITZ & LUXENBERG, PC**

*/s/ Robin Greenwald*
Robin Greenwald
Alicia Butler
Chantal Khalil Levy
700 Broadway
New York, NY 10003
212-558-5500 phone
rgreenwald@weitzlux.com
abutler@weitzlux.com
ckhalil@weitzlux.com

*Counsel for Intervenors*

## CERTIFICATE OF SERVICE

I hereby certify that on June 2, 2026, I caused a true and complete copy of the foregoing to be electronically filed via the Court's ECF system, which will cause a copy to be served upon all counsel of record.

*/s/ Mark R. Niemeyer*

16